# UNITED STATES BANKRUPTCY COURT

# DISTRICT OF HAWAII

| | |
|---|---|
| In re<br><br>CHA HAWAII, LLC, et al.,<br><br>      Debtors.<br><br>This document relates to:<br>ALL CASES | Case No. 08-1369<br>Chapter 11<br>Jointly Administered<br><br>Re: Docket No. 886 |

## MEMORANDUM OF DECISION ON
## MOTION FOR ADEQUATE PROTECTION[1]

      The debtors have admittedly used millions of dollars of cash collateral in which St. Francis Healthcare System of Hawaii and its affiliates ("SFHS") have an interest, without obtaining the consent of SFHS or a court order authorizing the use of SFHS' cash collateral. The only questions are (1) exactly how much cash collateral the debtors used without authority and (2) what remedy should be imposed.

1.

      The dispute concerns funds that passed through an account at First Hawaiian Bank. After the petition date and until the debtors froze the account, $9,002,728

---

[1]The court has not selected this decision for publication.

flowed into and out of the account. Of this amount, the debtors agree that $2,697,719 was SFHS' cash collateral. The disputed balance is $6,305,009.

2.

Under its security agreement (docket no. 887-3), SFHS' security interest attached to "all personal property and other assets, excluding Accounts and the identifiable proceeds of Accounts . . ., including . . . [a]ll 'Contracts' . . ., [a]ll Deposit Accounts . . ., [a]ll 'General Intangibles" . . ., [and] [a]ll 'Proceeds' . . . ."

The security agreement provides that "Accounts" means "accounts" as defined in Hawaii's Uniform Commercial Code. Under Haw. Rev. Stat. § 490:9-102(a), "accounts"

> Means a right to payment of a monetary obligation, whether or not earned by performance:
>
> (A)  For property that has been or is to be sold, leased, licensed, assigned, or otherwise disposed of [or];
>
> (B)  For services rendered or to be rendered . . . .
>
> * * *
>
> The term includes health-care-insurance receivables.

The debtors and the committee argue that most of the disputed balance ($5,457,492) is the proceeds of "Accounts" in which SFHS has no interest. SFHS claims that most of this sum (specifically, the DSH and Medicaid rate

2

reimbursement payments, the HMSA quality award payments, the payments for drug protocols and clinical trials, and drug rebates) are not proceeds of Accounts and rather are part of SFHS' collateral.

a.

SFHS points out that, in their monthly operating reports and other filed documents, the debtors stated (in summary) that the deposits in the FHB account were not the proceeds of accounts receivable. SFHS argues that the doctrine of judicial estoppel precludes the debtors from denying that all of the money that passed through the FHB account was SFHS' cash collateral. I do not accept this argument. There is no evidence that, when the debtors labeled their disbursements in the filed documents, they intended to give the labels the same technical meaning ascribed to those words in the loan documents. Further, judicial estoppel should not be employed where innocent parties, such as the unsecured creditors in this case, would be harmed. Cheng v. K&S Diversified Invs., Inc. (In re Cheng), 308 B.R. 448, 459 (B.A.P. 9th Cir. 2004).

SFHS argues that, by consistently depositing certain types of receipts in the FHB account, SFHS admitted that those receipts are SFHS' collateral. The definition of "Accounts" in the security agreement, which incorporates the UCC's statutory definition of "accounts," is not ambiguous. Parol evidence, such as

3

evidence based on conduct, is not admissible to vary the terms of the agreement. Thomas v. Pankow Holdings, Inc., 2000 Haw. LEXIS 194, 21 (Haw. June 19, 2000).

b.

The security agreement's collateral description is confusing at first glance. It seems odd to say that the collateral consists of everything, except for one category of things, and including many other categories of things. What happens when a particular item arguably belongs both in the excluded category and in one or more of the included categories?

The confusion disappears when one remembers that a so-called "supergeneric" description of collateral is legally insufficient. Haw. Rev. Stat. § 490:9-108(c). In other words, if the security agreement simply said "all of the debtors' personal property except Accounts," the security agreement would have been ineffective. The security agreement lists the categories of included assets to make the agreement valid, not to limit the scope of the excluded category of assets ("Accounts" and their proceeds).

Therefore, it is only necessary to determine whether the disputed items are "Accounts." If an item is not an Account, it is part of SFHS' collateral (because SFHS' collateral consists of all of the debtors' personal property other than

4

Accounts). It is not necessary to determine whether a particular item is a "Contract," or a "General Intangible," or one of the other included categories.[2]

c.

The largest item in dispute is labeled "DSH/Medicaid rate reconsideration" ($3,447,948). DSH, an acronym for "disproportionate share hospital," is a program under which the government makes payments, in addition to the other amounts payable under the Medicare and Medicaid programs, to certain qualifying hospitals serving a disproportionate share of low-income payments. The purpose of the DSH program is to supplement the other payments for services rendered.

> <u>Federal reimbursement of hospitals' operating costs under Medicare occurs under the Prospective Payment System (PPS)</u>. This system bases reimbursement on a predetermined amount that an efficiently run hospital should incur for inpatient services. In 1983, Congress found that providing services to low-income patients may cost medical centers more than is provided for by this scheme and, accordingly, <u>Congress directed the Secretary to make additional payments</u> to hospitals that serve a significantly disproportionate number of low income patients.

<u>Portland Adventist Medical Center v. Thompson</u>, 399 F.3d 1091, 1093-94 (9th Cir. 2005) (emphasis added, internal citations and quote marks omitted). "Congress'

---

[2] This approach also makes it unnecessary to resolve difficulties in the security agreement's definition of "Contracts." <u>See</u> docket no. 1093 at 4-5.

'overarching intent' in passing the disproportionate share provision was to supplement the prospective payment system payments of hospitals serving 'low income' persons." Legacy Emanuel Hosp. & Health Ctr. v. Shalala, 97 F.3d 1261, 1265 (9th Cir. 1996) (emphasis added). The "overarching intent of Congress" is to "provide and supplement the resources available to PPS hospitals . . . ." Jewish Hosp. v. Secretary of Health & Human Servs., 19 F.3d 270, 275 (6th Cir. 1994).

SFHS does not dispute that Medicare and Medicaid payments are the proceeds of "Accounts" and are not SFHS' cash collateral. Because the DSH payments are intended to "supplement" the Medicare and Medicaid payments, they are also not part of SFHS' collateral.

d.

The loan agreement between SFHS and the debtors resolves the treatment of some other categories of receipts. Annex E to the loan agreement (docket no. 932-1) provides that:

> The Borrower shall maintain the [FHB] Account as security for the Borrower's obligations under the Loan Documents, subject to the terms of the applicable Deposit Account Control Agreement, in accordance with the following:
>
> (a) The Borrower shall deposit directly into the [FHB] Account, without prior commingling or deposit into any other accounts (i) all Proceeds of Collateral (including proceeds of any insurance on the Collateral),

6

> and (ii) all other receipts except for the proceeds of
> Health Care Accounts.
>
> (b) Moneys deposited in the [FHB] Account
> shall be maintained therein as security for the Borrower's
> obligations under the Loan Agreement and shall not be
> commingled with any other funds or accounts.

The loan agreement defines "Health Care Accounts" and says that:

> For the avoidance of doubt, it is expressly agreed that
> Health Care Accounts shall not include any Accounts not
> arising from the provision of health care services or sales
> of goods in connection therewith and, without limiting
> the generality of the foregoing, shall not include any
> Accounts arising from cost report settlements, rental
> revenue (physician timeshare, gift shop), St. Francis
> transitional services, protocol revenue, grant income,
> joint venture income distributions, HMSA Quality
> Awards, Consort GPO Rebate Checks, photo/xray copy
> reimbursement, drug rebates, and silver recovery.

The debtors argue that this language does not control because it is not found in the security agreement. I disagree for two reasons.[3]

First, the loan agreement and security agreement were executed at the same time, as parts of a tightly integrated set of agreements. It would be wrong to interpret one part of a security agreement in a way that nullifies another part of the security agreement. Brown v. KFC Nat'l Mgmt. Co., 82 Haw. 226, 240 (1996). It

---

[3]Annex E would also be admissible parol evidence if the security agreement's definition of "Accounts" were ambiguous. Hokama v. Relinc Corp., 57 Haw. 470, 475-76 (1977). That definition is not ambiguous, however.

7

would be equally wrong to interpret the security agreement in a way that makes meaningless a part of the loan agreement. Parker v. Bankamerica Corp., 50 F.3d 757, 763 (9th Cir. 1995).

Second, Annex E of the loan agreement is probably sufficient, standing alone, as a security agreement. Haw. Rev. Stat. §§ 490:9-102, -203(b)(3)(A).

Therefore, among the line items on the Debtors' schedule of receipts (docket no. 1068 at 23), the following are included in SFHS' collateral by virtue of Annex E:

| Category per debtors' schedule | Category per Annex E | Amount |
| --- | --- | --- |
| HMSA Quality | HMSA Quality Awards | $558,313 |
| Protocols | Protocol revenue | 511,248 |
| Rebates | Consort GPO rebate checks | 226,295 |
| Cost Report Settlement | Cost report settlements | 154,820 |
| SF Transition | St. Francis transitional services | 97,407 |
| Grant (breast & cervical cancer screening) | Grant income | 36,167 |
| | TOTAL | $1,584,250 |

e.

The debtors argue that certain classes of receipts represent a return of funds advanced by, or consisting of the cash collateral of, Siemens, the debtors' other

8

prepetition secured lender. Although Siemens may have a security interest in these amounts, that does not exclude the possibility that SFHS also has a security interest, subordinate to Siemens by virtue of the intercreditor agreement (docket no. 1067-1).

f.

The categories labeled bone marrow transplant reimbursement ($30,949) and Medicaid bi-weekly pass through ($321,000) are "Accounts" within the meaning of the security agreement. All of these receipts represent compensation for medical services rendered by the debtors to patients. The debtors would not have received these amounts if they did not render medical services to patients.

The "Foundation transfers" are proceeds of an Account. The debtors provided administrative and clerical services for the Foundation which later paid the debtors for the cost of those services. The amounts due to the debtors are the proceeds of a right to payment for services rendered, and are therefore proceeds of an Account.

The Expense Reimbursement and Miscellaneous categories include refunds of overpayments to vendors, reimbursement for accounts receivable collection, and "certain payments relating to protocols." These amounts are (respectively) proceeds of Contracts which are included in SFHS' collateral, proceeds of

9

Accounts that are not part of SFHS' collateral, and included in SFHS' collateral by virtue of Annex E to the loan agreement. The debtors' filings do not state separately the amounts in each of these categories.

The Return of IIC Deposit ($100,000) and Refund of BK Deposit ($132,519) are not proceeds of Accounts, because they do not arise from the sale of goods or services by the debtors. The same is likely true of the Pre BK Returns, but one cannot be sure without knowing the purpose for each check.

SFHS does not dispute the debtors' contention that the Payroll/Benefits, Medical Staff Funds, and SNF Funds categories represent disbursements of money which the debtors held for third parties and which are not collateral for either SFHS or Siemens.

3.

The parties disagree about whether a control agreement, intended to perfect SFHS's security interest in the FHB account, became effective.

The effectiveness of the control agreement is irrelevant. SFHS' security interest covers the identifiable cash proceeds of its original collateral. SFHS filed financing statements that perfect its security interest in the original collateral and the identifiable cash proceeds. The debtors have been able to trace all of the money that passed through the FHB account, so all of the proceeds that passed

10

through that account are identifiable.  Therefore, SFHS' security interest is perfected even if the control agreement is ineffective.

In any event, the control agreement was effective.  The debtors argue that the control agreement was not effective because, although the debtors, SFHS, and FHB all signed copies of the control agreement when the SFHS loan closed, FHB did not receive a copy bearing the other parties' signatures until after the petition date.  Under Haw. Rev. Stat. § 490:9-104, "control" requires (among other conditions) that "the debtor, secured party and bank have agreed in an authenticated record . . . ."  The definitions of "authenticate" and "record" do not require that all of the parties to the agreement sign the same copy of the record or that a fully signed copy be provided to all three parties.

4.

SFHS also argues that these payments are included in its collateral under the mortgages.  The mortgages grant liens, not only on the debtors' interests in the land and buildings, but also:

> any and all rents, royalties, profits, revenues, incomes
> and other benefits arising from the use or enjoyment of
> all or any portion of the Mortgaged Properties or from
> any contract pertaining to such use or enjoyment . . . .

(Docket no 887-6 at 4.)  The mortgages do not create a lien in any of the Accounts, for two reasons.

11

First, as noted above, the loan agreement, security agreement, and mortgages were all parts of a single closely integrated set of transaction documents. It would violate a cardinal rule of contract interpretation to hold that the mortgages created a lien on personal property which the security agreement specifically excluded.

Second, an assignment of rents provision, like the ones in the SFHS mortgages, does not create a lien on the proceeds of a business operated on the mortgaged property.

> HUD [the mortgagee] claims that the revenues received from Medi-Cal and Medicare are "rents" and, hence, cash collateral by virtue of an assignment of rents in the deed of trust or the Regulatory Agreement. We disagree. Money paid for the care of nursing home patients can no more be described as "rents" than could hospital bills. That the patients live there is incidental to the fact that the nursing home is providing them with care.

In re Hillside Assoc. Ltd. Partnership, 121 BR 23 (B.A.P. 9th Cir. 1990). See also In re Zeeway Corp., 71 BR 210, 211 (B.A.P. 9th Cir. 1987) (mortgage did not create a lien on income from raceway operated on mortgaged property).[4]

5.

In summary, I hold that the debtors used at least $ 4,514,488 (plus unquantified portions of the Expense Reimbursement, Miscellaneous, and Pre BK

---

[4]SFHS cites cases holding that governmental crop subsidy payments are encumbered by an assignment of rents contained in a mortgage. These cases are inapplicable because growing crops, for which the subsidies are a replacement, are treated as part of the land.

U.S. Bankruptcy Court - Hawaii   #08-01369   Dkt # 1109   Filed 03/04/10   Page 12 of 20

Returns categories) of cash collateral in which SFHS had an interest.

6.

This leaves the question of the appropriate remedy for the unauthorized use of cash collateral.

a.

The committee argues that no remedy should be imposed. I reject this position for several reasons.

First, the unauthorized use of cash collateral is a significant offense that I will not overlook or condone. This is true even though there is no evidence that the debtors knowingly or intentionally violated SFHS' rights in the cash collateral, and even though SFHS has never contended that the debtors used the cash for any purpose other than paying normal and reasonable business and administrative expenses.

Second, the committee argues that SFHS has not proven that the misuse of the cash collateral harmed it. This stands the burden of proof on its head. Under section 363(p)(1), the debtor in possession has the burden of proving that the creditor's interest is adequately protected. If the debtor has the burden of proof when it seeks advance permission to use cash collateral, it ought to bear at least as heavy a burden when it seeks forgiveness for using cash collateral without

13

U.S. Bankruptcy Court - Hawaii    #08-01369    Dkt # 1109    Filed 03/04/10    Page 13 of 20

permission.[5]

Third, the committee points out that SFHS delayed for several months before filing its motion for adequate protection. This fact does not warrant the denial of any remedy. The debtors had a duty to seek SFHS' consent or a court order before using any of SFHS' cash collateral. The creditor does not have a duty to stop the debtor from doing that which the Bankruptcy Code forbids. The committee's position would undercut the firmly established rule that the creditor's consent to the use of cash collateral must be express, not implied. Freightliner Mkt Dev. Corp. v. Silver Shell Frightlines, Inc. 823 F.2d 362 (9th Cir. 1987).

The committee's fourth argument is that a plan of reorganization will probably be confirmed soon, and such a plan must make SFHS whole. Although I have approved disclosure statements for three plans, there is no certainty that any of them will be confirmed, let alone that confirmation will occur within a fixed time. This case has been pending for too long, despite the fact that plans have been on the table for months, and the timetable for confirmation of the three current plans is apparently going to slip again. SFHS has always been entitled to adequate

---

[5] I decline to follow the cases cited by the committee, In re Czyzk, 297 B.R. 406 (Bankr. D.N.J. 2003); In re Kleather, 208 B.R. 406 (Bankr. S.D. Ohio 1997); In re National Safe, 76 B.R. 896 (Bankr. D. Conn. 1987). None of them are binding in this jurisdiction, and all of them incorrectly state (or assume) that the creditor bears the burden of proving harm from an unauthorized use of cash collateral or that implied consent to the use of cash collateral is sufficient.

14

U.S. Bankruptcy Court - Hawaii   #08-01369   Dkt # 1109   Filed  03/04/10   Page 14 of 20

protection and it should not be left hanging indefinitely while we see if and when a plan can be confirmed.

b.

The debtors echo the committee's argument that no remedy should be imposed. The debtors also contend that, if a remedy is necessary, a junior lien on the debtors' postpetition accounts is sufficient. Siemens has a first lien on that property to secure a claim of $3.5 million plus a contingent reimbursement obligation on an undrawn letter of credit for $2 million. All of the debtors' assets are encumbered.

The debtors have offered only two sentences of evidence about the value of their accounts:

> The value of the Debtors' collectible postpetition accounts receivable is approximately $16 million. This amount excludes any uncollectible accounts and applies any appropriate discounts related to collection.

(Docket no. 1068-2 at 11.) For several reasons, this statement does not establish with sufficient certainty that a junior lien on the postpetition accounts would be the indubitable equivalent (11 U.S.C. § 361(3)) of the cash collateral that the debtors improperly used.

First, the debtors' accounts have shrunk during this case. According to the reconciliation statements attached to the debtors' monthly operating reports, the

U.S. Bankruptcy Court - Hawaii   #08-01369   Dkt # 1109   Filed 03/04/10   Page 15 of 20

debtors' accounts were $19,745,786 as of September 30, 2008. As of December 31, 2009, they amounted to only $15,168,520, a decline of 23%.[6]

Second, the debtors' reported operating margin (operating income minus operating expenses, expressed as a percentage of operating income) has been negative since the beginning of the case. As of December 31, 2009, the debtors reported operating margin of negative 12.83 percent. In other words, it costs the debtors $112.83 to provide services for which they are paid only $100. With a negative operating margin, the debtors' accounts will almost certainly continue to decline.

Third, the debtor provides no information about the "appropriate discounts related to collection" which is used to value its accounts. Accounts tend to be a fragile form of collateral that often lose significant value if the business stops operating. Although all parties want the debtors' hospitals to stay open, the adequate protection calculus must take into account the risk of a bad outcome that no one wants. Because the estimated reported value is so close to the amount of accounts reported in the monthly operating report, it is not likely that the estimated value is a "worst case" estimate.

---

[6]The debtors' cash balance has increased, from $7,252,853 as of September 30, 2008, to $8,190,984, but not by nearly enough to offset the decline in accounts.

16

U.S. Bankruptcy Court - Hawaii    #08-01369    Dkt # 1109    Filed 03/04/10    Page 16 of 20

Debtors often provide adequate protection for an interest in prepetition accounts by granting a replacement lien in postpetition accounts. The notion is that the debtor will generate new accounts at least as quickly as it consumes the proceeds of the old accounts, so the value of the creditors' collateral base does not decline. Because the debtors' accounts have declined and the debtors continue to incur operating losses, the debtors have not carried their burden of proving that this premise will hold true in this case.

c.

SFHS has suggested several possible remedies, all of which have shortcomings.

SFHS' moving papers request a replacement lien on all of the debtors' assets that are not already subject to SFHS's liens and security interest. The debtors do not object to this proposal, but, based on the information that has been developed after the motion was filed, the remedy is not adequate.

During the hearings, SFHS suggested that the court require the debtors to replace the cash in a few days or weeks. This would be the ideal compensatory remedy, but the debtors do not have sufficient cash to do so. I am reluctant to require the debtors to do something that everyone knows the debtors cannot do.

SFHS also suggested the appointment of a chapter 11 trustee. Although the

U.S. Bankruptcy Court - Hawaii   #08-01369   Dkt # 1109   Filed  03/04/10   Page 17 of 20

misuse of cash collateral might constitute "cause" for the appointment of a trustee, I am not convinced that it is appropriate in this case. The debtors stopped using the cash collateral promptly after the issue came to light, so there is no ongoing misconduct. A trustee would be no more likely than the debtors to raise enough cash to restore the misused funds. The appointment of a trustee therefore is a remedy entirely disconnected from the wrong.

d.

Considering all relevant factors, I will require the debtors to provide adequate protection to SFHS as follows:

1. A lien on all of the debtors' property in which SFHS does not already have an interest, subject to the rights of Siemens and the intercreditor agreement;

2. A superpriority administrative claim to the extent that the junior replacement lien proves insufficient, pari passu with Siemens' superpriority claim; and

3. A first priority security interest in additional cash, which the debtors shall deposit in the FHB account not later than June 1, 2010, in the amount of $4,514,488.

The protective provisions of paragraphs 2 through 6 of the interim order (docket no. 1053) shall continue to apply.

18

Nothing contained in this decision or in the order based on this decision determines any issues concerning the Siemens security interests.

7.

SFHS's claims are also secured by a mortgage on the "Sullivan Building" at the debtors' East facility (the hospital in Liliha). The mortgagor must "keep and maintain the Mortgaged Properties in good repair, working order and condition . . ." and procure insurance, reasonably satisfactory to SFHS, for the replacement value of the building.

SFHS has presented evidence that the debtors' insurer was sufficiently concerned about the condition of the roof that it increased the deductible to $250,000, reduced the coverage from replacement value to actual cash loss, and threatened not to renew the policy. In response, the debtors offer assurances that the policy will be renewed, but the debtors do not claim that the deductible has been reduced or that replacement value coverage has been restored.

The maintenance of adequate insurance is a fundamental obligation of a debtor in possession. The debtors have agreed, and I will require the debtors, to repair the roof and associated equipment, and obtain insurance in full compliance with the mortgage, before the hurricane season begins on June 1, 2010.

19

8.

I will not award attorneys' fees or other sanctions at this time. The record does not justify a punitive award. SFHS' contractual rights (if any) to recover attorneys' fees and costs are adequate for compensatory purposes.

\* \* \* \* \*

Counsel for SFHS shall prepare an appropriate separate judgment and circulate it for approval as to form by counsel for the debtors, the committee, and Siemens.

/s/ Robert J. Faris
United States Bankruptcy Judge
Dated: 03/04/2010