# UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| In re | ) Case No. 08-01369 |
| | ) |
| CHA Hawaii, LLC, *et al.*, | ) (Reorganization Cases) |
| | ) |
| Debtors. | ) (Jointly Administered) |
| | ) |
| This Document Relates to: | ) (Honorable Robert J. Faris) |
| ALL CASES EXCEPT CHA | ) |
| HAWAII, LLC | ) |
| | ) |

**SECOND AMENDED DISCLOSURE STATEMENT FOR THE SECOND
AMENDED JOINT PLAN OF REORGANIZATION FOR HAWAII
MEDICAL CENTER LLC, HAWAII MEDICAL CENTER WEST, LLC,
AND HAWAII MEDICAL CENTER EAST, LLC PROPOSED BY ST.
FRANCIS HEALTHCARE SYSTEM OF HAWAII, ST. FRANCIS
MEDICAL CENTER, AND ST. FRANCIS MEDICAL CENTER – WEST**

McCORRISTON MILLER MUKAI
MacKINNON LLP
JONATHAN STEINER (Bar No. 006084)
Five Waterfront Plaza, 4th Floor
500 Ala Moana Blvd.
Honolulu, HI 96813
Telephone (808) 529-7300

HENNIGAN, BENNETT & DORMAN LLP
BRUCE BENNETT (Admitted *Pro Hac Vice*)
JOSHUA M. MESTER (Admitted *Pro Hac Vice*)
865 South Figueroa Street, Suite 2900
Los Angeles, CA 90017
Telephone (213) 694-1200

*Counsel to St. Francis Healthcare System Of
Hawaii, St. Francis Medical Center, And St. Francis Medical Center-West*

Dated: March 12, 2010

**THIS IS NOT A SOLICITATION OF ACCEPTANCE OR REJECTION OF
THE JOINT PLAN. THIS DISCLOSURE STATEMENT IS BEING
SUBMITTED FOR APPROVAL BUT HAS NOT YET BEEN APPROVED
BY THE BANKRUPTCY COURT. SOLICITATION OF ACCEPTANCE
OR REJECTION OF THE JOINT PLAN MAY OCCUR ONLY AFTER
THE BANKRUPTCY COURT APPROVES THIS DISCLOSURE
STATEMENT.**

770814.5

# TABLE OF CONTENTS

**Page**

I.  INTRODUCTION, DISCLAIMER AND SUMMARY OF
    TREATMENT OF CLAIMS AND INTERESTS ...........................................1

    A.  FAILURE TO SATISFY VOTE REQUIREMENT ............................................4

    B.  NON-CONFIRMATION OR DELAY OF CONFIRMATION OF THE
        JOINT PLAN ..............................................................................4

    C.  NON-CONSENSUAL CONFIRMATION ......................................................5

    D.  RISK OF NON-OCCURRENCE OF THE EFFECTIVE DATE.........................5

    E.  CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS ...........5

    F.  INCREASED COMPETITION ON THE ISLAND OF OAHU FOR
        PATIENT CARE SERVICES ..........................................................6

II.  SUMMARY OF TREATMENT OF CLAIMS AND INTERESTS
     UNDER THE JOINT PLAN ...........................................................7

    A.  OVERVIEW OF TREATMENT...............................................................7

III.  THE DEBTORS AND THE CHAPTER 11 CASES ....................................14

    A.  BUSINESS OVERVIEW AND HISTORY ...................................................14

    B.  PREPETITION EQUITY STRUCTURE ......................................................14

    C.  BOARDS OF MANAGERS AND EXECUTIVE OFFICERS..........................15

    D.  PREPETITION DEBT STRUCTURE .........................................................16

    E.  DEBTORS' REASONS FOR CHAPTER 11 FILING ...................................17

    F.  THE CHAPTER 11 CASES...................................................................19

        1.  First Day Relief.................................................................19

        2.  The Company's Professional Advisors ....................................19

        3.  Appointment of the Creditors Committee ................................19

        4.  Exclusivity, Company's Plan of Reorganization,
            and Creditors Committee's Plan of Reorganization .................20

5.  Bar Dates And Objections To Claims .......................................21

6.  Postpetition Operations.................................................................21

7.  Equipment Upgrades....................................................................21

8.  Patient Care Ombudsman ............................................................21

9.  St. Francis' Motion For Adequate Protection And
    Sanctions .......................................................................................22

IV.  SUMMARY OF THE JOINT PLAN OF REORGANIZATION .................23

A.  OVERVIEW OF CHAPTER 11.......................................................24

B.  CONVERSION OF REORGANIZED DEBTORS TO NONPROFIT
    CORPORATIONS AND CANCELLATION OF ALL INTERESTS IN THE
    DEBTORS .......................................................................................24

C.  OVERALL STRUCTURE OF THE JOINT PLAN.........................................25

D.  CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS .........25

1.  Unclassified Claims. ....................................................................25

2.  Bar Dates for Administrative Expense Claims..........................27

3.  Classified Claims and Interests..................................................28

E.  MEANS FOR IMPLEMENTATION OF THE JOINT PLAN. ...........................34

1.  Substantive Consolidation For Purposes of Treating
    Impaired Claims...........................................................................34

2.  Articles of Incorporation & By-Laws.........................................35

3.  Management/Board of Directors. ...............................................35

4.  Corporate Actions. ......................................................................36

5.  Reorganized Debtors' Conversion to Nonprofit
    Corporations.................................................................................36

U.S. Bankruptcy Court - Hawaii   #08-01369   Dkt # 1118   Filed  03/12/10   Page 3 of 143

6. Sources of Cash for Plan Distributions.....................36

7. Working Capital Facility. ...........................................36

8. St. Francis Guaranties. ...............................................37

F. TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED
LEASES ........................................................................37

1. Assumption and Rejection of Executory Contracts
and Unexpired Leases.................................................37

2. Collective Bargaining Agreements...........................38

3. St. Francis Leases. .....................................................38

4. Assumption of Medicare Provider Agreement(s)......38

5. Treatment of Bank of Hawaii's Lease. .....................39

6. Treatment of Siemens Medical Leases. ....................39

7. Cure of Defaults in Connection with Assumption.....39

8. Bar Date for Rejection Damages. ..............................40

9. Bar Date for Bankruptcy Code § 365(n) Election. ....40

10. Licensing Requirements. ...........................................40

G. DISTRIBUTIONS AND PROCEDURES FOR RESOLVING DISPUTED
CLAIMS........................................................................40

1. Reorganized Debtors to Serve As Disbursing Agent. ..............40

2. Dates of Distributions. ...............................................41

3. Cash Distributions......................................................41

4. De Minimis Distributions. ..........................................41

5. Disputed Claims..........................................................42

U.S. Bankruptcy Court - Hawaii   #08-01369   Dkt # 1118   Filed  03/12/10   Page 4 of 143

6.   Undeliverable and Unclaimed Distributions. ............................42

7.   Objections to Claims....................................................................43

8.   Authority to Prosecute Objections.............................................43

9.   Setoff............................................................................................43

10.  Rights of Action..........................................................................44

H.   CONFIRMATION AND EFFECTIVENESS OF THE JOINT PLAN .................45

1.   Conditions to Confirmation. .....................................................45

2.   Conditions to the Effective Date................................................45

3.   Waiver of Conditions to the Confirmation or
Effective Date. ...........................................................................46

4.   Cramdown....................................................................................46

5.   Binding Effect of Confirmation.................................................46

6.   Good Faith. .................................................................................46

7.   No Limitations on Effect of Confirmation. ...............................46

8.   Discharge of Claims, Administrative Expenses and
Interests. .....................................................................................46

9.   Judicial Determination of Discharge. .......................................47

10.  Injunctions...................................................................................47

11.  Exculpation and Limitation of Liabilities..................................48

12.  Compromise And Release Of Claims Against St.
Francis.........................................................................................49

13.  Creditors Committee....................................................................49

V.   RISK FACTORS TO BE CONSIDERED ...................................................50

U.S. Bankruptcy Court - Hawaii   #08-01369   Dkt # 1118   Filed  03/12/10   Page 5 of 143

A.  FAILURE TO SATISFY VOTE REQUIREMENT ........................................... 50

B.  NON-CONFIRMATION OR DELAY OF CONFIRMATION OF THE JOINT PLAN ............................................................................ 50

C.  NON-CONSENSUAL CONFIRMATION ...................................................... 50

D.  RISK OF NON-OCCURRENCE OF THE EFFECTIVE DATE ....................... 51

E.  FAILURE TO OBTAIN WORKING CAPITAL FACILITY. ........................... 51

F.  CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS. ........ 51

G.  INCREASED COMPETITION ON THE ISLAND OF OAHU FOR PATIENT CARE SERVICES .................................................... 52

VI.  CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE JOINT PLAN ........................................................................ 53

A.  U.S. FEDERAL INCOME TAX CONSEQUENCES TO THE DEBTORS AND HOLDERS OF INTERESTS ............................................... 54

    1.  Tax Consequences to Reorganized HMC, HMCW, and HMCE. ................................................................. 54

    2.  Tax Consequences to Holders of Interests ................................ 55

B.  U.S. FEDERAL INCOME TAX CONSEQUENCES TO HOLDERS OF CLAIMS ................................................................................ 55

    1.  General Treatment of Holders of Claims ................................... 56

    2.  Bad Debt Deduction ................................................................. 56

    3.  Information Reporting and Backup Withholding ...................... 57

    4.  Importance of Obtaining Professional Tax Assistance ................................................................................ 57

VII.  FEASIBILITY OF THE JOINT PLAN AND BEST INTEREST OF CREDITORS ............................................................................. 59

U.S. Bankruptcy Court - Hawaii    #08-01369    Dkt # 1118    Filed  03/12/10    Page 6 of 143

# TABLE OF CONTENTS CONT'D

A. FEASIBILITY OF THE JOINT PLAN ...................................................... 59

B. ACCEPTANCE OF THE JOINT PLAN ................................................... 60

C. BEST INTERESTS TEST ...................................................................... 60

D. LIQUIDATION ANALYSIS .................................................................. 61

E. APPLICATION OF THE 'BEST INTERESTS' OF CREDITORS TEST TO THE LIQUIDATION ANALYSIS ............................................................. 62

F. CONFIRMATION WITHOUT ACCEPTANCE OF ALL IMPAIRED CLASSES: THE "CRAMDOWN" ALTERNATIVE ..................................... 62

VIII. THE SOLICITATION; VOTING PROCEDURE ........................................ 64

A. PARTIES IN INTEREST ENTITLED TO VOTE ..................................... 64

B. VOTING PROCEDURES ....................................................................... 64

C. WAIVERS OF DEFECTS, IRREGULARITIES, ETC. ............................. 64

D. WITHDRAWAL OF BALLOTS; REVOCATION ................................... 65

E. FURTHER INFORMATION; ADDITIONAL COPIES ............................. 66

## APPENDICES

Appendix A – Amended Joint Plan of Reorganization

Appendix B – Disclosure Statement Order

Appendix C – Voting Procedures

Appendix D – Historical Financial Information

Appendix E – Financial Forecast

Appendix F – Liquidation Analysis

U.S. Bankruptcy Court - Hawaii    #08-01369    Dkt # 1118    Filed  03/12/10    Page 7 of 143

# I.  INTRODUCTION, DISCLAIMER AND SUMMARY OF TREATMENT OF CLAIMS AND INTERESTS

St. Francis Healthcare System of Hawaii, St. Francis Medical Center, and St. Francis Medical Center – West (collectively, "St. Francis") provides this disclosure statement (the "Disclosure Statement") pursuant to section 1125 of the Bankruptcy Code, for use in the solicitation of votes on the Amended Joint Plan of Reorganization (the "Joint Plan") of Hawaii Medical Center LLC ("HMC"), Hawaii Medical Center East, LLC ("HMCE"), and Hawaii Medical Center West, LLC ("HMCW" and collectively with HMC and HMCE, the "Debtors") proposed by St. Francis.  The Joint Plan is being proposed by St. Francis and was filed with the United States Bankruptcy Court for the District of Hawaii (the "Bankruptcy Court") on January 7, 2010.  A copy of the Joint Plan is annexed as Appendix A to this Disclosure Statement.  The Joint Plan is a plan of reorganization for HMC, HMCE and HMCW.  The Joint Plan is not a plan of reorganization for CHA Hawaii, LLC ("CHA Hawaii" and collectively with HMC, HMCE and HMCW, the "Company").

The United States Bankruptcy Court for the District of Hawaii has scheduled a hearing on _____, 2010 at _____.m. (Hawaii time) to consider whether to confirm the Joint Plan.

On _____, 2010, after notice and a hearing, the Bankruptcy Court entered the Disclosure Statement Order approving this Disclosure Statement as containing adequate information of a kind and in sufficient detail to enable a hypothetical, reasonable investor typical of the Debtors' creditors and equity interest holders to make an informed judgment whether to accept or reject the Joint Plan. APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT, HOWEVER, CONSTITUTE A DETERMINATION BY THE BANKRUPTCY COURT AS TO THE FAIRNESS OR MERITS OF THE JOINT PLAN. THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND RULE 3016 OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE.

The Disclosure Statement Order, a copy of which is attached as Appendix B, sets forth deadlines for voting to accept or reject the Joint Plan and concerning procedures to be followed to object to confirmation of the Joint Plan, and the record date for voting purposes.  A Ballot for the acceptance or rejection of the Joint Plan is enclosed with each Disclosure Statement submitted to a Holder of a Claim that is entitled to vote to accept or reject the Joint Plan.  In addition, voting instructions are attached hereto as Appendix C.

This Disclosure Statement sets forth certain information regarding the Debtors' prepetition history, the need to seek chapter 11 protection, significant events that have occurred during the Debtors' chapter 11 cases, and the anticipated reorganization and restructuring of the Debtors upon successful emergence from chapter 11. This Disclosure Statement also describes terms and provisions of the Joint Plan, certain effects of confirmation of the Joint Plan, certain risk factors associated with securities to be issued under the Joint Plan, and the manner in which distributions will be made under the Joint Plan. In addition, this Disclosure Statement discusses the confirmation process and the voting procedures that Holders of Claims entitled to vote under the Joint Plan must follow for their votes to be counted.

Except as otherwise provided herein, capitalized terms used, but not otherwise defined, in this Disclosure Statement have the meanings ascribed to them in the Joint Plan. Unless otherwise noted herein, all dollar amounts provided in this Disclosure Statement and in the Joint Plan are given in United States dollars.

This Disclosure Statement describes certain aspects of the Joint Plan and other related matters. FOR A COMPLETE UNDERSTANDING OF THE JOINT PLAN, YOU SHOULD READ THIS DISCLOSURE STATEMENT, THE JOINT PLAN, AND THE EXHIBITS, APPENDICES, AND SCHEDULES THERETO IN THEIR ENTIRETY. IF ANY INCONSISTENCY EXISTS BETWEEN THE JOINT PLAN AND THIS DISCLOSURE STATEMENT, THE TERMS OF THE JOINT PLAN ARE CONTROLLING.

This Disclosure Statement does not constitute an offer to exchange or sell, or the solicitation of an offer to exchange or buy, any securities that may be deemed to be offered hereby with respect to any creditor that is not an "accredited investor" as defined in Regulation D under the Securities Act. In any state or other jurisdiction (domestic or foreign) in which any securities that may be deemed to be offered hereby are required to be qualified for offering in such jurisdiction, no offer is hereby being made to, and the receipt of ballots will not be accepted from, residents of such jurisdiction unless and until such requirements, in the sole and final determination of St. Francis, have been fully satisfied. Until such time, any ballot submitted with respect to any such creditor will be deemed null and void and will not constitute a rejection or acceptance for purposes of determining whether requisite votes for acceptance of the Joint Plan have been received.

NO PERSON IS AUTHORIZED BY ST. FRANCIS TO GIVE ANY INFORMATION OR TO MAKE ANY REPRESENTATION REGARDING THIS DISCLOSURE STATEMENT OR THE JOINT PLAN OTHER THAN AS

U.S. Bankruptcy Court - Hawaii   #08-01369   Dkt # 1118   Filed  03/12/10   Page 9 of 143

CONTAINED IN THIS DISCLOSURE STATEMENT AND THE EXHIBITS, APPENDICES, AND/OR SCHEDULES ATTACHED HERETO OR INCORPORATED BY REFERENCE OR REFERRED TO HEREIN, AND, IF GIVEN OR MADE, SUCH INFORMATION OR REPRESENTATION MAY NOT BE RELIED UPON.

THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE LEGAL, BUSINESS, FINANCIAL, OR TAX ADVICE. ANY CREDITOR OR INTEREST HOLDER DESIRING ANY SUCH ADVICE OR ANY OTHER ADVICE SHOULD CONSULT WITH ITS OWN ADVISORS.

THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE AS OF THE DATE HEREOF UNLESS ANOTHER TIME IS SPECIFIED HEREIN, AND THE DELIVERY OF THIS DISCLOSURE STATEMENT WILL NOT CREATE AN IMPLICATION THAT THERE HAS NOT BEEN ANY CHANGE IN THE INFORMATION STATED SINCE THE DATE HEREOF.

THIS DISCLOSURE STATEMENT MAY NOT BE RELIED ON FOR ANY PURPOSE OTHER THAN TO DETERMINE WHETHER TO VOTE TO ACCEPT OR TO REJECT THE JOINT PLAN, AND NOTHING STATED HEREIN WILL CONSTITUTE AN ADMISSION OF ANY FACT OR LIABILITY BY ANY PARTY, OR BE ADMISSIBLE IN ANY PROCEEDING INVOLVING ST. FRANCIS OR ANY OTHER PARTY, OR BE DEEMED A REPRESENTATION OF THE TAX OR OTHER LEGAL EFFECTS OF THE JOINT PLAN ON THE DEBTORS OR HOLDERS OF CLAIMS OR INTERESTS. CERTAIN OF THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT, BY NATURE, ARE FORWARD LOOKING AND CONTAIN ESTIMATES AND ASSUMPTIONS. THERE CAN BE NO ASSURANCE THAT SUCH STATEMENTS WILL BE REFLECTIVE OF ACTUAL OUTCOMES. ALL HOLDERS OF CLAIMS SHOULD CAREFULLY READ AND CONSIDER THIS DISCLOSURE STATEMENT AND THE JOINT PLAN IN THEIR ENTIRETY, INCLUDING ARTICLE V, "RISK FACTORS TO BE CONSIDERED," OF THIS DISCLOSURE STATEMENT, BEFORE VOTING TO ACCEPT OR REJECT THE JOINT PLAN.

U.S. Bankruptcy Court - Hawaii   #08-01369   Dkt # 1118   Filed 03/12/10   Page 10 of 143

## SPECIAL NOTE REGARDING
## FORWARD-LOOKING STATEMENTS

This Disclosure Statement contains forward-looking statements, including statements concerning possible or assumed future results of operations of the Debtors or the Reorganized Debtors and those preceded by, followed by, or that include the word may, will, should, could, expects, plans, anticipates, believes, estimates, predicts, potential, or continue or the negative of such terms and other comparable terminology. You should understand that the factors described below, in addition to those discussed elsewhere in this Disclosure Statement could materially affect the Debtors' or the Reorganized Debtors' future results and could cause those results to differ materially from those expressed in such forward-looking statements. Holders of Claims against the Debtors should read and consider carefully the information set forth below, as well as the other information set forth in this Disclosure Statement (and the documents delivered together herewith and/or incorporated by reference), prior to voting to accept or reject the Joint Plan. This information, however, should not be regarded as the only risks involved in connection with the Joint Plan and/or its implementation. These factors include, but are not limited to:

### A.    Failure to Satisfy Vote Requirement

If St. Francis obtains the requisite votes to accept the Joint Plan in accordance with the requirements of the Bankruptcy Code, St. Francis intends, as promptly as practicable thereafter, to seek confirmation of the Joint Plan. In the event that sufficient votes are not received, St. Francis may pursue an alternative restructuring.

Pursuant to section 1126(c) of the Bankruptcy Code, Classes 3, 7 and 8 will be determined to have accepted the Joint Plan if at least two-thirds in amount and more than one-half in number of Allowed Claims in Classes 3, 7 and 8 (that actually vote) vote in favor of the Joint Plan. If such thresholds are not met, St. Francis may not be able to confirm the Joint Plan as it is currently structured.

### B.    Non-Confirmation or Delay of Confirmation of the Joint Plan

Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation and requires, among other things, that the confirmation of the Joint Plan not be followed by a need for further financial reorganization and that the value of distributions to dissenting creditors and shareholders not be less than the value of distributions such creditors and shareholders would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code. Although St. Francis

U.S. Bankruptcy Court - Hawaii   #08-01369   Dkt # 1118   Filed  03/12/10   Page 11 of 143

believes that the Joint Plan will meet such tests, there can be no assurance that the Bankruptcy Court would reach the same conclusion.

### C. Non-Consensual Confirmation

In the event an impaired Class of Claims does not accept a plan, a bankruptcy court may nevertheless confirm such plan at the proponent's request if at least one impaired class of claims has accepted the Joint Plan (with such acceptances being determined without including the vote of any "insider" in such class), and, as to each impaired class that has not accepted the Joint Plan, the bankruptcy court determines that the Joint Plan of reorganization "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting impaired classes. St. Francis believes that the Joint Plan satisfies these requirements for Classes 7, 8, and 9.

### D. Risk of Non-Occurrence of the Effective Date

Although St. Francis believes that the Effective Date will occur reasonably soon after the Confirmation Date, there can be no assurance as to such timing or as to whether the Effective Date will occur at all.

### E. Classification and Treatment of Claims and Interests

Section 1122 of the Bankruptcy Code requires that the Joint Plan classify Claims against, and Interests in, the Debtors. The Bankruptcy Code also provides that the Joint Plan may place a Claim or Interest in a particular Class only if such Claim or Interest is substantially similar to the other Claims or Interests of such Class. St. Francis believes that all Claims and Interests have been appropriately classified in the Joint Plan.

To the extent that the Bankruptcy Court finds that a different classification is required for the Joint Plan to be confirmed, St. Francis presently anticipates that it would seek (i) to modify the Joint Plan to provide for whatever classification might be required for confirmation and (ii) to use the acceptances received from any creditor pursuant to this solicitation for the purpose of obtaining the approval of the Class or Classes of which such creditor ultimately is deemed to be a member. Any such reclassification of creditors, although subject to the notice and hearing requirements of the Bankruptcy Code, could adversely affect the Class in which such creditor was initially a member, or any other Class under the Joint Plan, by changing the composition of such Class and the vote required for approval of the Joint Plan. There can be no assurance that the Bankruptcy Court, after finding that a classification was inappropriate and requiring a reclassification, would approve the Joint Plan based upon such reclassification. Except to the extent that

U.S. Bankruptcy Court - Hawaii   #08-01369   Dkt # 1118   Filed 03/12/10   Page 12 of 143

modification of classification in the Joint Plan requires re-solicitation, St. Francis will, in accordance with the Bankruptcy Code and the Bankruptcy Rules, seek a determination by the Bankruptcy Court that acceptance of the Joint Plan of any Holder of Claims pursuant to this solicitation will constitute a consent to the Joint Plan's treatment of such Holder regardless of the Class as to which such Holder is ultimately deemed to be a member. St. Francis believes that under the Federal Rules of Bankruptcy Procedure St. Francis would be required to re-solicit votes for or against the Joint Plan only when a modification adversely affects the treatment of the claim of any creditor or equity holder.

The Bankruptcy Code also requires that the Joint Plan provide the same treatment for each Claim or Interest of a particular Class unless the Holder of a particular Claim or Interest agrees to a less favorable treatment of its Claim or Interest. St. Francis believes that it has complied with the requirement of equal treatment. To the extent that the Bankruptcy Court finds that the Joint Plan does not satisfy such requirement, the Bankruptcy Court could deny confirmation of the Joint Plan.

Issues or disputes relating to classification and/or treatment could result in a delay in the Confirmation and Consummation of the Joint Plan and could increase the risk that the Joint Plan will not be consummated.

**F.     Increased Competition on the Island of Oahu for Patient Care Services**

It has become increasingly difficult to compete against other, financially strong competitors on the island of Oahu. The healthcare industry in Hawaii has seen the entry of several significant changes during recent years. The level of competition on the island remains formidable.

ANY FINANCIAL FORECASTS OR OTHER FORWARD-LOOKING ANALYSES CONTAINED HEREIN WERE NOT PREPARED WITH A VIEW TO COMPLYING WITH THE GUIDELINES FOR PROSPECTIVE FINANCIAL STATEMENTS PUBLISHED BY THE AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS. ST. FRANCIS'S FINANCIAL ADVISORS HAVE NEITHER COMPILED NOR EXAMINED THE ACCOMPANYING PROSPECTIVE FINANCIAL INFORMATION TO DETERMINE THE REASONABLENESS THEREOF AND, ACCORDINGLY, HAS NOT EXPRESSED AN OPINION OR ANY OTHER FORM OF ASSURANCE WITH RESPECT THERETO.

## II.    SUMMARY OF TREATMENT OF CLAIMS AND INTERESTS UNDER THE JOINT PLAN

### A.    Overview of Treatment

As contemplated by the Bankruptcy Code, Administrative Claims and Priority Tax Claims are not classified under the Joint Plan.  Allowed Administrative Claims are to be paid in full in accordance with the terms of the Joint Plan.  *See* Article IV, Section D.1 of this Disclosure Statement for a summary of the treatment proposed under the Joint Plan for Administrative Claims.  *See* Article IV, Section D.1(c) of this Disclosure Statement for a summary of the treatment proposed under the Joint Plan for Priority Tax Claims.

The Joint Plan further provides that all Secured Tax Claims (Class 1), Siemens Secured Lender Claim (Class 2), Other Secured Claims (Class 4), Other Priority Claims (Class 6) will remain unimpaired.  In addition, the Joint Plan provides that Unimpaired Employee PTO Claims (Class 5) will be Reinstated.

The table below summarizes the classification and treatment of the prepetition Claims and Interests under the Joint Plan. St. Francis believes that the Joint Plan provides distributions to all Classes of Claims that reflect an appropriate resolution of the Claims, taking into account the differing nature and priority of such Claims.

### *Classification of Debtors' Claims and Interests*

| Description of Claims and Interests | Est. Allowed Amount | Treatment | Recovery |
|---|---|---|---|
| Class 1 – Secured Tax Claims<br><br>Class 1 consists of Secured Tax Claims.<br><br>Class 1 is unimpaired. | TBD | On the Effective Date, each holder of an Allowed Secured Tax Claim shall retain its lien and receive, in full satisfaction of its Allowed Secured Tax Claim, at the sole option and discretion of the Reorganized Debtors, payment (a) in full, in Cash, on the later of the Effective Date or the Date of Assessment, (b) in accordance with section 1129(a)(9)(c) of the Bankruptcy Code, in full, in Cash, in up to twenty-four (24) equal quarterly installments, commencing on the first Business Day following the Date of Assessment of such Allowed Secured Tax Claim, together with interest from the Date of Assessment at a rate of 3.25% per annum, or (c) by mutual agreement of the holder of such | 100% |

U.S. Bankruptcy Court - Hawaii   #08-01369   Dkt # 1118   Filed 03/12/10   Page 14 of 143

| Description of Claims and Interests | Est. Allowed Amount | Treatment | Recovery |
|---|---|---|---|
| | | Allowed Secured Tax Claim and the pertinent Reorganized Debtors. | |
| Class 2 – Siemens Secured Lender Claims<br><br>Class 2 consists of the Siemens Secured Lender Claims.<br><br>Class 2 is unimpaired | $3,415,250 | On the Effective Date, the Reorganized Debtors shall (A) pay the Allowed Siemens Secured Lender Claim in full in Cash and (B) either (i) cause the cancellation of the Workers Compensation LC or (ii) fully collateralize the Workers Compensation LC with a cash deposit. | 100% |
| Class 3 – St. Francis Secured Claims<br><br>Class 3 consists of the St. Francis Secured Claims, including Secured Claims arising under the St. Francis Credit Documents and the St. Francis Leases.<br><br>Class 3 is impaired. | $67.1 million | While St. Francis believes that it is entitled to more consideration than what is provided under the Joint Plan, in a compromise of its Claims against the Estates, on the Effective Date St. Francis shall receive Term Note A, Term Note B, a Term Note C in a face amount equal to $19.5 million and 100% of the equity of each of the Reorganized Debtors on account of the St. Francis Secured Claims, provided however that if Classes 7 and 8 are found to have voted to accept the Joint Plan and the Committee does not object to, oppose, impede, impair, or otherwise delay confirmation of the Joint Plan, then the Term Note C distributed to St. Francis under this section shall have a face amount equal to $10 million.<br><br>"Term Note A" means a new note issued by the Reorganized Debtors in the principal amount of $20,000,000 to be secured by a first priority lien against and security interest in substantially all of the Reorganized Debtors' assets, bearing interest at the rate of 10% per annum from the Effective Date payable semi-annually, having a maturity date of the fifth anniversary of the Effective Date and containing affirmative and negative covenants and events of default similar to those included in the St. Francis Credit | Less than 100% |

| Description of Claims and Interests | Est. Allowed Amount | Treatment | Recovery |
|---|---|---|---|
| | | Documents.<br><br>"Term Note B" means a new note issued by the Reorganized Debtors in the principal amount of $37,500,000 secured by a second priority lien against and security interest in substantially all of the Reorganized Debtors' assets, bearing interest at the rate of 7% per annum from the Effective Date payable semi-annually, having a maturity date of the eighth anniversary of the Effective Date, with the amount necessary to satisfy the principal in full to be calculated as a percentage of the principal based upon the Reorganized Debtors' average EBIDA over the four years prior to the maturity date as follows: (a) Average EBIDA is less than $11,000,000 then 60% of the principal amount; (b) Average EBIDA is greater than $11,000,000 but less than or equal to $13,500,000, then 80% of the principal amount; (c) Average EBIDA is greater than $13,500,000 but less than or equal to $16,000,000 then 100% of the principal amount; and (d) Average EBIDA is greater than $16,000,000 then 160% of the principal amount, and containing affirmative and negative covenants and events of default similar to those included in the St. Francis Credit Documents. In the event that the Reorganized Debtors are required to issue Term Note D, then Term Note B shall provide that in the event that, and only in the even that, the Reorganized Debtors commence voluntarily proceedings under Title 11 of the United States Code or an involuntary proceeding under Title 11 of the United States Code in which an order for relief is entered is commenced against the Reorganized Debtors prior to the maturity date of Term Note D, then Term Note B shall be subordinated in right of payment only to Term Note D. | |

U.S. Bankruptcy Court - Hawaii   #08-01369   Dkt # 1118   Filed 03/12/10   Page 16 of 143

| Description of Claims and Interests | Est. Allowed Amount | Treatment | Recovery |
|---|---|---|---|
| | | "Term Note C" means a new unsecured note issued by the Reorganized Debtors, bearing interest at the rate of 2% per annum from the Effective Date payable semi-annually, having a maturity date of the tenth anniversary of the Effective Date, with the amount necessary to satisfy the principal in full to be calculated as a percentage of the principal based upon the Reorganized Debtors' average EBIDA over the five years prior to the maturity date as follows:  (a) Average EBIDA is less than $13,500,000 then 20% of the principal amount; (b) Average EBIDA is greater than $13,500,000 but less than or equal to $14,485,000, then 40% of the principal amount; (c) Average EBIDA is greater than $14,485,000 but less than or equal to $16,485,000 then 80% of the principal amount; (d) Average EBIDA is greater than $16,485,000 but less than or equal to $18,485,000 then 100% of the principal amount; (e) Average EBIDA is greater than $18,485,000 but less than or equal to $20,485,000 then 120% of the principal amount; (d) Average EBIDA is greater than $20,485,000 but less than or equal to $22,485,000 then 140% of the principal amount; and (d) Average EBIDA is greater than $22,485,000 then 160% of the principal amount.  In the event that the Reorganized Debtors are required to issue Term Note D, then Term Note C shall provide that in the event that, and only in the even that, the Reorganized Debtors commence voluntarily proceedings under Title 11 of the United States Code or an involuntary proceeding under Title 11 of the United States Code in which an order for relief is entered is commenced against the Reorganized Debtors prior to the maturity date of Term Note D, then Term Note C shall be subordinated in right of payment only to Term Note D. | |

U.S. Bankruptcy Court - Hawaii   #08-01369   Dkt # 1118   Filed  03/12/10   Page 17 of 143

| Description of Claims and Interests | Est. Allowed Amount | Treatment | Recovery |
|---|---|---|---|
| Class 4 – Other Secured Claims<br><br>Class 4 consists of all Secured Claims other than the Siemens Secured Lender Claims, Secured Tax Claims, and St. Francis Secured Claims.<br><br>Class 4 is unimpaired. | $5.4 million | On the Effective Date, at the election of the Reorganized Debtor, the Holder of each Allowed Other Secured Claim shall, on account of such Claim, either: (i) be paid in Cash in full, (ii) have surrendered to it, without representation or warranty, the collateral securing its Claim, (iii) notwithstanding any contractual provision or applicable law that entitles the Holder of such Claim to demand or receive accelerated payment of such Claim after the occurrence of a default (A) be paid a cure of any such default that occurred prior to the Effective Date, other than a default of a kind specified in section 365(b)(2) of this title, (B) have Reinstated the maturity of such Claim as such maturity existed before such default, (C) be compensated for any damages incurred as a result of any reasonable reliance by such Holder on such contractual provision or such applicable law, and (D) otherwise not have altered the legal, equitable, or contractual rights to which such Claim entitles the Holder of such Claim, or (iv) have left unaltered the legal, equitable, and contractual rights to which such Claim entitles the Holder of such Claim. | 100% |
| Class 5 – Employee PTO Claims<br><br>Class 5 consists of Claims of employees for PTO.<br><br>Class 5 is unimpaired. | $300,000 | Reinstated | 100% |
| Class 6 – Other Priority Claims<br><br>Class 6 consists of all Other Priority | $100,000 | On the Effective Date, each holder of an Allowed Other Priority Claim shall receive Cash equal to the amount of such Allowed Other Priority Claim or have its Allowed Other Priority Claim Reinstated. | 100% |

U.S. Bankruptcy Court - Hawaii   #08-01369   Dkt # 1118   Filed  03/12/10   Page 18 of 143

| Description of Claims and Interests | Est. Allowed Amount | Treatment | Recovery |
|---|---|---|---|
| Claims.<br><br>Class 6 is unimpaired. | | | |
| Class 7 – General Unsecured Claims<br><br>Class 7 consists of all Unsecured Claims other than Convenience Claims.<br><br>Class 7 is impaired. | $31 - $36 million | <u>Acceptance and No Committee Opposition:</u><br>In the event that Class 7 is found to have voted to accept the Joint Plan and the Committee does not object to, oppose, impede, impair, or otherwise delay confirmation of the Joint Plan, then on the Effective Date or as soon thereafter as is practicable, each Holder of an Allowed Class 7 Unsecured Claim shall receive a Term Note C in a face amount equal to its Allowed Class 7 Unsecured Claim and St. Francis shall receive no distribution on account of the St. Francis Deficiency Claim.<br><br>"<u>Term Note C</u>" is defined above.<br><br><u>Rejection or Committee Opposition:</u><br>In the event that Class 7 is found to have voted to reject the Joint Plan or the Committee objects to, opposes, impedes, impairs, or otherwise delays confirmation of the Joint Plan, then on the Effective Date or as soon thereafter as is practicable, then each Holder of an Allowed Class 7 Unsecured Claim, including the St. Francis Deficiency Claim, shall receive a Pro Rata interest in Term Note D and shall not receive a Term Note C.<br><br>"<u>Term Note D</u>" means a new non-interest bearing unsecured note issued by the Reorganized Debtors in the principal amount of $1,750,000 having a maturity date of the third anniversary of the Effective Date. | 20%<br><br><br><br><br><br><br><br><br><br><br><br>4.8% |
| Class 8 – Convenience Claims | $230,000 - $440,000 | <u>Acceptance and No Committee Opposition:</u><br>In the event that Class 8 is found to have voted to accept the Joint Plan and the | 20% |

| Description of Claims and Interests | Est. Allowed Amount | Treatment | Recovery |
|---|---|---|---|
| Class 8 consists of all Convenience Claims.<br><br>Class 8 is impaired. | | Committee does not object to, oppose, impede, impair, or otherwise delay confirmation of the Joint Plan, then each Holder of an Allowed Class 8 Convenience Claim may elect to receive either (a) Cash in an amount equal to 20% of such Allowed Class 8 Convenience Claim on the Effective Date or as soon thereafter as is practicable or (b) a Term Note C in a principal amount equal to the amount of such Allowed Class 8 Convenience Claim.<br><br>Rejection or Committee Opposition:<br>In the event that Class 8 is found to have voted to reject the Joint Plan or the Committee objects to, opposes, impedes, impairs, or otherwise delays confirmation of the Joint Plan, then on the Effective Date or as soon thereafter as is practicable each Holder of an Allowed Class 8 Convenience Claim shall receive Cash in an amount equal to 5% of such Allowed Class 8 Convenience Claim and shall not have the option of receiving a Term Note C. | 5% |
| Class 9 – Interests<br><br>Class 9 consists of all Interests in the Debtors.<br><br>Class 9 is impaired. | N/A | All Interests in the Debtors will be canceled on the Effective Date. Holders of Class 9 Interests shall not receive or retain any Interests or property under the Joint Plan. | 0% |

ST. FRANCIS BELIEVES THAT THE JOINT PLAN PROVIDES THE BEST RECOVERIES POSSIBLE FOR HOLDERS OF CLAIMS AGAINST THE DEBTORS AND THUS STRONGLY RECOMMENDS THAT YOU VOTE TO ACCEPT THE JOINT PLAN.

U.S. Bankruptcy Court - Hawaii   #08-01369   Dkt # 1118   Filed  03/12/10   Page 20 of 143

## III. THE DEBTORS AND THE CHAPTER 11 CASES

*The following overview is a general summary only, which is qualified in its entirety by, and should be read in conjunction with, the more detailed discussions, information, and financial statements and notes thereto appearing elsewhere in this Disclosure Statement and the Joint Plan.*

### A. Business Overview and History

Established in January 2007, HMC is a Hawaii limited liability company that owns two hospital campuses — HMCE and HMCW — located in Honolulu and in Ewa Beach, respectively. HMCE has 240 licensed beds (188 acute and 52 skilled nursing facility beds), and HMCW has 102 acute licensed beds — for a combined total of 342 beds for HMCE and HMCW. The Debtors report that as of the Petition Date, they collectively employed approximately 1,153 individuals, including full-time, part-time, salaried, union and temporary employees. According to the Debtors, consolidated net revenues for the fiscal year ending June 30, 2008 were approximately $167 million.

The Debtors' hospital system was originally established in 1927 under the sponsorship of the Sisters of the Third Franciscan Order of Syracuse, New York. The hospitals came to be known as St. Francis Medical Center. Among the programs for which St. Francis had become well known were transplant services (operating Hawaii's first and only program), End Stage Renal Disease care, cardiac care and the Institute of Cancer.

Shortly after the passage of the Balanced Budget Act of 1997, the hospitals began incurring losses, partially due to its role as the primary health care provider for the uninsured or government-insured in the Honolulu market. St. Francis faced a nine-week nursing strike in 2002 and the subsequent loss of physician and community support. By 2005, 74% of the hospitals' patients were either on Medicare or Medicaid. Although the costs of caring for these patients continued to increase, the Medicare and Medicaid reimbursements remained flat.

### B. Prepetition Equity Structure

The ownership structure of the Debtors is as follows: CHA Hawaii owns 54% of the outstanding membership units in HMC; Hawaii Physicians Group, LLC ("HPG") owns 45% of the outstanding units in HMC; and St. Francis retained a 1% ownership interest in HMC (also holds non-voting observation rights on the Board of Managers). HMC is the sole member of both HMCE and HMCW, owning 100% of the membership units in each. Cardiovascular Hospitals of

America, LLC ("Cardiovascular Hospitals") is the 84.3% owner of CHA Hawaii; a group of various individual investors owns the remaining 15.7% of CHA Hawaii.

## C. Boards of Managers and Executive Officers

Following is a list of the board of managers for HMC and the executive officers for each of HMC, HMCE, and HMCW as of September 1, 2009.

- Badr Idbeis, M.D. Chairman, Board of Managers HMC
- Henry Louie, M.D. Vice-Chairman, Board of Managers HMC
- William Lau, M.D. Secretary, Board of Managers HMC
- Douglas Kell Treasurer, Board of Managers HMC
- Edward Alquero, M.D. Board Member HMC
- Danelo Canete, M.D. Board Member HMC
- Robert Fleming, M.D. Board Member HMC
- Rahul Hooda, M.D. Board Member HMC
- Marc Kruger, M.D. Board Member HMC
- Melanie Kelly, M.D. Board Member HMC
- David Phillips Board Member HMC
- Charlie Sonido, M.D. Board Member HMC
- Richard Steckley Board Member HMC
- Mickey Tseng Board Member HMC
- Stewart Pressman Board Observer HMC
- Jerry Correa Board Observer HMC
- Collin Dang, M.D. Chief Executive Officer HMC
- Salim Hasham Chief Restructuring Officer (acting as Implementation Officer) HMC
- Suanne Morikuni Chief Financial Officer HMC
- Dean Pang Chief Information Officer HMC
- Jessica Sphar Director of Human Services HMC
- Paul Ross Administrator – HMCE

U.S. Bankruptcy Court - Hawaii   #08-01369   Dkt # 1118   Filed  03/12/10   Page 22 of 143

- Michael Matwichyna Administrator -HMCW
- James Lumeng, M.D. Chief Medical Officer HMCE
- Maria Kostylo Chief Nursing Officer HMCE
- Wayne Nadamoto, M.D. Chief Surgical Officer HMCE
- Danilo Ablan, M.D. Chief Medical Officer HMCW
- Rebecca Klungreseter Chief Nursing Officer HMCW
- Joseph Zobian, M.D. Chief Surgical Officer HMCW

### D. Prepetition Debt Structure

As further described herein, the Debtors are parties to various loan, security and guaranty documents with St. Francis and separately with Siemens Financial Services, Inc. ("Siemens Financial" and together with St. Francis, the "Prepetition Secured Lenders").  As of July 31, 2008, the Debtors' consolidated books and records reflected assets totaling approximately $90,442,814 (book value) and total liabilities of $101,663,550 (book value).  As of the Petition Date, the Debtors owed their Prepetition Secured Lenders approximately $51,018,425 in the aggregate on the loans identified below.  The Debtors also owed various parties approximately $19,615,000 for prepetition trade debt:

| **Obligation** | **Original Principal Amount** |
|---|---|
| Prepetition St. Francis Secured Obligations | |
| Working Capital Loan | $6,261,116 |
| Term Loan | $40,032,500 |
| Prepetition Siemens Secured Obligations | $4,724,809 |
| Prepetition Trade Debt | $19,615,000 |

On or about January 13, 2007, the Debtors, as borrowers, entered into that certain Loan and Security Agreement with Siemens Financial (the "Prepetition Siemens Secured Obligations"), pursuant to which the Debtors could borrow from Siemens Financial up to $20,000,000. As of the Petition Date, the balance on the Prepetition Siemens Secured Obligations was approximately $4,724,809.  To

U.S. Bankruptcy Court - Hawaii   #08-01369   Dkt # 1118   Filed  03/12/10   Page 23 of 143

secure the obligations under the Prepetition Siemens Secured Obligations, the Debtors granted to Siemens Financial a first priority security interest in and lien on the Debtors' healthcare insurance accounts receivable (as such term is defined in the Uniform Commercial Code) and the proceeds thereof (the "Prepetition Siemens Collateral"). CHA Hawaii, HPG and certain other individuals each guaranteed the Debtors' obligations under the Prepetition Siemens Secured Obligations.

As part of the purchase from St. Francis, on or about January 13, 2007, HMC, as borrower, entered into that certain Loan Agreement with the St. Francis, which consisted of two separate credit facilities (collectively, the "Prepetition St. Francis Secured Obligations"): (i) a term loan with an initial principal amount not to exceed $40,200,000; and (ii) a working capital loan with an initial principal amount of $8,970,833. To secure the Prepetition St. Francis Secured Obligations, the Debtors granted St. Francis a first priority security interest in and lien on substantially all of the Debtors' assets (excluding the Prepetition Siemens Collateral). In addition, HMC also has granted, for the benefit of St. Francis, mortgages on all of HMC's real property. CHA Hawaii and HPG also conveyed the benefits of two separate membership interest pledge and security agreements to St. Francis. Finally, CHA Hawaii, HMCE, HMCW, HPG and all of the members of HPG have also each executed and delivered certain guaranties in favor of St. Francis. As of the Petition Date, the Debtors owed approximately $46,394,000 on account of the Prepetition St. Francis Secured Obligations.

### E.    Debtors' Reasons for Chapter 11 Filing

The Debtors have reported that between the January 2007 acquisition and August 2008, the Debtors suffered operating losses of approximately $21,821,000. The losses were the result of a variety of external and internal factors — from the provision of care beyond actual reimbursements to being overstaffed. The Debtors contend that since 2007, the Debtors have made several attempts to correct certain organizational and structural problems the Debtors say they inherited from St. Francis in an effort to increase revenues and reduce losses. The Debtors say that they devised a turnaround plan that identified several major initiatives, including debt restructuring, drug formulary development, pharmacy processing improvement, acute renal dialysis, revenue cycle outsourcing, leasing of unneeded space, improving referrals and reduction of general excise tax costs. The Debtors have reported that these initiatives are at different phases of implementation, and most are not completed. For example, in April 2008, HMC signed an agreement with Perot Systems Revenue Cycle Solutions, LLC ("Perot") whereby Perot assumed HMCE's and HMCW's revenue cycle in order to improve cash collections and revenue flow. The Debtors have also reported improved collections and revenues as a result of this arrangement with Perot.

The Debtors have also stated that they worked to address various defaults under their credit agreements. On or about September 25, 2007, Siemens Financial delivered a notice of default to the Debtors alleging that they had breached various financial covenants and coverage ratios and were in default under the Prepetition Siemens Loan Agreement. As a result, and on or about November 9, 2007, the Debtors entered into a Forbearance Agreement with Siemens Financial pursuant to which Siemens Financial agreed to continue lending to the Debtors under the Siemens Prepetition Loan Agreement, but subject to certain financial accommodations, including among others: (i) modification of certain financial covenants; (ii) a change in the fixed charge coverage ratio covenant; and (iii) higher interest on the Prepetition Siemens Secured Obligations.

The Debtors and Siemens Financial later entered into that certain Second Forbearance and Amendment Agreement, effective February 20, 2008 (the "Second Forbearance"). Among other things, the Second Forbearance increased the availability block under the Prepetition Siemens Loan Agreement to $2,750,000 and reduced the maximum revolving credit facility to $12,000,000. The Second Forbearance also required the Debtors to submit a 13-week cash flow forecast and unaudited financial statements, as well as the hiring of a restructuring advisor. In June 2008, at the request of their lenders, the Debtors hired Focus Management Group to assist with developing a restructuring plan.

The Second Forbearance subsequently was amended on three separate occasions — March 31, May 6 and June 5. The amendments to the Second Forbearance included the payment of additional forbearance fees, increasing the availability block to $3,250,000, and reducing the maximum revolving credit to $10,500,000.

On July 25, 2008, the Debtors and Siemens Financial executed the Third Forbearance and Amendment Agreement (the "Third Forbearance"). The Third Forbearance was set to expire on August 31, 2008. Among other things, the Third Forbearance required the Debtors to provide Siemens Financial with a copy of a turnaround plan along with evidence satisfactory to Siemens Financial that such plan had been implemented.

On August 29, 2008, the Debtors approached both Siemens Financial and St. Francis with a restructuring plan, as well as a proposal, whereby the Debtors would sell substantially all of their outstanding accounts receivable to an outside purchaser for approximately $25 million. The proceeds of such sale were to be used, in part, to pay down the Prepetition Siemens Secured Obligations. The remaining cash was to be used to bolster cash flows as the Company implemented the restructuring plan. Siemens Financial ultimately did not accept the

restructuring proposal and indicated that it was unwilling to extend any forbearance period beyond August 31, 2008 — the date the Third Forbearance was set to expire.

### F.    The Chapter 11 Cases

On the Petition Date, the Debtors and CHA Hawaii each filed a voluntary petition for relief under the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (the "Delaware Court").  At that time, certain actions and proceedings against the Company and all acts to obtain property from the Company were stayed under section 362 of the Bankruptcy Code.  The Debtors and CHA Hawaii have continued to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  On September 5, 2008, St. Francis filed a motion to transfer venue of the Chapter 11 cases from the District of Delaware to the District of Hawaii.  On September 19, 2008, the Delaware Court granted St. Francis' motion and transferred venue of the Company's Chapter 11 cases to the United States Bankruptcy Court for the District of Hawaii.

### 1.    First Day Relief

To expedite their emergence from chapter 11, the Company, on the Petition Date, filed "first day" motions seeking the relief to continue uninterrupted operations, including payment of prepetition wages, trust fund taxes and insurance and the acquisition of the use of cash collateral, among other relief, from the Bankruptcy Court.

### 2.    The Company's Professional Advisors

The Company has been advised by the following: McDonald Hopkins LLC, as the Company's chapter 11 counsel; Moseley Biehl, Tsugawa, Lau & Muzzi, LLC, as the Company's co-counsel; Scouler & Company as the Company's financial advisors; Focus Management Group, as the Company's financial advisor; Ernst & Young as the Company's tax preparer; Thomas T. Ueno, CPA as the Company's accountant; and various other legal firms, as ordinary course counsel, primarily defending various lawsuits and providing labor counsel.  The Company has also filed an application to retain Jones Lang LaSalle as real estate advisors.

### 3.    Appointment of the Creditors Committee

On September 11, 2008, the Office of the United States Trustee appointed the official committee of unsecured creditors consisting of the following members: (i) Clinical Laboratories of Hawaii, LLP; (ii) SBM Site Services LLC; (iii)

Sodexho America LLC; (iv) Organ Donor Center of Hawaii; and (v) Liberty Dialysis Hawaii LLC. On October 22, 2008, the Office of the United States Trustee appointed the following two additional members to the Creditors Committee: (i) McKesson and (ii) Medical Specialists of Hawaii, LLC. On October 30, 2008 and October 31, 2008, the Bankruptcy Court entered orders approving the retention of Alston & Bird LLP and Wagner Choi & Verbrugge as co-counsel to the Creditors Committee. Deloitte Financial Advisory Services LLP was retained as the financial advisor to the Creditors Committee.

### 4. Exclusivity, Company's Plan of Reorganization, and Creditors Committee's Plan of Reorganization

On November 19, 2008, the Debtors filed the Motion for an Order Pursuant to 11 U.S.C. § 1121(d) Extending the Time Periods During Which the Debtors Have the Exclusive Right to File a Plan and to Solicit Acceptances Thereto (the "Exclusivity Motion"), Docket No. 254. After a bridge order, on February 10, 2009, the Bankruptcy Court granted the Exclusivity Motion, Docket No. 401, extending the Company's exclusive period to file a chapter 11 plan of reorganization under section 1121(d) of the Bankruptcy Code to March 27, 2009 (the "Exclusivity Period") and extending the Company's exclusive period to solicit acceptances for such plan pursuant to section 1121(c) of the Bankruptcy Code to May 26, 2009. The Bankruptcy Court, with the consent of the Debtors, Creditors Committee and Prepetition Secured Lenders, extended the Exclusivity Period through March 30, 2009. In July 2009, St. Francis, as well as other parties, objected to any further extension of exclusivity and the Bankruptcy Court denied the Debtors' request to further extend exclusivity.

The Company filed an initial plan of reorganization on March 30, 2009. (the "Company's First Plan"). The Company filed the related disclosure statement for the Company's First Plan on April 13, 2009 (Docket No. 481). Neither St. Francis nor the Creditors Committee supported the Company's First Plan and both objected to the related disclosure statement. The Bankruptcy Court approved a disclosure statement with respect to the Company's First Plan, as amended, but provided comments on the record at the hearing that it believed that there were substantial challenges to confirmation of the Company's First Plan, as amended. Thereafter, the Company filed a Second Amended plan of reorganization (the "Company's Second Plan"). A hearing to consider approval of the disclosure statement for the Company's Second Plan was held on December 14, 2009 and continued to January 27, 2010. On December 18, 2009, the Company filed proposed revisions to disclosure statement for the Company's Second Plan.

U.S. Bankruptcy Court - Hawaii   #08-01369   Dkt # 1118   Filed 03/12/10   Page 27 of 143

On November 6, 2009, the Creditors Committee filed a plan of reorganization for HMC, HMCE, and HMCW ("Committee Plan"). On November 13, 2009, the Creditors Committee filed its disclosure statement with respect to the Committee Plan. A hearing to consider approval of the Committee's disclosure statement was held on December 14, 2009 and continued to January 27, 2010.

### 5. Bar Dates And Objections To Claims

The Bankruptcy Court established a bar date for filing proofs of Claim. Generally, proofs of Claim were required to be filed no later than February 4, 2009, except that proofs of Claim for any governmental units were required to be filed no later than February 25, 2009. On December 4, 2009, the Debtors filed their First Omnibus Objection To Certain Filed Proofs Of Claims pursuant to which they sought to disallow certain claims on the grounds that certain claims were duplicative of other claims, amended or replaced by subsequently filed claims, filed without required documentation, were filed after the applicable bar date, have already been paid, or are not capable of determination of whether any amount is owed. On December 4, 2009, the Debtors filed their Second Omnibus Objection To Certain Filed Proofs Of Claims pursuant to which they sought to disallow certain claims that were filed against multiple Debtors in the same monetary amount. On December 4, 2009, the Debtors filed their Third Omnibus Objection To Certain Filed Proofs Of Claims pursuant to which they sought to reclassify claims that were filed against the incorrect Debtor entity. On December 4, 2009, the Debtors filed their Fourth Omnibus Objection To Certain Filed Proofs Of Claims pursuant to which they sought to disallow certain claims that are for amounts in excess of the Debtors' books and records.

### 6. Postpetition Operations

Attached in Appendix D is a summary of the Company's financial performance since the Petition Date as reported by the Company.

### 7. Equipment Upgrades

During the Chapter 11 Cases, the Company sought and received Bankruptcy Court approval for the acquisition of 64-slice CT scanners and MRI imaging equipment at both HMCE and HMCW.

### 8. Patient Care Ombudsman

On October 16, 2008, the Office of the United States Trustee appointed Dianne M. Okumura to act as the patient care ombudsman (the "Ombudsman") in the Company's Chapter 11 cases. On December 12, 2008, the Bankruptcy Court

U.S. Bankruptcy Court - Hawaii   #08-01369   Dkt # 1118   Filed 03/12/10   Page 28 of 143

authorized the appointment of Lyons, Brandt, Cook & Hiramatsu as counsel for the Ombudsman. The Ombudsman has filed reports with the Bankruptcy Court.

### 9. St. Francis' Motion For Adequate Protection And Sanctions

On December 30, 2009, St. Francis filed a Motion For (I) Adequate Protection And (II) Sanctions For Violations Of Bankruptcy Code Section 363(c)(2)" (the "St. Francis Motion"). Pursuant to the St. Francis Motion, St. Francis has requested an order for adequate protection and compensation for (a) the Debtors' unauthorized use of St. Francis' cash collateral, pursuant to section 363(c)(2) of title 11 of the Bankruptcy Code and (b) the Debtors' failure to maintain St. Francis' collateral in good working condition. St. Francis believes that the Debtors have used in excess of $8.5 million of St. Francis' cash collateral and has requested a replacement lien against all of the Debtors' assets in which St. Francis does not currently have an interest, including health-care insurance receivables, deposit accounts, and cash. In addition, St. Francis has requested that the Debtors perform required repairs and maintenance to the Sullivan Building and create a segregated account holding $1.5 million for the benefit of St. Francis pending the completion of the repairs.

The Debtors and the Committee opposed the St. Francis Motion. On March 4, 2010, the Bankruptcy Court issued a Memorandum of Decision in which it found that the Debtors had used, without court authorization or consent, approximately $4.7 million of cash in which St. Francis had an interest. As a result, the Bankruptcy Court granted St. Francis a lien against property in which St. Francis did not previously have an interest, including cash and health-care accounts receivable, a superpriority claim to the extent that the adequate protection liens were insufficient to compensate St. Francis, and ordered the Debtors to deposit, no later than June 1, 2010, approximately $4.7 million into an account in which St. Francis would have a first priority lien. In addition, the Bankruptcy Court ordered the Debtors to repair the roof and associated equipment at the Sullivan Building, and obtain full insurance in compliance with St. Francis' credit documents, no later than June 1, 2010.

U.S. Bankruptcy Court - Hawaii   #08-01369   Dkt # 1118   Filed  03/12/10   Page 29 of 143

## IV.   SUMMARY OF THE JOINT PLAN OF REORGANIZATION

The primary objectives of the Joint Plan are to (i) convert the Reorganized Debtors to Hawaii nonprofit corporations; (ii) alter the Debtors' debt and capital structures to permit them to emerge from their Chapter 11 Cases with a viable capital structure, (iii) maximize the value of the ultimate recoveries to all creditor groups on a fair and equitable basis, and (iv) settle, compromise or otherwise dispose of Claims and Interests on terms that St. Francis believes to be fair and reasonable and in the best interests of the Debtors' respective estates and creditors. The Joint Plan provides for, among other things: (A) the restructuring of certain indebtedness, (B) the discharge of Claims, subject to the terms of the Joint Plan and the Reorganized Debtors' obligations under the Joint Plan and (C) the cancellation of all existing Interests in the Debtors.  St. Francis believes that the Joint Plan ensures that the Reorganized Debtors will have requisite funding to be a viable institution and will allow the Reorganized Debtors to become a nonprofit hospital system which will actively serve and participate in its community.

St. Francis believes that, through the Joint Plan, Holders of Allowed Claims will obtain a substantially greater recovery from the estates of the Debtors than the recovery they would receive (a) from any other restructuring (b) if the Debtors were to liquidate under chapter 7 of the Bankruptcy Code, or (c) if St. Francis sought and obtained relief from the automatic stay to enforce its claims and rights against the Debtors and their estates.  St. Francis also believes that the Joint Plan will afford the Reorganized Debtors the opportunity and ability to continue their businesses as viable going concerns and preserve ongoing employment for the Reorganized Debtors' employees.

The statements contained in this Disclosure Statement include summaries of the provisions contained in the Joint Plan and in documents referred to therein. The statements contained in this Disclosure Statement do not purport to be precise or complete statements of all the terms and provisions of the Joint Plan or documents referred to therein, and reference is made to the Joint Plan and to such documents for the full and complete statements of such terms and provisions.

The Joint Plan itself and the documents referred to therein control the actual treatment of Claims against and Interests in the Debtors under the Joint Plan and will, upon the Effective Date, be binding upon all Holders of Claims against and Interests in the Debtors and their Estates, the Reorganized Debtors and other parties in interest. In the event of any conflict between this Disclosure Statement, on the one hand, and the Joint Plan or any other operative document, on the other hand, the terms of the Joint Plan and such other operative document are controlling.

U.S. Bankruptcy Court - Hawaii   #08-01369   Dkt # 1118   Filed  03/12/10   Page 30 of 143

## A.    Overview of Chapter 11

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code. Under chapter 11 of the Bankruptcy Code, a debtor is authorized to reorganize its business for the benefit of itself, its creditors and interest holders. Another goal of chapter 11 is to promote equality of treatment for similarly situated creditors and similarly situated interest holders with respect to the distribution of a debtor's assets.

The commencement of a chapter 11 case creates an estate that is comprised of all of the legal and equitable interests of the debtor as of the filing date. The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor in possession."

The consummation of a plan of reorganization is the principal objective of a chapter 11 case. A plan of reorganization sets forth the means for satisfying claims against and interests in a debtor. Confirmation of a plan of reorganization by the Bankruptcy Court makes the Joint Plan binding upon the debtor, any issuer of securities under the Joint Plan, any person or entity acquiring property under the Joint Plan and any creditor of or equity security holder in the debtor, whether or not such creditor or equity security holder (i) is impaired under or has accepted the Joint Plan or (ii) receives or retains any property under the Joint Plan. Subject to certain limited exceptions and other than as provided in the Joint Plan itself or the confirmation order, the confirmation order discharges the debtor from any debt that arose prior to the date of confirmation of the Joint Plan and substitutes, therefore, the obligations specified under the confirmed plan and terminates all rights and interests of equity security holders.

## B.    Conversion of Reorganized Debtors to Nonprofit Corporations and Cancellation of All Interests in the Debtors

The Joint Plan provides for the vesting of the Debtors' assets in the Reorganized Debtors, which shall be wholly-owned subsidiaries of St. Francis that are qualified as nonprofit to nonprofit Hawaii corporations.  Currently, HMCE and HMCW, as for-profit hospitals in the state of Hawaii, are required to pay Hawaii general excise tax ("GET") and property tax.  Converting HMCE and HMCW to nonprofit hospitals will eliminate the payment of the GET and property taxes which will generate a substantial cost savings.

On the Effective Date, and simultaneously with the conversion of the Reorganized Debtors to nonprofit corporate form, the Joint Plan provides that the Reorganized Debtors shall each (i) adopt articles of incorporation and by-laws in a form acceptable to St. Francis and (ii) appoint an initial board of directors and

initial officers that have been approved by St. Francis. Accordingly, with the conversion of the Debtors to nonprofit Hawaii corporations, the Joint Plan also provides that, on the Effective Date, all Interests in the Debtors will be cancelled.

### C. Overall Structure of the Joint Plan

St. Francis believes that the Joint Plan provides the highest, best and most timely possible recovery to the Debtors' Claim Holders. Under the Joint Plan, Claims against the Debtors are divided into different classes. If the Joint Plan is confirmed by the Bankruptcy Court and consummated, on the Effective Date, and at certain times thereafter as Claims are resolved, liquidated or otherwise allowed, the Reorganized Debtors will make distributions to certain Classes of Claims as provided in the Joint Plan. The Classes of Claims against the Debtors created under the Joint Plan, the treatment of those Classes of Claims under the Joint Plan and distributions to be made under the Joint Plan are described below.

Under the Joint Plan, there are three classes of Impaired Claims (Class 3 St. Francis Secured Claims, Class 7 General Unsecured Claims and Class 8 Convenience Claims) and one class of Impaired Interests (Class 9). All other Claims are Unimpaired. Holders of Class 1 Secured Tax Claims, Class 2 Siemens Secured Lender Claims, Class 4 Other Secured Claims, Class 5 Employee PTO Claims, and Class 6 Other Priority Claims will be unimpaired by the Joint Plan.

Under the Joint Plan, St. Francis will receive three different notes, Term Note A (secured), Term Note B (secured), and a Term Note C (unsecured), along with all of the equity in the Reorganized Debtors. The Joint Plan does not impair, affect, modify, amend, or release, in any way, St. Francis' rights against third parties, including rights arising under non-debtor guaranties of the Debtors' obligations to St. Francis. General Unsecured Creditors will receive a Term Note C that provides interest only payments for a period of ten years with the amount to be repaid at maturity to be adjusted based upon the Reorganized Debtors' performance. Convenience Claims will have the right to receive a cash payment equal to 20% of the Allowed Amount of their claims in lieu of a Term Note C.

### D. Classification and Treatment of Claims and Interests

#### 1. Unclassified Claims.

##### a) Administrative Expense Claims

Except as provided in Section 2.2 of the Joint Plan or to the extent that the holder of an Allowed Administrative Expense Claim agrees to a different treatment, the Reorganized Debtor shall pay to each holder of an Allowed

U.S. Bankruptcy Court - Hawaii   #08-01369   Dkt # 1118   Filed  03/12/10   Page 32 of 143

Administrative Expense Claim Cash in an amount equal to such Allowed Administrative Expense Claim on the later of the Effective Date and the date such Administrative Expense Claim becomes an Allowed Administrative Expense Claim, or as soon thereafter as is practicable; provided, however, that all Ordinary Course Administrative Expenses shall be paid in full by Reorganized Debtor in the ordinary course of business in accordance with the terms and conditions of agreements relating thereto. The Confirmation Order shall contain a bar date for purposes of assertion and allowance of Administrative Expense Claims, other than Ordinary Course Administrative Expenses.

### b) Compensation and Reimbursement Claims

Except as provided in Section 2.3 of the Joint Plan, all Entities that are awarded compensation or reimbursement of expenses by the Bankruptcy Court in accordance with section 330 or 331 of the Bankruptcy Code or entitled to the priority pursuant to section 503(b)(2), 503(b)(3), 503(b)(4) or 503(b)(5) of the Bankruptcy Code, shall be paid in full, in Cash, the amounts allowed by the Bankruptcy Court (a) on or as soon as reasonably practicable following the later to occur of (i) the Effective Date and (ii) the date on which the Bankruptcy Court order allowing such Claim becomes a Final Order, or (b) upon such other terms as may be mutually agreed upon between such holder of an Allowed Administrative Expense Claim and Reorganized Debtor.

### c) Payment of Priority Tax Claims

The Allowed Priority Tax Claim held by the Internal Revenue Service and any state taxing authority relating to any taxable year shall be the lesser of: (a) the Allowed Claim held by such Entity; (b) the estimated claim amount held by such Entity, if estimated by the Bankruptcy Court for purposes of allowance; or (c) the amount of such claim as determined by any administrative or judicial tribunal of competent jurisdiction before which such issue is brought by final order or as compromised and settled by the pertinent Reorganized Debtor and such taxing authority. Notwithstanding any other provision of the Joint Plan to the contrary, payments in respect of Allowed Priority Tax Claims shall not be made on the Effective Date, but rather shall, at the sole option and discretion of the pertinent Reorganized Debtors be made (a) in full, in Cash, on the later of the Effective Date or the Date of Assessment, (b) in accordance with section 1129(a)(9)(c) of the Bankruptcy Code, in full, in Cash, in up to twenty (20) equal quarterly installments, commencing on the first Business Day following the Date of Assessment of such Allowed Priority Tax Claim, together with interest from the Date of Assessment at a rate to be determined by the Bankruptcy Court, or (c) by

U.S. Bankruptcy Court - Hawaii   #08-01369   Dkt # 1118   Filed  03/12/10   Page 33 of 143

mutual agreement of the holder of such Allowed Priority Tax Claim and pertinent Reorganized Debtor.

### 2. Bar Dates for Administrative Expense Claims.

#### a) General Bar Date Provisions

Except as otherwise provided in the Joint Plan, unless previously Filed, requests for payment of Administrative Expense Claims must be Filed and served on the pertinent Reorganized Debtors, pursuant to the procedures specified in the Confirmation Order and the notice of entry of the Confirmation Order, no later than 30 days after the Effective Date (the "<u>Administrative Claims Bar Date</u>"). Holders of Administrative Expense Claims that are required to File and serve a request for payment of such Administrative Expense Claims and that do not File and serve such a request by the applicable Bar Date will be forever barred from asserting such Administrative Expense Claims against the Debtors or the Reorganized Debtors or their respective property, and such Administrative Expense Claims will be deemed discharged as of the Effective Date. Objections to such requests must be Filed and served on the Reorganized Debtors and the requesting party by the later of (A) 120 days after the Effective Date or (B) 60 days after the Filing of the applicable request for payment of Administrative Expense Claims.

#### b) Bar Dates for Certain Administrative Expense Claims

Professionals or other Entities asserting a Professional Fee Claim for services rendered to the Estate before the Effective Date must File and serve on the pertinent Reorganized Debtors and such other Entities who are designated by the Bankruptcy Rules, the Confirmation Order, the Professional Fee Order or other order of the Bankruptcy Court an application for final allowance of such Professional Fee Claim, as it relates to services provided to the Estate, no later than 60 days after the Effective Date. Objections to any Professional Fee Claim must be Filed and served on the Reorganized Debtors and the requesting party by the later of (1) 90 days after the Effective Date or (2) 30 days after the Filing of the applicable request for payment of the Professional Fee Claim. To the extent necessary, the Confirmation Order will amend and supersede any previously entered order of the Bankruptcy Court, including the Professional Fee Order, regarding the payment of Professional Fee Claims.

U.S. Bankruptcy Court - Hawaii   #08-01369   Dkt # 1118   Filed  03/12/10   Page 34 of 143

### 3. Classified Claims and Interests.

#### a) Class 1 – Secured Tax Claims

Class 1 consists of Secured Tax Claims. On the Effective Date, each holder of an Allowed Secured Tax Claim shall retain its lien and receive, in full satisfaction of its Allowed Secured Tax Claim, at the sole option and discretion of the Reorganized Debtors, payment (a) in full, in Cash, on the later of the Effective Date or the Date of Assessment, (b) in accordance with section 1129(a)(9)(c) of the Bankruptcy Code, in full, in Cash, in up to twenty (20) equal quarterly installments, commencing on the first Business Day following the Date of Assessment of such Allowed Secured Tax Claim, together with interest from the Date of Assessment at a rate of 3.25% per annum, or (c) by mutual agreement of the holder of such Allowed Secured Tax Claim and the pertinent Reorganized Debtors. Class 1 is unimpaired. The Holders of Claims in Class 1 will not vote to accept or reject the Joint Plan.

#### b) Class 2 – Siemens Secured Lender Claim

Class 2 consists of the Siemens Secured Lender Claim. The Siemens Secured Lender Claim shall be Allowed in the amount of $3,415,250, plus all applicable interest, fees and costs of Siemens Financial pursuant to the Secured Financing Agreements (as defined in the Final Cash Collateral Order). On the Effective Date, the Reorganized Debtors shall (A) pay the Allowed Siemens Secured Lender Claim in full in Cash and (B) either (i) cause the cancellation of the Workers Compensation LC or (ii) fully collateralize the Workers Compensation LC with a cash deposit.

#### c) Class 3 – St. Francis Secured Claims

Class 3 consists of the St. Francis Secured Claims. The St. Francis Secured Claims consist of all obligations owed by the Debtors under the St. Francis Credit Documents and the St. Francis Leases, including, without limitation, all loans, advances, debts, liabilities, fees, charges, expenses and obligations for the performance of covenants, tasks or duties, of any kind or nature, whether or not evidenced by any note, agreement or other instrument, and whether arising by reason of an extension of credit, loan, foreign exchange risk, guaranty, indemnification, or in any other manner. On the Effective Date St. Francis shall receive Term Note A, Term Note B, a Term Note C in a face amount equal to $19.5 million and 100% of the equity of each of the Reorganized Debtors on account of the St. Francis Secured Claims, provided however, that if Classes 7 and 8 are found to have voted to accept the Joint Plan and the Committee does not object to, oppose, impede, impair, or otherwise delay confirmation of the Joint

U.S. Bankruptcy Court - Hawaii   #08-01369   Dkt # 1118   Filed 03/12/10   Page 35 of 143

Plan, then the Term Note C distributed to St. Francis under the Joint Plan shall have a face amount equal to $10 million.[1]

The Term Note A is a new note issued by the Reorganized Debtors in the principal amount of $20,000,000 to be secured by a first priority lien against and security interest in substantially all of the Reorganized Debtors' assets, bearing interest at the rate of 10% per annum from the Effective Date payable semi-annually, having a maturity date of the fifth anniversary of the Effective Date and containing affirmative and negative covenants and events of default similar to those included in the St. Francis Credit Documents.

The Term Note B is a new note issued by the Reorganized Debtors in the principal amount of $37,500,000 secured by a second priority lien against and security interest in substantially all of the Reorganized Debtors' assets, bearing interest at the rate of 7% per annum from the Effective Date payable semi-annually, having a maturity date of the eighth anniversary of the Effective Date, with the amount necessary to satisfy the principal in full to be calculated as a percentage of the principal based upon the Reorganized Debtors' average EBIDA over the four years prior to the maturity date as follows:  (a) Average EBIDA is less than $11,000,000 then 60% of the principal amount; (b) Average EBIDA is greater than $11,000,000 but less than or equal to $13,500,000, then 80% of the principal amount; (c) Average EBIDA is greater than $13,500,000 but less than or equal to $16,000,000 then 100% of the principal amount; and (d) Average EBIDA is greater than $16,000,000 then 160% of the principal amount, and containing affirmative and negative covenants and events of default similar to those included in the St. Francis Credit Documents.  In the event that the Reorganized Debtors are required to issue Term Note D, then Term Note B shall provide that in the event that, and only in the even that, the Reorganized Debtors commence voluntarily proceedings under Title 11 of the United States Code or an involuntary proceeding under Title 11 of the United States Code in which an order for relief is entered is commenced against the Reorganized Debtors prior to the maturity date of Term

---

[1]  Although St. Francis is intends to accept the treatment of its claims proposed in the Joint Plan, it is not willing to accept this treatment under any other plan of reorganization proposed for the Debtors.  Indeed, St Francis cannot be compelled to accept the treatment proposed in this Joint Plan if it were to vote to reject the Joint Plan.

U.S. Bankruptcy Court - Hawaii   #08-01369   Dkt # 1118   Filed  03/12/10   Page 36 of 143

Note D, then Term Note B shall be subordinated in right of payment only to Term Note D.

St. Francis' Term Note C is a new unsecured note issued by the Reorganized Debtors, with a face amount equal to $19.5 million bearing interest at the rate of 2% per annum from the Effective Date payable semi-annually, having a maturity date of the tenth anniversary of the Effective Date, with the amount necessary to satisfy the principal in full to be calculated as a percentage of the principal based upon the Reorganized Debtors' average EBIDA over the five years prior to the maturity date as follows: (a) Average EBIDA is less than $13,500,000 then 20% of the principal amount; (b) Average EBIDA is greater than $13,500,000 but less than or equal to $14,485,000, then 40% of the principal amount; (c) Average EBIDA is greater than $14,485,000 but less than or equal to $16,485,000 then 80% of the principal amount; (d) Average EBIDA is greater than $16,485,000 but less than or equal to $18,485,000 then 100% of the principal amount; (e) Average EBIDA is greater than $18,485,000 but less than or equal to $20,485,000 then 120% of the principal amount; (d) Average EBIDA is greater than $20,485,000 but less than or equal to $22,485,000 then 140% of the principal amount; and (d) Average EBIDA is greater than $22,485,000 then 160% of the principal amount. In the event that the Reorganized Debtors are required to issue Term Note D, then Term Note C shall provide that in the event that, and only in the even that, the Reorganized Debtors commence voluntarily proceedings under Title 11 of the United States Code or an involuntary proceeding under Title 11 of the United States Code in which an order for relief is entered is commenced against the Reorganized Debtors prior to the maturity date of Term Note D, then Term Note C shall be subordinated in right of payment only to Term Note D.

Class 3 is Impaired. Because Class 3 is Impaired and Holders of Class 3 Claims receive consideration under the Joint Plan, the Holders of Claims in Class 3 are permitted to vote to accept or reject the Joint Plan.

### d) Class 4 – Other Secured Claims

Class 4 consists of all Other Secured Claims. On the Effective Date, at the election of the pertinent Reorganized Debtor, the Holder of each Allowed Other Secured Claim shall, on account of such Claim, either: (i) be paid in Cash in full, (ii) have surrendered to it, without representation or warranty, the collateral securing its Claim, (iii) notwithstanding any contractual provision or applicable law that entitles the Holder of such Claim to demand or receive accelerated payment of such Claim after the occurrence of a default (A) be paid a cure of any such default that occurred prior to the Effective Date, other than a default of a kind specified in section 365(b)(2) of this title, (B) have Reinstated the maturity of such

U.S. Bankruptcy Court - Hawaii   #08-01369   Dkt # 1118   Filed  03/12/10   Page 37 of 143

Claim as such maturity existed before such default, (C) be compensated for any damages incurred as a result of any reasonable reliance by such Holder on such contractual provision or such applicable law, and (D) otherwise not have altered the legal, equitable, or contractual rights to which such Claim entitles the Holder of such Claim, or (iv) have left unaltered the legal, equitable, and contractual rights to which such Claim entitles the Holder of such Claim. In the case of option (ii) or (iii), in the event that any such Claim is not completely satisfied by such distribution, the Deficiency Amount will constitute a Deficiency Claim against the Debtor and will be classified in the appropriate other Class and will receive the same treatment as other Claims in such Class. Any Holder of an Other Secured Claim may agree to accept less favorable treatment. Class 4 is unimpaired. The Holders of Claims in Class 4 will not vote to accept or reject the Joint Plan.

### e)     Class 5 – Employee PTO Claims

Class 5 consists of all Claims for PTO by employees of the Debtors that are employed by the Reorganized Debtors. On the Effective Date, all PTO that was accrued as of the Petition Date by an employee of the Debtors that is employed by the Reorganized Debtors as of the Effective Date shall be Reinstated against the Reorganized Debtors. Class 5 is unimpaired. The Holders of Claims in Class 5 will not vote to accept or reject the Joint Plan.

### f)     Class 6 – Other Priority Claims

Class 6 consists of all Other Priority Claims. On the Effective Date, each holder of an Allowed Other Priority Claim shall receive Cash equal to the amount of such Allowed Other Priority Claim or have its Allowed Other Priority Claim Reinstated. Class 6 is unimpaired. The Holders of Claims in Class 6 will not vote to accept or reject the Joint Plan.

### g)     Class 7 – Unsecured Claims

Class 7 consists of all Unsecured Claims, other than Convenience Claims. Class 7 also includes an Allowed Unsecured Claim in favor of St. Francis in the amount of $14 million that is included in Class 7 (the "**St. Francis Deficiency Claim**"). The treatment of Unsecured Claims will depend upon whether Class 7 votes to accept the Joint Plan <u>and</u> whether the Committee objects to, opposes, impedes, impairs, or otherwise delays confirmation of the Joint Plan. Both treatments are presented below:

<u>Acceptance and No Committee Opposition</u>: In the event that Class 7 is found to have voted to accept the Joint Plan and the Committee does not object to, oppose, impede, impair, or otherwise delay confirmation of the

U.S. Bankruptcy Court - Hawaii   #08-01369   Dkt # 1118   Filed 03/12/10   Page 38 of 143

Joint Plan, then on the Effective Date or as soon thereafter as is practicable, each Holder of an Allowed Class 7 Unsecured Claim shall receive a Term Note C in a face amount equal to its Allowed Class 7 Unsecured Claim and St. Francis shall receive no distribution on account of the St. Francis Deficiency Claim.

> Rejection or Committee Opposition:  In the event that Class 7 is found to have voted to reject the Joint Plan or the Committee objects to, opposes, impedes, impairs, or otherwise delays confirmation of the Joint Plan, then on the Effective Date or as soon thereafter as is practicable, then each Holder of an Allowed Class 7 Unsecured Claim, including the St. Francis Deficiency Claim, shall receive a Pro Rata interest in Term Note D and shall not receive a Term Note C as described in Section 4.7.1(A) of the Joint Plan.

The Term Note C is a new unsecured note issued by the Reorganized Debtors, with a principal amount equal to the Allowed Amount of each Holders' Class 7 Unsecured Claim, bearing interest at the rate of 2% per annum from the Effective Date payable semi-annually, having a maturity date of the tenth anniversary of the Effective Date, with the amount necessary to satisfy the principal in full to be calculated as a percentage of the principal based upon the Reorganized Debtors' average EBIDA over the five years prior to the maturity date as follows:  (a) Average EBIDA is less than $13,500,000 then 20% of the principal amount; (b) Average EBIDA is greater than $13,500,000 but less than or equal to $14,485,000, then 40% of the principal amount; (c) Average EBIDA is greater than $14,485,000 but less than or equal to $16,485,000 then 80% of the principal amount; (d) Average EBIDA is greater than $16,485,000 but less than or equal to $18,485,000 then 100% of the principal amount; (e) Average EBIDA is greater than $18,485,000 but less than or equal to $20,485,000 then 120% of the principal amount; (d) Average EBIDA is greater than $20,485,000 but less than or equal to $22,485,000 then 140% of the principal amount; and (d) Average EBIDA is greater than $22,485,000 then 160% of the principal amount.

Term Note D is a new non-interest bearing unsecured note issued by the Reorganized Debtors in the principal amount of $1,750,000 having a maturity date of the third anniversary of the Effective Date.

Class 7 is Impaired.  Because Class 7 is Impaired and Holders of Class 7 Claims receive consideration under the Joint Plan, the Holders of Claims in Class 7 are permitted to vote to accept or reject the Joint Plan.

U.S. Bankruptcy Court - Hawaii   #08-01369   Dkt # 1118   Filed  03/12/10   Page 39 of 143

### h)  Class 8 – Convenience Claims

Class 8 consists of all Convenience Claims.  By checking the appropriate box on a timely cast Ballot, the Holder of what otherwise would be an Allowed Unsecured Claim in an amount greater than $5,000 may elect to reduce the collective amount of all of such Holder's Allowed Unsecured Claims to $5,000 and be treated as the Holder of an Allowed Class 8 Convenience Claim in the amount of $5,000.  Such an election shall constitute a waiver of the right to collect, and a release of, the amount of all such Holder's Unsecured Claims to the extent that the aggregate amount thereof exceeds $5,000.  Thus, upon such election, the Holder of such Allowed Class 8 Convenience Claim shall be deemed to have released the Debtors and their Estates, the Reorganized Debtors and their property, and all other parties (unless such other parties expressly waive and release any indemnity or contribution claim against the Debtor relating to such Claim) from any and all liability for such excess amount.

The treatment of Convenience Claims will depend upon whether Class 8 votes to accept the Joint Plan <u>and</u> whether the Committee objects to, opposes, impedes, impairs, or otherwise delays confirmation of the Joint Plan.  Both treatments are presented below:

<u>Acceptance and No Committee Opposition</u>:  In the event that Class 8 is found to have voted to accept the Joint Plan and the Committee does not object to, oppose, impede, impair, or otherwise delay confirmation of the Joint Plan, then each Holder of an Allowed Class 8 Convenience Claim may elect to receive either (a) Cash in an amount equal to 20% of such Allowed Class 8 Convenience Claim on the Effective Date or as soon thereafter as is practicable or (b) a Term Note C in a principal amount equal to the amount of such Allowed Class 8 Convenience Claim.

<u>Rejection or Committee Opposition</u>:  In the event that Class 8 is found to have voted to reject the Joint Plan or the Committee objects to, opposes, impedes, impairs, or otherwise delays confirmation of the Joint Plan, then on the Effective Date or as soon thereafter as is practicable each Holder of an Allowed Class 8 Convenience Claim shall receive Cash in an amount equal to 5% of such Allowed Class 8 Convenience Claim and shall not receive the treatment described in Section 4.8.2(A) of the Joint Plan.

Class 8 is Impaired.  Because Class 8 is Impaired and Holders of Class 8 Claims receive consideration under the Joint Plan, the Holders of Claims in Class 8 are permitted to vote to accept or reject the Joint Plan.

U.S. Bankruptcy Court - Hawaii   #08-01369   Dkt # 1118   Filed  03/12/10   Page 40 of 143

Class 9 consists of all Interests in the Debtors.  All Interests in the Debtors will be canceled on the Effective Date.  Holders of Class 9 Interests shall not receive or retain any Interests or property under the Joint Plan.  Class 9 is Impaired.  Because holders of Class 9 Interests shall not receive any property under the Joint Plan, Class 9 is deemed to reject the Joint Plan.

## E.     Means For Implementation Of The Joint Plan.

### 1.     Substantive Consolidation For Purposes of Treating Impaired Claims.

#### a)     Substantive Consolidation.

This Joint Plan contemplates and is predicated upon entry of an order substantively consolidating the Debtors solely for the purposes of this Joint Plan, that is, for voting, confirmation and distribution purposes.  The Joint Plan does not contemplate the substantive consolidation of the Debtors for any other purpose. On the Effective Date (i) any obligation of any Debtor and all guarantees executed by one or more of the other Debtors shall be treated as a single obligation and any obligation of two or more Debtors, and all multiple Impaired Claims against such entities on account of such joint obligations shall be treated and Allowed only as a single Impaired Claim against the consolidated Debtors and (ii) each Claim filed against any Debtor shall be deemed filed against the consolidated Debtors and shall be deemed a single Claim against and a single obligation of the consolidated Debtors.  Except as set forth in Section 5.1 of the Joint Plan, such substantive consolidation shall not (other than for purposes related to this Joint Plan) (i) affect the legal and corporate structures of the Reorganized Debtors, (ii) cause any Debtor to be liable for any Impaired Claim or Unimpaired Claim under this Joint Plan for which it otherwise is not liable, and the liability for any such Claim shall not be affected by such substantive consolidation, (iii) affect Interests in Debtors, (iv) affect any obligations under any leases or contracts assumed in this Joint Plan or otherwise subsequent to the filing of the Reorganization Cases or (v) affect any obligations to pay quarterly fees to the United States Trustee.  All Claims of a Debtor against another Debtor shall be deemed extinguished.

#### b)     Substantive Consolidation Order.

This Joint Plan shall serve as, and shall be deemed to be, a motion for entry of an order substantively consolidating the Debtors solely to the extent provided in

Section 5.1 of the Joint Plan. If no objection to substantive consolidation is timely filed and served by any Holder of an Impaired Claim affected by the Joint Plan as provided herein on or before the deadline for objection to confirmation of this Joint Plan, the Substantive Consolidation Order (which may be the Confirmation Order) may be entered by the Bankruptcy Court. If any such objections are timely filed and served, a hearing with respect to the substantive consolidation of the Reorganization Cases and the objections thereto shall be scheduled by the Bankruptcy Court, which hearing may, but is not required to, coincide with the Confirmation Hearing.

### c) Transfer of Assets.

Except as otherwise provided in the Joint Plan, the Joint Plan provides that on and after the Effective Date, all property of the Estates of the Debtors, including all Rights of Action, and any property acquired by the Debtors under or in connection with the Joint Plan shall be assigned to and will vest in the Reorganized Debtors free and clear of all Claims, Liens, charges, other encumbrances and Interests. On and after the Effective Date, the Reorganized Debtors may operate their business and may use, acquire and dispose of property and compromise or settle any Claims or Interests without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules, other than restrictions expressly imposed by the Joint Plan or the Confirmation Order. Sources of Cash for future operations will include, inter alia, Cash of the Debtors and anticipated revenue from further business operations. In accordance with section 1109(b) of the Bankruptcy Code, nothing in this paragraph shall preclude any party in interest from appearing and being heard on any issue in the Reorganization Cases.

### 2. Articles of Incorporation & By-Laws.

The Articles of Incorporation will, among other things, prohibit the issuance of nonvoting equity securities to the extent required by section 1123(a) of the Bankruptcy Code. After the Effective Date, the Reorganized Debtors may amend and restate their Articles of Incorporation, By-Laws and other constituent documents as permitted by applicable non-bankruptcy law.

### 3. Management/Board of Directors.

From and after the Effective Date, the persons named in the Joint Plan Supplement shall serve as the Reorganized Debtors' board of directors subject to the terms and conditions of the Articles of Incorporation, the By-Laws and

U.S. Bankruptcy Court - Hawaii   #08-01369   Dkt # 1118   Filed 03/12/10   Page 42 of 143

applicable law.  The officers of the Reorganized Debtor shall be disclosed in the Joint Plan Supplement.

### 4.    Corporate Actions.

On the Effective Date, all actions contemplated by the Joint Plan shall be deemed authorized and approved in all respects (subject to the provisions of the Joint Plan), including, without limitation, the following:  (a) the adoption and the filing with the Director of the Department of Commerce and Consumer Affairs of the Articles of Incorporation; (b) the adoption of the By-Laws; (c) the issuance of the New Notes; (d) the cancellation of the Interests; (e) the execution and delivery of the Working Capital Facility; and (f) the execution and the delivery of, and the performance under, all documents and agreements contemplated by or relating to any of the foregoing.  All matters provided for under the Joint Plan involving the corporate structure of the Reorganized Debtors and any corporate action required by the Reorganized Debtors in connection with the Joint Plan shall be deemed to have occurred and shall be in effect pursuant to the Bankruptcy Code, without any requirement of further action by the shareholders or the directors of the Reorganized Debtors.  On the Effective Date, the appropriate officers of each of the Reorganized Debtors are authorized and directed to execute and to deliver all agreements, documents and instruments contemplated by the Joint Plan in the name and on behalf of the pertinent Reorganized Debtors.

### 5.    Reorganized Debtors' Conversion to Nonprofit Corporations.

On the Effective Date, the Reorganized Debtors shall be qualified as nonprofit entities owned or controlled by St. Francis.

### 6.    Sources of Cash for Plan Distributions.

The sources of Cash for distribution under the Joint Plan shall be the Debtors' Cash, the proceeds of a Working Capital Facility, and future revenues of the Reorganized Debtors that may be retained by the Reorganized Debtors or transferred to the Disbursing Agent as necessary for distribution pursuant to the terms and conditions of the Joint Plan.

### 7.    Working Capital Facility.

To the extent that the Reorganized Debtors require working capital financing, the Joint Plan provides that the Reorganized Debtors shall be authorized to (a) enter into the Working Capital Facility, (b) grant any liens and security interests and incur or guarantee the indebtedness as required under the Working

Capital Facility, and (c) issue, execute and deliver all documents, instruments and agreements necessary to implement and effectuate borrowings under the Working Capital Facility.

## 8. St. Francis Guaranties.

To the extent permissible under applicable law and only upon receipt of a satisfactory advisory opinion from the United States Department of Health & Human Services Office of Inspector General, the Joint Plan provides that St. Francis and the Reorganized Debtors will offer to enter into a Tolling Agreement with each Physician Guarantor. The Tolling Agreement shall contain an agreement among St. Francis, the Reorganized Debtors, and such Physician Guarantor for the Physician Guarantor to provide services to either St. Francis or the Reorganized Debtors, on terms and conditions acceptable to St. Francis or the Reorganized Debtors, in exchange for the cancellation or extinguishment of some or all of such participating Physician Guarantor's obligation under the applicable St. Francis Guaranty. The Tolling Agreement shall further provide that the executing Physician Guarantor agrees to toll any applicable limitations period related to St. Francis' rights under the applicable St. Francis Guaranty for 60 days after the executing Physician Guarantor fails to comply with the terms of the Tolling Agreement. In order to be eligible for such Tolling Agreement, a Physician Guarantor must enter into a stipulation with St. Francis prior to the Voting Deadline that such Physician Guarantor (A) will not object to confirmation of the Joint Plan and (B) will not support any other Person that objects to, opposes, impairs, impedes, or otherwise delays confirmation of the Joint Plan.

## F. Treatment Of Executory Contracts And Unexpired Leases

### 1. Assumption and Rejection of Executory Contracts and Unexpired Leases.

On the Effective Date, all executory contracts or unexpired leases to which any of the Debtors is a party shall be deemed automatically assumed in accordance with the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code, unless such executory contracts or unexpired leases (i) shall have been previously rejected by the Debtors by Final Order of the Bankruptcy Court, (ii) shall be the subject of a motion to reject pending on or before the Effective Date, (iii) are listed on Joint Plan Schedule 6.1, which shall be the schedule of executory contracts or unexpired leases rejected pursuant to this Plan, or (iv) are otherwise rejected pursuant to the terms of this Joint Plan. Joint Plan Schedule 6.1 shall be Filed no later than five Business Days prior to the Confirmation Date. The

U.S. Bankruptcy Court - Hawaii   #08-01369   Dkt # 1118   Filed  03/12/10   Page 44 of 143

Joint Plan Proponents reserve the right to amend Joint Plan Schedule 6.1 at any time prior to the Confirmation Date. Entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of the rejections and assumptions contemplated hereby pursuant to sections 365(a) and 1123 of the Bankruptcy Code as of the Effective Date. Each executory contract and unexpired lease assumed pursuant to Article VI shall revest in and be fully enforceable by the respective Reorganized Debtor in accordance with its terms, except as modified by the provisions of this Plan, or any order of the Bankruptcy Court authorizing and providing for its assumption or applicable federal law. Neither the exclusion nor the inclusion by the Joint Plan Proponents of a contract or lease on Joint Plan Schedule 6.1 nor anything contained in this Joint Plan shall constitute an admission by the Joint Plan Proponents that such lease or contract is an unexpired lease or executory contract that any Debtor or Non-Debtor Affiliate has any liability thereunder. The Joint Plan Proponents reserve the right, subject to notice, to amend, modify, supplement, or otherwise change Joint Plan Schedule 6.1 on or before the Effective Date.

## 2. Collective Bargaining Agreements.

The Debtors shall assume their collective bargaining agreements pursuant to the Joint Plan.

## 3. St. Francis Leases.

St. Francis contends that the St. Francis Leases constitute "true" leases, however, in the interest of compromising controversies, St. Francis has agreed to treat the St. Francis Leases as secured financings, which are included in the amount of the St. Francis Secured Claims.

## 4. Assumption of Medicare Provider Agreement(s).

The Reorganized Debtors shall expressly assume all of the Debtors' Medicare provider agreement(s) and numbers with the Centers for Medicare and Medicaid Services ("CMS") with modifications that are satisfactory to St. Francis. The Reorganized Debtors shall cure any defaults under such agreements, pursuant to 11 U.S.C. § 365, by paying such defaults in the ordinary course (or such defaults shall be cured by CMS' collection of any amount due via offset or recoupment in the ordinary course). Because any amount due shall be collected in the ordinary course, CMS shall not be required to file any separate claim in the bankruptcy to collect any amounts due to CMS under the Medicare program, whether via a proof of claim, claim for cure, or administrative claim. The terms of the Debtors' participation in the Medicare program are governed by the Medicare Act and federal law and shall not be modified by the terms of this Joint Plan or the

U.S. Bankruptcy Court - Hawaii   #08-01369   Dkt # 1118   Filed 03/12/10   Page 45 of 143

Confirmation Order, including but not limited to any language in this Joint Plan or the Confirmation Order granting security interests to other parties in the Debtors' healthcare accounts receivable, granting releases or imposing injunctions. Notwithstanding any other provision to this Joint Plan or the Confirmation Order, nothing in this Joint Plan or the Confirmation Order shall release (or operate to enjoin) any claim of the United States against any non-debtor, nor shall this Joint Plan or the Confirmation Order operate to release or enjoin any claim of the United States against the Debtors, except as provided expressly by the Bankruptcy Code.

### 5.     Treatment of Bank of Hawaii's Lease.

HMC and HMCW are parties to a certain Equipment Lease Agreement (the "BOH Lease") with Bank of Hawaii ("BOH"). The Reorganized Debtors shall assume the BOH Lease upon the Effective Date of this Plan.

### 6.     Treatment of Siemens Medical Leases.

The Siemens Leases and the Siemens Service Agreements shall be deemed assumed as of the Effective Date by the Reorganized Debtors. All cure payments required by section 365(b)(1) of the Bankruptcy Code (in an amount to be provided by Siemens Financial and Siemens Medical prior to the Confirmation Hearing) relating to the Siemens Leases and Siemens Service Agreements shall be paid on or prior to the Effective Date.

### 7.     Cure of Defaults in Connection with Assumption.

Any monetary amounts by which each executory contract and unexpired lease to be assumed or assumed and assigned pursuant to the Joint Plan is in default will be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, at the option of the pertinent Reorganized Debtor: (a) by payment of the default amount in Cash on the Effective Date or (b) on such other terms as are agreed to by the parties to such executory contract or unexpired lease. If there is a dispute regarding: (a) the amount of any cure payments; (b) the ability of the pertinent Reorganized Debtor to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the contract or lease to be assumed; or (c) any other matter pertaining to assumption, the cure payments required by section 365(b)(1) of the Bankruptcy Code will be made promptly following the entry of a Final Order resolving the dispute and approving the assumption.

U.S. Bankruptcy Court - Hawaii   #08-01369   Dkt # 1118   Filed  03/12/10   Page 46 of 143

### 8. Bar Date for Rejection Damages.

If the rejection of an executory contract or unexpired lease pursuant to the Joint Plan gives rise to a Claim by the other party or parties to such contract or lease, such Claim shall be forever barred and shall not be enforceable against the Reorganized Debtor, their successors or properties unless a proof of Claim is filed and served on the pertinent Reorganized Debtor and its counsel within 30 days after the Effective Date. Notice of the Bar Date for rejection damages shall be sent to all parties to such Contracts or Leases that were rejected. All such Claims for which proofs of Claim are required to be filed, if Allowed, will be, and will be treated as, Unsecured Claims (or Convenience Claims, if appropriate) subject to the provisions of the Joint Plan.

### 9. Bar Date for Bankruptcy Code § 365(n) Election.

If the rejection of an executory contract pursuant to the Joint Plan gives rise to the right by the other party or parties to such contract to make an election under § 365(n) of the Bankruptcy Code to either treat such contract as terminated or to retain its rights under such contract, such other party to such contract will be deemed to elect to treat such contract as terminated unless such other party files and serves a notice of its alternative election on the pertinent Reorganized Debtor and its counsel within 30 days after the Effective Date.

### 10. Licensing Requirements.

The Reorganized Debtors shall, as of the Effective Date, comply with all the proper state and federal regulatory requirements, including but not limited to, acquiring any certificates of need, licenses, permits, notices and approvals necessary to operate without restriction as healthcare facilities and to participate in Medicare, Medicaid, and any other government health benefit program in which the Debtors are currently participants under federal and Hawaii law.

### G. Distributions and Procedures For Resolving Disputed Claims

### 1. Reorganized Debtors to Serve As Disbursing Agent.

The Reorganized Debtors shall serve as the Disbursing Agents to hold and distribute Cash and such other property as may be distributed pursuant to the Joint Plan, provided however, that the Reorganized Debtors, in their sole and absolute discretion, may employ another Person, on such terms as may be determined by the Reorganized Debtors, to hold and distribute Cash and such other property as may be distributed pursuant to the Joint Plan. Even if the Disbursing Agent is a Person other than the Reorganized Debtors, the Disbursing Agent shall be an agent of the

U.S. Bankruptcy Court - Hawaii   #08-01369   Dkt # 1118   Filed  03/12/10   Page 47 of 143

Reorganized Debtors and not a separate taxable entity with respect to, for example, the assets held, income received or disbursements or distributions made for the Reorganized Debtors. The Reorganized Debtors shall not be required to post or otherwise provide a bond in connection with the making of any distributions pursuant to the Joint Plan.

## 2. Dates of Distributions.

The Sections of the Joint Plan on treatment of Administrative Expense Claims, Claims, and Interests specify the times for distributions. Whenever any payment or distribution to be made under the Joint Plan shall be due on a day other than a Business Day, such payment or distribution shall instead be made, without interest, on the immediately following Business Day. Distributions due on the Effective Date will be paid on such date or as soon as practicable thereafter, provided that if other provisions of the Joint Plan require the surrender of securities or establish other conditions precedent to receiving a distribution, the distribution may be delayed until such surrender occurs or conditions are satisfied. If, under the terms of the Joint Plan, the resolution of a particular Disputed Claim, (e.g., it is Disallowed), entitles other Holders of Claims or Interests to a further distribution, either (a) the Reorganized Debtor or the Disbursing Agent may make such further distribution as soon practicable after the resolution of the Disputed Claim or (b) if the further distribution is determined in good faith, by the Reorganized Debtor or the Disbursing Agent who is to make such distribution, to be less than $500 for any Creditor, then, in order to afford the Reorganized Debtor an opportunity to minimize costs and aggregate such distributions, the Reorganized Debtor or the Disbursing Agent may make such further distribution any time prior to sixty (60) days after the Final Resolution Date.

## 3. Cash Distributions.

Distributions of Cash may be made either by check drawn on a domestic bank or wire transfer from a domestic bank, at the option of the Reorganized Debtor, as applicable, except that Cash payments made to foreign Creditors may be made in such funds and by such means as are necessary or customary in a particular foreign jurisdiction.

## 4. De Minimis Distributions.

The Reorganized Debtor or Disbursing Agent shall not distribute Cash to the holder of an Allowed Claim in an impaired Class if the total aggregate amount of Cash to be distributed on account of such Claim is less than $25, unless the Reorganized Debtor or the Disbursing Agent determines within its sole discretion to make such distribution. Any holder of an Allowed Claim on account of which

U.S. Bankruptcy Court - Hawaii  #08-01369  Dkt # 1118  Filed  03/12/10  Page 48 of 143

the total aggregate amount of Cash to be distributed is less than $25 will have its claim for such distribution discharged and will be forever barred from asserting any such claim against the Debtor, the Reorganized Debtor or Disbursing Agent, or their respective property.

### 5. Disputed Claims.

Distributions of consideration due in respect of a Disputed Claim shall be held and not made pending resolution of the Disputed Claim.

After an objection to a Disputed Claim is withdrawn, resolved by agreement, or determined by Final Order, the distributions due on account of any resulting Allowed Claim, Allowed Interest or Allowed Administrative Expense Claim shall be made by the Reorganized Debtors or the Disbursing Agent. Such distribution shall be made at the time provided in the Joint Plan for the next scheduled distribution to the class or type of Claim, Interest or Administrative Expense of such Holder and, if there is no such further scheduled time, within forty-five (45) days of the date that the Disputed Claim becomes an Allowed Claim, Allowed Interest or Allowed Administrative Expense. No interest shall be due to a Holder of a Disputed Claim based on the delay attendant to determining the allowance of such Claim, Interest or Administrative Expense.

If the Claim or Interest of a Holder of a Claim or Interest is Disallowed (by example only, under 11 U.S.C. § 502(d)), the Claim or Interest of such Holder shall be cancelled, retired and of no further force and effect and such Holder shall be obligated to surrender any document, certificate or other matter evidencing such Claim or Interest. The Holders of any such cancelled instruments, securities and other documentation will have no rights arising from or relating to such instruments, securities or other documentation, or the cancellation thereof, except the rights provided pursuant to the Joint Plan.

### 6. Undeliverable and Unclaimed Distributions.

If any distribution under the Joint Plan is returned to the Reorganized Debtor or its agents as undeliverable or the check or other similar instrument or distribution by the Reorganized Debtor remains uncashed or unclaimed for one hundred eighty (180) days, such distribution shall be deemed to be "Unclaimed Property." Upon a distribution becoming Unclaimed Property, it immediately shall be revested in the Reorganized Debtor. Pending becoming Unclaimed Property, such distribution will remain in the possession of the Disbursing Agent and, if the Disbursing Agent is notified in writing of a new address for the Holder, it shall cause distribution of the Cash or New Notes, as appropriate, within 45 days thereafter. Once there becomes Unclaimed Property for a Holder, no subsequent

U.S. Bankruptcy Court - Hawaii   #08-01369   Dkt # 1118   Filed 03/12/10   Page 49 of 143

distributions for such Holder which may otherwise be due under the Joint Plan will accrue or be held for such Holder, provided that, if the Reorganized Debtor is notified in writing of such Holder's then-current address and status as a Holder under the Joint Plan, thereafter, the Holder will become entitled to its share of distributions, if any, which first become due after such notification.

### 7. Objections to Claims.

All objections to Claims must be Filed and served on the holders of such Claims by the Claims Objection Bar Date, and, if Filed prior to the Effective Date, such objections will be served on the parties on the then-applicable service list in the Reorganization Cases.  If an objection is required to be Filed and has not been Filed to a proof of Claim or a scheduled Claim by the Claims Objection Bar Date, the Claim to which the proof of Claim or scheduled Claim relates will be treated as an Allowed Claim if such Claim has not been allowed earlier.  An objection is deemed to have been timely Filed as to all Tort Claims, thus making each such Claim a Disputed Claim as of the Claims Objection Bar Date.  Each such Tort Claim will remain a Disputed Claim until it becomes an Allowed Claim.

### 8. Authority to Prosecute Objections.

After entry of the Confirmation Order, only the Reorganized Debtor will have the authority to file, settle, compromise, withdraw or litigate to judgment objections to Claims, including pursuant to any alternative dispute resolution or similar procedures approved by the Bankruptcy Court.

### 9. Setoff.

The Joint Plan provides that the Reorganized Debtors may, pursuant to section 553 of the Bankruptcy Code or applicable nonbankruptcy law, set off against any Allowed Claim, Interest or Administrative Expense Claim and the distributions to be made pursuant to the Joint Plan on account of such Claim, Interest or Administrative Expense Claim (before any distribution is made on account of such Claim, Interest or Administrative Expense Claim), the Rights of Action of any nature that the Debtor may hold against the Holder of such Allowed Claim, Interest or Administrative Expense Claim.  The Joint Plan further provides that neither the failure to set off nor the allowance of any Claim, Interest or Administrative Expense Claim hereunder will constitute a waiver or release by the Reorganized Debtor of any such Rights of Action that it may have against such Holder.

U.S. Bankruptcy Court - Hawaii   #08-01369   Dkt # 1118   Filed  03/12/10   Page 50 of 143

### 10.    Rights of Action.

The Joint Plan provides that in accordance with section 1123(b) of the Bankruptcy Code, the Reorganized Debtors, to the extent set forth below, and its successors, any assigns hereunder and future assigns will retain and may exclusively enforce any Rights of Action subject only to any <u>express</u> waiver or release thereof in the Joint Plan or in any other contract, instrument, release, indenture or other agreement entered into in connection with the Joint Plan, and the Confirmation Order's approval of the Joint Plan shall be deemed a *res judicata* determination of such rights to retain and exclusively enforce such Rights of Action.  Absent such express waiver or release, the Reorganized Debtors, or its successors or assigns may pursue Rights of Action, as appropriate, in accordance with the best interests of the Reorganized Debtor (or its successors or future assigns).  The Rights of Actions may be asserted or prosecuted before or after solicitation of votes on the Joint Plan or before or after the Effective Date.

The Joint Plan further provides that absent an express waiver or release as referenced above, nothing in the Joint Plan shall (or is intended to) prevent, estop or be deemed to preclude the Reorganized Debtors from utilizing, pursuing, prosecuting or otherwise acting upon all or any of their Rights of Action and, therefore, no preclusion doctrine, including, without limitation, the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable or otherwise) or laches shall apply to such Rights of Action upon or after Confirmation or Consummation.  *By example only and without limiting the foregoing, the utilization or assertion of a Right of Action or the initiation of any proceeding with respect thereto against a Person, by the Reorganized Debtor or any successor to or assign of it, shall not be barred (whether by estoppel, collateral estoppel, res judicata or otherwise) as a result of: (a) the solicitation of a vote on the Joint Plan from such Person or such Person's predecessor in interest; (b) the Claim, Interest or Administrative Expense Claim of such Person or such Person's predecessor in interest having been listed in the Debtors' Schedules, List of Holders of Interests, or in the Joint Plan, Disclosure Statement or any exhibit thereto; (c) prior objection to or allowance of a Claim, Interest or Administrative Expense Claim of the Person or such Person's predecessor in interest; or (d) Confirmation of the Joint Plan.*

Notwithstanding any allowance of a Claim or Administrative Expense Claim, the Reorganized Debtors reserve the right to seek, among other things, to have such Claim or Administrative Expense Claim disallowed if the Reorganized Debtors, at the appropriate time, determine that one or more of them has a defense under 11 U.S.C. § 502(d), *e.g.*, a Reorganized Debtor holds a Right of Action for an Avoidance claim against the Holder of such Claim or Administrative Expense

U.S. Bankruptcy Court - Hawaii   #08-01369   Dkt # 1118   Filed 03/12/10   Page 51 of 143

Claim and such Holder after demand refuses to pay the amount due in respect thereto. Such reservation shall remain subject to any limitation on application of 11 U.S.C. § 502(d) to Administrative Expense Claim under applicable law.

### H. Confirmation And Effectiveness Of The Joint Plan

#### 1. Conditions to Confirmation.

The Bankruptcy Court will not enter the Confirmation Order unless and until the following conditions have been satisfied or duly waived pursuant to Section 10.3 of the Joint Plan:

   a) The Confirmation Order will be reasonably acceptable in form and substance to the Joint Plan Proponents.

   b) All Exhibits to the Joint Plan are in form and substance reasonably satisfactory to the Joint Plan Proponents.

#### 2. Conditions to the Effective Date.

The Effective Date will not occur, and the Joint Plan will not be consummated, unless and until each of the following conditions have been satisfied or duly waived pursuant to Section 10.3 of the Joint Plan:

   a) The Confirmation Order has been entered, has not been reversed, stayed, modified or amended and has become a Final Order.

   b) The Confirmation Order shall authorize the Reorganized Debtor to take all actions necessary or appropriate to implement the Joint Plan, including consummation of the transactions contemplated by the Joint Plan, as well as the implementation and consummation of all contracts, instruments, releases and other agreements or documents generated in connection with the Joint Plan.

   c) The Joint Plan shall not have been amended, altered or modified from the Joint Plan as confirmed, in any material respect, unless such amendment, alteration or modification has been consented to in accordance with Section 15.1 of the Joint Plan, and all Exhibits to the Joint Plan remain in form and substance reasonably satisfactory to the Joint Plan Proponents.

   d) The Effective Date has occurred by June 30, 2010.

### 3. Waiver of Conditions to the Confirmation or Effective Date.

The conditions to Confirmation and the conditions to the Effective Date may be waived, in writing, in whole or in part by the Joint Plan Proponents at any time without an order of the Bankruptcy Court.

### 4. Cramdown.

The Joint Plan Proponents request Confirmation under section 1129(b) of the Bankruptcy Code with respect to any impaired Class, other than Class 3, that does not accept the Joint Plan pursuant to section 1126 of the Bankruptcy Code. The Joint Plan Proponents reserve the right to modify the Joint Plan to the extent, if any, that Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification.

### 5. Binding Effect of Confirmation.

Confirmation will bind the Debtor, all Holders of Claims, Administrative Expense Claims or Interests and other parties in interest to the provisions of the Joint Plan whether or not the Claim, Administrative Expense Claim or Interest of such Holder is Impaired under the Joint Plan and whether or not the Holder of such Claim, Administrative Expense Claim or Interest has accepted the Joint Plan.

### 6. Good Faith.

Confirmation of the Joint Plan shall constitute a finding that: (i) this Plan has been proposed in good faith and in compliance with applicable provisions of the Bankruptcy Code; and (ii) all Persons' solicitations of acceptances or rejections of this Plan and the offer, issuance, sale, or purchase of a security offered or sold under the Joint Plan have been in good faith and in compliance with applicable provisions of the Bankruptcy Code.

### 7. No Limitations on Effect of Confirmation.

Nothing contained in the Joint Plan will limit the effect of Confirmation as described in section 1141 of the Bankruptcy Code.

### 8. Discharge of Claims, Administrative Expenses and Interests.

Except as provided in the Joint Plan or Confirmation Order, the rights afforded hereunder and the treatment of Claims, Administrative Expense Claims and Interests thereunder will be in exchange for and in complete satisfaction, discharge and release of all Claims and Administrative Expense Claims and

U.S. Bankruptcy Court - Hawaii   #08-01369   Dkt # 1118   Filed 03/12/10   Page 53 of 143

termination of all Interests, including any interest accrued on Claims from the Petition Date.  Except as provided in the Joint Plan or the Confirmation Order, Confirmation will: (i) discharge the Debtors and Reorganized Debtors from all Claims, Administrative Expense Claims or other debts that arose before the Confirmation Date and all debts of the kind specified in sections 502(g), 502(h) or 502(i) of the Bankruptcy Code, whether or not (a) a proof of Claim based on such debt is filed or deemed filed pursuant to section 501 of the Bankruptcy Code, (b) a Claim based on such debt is allowed pursuant to section 502 of the Bankruptcy Code or (c) the Holder of a Claim or Administrative Expense Claim based on such debt has accepted the Joint Plan; and (ii) terminate all Interests and other rights of Interest Holders in the Debtor.  As of the Confirmation Date, except as provided in the Joint Plan or the Confirmation Order, all Entities shall be precluded from asserting against the Debtor, the Reorganized Debtor, their successors or their property, any other or further claims, debts, rights, causes of action, liabilities or equity interests based upon any act, omission, transaction or other activity of any nature that occurred prior to the Confirmation Date.  For greater certainty, no guarantee executed by any person other than a Debtor shall be discharged or otherwise affected by this Joint Plan or by the Confirmation Order.  All such guarantees shall remain in full force and effect.

### 9.  Judicial Determination of Discharge.

As of the Confirmation Date, except as provided in the Joint Plan, all Persons shall be precluded from asserting against the Debtors and the Reorganized Debtors any other or further Claims, Administrative Expense Claims, Interests, debts, rights, causes of action, liabilities, or equity interests based on any act, omission, transaction or other activity of any kind or nature that occurred before the Confirmation Date.  In accordance with the foregoing, except as provided in the Joint Plan or in the Confirmation Order, the Confirmation Order will be a judicial determination of discharge of all such Claims, Administrative Expense Claims and other debts and liabilities against the Debtor and termination of all such Interests and other rights of Interest Holders in the Debtor, pursuant to sections 524 and 1141 of the Bankruptcy Code, and such discharges shall void any judgment obtained against the Debtor at any time, to the extent that such judgment relates to a discharged liability, Claim, or Administrative Expense Claim or terminated Interest.

### 10.  Injunctions.

Except as provided in the Joint Plan or the Confirmation Order, as of the Effective Date, all Entities that have held, currently hold or may hold a Claim or other debt or liability that is satisfied or released, as applicable, or an Interest or

U.S. Bankruptcy Court - Hawaii   #08-01369   Dkt # 1118   Filed  03/12/10   Page 54 of 143

other right of an equity security holder that is terminated pursuant to the terms of the Joint Plan will be permanently enjoined from taking any of the following actions on account of any such discharged or satisfied Claims, debts or liabilities or terminated Interests or rights: (a) commencing or continuing in any manner any action or other proceeding against the Debtors, Estates, the Reorganized Debtors or their respective property, other than to enforce any right pursuant to the Joint Plan to a distribution; (b) enforcing, attaching, collecting or recovering in any manner any judgment, award, decree or order against the Debtors, the Reorganized Debtors or their respective property, other than as permitted pursuant to (a) above; (c) creating, perfecting or enforcing any lien or encumbrance against the Debtors, Estates, the Reorganized Debtors or their respective property; (d) asserting a setoff, right of subrogation or recoupment of any kind against any debt, liability or obligation due to the Debtors, Estates, or the Reorganized Debtors; and (e) commencing or continuing any action, in any manner, in any place that does not comply with or is inconsistent with the provisions of the Joint Plan.

As of the Effective Date, all Entities that have held, currently hold or may hold any claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action or liabilities that are released pursuant to the Joint Plan will be permanently enjoined from taking any of the following actions against any released Entity or its property on account of such released claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action or liabilities: (a) commencing or continuing in any manner any action or other proceeding; (b) enforcing, attaching, collecting or recovering in any manner any judgment, award, decree or order; (c) creating, perfecting or enforcing any Lien; (d) asserting a setoff, right of subrogation or recoupment of any kind against any debt, liability or obligation due to any released Entity; and (e) commencing or continuing any action, in any manner, in any place that does not comply with or is inconsistent with the provisions of the Joint Plan.

By accepting any distributions pursuant to the Joint Plan, each Holder of an Allowed Claim or interest receiving distributions pursuant to the Joint Plan will be deemed to have specifically consented to the injunctions set forth in Section 13.6 of the Joint Plan.

## 11.    Exculpation and Limitation of Liabilities.

To the maximum extent permitted by law, none of the Joint Plan Proponents, nor any of their employees, officers, directors, agents, members, representatives, or the professionals employed or retained by any of them, whether or not by Bankruptcy Court order (each, an "Exculpated Person"), shall have or incur liability to any Person for an act taken or omission made in good faith in

U.S. Bankruptcy Court - Hawaii   #08-01369   Dkt # 1118   Filed 03/12/10   Page 55 of 143

connection with or related to the formulation of the Joint Plan, the Joint Disclosure Statement, or a contract, instrument, release, or other agreement or document created in connection therewith, the solicitation of acceptances for or confirmation of the Joint Plan, or the consummation and implementation of the Joint Plan and the transactions contemplated therein. Each Exculpated Person shall in all respects be entitled to reasonably rely on the advice of counsel with respect to its duties and responsibilities under the Joint Plan. Entry of the Confirmation Order constitutes a judicial determination that the exculpation provision contained in this Section is necessary to, *inter alia*, facilitate Confirmation and feasibility and to minimize potential claims arising after the Effective Date for indemnity, reimbursement or contribution from the Reorganized Debtor. The Confirmation Order's approval of the Joint Plan also constitutes a *res judicata* determination of the matters included in the exculpation provisions of the Joint Plan.

## 12. Compromise And Release Of Claims Against St. Francis.

The Joint Plan shall constitute a settlement and compromise of all Recovery Actions, Rights of Action, and Claims that the Debtors, the Estates, and the Reorganized Debtors may have against St. Francis, and the Debtors, Reorganized Debtors, and the Estates shall forever release, waive, and discharge any such Recovery Actions and Rights of Action against St. Francis, whether known or unknown, foreseen, or unforeseen, then existing or hereafter arising, in law, equity or otherwise. This settlement, compromise, release, and waiver includes, without limitation, the Debtors' allegations that St. Francis' liens and claims could be subject to reduction or avoidance under section 548(a) of the Bankruptcy Code or similar provision under Hawaii law, as fraudulent transfers. St. Francis believes that such claims have no merit.

## 13. Creditors Committee.

The Creditors Committee shall be terminated on the Effective Date; provided, however, that following the termination of the Creditors Committee, the professionals of the Creditors Committee may prepare their respective Fee Applications.

U.S. Bankruptcy Court - Hawaii   #08-01369   Dkt # 1118   Filed 03/12/10   Page 56 of 143

# V. RISK FACTORS TO BE CONSIDERED

*Holders of Claims against the Debtors should read and consider carefully the information set forth below, as well as the other information set forth in this Disclosure Statement (and the documents delivered together herewith and/or incorporated by reference), prior to voting to accept or reject the Joint Plan. This information, however, should not be regarded as the only risks involved in connection with the Joint Plan and/or its implementation.*

## A. Failure to Satisfy Vote Requirement

If St. Francis obtains the requisite votes to accept the Joint Plan in accordance with the requirements of the Bankruptcy Code, St. Francis intends, as promptly as practicable thereafter, to seek confirmation of the Joint Plan. In the event that sufficient votes are not received, St. Francis may be forced to pursue an alternative restructuring.

Pursuant to section 1126(c) of the Bankruptcy Code, Classes 3, 7 and 8 will be determined to have accepted the Joint Plan if at least two-thirds in amount and more than one-half in number of Allowed Claims in Classes 3, 7 and 8 (that actually vote) vote in favor of the Joint Plan. If such thresholds are not met, St. Francis may not be able to confirm the Joint Plan as it is currently structured.

## B. Non-Confirmation or Delay of Confirmation of the Joint Plan

Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation and requires, among other things, that the confirmation of the Joint Plan not be followed by a need for further financial reorganization and that the value of distributions to dissenting creditors and shareholders not be less than the value of distributions such creditors and shareholders would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code. Although St. Francis believes that the Joint Plan will meet such tests, there can be no assurance that the Bankruptcy Court would reach the same conclusion.

## C. Non-Consensual Confirmation

In the event any impaired Class of Claims does not accept a plan, a bankruptcy court may nevertheless confirm such plan at the proponent's request if at least one impaired class of claims has accepted the Joint Plan (with such acceptances being determined without including the vote of any "insider" in such class), and, as to each impaired class that has not accepted the Joint Plan, the bankruptcy court determines that the Joint Plan of reorganization "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting

U.S. Bankruptcy Court - Hawaii   #08-01369   Dkt # 1118   Filed 03/12/10   Page 57 of 143

impaired classes. St. Francis believes that the Joint Plan satisfies these requirements for Classes 7, 8, and 9.

### D. Risk of Non-Occurrence of the Effective Date.

Although St. Francis believes that the Effective Date will occur reasonably soon after the Confirmation Date, there can be no assurance as to such timing or as to whether the Effective Date will occur at all.

### E. Failure to Obtain Working Capital Facility.

St. Francis believes that it may be advantageous to have the Working Capital Facility to provide additional liquidity after the Effective Date for the Reorganized Debtors. St. Francis believes that such a Working Capital Facility should become available to the Reorganized Debtors, however, there can be no assurances that the Reorganized Debtors will obtain such Working Capital Facility.

### F. Classification and Treatment of Claims and Interests.

Section 1122 of the Bankruptcy Code requires that the Joint Plan classify Claims against, and Interests in, the Debtors. The Bankruptcy Code also provides that the Joint Plan may place a Claim or Interest in a particular Class only if such Claim or Interest is substantially similar to the other Claims or Interests of such Class. St. Francis believes that all Claims and Interests have been appropriately classified in the Joint Plan.

To the extent that the Bankruptcy Court finds that a different classification is required for the Joint Plan to be confirmed, St. Francis presently anticipates that it would seek (i) to modify the Joint Plan to provide for whatever classification might be required for confirmation and (ii) to use the acceptances received from any creditor pursuant to this solicitation for the purpose of obtaining the approval of the Class or Classes of which such creditor ultimately is deemed to be a member. Any such reclassification of creditors, although subject to the notice and hearing requirements of the Bankruptcy Code, could adversely affect the Class in which such creditor was initially a member, or any other Class under the Joint Plan, by changing the composition of such Class and the vote required for approval of the Joint Plan. There can be no assurance that the Bankruptcy Court, after finding that a classification was inappropriate and requiring a reclassification, would approve the Joint Plan based upon such reclassification. Except to the extent that modification of classification in the Joint Plan requires re-solicitation, St. Francis will, in accordance with the Bankruptcy Code and the Bankruptcy Rules, seek a determination by the Bankruptcy Court that acceptance of the Joint Plan of any Holder of Claims pursuant to this solicitation will constitute a consent to the Joint

U.S. Bankruptcy Court - Hawaii   #08-01369   Dkt # 1118   Filed  03/12/10   Page 58 of 143

Plan's treatment of such Holder regardless of the Class as to which such Holder is ultimately deemed to be a member. St. Francis believes that under the Federal Rules of Bankruptcy Procedure St. Francis would be required to re-solicit votes for or against the Joint Plan only when a modification adversely affects the treatment of the claim of any creditor or equity holder. The Bankruptcy Code also requires that the Joint Plan provide the same treatment for each Claim or Interest of a particular Class unless the Holder of a particular Claim or Interest agrees to a less favorable treatment of its Claim or Interest. St. Francis believes that it has complied with the requirement of equal treatment. To the extent that the Bankruptcy Court finds that the Joint Plan does not satisfy such requirement, the Bankruptcy Court could deny confirmation of the Joint Plan.

Issues or disputes relating to classification and/or treatment could result in a delay in the confirmation and consummation of the Joint Plan and could increase the risk that the Joint Plan will not be consummated.

### G. Increased Competition on the Island of Oahu for Patient Care Services

It has become increasingly difficult to compete against other, financially strong competitors on the island of Oahu. The healthcare industry in Hawaii has seen the entry of several significant changes during recent years. The level of competition on the island remains formidable.

U.S. Bankruptcy Court - Hawaii   #08-01369   Dkt # 1118   Filed 03/12/10   Page 59 of 143

# VI.    CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE JOINT PLAN

The discussion below summarizes certain anticipated U.S. Federal income tax consequences of the Joint Plan to the Debtors and certain Holders of Claims or Interests.  This summary is provided for information purposes only and is based on the Internal Revenue Code of 1986, as amended (the "Code"), Treasury regulations promulgated thereunder, judicial authorities, and current administrative rulings and practice, all as in effect as of the date hereof and all of which are subject to change, possibly with retroactive effect, that could adversely affect the U.S. Federal income tax consequences described below.

This summary does not address all aspects of U.S. Federal income taxation that may be relevant to a particular Holder of a Claim or Interest in light of its particular facts and circumstances or to certain types of Holders of Claims or Interests subject to special treatment under the Code (for example, non-U.S. taxpayers, financial institutions, broker-dealers, life insurance companies, tax exempt organizations, real estate investment trusts, regulated investment companies, grantor trusts, persons holding a Claim as part of a "hedging," "integrated," or "constructive" sale or straddle transaction, persons holding claims through a partnership or other pass-through entity, persons that have a "functional currency" other than the U.S. dollar, and persons who have acquired an Interest in HMC or a security in any Debtor in connection with the performance of services).

This summary does not address the tax considerations applicable to Holders who obtained their Claims or Interests (or the rights underlying such Claims or Interests) in connection with the performance of services.  In addition, this summary does not discuss any aspects of state, local, or non-U.S. taxation, nor does this summary address the U.S. Federal income tax consequences to Holders of Claims that are unimpaired under the Joint Plan and Holders of Claims that are not entitled to receive or retain any property under the Joint Plan.

A substantial amount of time may elapse between the date of this Disclosure Statement and the receipt of a final distribution or transfer under the Joint Plan. Events occurring after the date of this Disclosure Statement, such as additional tax legislation, court decisions, or administrative changes, could affect the U.S. Federal income tax consequences of the Joint Plan and the transactions contemplated thereby.  There can be no assurance that the Internal Revenue Service (the "IRS") will not take a contrary view with respect to one or more of the issues discussed below.  No ruling will be sought from the IRS with respect to any of the tax aspects of the Joint Plan, and no opinion of counsel has been or will be obtained by St. Francis with respect thereto.

U.S. Bankruptcy Court - Hawaii   #08-01369   Dkt # 1118   Filed 03/12/10   Page 60 of 143

TO ENSURE COMPLIANCE WITH TREASURY DEPARTMENT CIRCULAR 230, EACH HOLDER IS HEREBY NOTIFIED THAT: (A) ANY DISCUSSION OF U.S. FEDERAL TAX ISSUES IN THIS DISCLOSURE STATEMENT IS NOT INTENDED OR WRITTEN TO BE RELIED UPON, AND CANNOT BE RELIED UPON, BY ANY HOLDER FOR THE PURPOSE OF AVOIDING PENALTIES THAT MAY BE IMPOSED ON A HOLDER UNDER THE CODE; (B) SUCH DISCUSSION IS INCLUDED HEREBY BY ST. FRANCIS IN CONNECTION WITH THE PROMOTION OR MARKETING (WITHIN THE MEANING OF CIRCULAR 230) BY ST. FRANCIS OF THE TRANSACTIONS OR MATTERS ADDRESSED HEREIN; AND (C) EACH HOLDER SHOULD SEEK ADVICE BASED ON ITS PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.

### A.    U.S. Federal Income Tax Consequences to the Debtors and Holders of Interests

Each of the Debtors is a limited liability company ("LLC") taxed as a pass-through entity for U.S. federal income tax purposes.  Because HMC is the sole member (owner) of both HMCE and HMCW, HMCE and HMCW will for U.S. federal tax purposes be disregarded as entities separate from HMC, and any transfer of assets or liabilities by, or any discharge of the liabilities of, HMCE or HMCW will be treated as a transfer or discharge by HMC.  Accordingly, the discussion below as to HMC, HMCW and HMCE addresses only the U.S. Federal income tax consequences of the Joint Plan to HMC.  Since HMC is taxed as a partnership, the income consequences described below will be passed through to the Holders of Interests in HMC in the method described in HMC's operating agreement and in accordance with the Code and the regulations thereunder.  If any direct or indirect owner of HMC is itself a pass-through entity such as a partnership, LLC or S corporation, the income will again be passed through to the owners of that direct or indirect owner, and so on until income is allocated to an individual or to an entity that is not a pass-through for tax purposes.

### 1.    Tax Consequences to Reorganized HMC, HMCW, and HMCE.

Because HMCW and HMCE are disregarded entities that are owned by HMC, and because HMC is a partnership for U.S. federal income tax purposes, none of the Debtors would be required to pay tax on any income or gain recognized by HMCE, HMCW, or HMC.  Rather, any income, gain, or loss recognized on the transfer of assets to the Reorganized Debtors will be passed through to the Holders of Interests, and potentially to the direct or indirect owners of the Holders of Interests, as described in the immediately preceding paragraph.

U.S. Bankruptcy Court - Hawaii   #08-01369   Dkt # 1118   Filed  03/12/10   Page 61 of 143

## 2. Tax Consequences to Holders of Interests.

As noted above, the income consequences of the Joint Plan will be passed through to the Holders of Interests in a manner set forth on HMC's operating agreement and in accordance with the Code and regulations. Such Holders of Interests or their direct and indirect owners that are not pass-through entities for U.S. federal income tax purposes may be required to recognize income or gain as a result of the Joint Plan, and should consult their own tax advisors regarding the tax consequences of the Joint Plan. Because Interests shall be deemed cancelled and extinguished under the Joint Plan, Holders of Interests or their direct or indirect owners may recognize loss as a result of the Joint Plan. Such loss may be of a different character for U.S. federal income tax purposes than any income recognized by such Holders of Interests or their direct or indirect owners. Holders of Interests and their direct and indirect owners should consult their own tax advisors regarding the tax consequences of the Joint Plan.

## B. U.S. Federal Income Tax Consequences to Holders of Claims

The U.S. Federal income tax consequences to Holders of Claims arising from the distributions to be made in satisfaction of their Claims pursuant to the Joint Plan may vary, depending upon, among other things: (a) the type of consideration received by the Holder of a Claim in exchange for the Claim; (b) the nature of the indebtedness owed to it; (c) whether the Holder has previously claimed a bad debt or worthless security deduction in respect of its Claim against the corporation; (d) whether such Claim constitutes a security; (e) whether the Holder of a Claim is a citizen or resident of the United States for tax purposes, or otherwise subject to U.S. Federal income tax on a net income basis; (f) whether the Holder of a Claim reports income on the accrual or cash basis; and (g) whether the Holder of a Claim receives distributions under the Joint Plan in more than one taxable year. For tax purposes, the modification of a Claim may represent an exchange of the Claim for a new Claim, even though no actual transfer takes place. In addition, where gain or loss is recognized by a Holder of a Claim, the character of such gain or loss as long-term or short-term capital gain or loss or as ordinary income or loss will be determined by a number of factors, including the tax status of the Holder, whether the Claim constitutes a capital asset in the hands of the Holder and how long the Claim has been held or is treated as having been held, whether the Claim was acquired at a market discount, and whether and to what extent the Holder previously claimed a bad debt or worthless stock or securities deduction with respect to the underlying Claim. A Holder who purchased its Claim from a prior holder at a discount to its face amount may be subject to the market discount rules of the Code. Under those rules, assuming that the Holder has made no election to amortize the market discount into income on a current

basis with respect to any market discount instrument, any gain recognized on the exchange of its Claim (subject to a *de minimis* rule) generally would be characterized as ordinary income to the extent of the accrued market discount on such Claim as of the date of the exchange.

## 1.    General Treatment of Holders of Claims

Pursuant to the Joint Plan, the Debtors will transfer assets of the Debtors, either directly or indirectly, to holders of Allowed Claims in satisfaction and discharge of such Claims.  Holders of such Claims will likely recognize gain or loss equal to the amount realized under the Joint Plan in respect of their Claims less their respective tax bases in their Claims.  The amount realized for this purpose will generally equal the sum of the cash and the fair market value of any other consideration received under the Joint Plan in respect of their Claims. Any gain or loss recognized in the exchange will be capital or ordinary depending on the status of the Claim in the Holder's hands.

To the extent that cash received or deemed received by a Holder of a Claim is attributable to accrued interest on the Claim, the cash will be deemed made in payment of such interest.  The federal income tax laws are unclear on how much consideration will be deemed attributable to accrued interest when partial payments are made on a debt on which both principal and interest are owed.  To the extent that the Holder of a Claim has not yet included the accrued interest in gross income, the cash deemed received in payment of such interest will generally be included in the Holder's gross income for federal income tax purposes.  To the extent the Holder has previously included accrued interest on the Claim in gross income, the cash deemed received in payment of such interest generally will not be included in gross income.  The Holder of an Allowed Claim may be able to claim a deductible loss if the cash deemed received for the accrued interest is less than the amount the Holder had previously included in gross income.

## 2.    Bad Debt Deduction

The Holder of an Allowed Claim who under the Joint Plan will receive in respect of a Claim an amount less than the Holder's tax basis in such Claim may be entitled to a bad debt deduction under section 166(a) of the Code.  The rules regarding the ability of a taxpayer, who believes that a debt owed to it will not be collected in full to take a deduction related to such debt's partial or total worthlessness are very complex.  Moreover, the application and impact of such rules vary greatly depending upon a taxpayer's individual circumstances, including the facts and circumstances of the holder, the obligor, and the instrument with

respect to which a deduction is claimed. Holders of Claims are therefore urged to consult their tax advisors with respect to the allowability of such a deduction.

### 3. Information Reporting and Backup Withholding

Certain payments, including the payments with respect to Claims pursuant to the Joint Plan, may be subject to information reporting to the IRS. Moreover, under certain circumstances, Holders of Claims may be subject to "backup withholding" with respect to payments made pursuant to the Joint Plan, unless such Holder either (i) comes within certain exempt categories (which generally include corporations) and, when required, demonstrates this fact, or (ii) provides a correct United States taxpayer identification number and certifies under penalty of perjury that the Holder is a United States person, the taxpayer identification number is correct and the taxpayer is not subject to backup withholding because of a failure to report all dividend and interest income.

Backup withholding is not an additional tax. Amounts withheld under the backup withholding rules may be credited against a Holder of a Claim's U.S. Federal income tax liability, and such Holder may obtain a refund of any excess amounts withheld under the backup withholding rules by filing an appropriate claim for refund with the IRS (generally, a U.S. Federal income tax return).

In addition, Treasury regulations generally require disclosure by a taxpayer on its U.S. Federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer claiming a loss in excess of specified thresholds. Each Holder of a Claim is strongly urged to consult its tax advisor regarding these regulations and whether the transactions contemplated by the Joint Plan would be subject to these regulations and require disclosure on such taxpayer's tax returns.

### 4. Importance of Obtaining Professional Tax Assistance

THE FOREGOING DISCUSSION IS INTENDED ONLY AS A SUMMARY OF CERTAIN POTENTIAL TAX CONSEQUENCES OF THE JOINT PLAN AND IS NOT A SUBSTITUTE FOR INDIVIDUALLY TAILORED TAX ADVICE FROM A COMPETENT TAX ADVISOR. THE ABOVE DISCUSSION IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT TAX ADVICE.

THE TAX CONSEQUENCES OF THE JOINT PLAN ARE IN MANY CASES COMPLEX, UNCLEAR AND UNCERTAIN AND MAY VARY DEPENDING ON A NUMBER OF DIFFERENT FACTORS, INCLUDING A CLAIMHOLDER'S PARTICULAR CIRCUMSTANCES. ACCORDINGLY,

CLAIMHOLDERS ARE URGED TO CONSULT THEIR TAX ADVISORS ABOUT THE FEDERAL, STATE AND LOCAL, AND APPLICABLE FOREIGN INCOME AND OTHER TAX CONSEQUENCES OF THE JOINT PLAN.

U.S. Bankruptcy Court - Hawaii   #08-01369   Dkt # 1118   Filed  03/12/10   Page 65 of 143

## VII. FEASIBILITY OF THE JOINT PLAN AND BEST INTEREST OF CREDITORS

### A. Feasibility of the Joint Plan

The Bankruptcy Code requires that the Bankruptcy Court determine that confirmation of a Plan is not likely to be followed by liquidation or the need for further financial reorganization of the Debtors. For purposes of showing that the Joint Plan meets this feasibility standard, St. Francis has analyzed the ability of the Reorganized Debtors to meet their obligations under the Joint Plan and retain sufficient liquidity and capital resources to conduct their business. At the Confirmation Hearing, St. Francis will be prepared to demonstrate that the Joint Plan is feasible.

To support the belief in the feasibility of the Joint Plan, St. Francis has relied upon pro forma financial forecasts for the ten year period after the Effective Date (the "Financial Forecasts"), which are set forth in Appendix E of this Disclosure Statement. The Financial Forecasts indicate that the Reorganized Debtors should have sufficient cash flow to pay and service debt obligations and to fund their operations. Accordingly, St. Francis believes that the Joint Plan complies with the financial feasibility standard of section 1129(a)(11) of the Bankruptcy Code.

The Financial Forecasts were not prepared with a view toward compliance with the published guidelines of the American Institute of Certified Public Accountants or any other regulatory or professional agency or body or generally accepted accounting principles. Furthermore, St. Francis's financial advisors have not compiled or examined the Financial Forecasts in accordance with AICPA standards relating to prospective financial information and accordingly do not express any opinion or any other form of assurance with respect thereto and assume no responsibility for the Financial Forecasts.

The Financial Forecasts assume that (i) the Joint Plan will be confirmed and consummated in accordance with its terms, (ii) there will be no material change in legislation or regulations, or the administration thereof, including environmental legislation or regulations, that will have an unexpected effect on the operations of the Reorganized Debtors, (iii) there will be no change in the United States regarding generally accepted accounting principles that will have a material effect on the reported financial results of the Reorganized Debtors, and (iv) there will be no material contingent or unliquidated litigation or indemnity claims applicable to the Reorganized Debtors. To the extent that the assumptions inherent in the Financial Forecasts are based upon future business decisions and objectives, they are subject to change. In addition, although they are presented with numerical

U.S. Bankruptcy Court - Hawaii   #08-01369   Dkt # 1118   Filed 03/12/10   Page 66 of 143

specificity and considered reasonable by St. Francis when taken as a whole, the assumptions and estimates underlying the Financial Forecasts are subject to significant business, economic and competitive uncertainties and contingencies, many of which will be beyond the control of the Reorganized Debtors. Accordingly, the Financial Forecasts are only estimates that are necessarily speculative in nature. It can be expected that some or all of the assumptions in the Financial Forecasts will not be realized and that actual results will vary from the Financial Forecasts, which variation may be material. The Financial Forecasts should therefore not be regarded as a representation by St. Francis or any other person that the results set forth in the Financial Forecasts will be achieved. In light of the foregoing, readers are cautioned not to place undue reliance on the Financial Forecasts. The Financial Forecasts should be read together with the information in Article V of this Disclosure Statement entitled "Risk Factors to Be Considered," which sets forth important factors that could cause actual results to differ from those in the Financial Forecasts.

St. Francis does not intend to update or otherwise revise the Financial Forecasts, including any revisions to reflect events or circumstances existing or arising after the date of this Disclosure Statement or to reflect the occurrence of unanticipated events, even if any or all of the underlying assumptions do not come to fruition. Furthermore, St. Francis does not intend to update or revise the Financial Forecasts to reflect changes in general economic or industry conditions.

## B.  Acceptance of the Joint Plan

As a condition to confirmation, the Bankruptcy Code requires that each Class of Impaired Claims vote to accept the Joint Plan, except under certain circumstances. Section 1126I of the Bankruptcy Code defines acceptance of a plan by a class of impaired claims as acceptance by holders of at least two thirds (2/3) in dollar amount and more than one half (1/2) in number of claims in that class, but for that purpose counts only those who actually vote to accept or to reject the Joint Plan. For example, Class 7 General Unsecured Creditors votes to accept the Joint Plan only if two thirds (2/3) in amount and a majority in number actually voting in such Class cast their Ballots in favor of acceptance. Holders of Claims who fail to vote are not counted as either accepting or rejecting a plan.

## C.  Best Interests Test

Even if a plan is accepted by the holders of each class of claims and interests, the Bankruptcy Code requires a Bankruptcy Court to determine that the Joint Plan is in the best interests of all holders of claims or interests that are impaired by the Joint Plan and that have not accepted the Joint Plan. The "best

U.S. Bankruptcy Court - Hawaii   #08-01369   Dkt # 1118   Filed  03/12/10   Page 67 of 143

interests" test, as set forth in section 1129(a)(7) of the Bankruptcy Code, requires a Bankruptcy Court to find either that all members of an impaired class of claims or interests have accepted the Joint Plan or that the Joint Plan will provide a member who has not accepted the Joint Plan with a recovery of property of a value, as of the Effective Date of the Joint Plan, that is not less than the amount that such holder would recover if the debtor were liquidated under chapter 7 of the Bankruptcy Code.

To calculate the probable distribution to holders of each impaired class of claims and interests if the Debtors were liquidated under chapter 7 under the Bankruptcy Code, a bankruptcy court must first determine the aggregate dollar amount that would be generated from such Debtors' assets if their chapter 11 cases were converted to chapter 7 cases. This "liquidation value" would consist primarily of the proceeds from a forced sale of the debtors' assets by a chapter 7 trustee. If a liquidation were to occur in these cases, the costs and expenses associated with a liquidation and the claims of the Siemens Financial and St. Francis would erode any liquidation value available to unsecured creditors. More specifically, costs of liquidation under chapter 7 of the Bankruptcy Code would include the compensation of a trustee, as well as of counsel and other professionals retained by the trustee, asset disposition expenses, and claims arising from any operations of the Debtors during the chapter 7 cases. In addition, there may be unpaid expenses incurred in the Chapter 11 Cases (such as compensation of attorneys, financial advisors and accountants and claims arising from the operations of the Debtors during the Chapter 11 Cases). The liquidation might also prompt the rejection of a large number of executory contracts and unexpired leases and thereby significantly enlarge the total pool of unsecured claims by reason of resulting rejection claims. Once the court ascertains the recoveries in liquidation of secured creditors and priority claimants, it must determine the probable distribution to general unsecured creditors and equity security holders from the remaining available proceeds in liquidation. If such probable distribution has a value greater than the distributions to be received by such creditors and equity security holders under the Joint Plan, then the Joint Plan is not in the best interests of creditors and equity security holders.

D.    **Liquidation Analysis**

In order to determine the amount of liquidation value available to creditors, St. Francis has prepared a liquidation analysis that provides an estimate of the proceeds that may be generated as a result of a hypothetical chapter 7 liquidation of the Debtors (the "Liquidation Analysis") attached hereto as Appendix F. For the purposes of this Liquidation Analysis only, St. Francis has used the asset recovery values contained in the liquidation analyses prepared by the Company in

U.S. Bankruptcy Court - Hawaii   #08-01369   Dkt # 1118   Filed  03/12/10   Page 68 of 143

support of the Company's Second Plan and the Committee in support of the Committee Plan. St. Francis believes that asset recovery values could in fact be lower. If lower asset recovery values were included in the Liquidation Analysis, as St. Francis believes is possible, then General Unsecured Creditors would receive less than the amounts reflected in the attached Liquidation Analysis. In addition, it is possible that certain of the assumptions in the Liquidation Analysis would not be realized in an actual liquidation.

Notwithstanding the foregoing, St. Francis believes that any liquidation analysis with respect to the Debtors' assets is inherently speculative. The liquidation analysis for the Debtors necessarily contains estimates of the net proceeds that would be received from a forced sale of assets and/or business units, as well as the amount of Claims that will ultimately become Allowed Claims. The estimate of the amount of Allowed Claims set forth in the liquidation analysis should not be relied on for any other purpose, including, without limitation, any determination of the value of any distribution to be made on account of Allowed Claims under the Joint Plan.

The Liquidation Analysis demonstrates that, in an orderly liquidation, General Unsecured Creditors would receive less than what they would receive under the Joint Plan.

### E. Application of the 'Best Interests' of Creditors Test to the Liquidation Analysis

St. Francis believes that the "best interests" test of section 1129 of the Bankruptcy Code is satisfied because St. Francis believes that the members of each Impaired Class will receive greater or equal value under the Joint Plan than they would receive in a liquidation. Although St. Francis believes that the Joint Plan meets the "best interests test" of section 1129(a)(7) of the Bankruptcy Code, there can be no assurance that the Bankruptcy Court will determine that the Joint Plan meets this test.

### F. Confirmation Without Acceptance of All Impaired Classes: The "Cramdown" Alternative

In view of a potential rejection by certain holders of Claims, St. Francis may have to seek confirmation of the Joint Plan pursuant to the "cramdown" provisions of the Bankruptcy Code. Specifically, section 1129(b) of the Bankruptcy Code provides that a plan can be confirmed even if the Joint Plan is not accepted by all Impaired classes, as long as at least one impaired class of claims has accepted it. The Bankruptcy Court may confirm a plan at the request of the debtors if the Joint Plan "does not discriminate unfairly" and is "fair and equitable" as to each

U.S. Bankruptcy Court - Hawaii #08-01369 Dkt # 1118 Filed 03/12/10 Page 69 of 143

impaired class that has not accepted the Joint Plan. A plan does not discriminate unfairly within the meaning of the Bankruptcy Code if a dissenting class is treated equally with respect to other classes of equal rank. St. Francis believes the Joint Plan does not discriminate unfairly with respect to holders of Class 7 or 8 Claims or Holders of Interests in Class 9.

A plan is fair and equitable as to a class of unsecured claims which rejects a plan if the Joint Plan provides (i) for each holder of a claim included in the rejecting class to receive or retain on account of that claim property that has a value, as of the effective date of the Joint Plan, equal to the allowed amount of such claim; or (ii) that the holder of any claim or interest that is junior to the claims of such class will not receive or retain on account of such junior claim or interest any property at all.

A plan is fair and equitable as to a class of equity interests that rejects a plan if the Joint Plan provides (i) that each holder of an interest included in the rejecting class receive or retain on account of that interest property that has a value, as of the effective date of the Joint Plan, equal to the greatest of the allowed amount of any fixed liquidation preference to which such holder is entitled, any fixed redemption price to which such holder is entitled, or the value of such interest; or (ii) that the holder of any interest that is junior to the interests of such class will not receive or retain under the Joint Plan on account of such junior interest any property at all.

St. Francis believes that it will meet the "fair and equitable" requirements of section 1129(b) of the Bankruptcy Code with respect to Holders of Claims in Classes 7 and 8 and Interests in Class 9.

U.S. Bankruptcy Court - Hawaii  #08-01369  Dkt # 1118  Filed 03/12/10  Page 70 of 143

# VIII.  THE SOLICITATION; VOTING PROCEDURE

## A.    Parties in Interest Entitled to Vote

Under section 1124 of the Bankruptcy Code, a class of claims or interests is deemed to be "impaired" under a plan unless (i) the Joint Plan leaves unaltered the legal, equitable, and contractual rights to which such claim or interest entitles the holder thereof or (ii) notwithstanding any legal right to an accelerated payment of such claim or interest, the Joint Plan cures all existing defaults (other than defaults resulting from the occurrence of events of bankruptcy) and reinstates the maturity of such claim or interest as it existed before the default.

In general, a holder of a claim or interest may vote to accept or to reject a plan if (i) the claim or interest is "allowed," which means generally that no party in interest has objected to such claim or interest, and (ii) the claim or interest is impaired by the Joint Plan.  If, however, the holder of an impaired claim or interest will not receive or retain any distribution under the Joint Plan on account of such claim or interest, the Bankruptcy Code deems such holder to have rejected the Joint Plan, and, accordingly, holders of such claims and interests do not actually vote on the Joint Plan.

If a claim or interest is not impaired by the Joint Plan, the Bankruptcy Code deems the holder of such claim or interest to have accepted the Joint Plan and, accordingly, holders of such claims and interests are not entitled to vote on the Joint Plan.  Claims in Classes 1, 2, 4, 5 and 6 are Unimpaired under the Joint Plan, and Holders of such Claims are therefore not entitled to vote.  Furthermore, because all Interests in the Debtors are to be cancelled pursuant to the Joint Plan, Class 9 Interests are deemed to reject the Joint Plan and are also not entitled to vote.  Accordingly, only Holders of Claims in Classes 3, 7, and 8 are entitled to vote on the Joint Plan.

## B.    Voting Procedures

Detailed Voting Procedures are set forth in Appendix C of this Disclosure Statement.

## C.    Waivers of Defects, Irregularities, Etc.

Unless otherwise directed by the Bankruptcy Court, all questions as to the validity, form, eligibility (including time of receipt), acceptance, and revocation or withdrawal of Ballots will be determined by St. Francis in its sole discretion, which determination will be final and binding.  As indicated below under "Withdrawal of Ballots; Revocation," effective withdrawals of Ballots must be delivered to counsel

U.S. Bankruptcy Court - Hawaii   #08-01369   Dkt # 1118   Filed 03/12/10   Page 71 of 143

for St. Francis prior to the deadline for receipt of Ballots (the "Voting Deadline"). St. Francis reserves the absolute right to contest the validity of any such withdrawal. St. Francis also reserves the right to reject any and all Ballots not in proper form, the acceptance of which would, in the opinion of St. Francis or its counsel, be unlawful. St. Francis further reserves the right to waive any defects or irregularities or conditions of delivery as to any particular Ballot. The interpretation (including the Ballot and the respective instructions thereto) by St. Francis, unless otherwise directed by the Bankruptcy Court, will be final and binding on all parties. Unless waived, any defects or irregularities in connection with deliveries of Ballots must be cured within such time as St. Francis (or the Bankruptcy Court) determine. Neither St. Francis nor any other Person will be under any duty to provide notification of defects or irregularities with respect to deliveries of Ballots nor will any of them incur any liabilities for failure to provide such notification. Unless otherwise directed by the Bankruptcy Court, delivery of such Ballots will not be deemed to have been made until such irregularities have been cured or waived. Ballots previously furnished (and as to which any irregularities have not theretofore been cured or waived) will be invalidated.

### D. Withdrawal of Ballots; Revocation

Any party who has delivered a valid Ballot for the acceptance or rejection of the Joint Plan may withdraw such acceptance or rejection by delivering a written notice of withdrawal to counsel for St. Francis at any time prior to the Voting Deadline. A notice of withdrawal, to be valid, must (i) contain the description of the Claim(s) to which it relates and the aggregate principal amount represented by such Claim(s), (ii) be signed by the withdrawing party in the same manner as the Ballot being withdrawn, (iii) contain a certification that the withdrawing party owns the Claim(s) and possesses the right to withdraw the vote sought to be withdrawn, and (iv) be received by counsel for St. Francis in a timely manner. St. Francis will determine whether any withdrawals of Ballots were received and whether the requisite acceptances of the Joint Plan have been received. As stated above, St. Francis expressly reserves the absolute right to contest the validity of any such withdrawals of Ballots.

Unless otherwise directed by the Bankruptcy Court, a purported notice of withdrawal of Ballots which is not received in a timely manner will not be effective to withdraw a previously cast Ballot. Any party who has previously submitted prior to the Voting Deadline a properly completed Ballot may revoke such Ballot and change his or its vote by submitting prior to the Voting Deadline a subsequent properly completed Ballot for acceptance or rejection of the Joint Plan. In the case where more than one timely, properly completed Ballot is received,

only the Ballot that bears the latest date of receipt will be counted for purposes of determining whether the requisite acceptances have been received.

### E. Further Information; Additional Copies

If you have any questions or require further information about the voting procedure for voting your Claim or about the packet of material you received, or if you wish to obtain an additional copy of the Joint Plan, this Disclosure Statement, or any exhibits or appendices to such documents (at your own expense, unless otherwise specifically required by Bankruptcy Rule 3017(d)), please contact Kurtzman Carson Consultants, LLC:

Hawaii Medical Center, LLC
KURTZMAN CARSON CONSULTANTS, LLC
2335 Alaska Avenue
Los Angeles, CA 90245
Telephone: (310) 823-9000
Website: www.kccllc.net/chahawaii

DATED: March 12, 2010

                                        _____ /s/ Sister Agnelle Ching_____

                                        Sister Agnelle Ching
                                        St. Francis Healthcare System of Hawaii, St. Francis Medical Center, and St. Francis Medical Center – West

# APPENDIX A

## (Joint Plan)

# UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF HAWAII

In re                 )   Case No. 08-01369

                       )   (Reorganization Cases)

CHA Hawaii, LLC., et. al,       )   (Jointly Administered)

           Debtors.     )   (Honorable Robert J. Faris)

This Document Relates to:      )

ALL CASES EXCEPT CHA      )
HAWAII, LLC                  )

_____ )

## SECOND AMENDED JOINT PLAN OF REORGANIZATION FOR HAWAII MEDICAL CENTER, LLC, HAWAII MEDICAL CENTER WEST, LLC, AND HAWAII MEDICAL CENTER EAST, LLC PROPOSED BY ST. FRANCIS HEALTHCARE SYSTEM OF HAWAII, ST. FRANCIS MEDICAL CENTER, AND ST. FRANCIS MEDICAL CENTER – WEST

McCORRISTON MILLER MUKAI
MacKINNON LLP
JONATHAN STEINER (Bar No. 006084)
Five Waterfront Plaza, 4th Floor
500 Ala Moana Blvd.
Honolulu, HI 96813
Telephone (808) 529-7300

HENNIGAN, BENNETT & DORMAN LLP
BRUCE BENNETT (Admitted Pro Hac Vice)
JOSHUA M. MESTER (Admitted Pro Hac Vice)
865 South Figueroa Street, Suite 2900
Los Angeles, CA 90017
Telephone (213) 694-1200

*Counsel to St. Francis Healthcare System Of
Hawaii, St. Francis Medical Center, And St. Francis Medical Center*

Dated: March 12, 2010

St. Francis Healthcare System Of Hawaii, St. Francis Medical Center, And St. Francis Medical Center – West (collectively, "**St. Francis**", hereby propose the following Amended Joint Plan of Reorganization (the "**Joint Plan**") pursuant to chapter 11 of the Bankruptcy Code:

## INTRODUCTION

The Joint Plan defines the Debtors' financial structure from and after the Effective Date, including the ownership interests in the Reorganized Debtors. Among other things, the Joint Plan designates classes of Claims and classes of Interests, identifies each Class of Claim or Interest as Unimpaired or Impaired, provides for the satisfaction of all Claims against and Interests in the Debtors, and provides adequate means for the implementation of the Joint Plan.

A separate document, entitled the "Disclosure Statement in Support of Joint Plan of Reorganization" (the **"Disclosure Statement"**), accompanies the Joint Plan. The Disclosure Statement is intended to provide you with information sufficient to enable you to determine whether to vote for or against the Joint Plan. The Disclosure Statement includes a summary of the Debtors' assets and liabilities, a summary of what Holders of Claims and Interests will receive under the Joint Plan, a discussion of certain alternatives to the Joint Plan, and a summary of the procedures and voting requirements necessary for Confirmation of the Joint Plan. Along with the Joint Plan and the Disclosure Statement, Holders of Claims and Interests entitled to vote on the Joint Plan will receive a Ballot for voting on the Joint Plan.

The St. Francis strongly recommends that you review thoroughly both the Joint Plan and Disclosure Statement before deciding whether you will accept or reject the Joint Plan.

ARTICLE I

DEFINITIONS AND CONSTRUCTION OF TERMS

1. <u>Definitions</u>. As used herein, the following terms have the respective meanings specified below, unless the context otherwise requires:

      1.1    **"Administrative Expense Claim"** means any claim alleged to have priority under sections 503(b) and 507(a)(1) of the Bankruptcy Code, including, without limitation, any actual and necessary expenses of preserving the estate of a Debtor, any actual and necessary expenses of operating the business of the Debtors, all compensation and reimbursement of expenses allowed by the Bankruptcy Court under sections 330 or 503 of the Bankruptcy Code, and any fees or charges assessed against the estates of the Debtors under section 1930 of chapter 123 of title 28 of the United States Code.

      1.2    **"Allowed Claim/Allowed Interest"** means any Claim against or Interest in the Debtors, (a) proof of which was filed on or before the date designated by the Bankruptcy Court as the last date for filing proofs of Claim against or proofs of Interest in the Debtors, (b) if no proof of Claim or Interest has been timely filed, which has been or hereafter is listed by the Debtors in their Schedules as liquidated in amount and not disputed or contingent, or (c) any Interest registered in the stock register maintained by or on behalf of the Debtors as of the Confirmation Date and, in each such case in clauses (a), (b) and (c) above, a Claim or Interest as to which no objection to the allowance thereof has been interposed within the applicable period of limitation fixed by the Joint Plan, the Bankruptcy Code, the Bankruptcy Rules or the Confirmation Order, or as to which an objection has been interposed and such Claim or Equity Interest has been allowed in whole or in part by a Final Order. Unless otherwise specified herein or by order of the Bankruptcy Court, "Allowed Claim" or "Allowed Interest" shall

2

not, for purposes of computation of distributions under the Joint Plan, include interest on such Claim or Interest from and after the Commencement Date.

1.3 **"Allowed Administrative Expense Claim"** means an Administrative Expense Claim, to the extent it is or has become an Allowed Claim.

1.4 **"Allowed Other Priority Claim"** means an Other Priority Claim, to the extent it is or has become an Allowed Claim.

1.5 **"Allowed Other Secured Claim"** means an Other Secured Claim, to the extent it is or has become an Allowed Claim.

1.6 **"Allowed Priority Tax Claim"** means a Priority Tax Claim, to the extent it is or has become an Allowed Claim.

1.7 **"Allowed Secured Claim"** means a Secured Claim, to the extent it is or has become an Allowed Claim.

1.8 **"Allowed Unsecured Claim"** means an Unsecured Claim, to the extent it is or has become an Allowed Claim.

1.9 **"Articles of Incorporation"** means the Articles of Incorporation of the Reorganized Debtors in substantially the form included in the Joint Plan Supplement.

1.10 **"Ballot"** means the form or forms distributed to each holder of an impaired Claim or Interest entitled to vote on the Joint Plan on which the holder indicates acceptance or rejection of the Joint Plan or any election for treatment of such Claim under the Joint Plan.

1.11 **"Bankruptcy Code"** means title 11 of the United States Code, 11 U.S.C. §§ 101-1330, as now in effect or hereafter amended.

1.12 **"Bankruptcy Court"** means the United States Bankruptcy Court for the District of Hawaii.

3

1.13 **"Bankruptcy Rules"** means, collectively, the Federal Rules of Bankruptcy Procedure and the local rules of the Bankruptcy Court, as now in effect or hereafter amended.

1.14 **"Bar Date"** means the applicable bar date by which a proof of Claim must be or must have been Filed.

1.15 **"Business Day"** means any day, other than a Saturday, Sunday or "legal holiday" (as defined in Bankruptcy Rule 9006(a)).

1.16 **"Bylaws"** means the Bylaws of the Reorganized Debtors in substantially the form included in the Joint Plan Supplement.

1.17 **"Cash"** means legal tender of the United States of America and equivalents thereof.

1.18 **"Claim"** means a "claim," as defined in section 101(5) of the Bankruptcy Code, against HMC, HMCE, and/or HMCW.

1.19 **"Claims Objection Bar Date"** means, for all Claims and all Interests, other than those Claims and Interests expressly not specifically allowed in the Joint Plan, the later of: (a) 90 days after the Effective Date; (b) 60 days after the Filing of a proof of Claim for such Claim; and (c) such other period of limitation as may be specifically fixed by the Joint Plan, the Confirmation Order, the Bankruptcy Rules or a Final Order for objecting to such Claim.

1.20 **"Class"** means a class of Claims or Interests, as described in Article II.

1.21 **"Committee"** means the official committee of unsecured creditors appointed pursuant to section 1102 of the Bankruptcy Code in the Reorganization Cases for CHA Hawaii, HMC, HMCE, and HMCW.

1.22 **"Confirmation"** means the entry of the Confirmation Order on the docket of the Bankruptcy Court.

4

1.23 **"Confirmation Date"** means the date on which the Bankruptcy Court enters the Confirmation Order on its docket within the meaning of Bankruptcy Rules 5003 and 9021.

1.24 **"Confirmation Hearing"** means the hearing held by the Bankruptcy Court on Confirmation of the Joint Plan, as such hearing may be continued from time to time.

1.25 **"Confirmation Order"** means the order of the Bankruptcy Court confirming the Joint Plan pursuant to section 1129 of the Bankruptcy Code.

1.26 **"Convenience Claim"** means any Claim against the Debtor that meets the following conditions: (a) the Claim is not (i) an Administrative Expense Claim, (ii) a Tax Claim, (iii) an Other Priority Claim, or (iv) a Secured Claim; and (b) either (i) such Claim, when aggregated with all similar Claims of such Holder, are Allowed in the amount of $5,000 or less or (ii) the total amount of such Claim and all similar Claims by their Holder is reduced to $5,000 by the election of the Holder thereof on such Holder's Ballot and is therefore Allowed in an amount of $5,000 or less.

1.27 **"Cure Amount Claim"** means a Claim based upon the Debtors' defaults under an Executory Contract and Unexpired Lease at the time such contract or lease is assumed by the Debtor under section 365 of the Bankruptcy Code, including any actual pecuniary loss resulting from such default, but shall not include defaults arising from a provision relating to (i) the insolvency or financial condition of the Debtors at any time before the closing of the Reorganization Casess, (ii) the commencement of the Reorganization Cases, or (iii) the satisfaction of any penalty rate or provision relating to a default arising from any failure by the Debtor to perform nonmonetary obligations under the Executory Contract or Unexpired Lease.

U.S. Bankruptcy Court - Hawaii   #08-01369   Dkt # 1118   Filed  03/12/10   Page 80 of 143

1.28 **"Date of Assessment"** means in the case of a federal Priority Tax Claim the later of (a) first Business Day following the ninetieth day after a notice of deficiency in respect of such Allowed Priority Tax Claim is issued and (b) if a case is commenced in the United States Tax Court, the date any judgment of the United States Tax Court determining the amount of any Claim for taxes against the Debtor becomes final and, in the case of any other Priority Tax Claim, sixty days after the date any such Claim becomes an Allowed Claim.

1.29 **"Debtor(s)"** means, individually or collectively, HMC, HMCE, and HMCW as chapter 11 debtors in the Reorganization Cases.

1.30 **"Deficiency Amount"** means the amount, if any, by which the Allowed amount of a Secured Claim exceeds the value of the collateral securing such Claim or the amount by which a Claim subject to setoff exceeds the Allowed amount of any setoff.

1.31 **"Deficiency Claim"** means any Claim against the Debtors representing a Deficiency Amount.

1.32 **"Derivative Claim"** means a claim that is property of the Debtors' Estates pursuant to section 541 of the Bankruptcy Code.

1.33 **"Disbursing Agent"** means (a) a Person designated by one or more Reorganized Debtors to act as a Disbursing Agent and/or (b) the Reorganized Debtors, as applicable, pursuant to Section 8.1.

1.34 **"Disclosure Statement"** means the disclosure statement (including all exhibits and schedules thereto or referenced therein) that relates to the Joint Plan, as approved by the Bankruptcy Court pursuant to section 1125 of the Bankruptcy Code, as the same may be amended, modified or supplemented.

1.35 **"Disputed Claim"** means: (a) a Claim that is listed on the Debtors' Schedules as other than disputed, contingent or unliquidated, but as to which a Reorganized Debtors or, prior to the Confirmation Date, any other party in

U.S. Bankruptcy Court - Hawaii   #08-01369   Dkt # 1118   Filed 03/12/10   Page 81 of 143

interest, has Filed an objection on or before the Claims Objection Bar Date, and such objection has not been withdrawn or denied by a Final Order; (b) a Claim that is listed on the Debtors' Schedules as disputed, contingent or unliquidated; or (c) if a proof of Claim or request for payment of an Administrative Expense Claim has been Filed by the Bar Date or has otherwise been deemed timely Filed under applicable law: (i) a Claim for which no corresponding Claim is listed on the Debtors' Schedules; (ii) a Claim for which a corresponding Claim is listed on the Debtors' Schedules as other than disputed, contingent or unliquidated, but the nature or amount of the Claim as asserted in the proof of Claim varies from the nature and amount of such Claim as it is listed on the Schedules; (iii) a Claim for which a corresponding Claim is listed on the Debtors' Schedules as disputed, contingent or unliquidated; (iv) a Claim for which an objection has been Filed by a Reorganized Debtor or, prior to the Confirmation Date, any other party in interest, by the Claims Objection Bar Date, and such objection has not been withdrawn or denied by a Final Order; or (v) a Tort Claim.

   1.36 **"Disputed Insured Claim"** and **"Disputed Uninsured Claim"** mean, respectively, an Insured Claim or an Uninsured Claim that is also a Disputed Claim.

   1.37 **"Distribution Record Date"** means the close of business on the Confirmation Date.

   1.38 **"Effective Date"** means a day, as determined by the Joint Plan Proponents, that is the Business Day as soon as reasonably practicable after all conditions to the Effective Date in Section 11.2 have been met or waived pursuant to Section 11.3.

   1.39 **"Estate(s)"** means the estates created for HMC, HMCE, and HMCW in their Reorganization Cases pursuant to section 541 of the Bankruptcy Code.

U.S. Bankruptcy Court - Hawaii   #08-01369   Dkt # 1118   Filed  03/12/10   Page 82 of 143

1.40 **"Executory Contract and Unexpired Lease"** means a contract or lease to which the Debtor is a party that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

1.41 **"File," "Filed"** or **"Filing"** means file, filed or filing with the Bankruptcy Court or its authorized designee in the Reorganization Cases.

1.42 **"Final Cash Collateral Order"** means "Stipulated and Agreed Final Order (I) Authorizing The Use Of Cash Collateral Pursuant To 11 U.S.C. § 363, (II) Granting Adequate Protection Pursuant to 11 U.S.C. §§ 361 and 363, And (III) Granting Related Relief" entered on September 19, 2008, as extended from time to time.

1.43 **"Final Order"** means an order or judgment of the Bankruptcy Court, or other court, as entered on the docket in any Reorganization Cases or the docket of such other court, that has not been reversed, stayed, modified or amended, and as to which the time to appeal or seek certiorari or move for a new trial, reargument or rehearing has expired, and no appeal or petition for certiorari or other proceedings for a new trial, reargument or rehearing has been timely taken, or as to which any appeal that has been taken or any petition for certiorari that has been timely filed has been withdrawn or resolved by the highest court to which the order or judgment was appealed or from which certiorari was sought or the new trial, reargument or rehearing shall have been denied or resulted in no modification of such order.

1.44 **"HMC"** means Hawaii Medical Center LLC, a Hawaii limited liability company that owns 100% of the membership units in HMCE and HMCW and a debtor in possession in the Reorganization Cases.

1.45 **"HMCE"** means Hawaii Medical Center East, LLC, a Hawaii limited liability company and a debtor in possession in the Reorganization Cases.

8

1.46 "**HMCW**" means Hawaii Medical Center West, LLC, a Hawaii limited liability company and a debtor in possession in the Reorganization Cases.

1.47 **"Holder"** means the beneficial owners of any Claim, Interest or Administrative Expense, which, in the case of an investment company, shall be the investment company and not their shareholders, and which in the case of an insurance company, shall be the insurance company and not their insured.

1.48 **"Insured Claim"** means any Claim arising from an incident or occurrence alleged to have occurred prior to the Effective Date that is covered under an insurance policy, other than a workers' compensation insurance policy, applicable to the Debtor or its businesses.

1.49 **"Interest"** means the interest of any holder of an equity security of the Debtors represented by any issued and outstanding membership interest in or other instrument evidencing a present ownership interest in the Debtor, whether or not transferable, or any option, warrant or right, contractual or otherwise, to purchase, sell, or subscribe to such interest in the Debtors.

1.50 **"Joint Plan"** means this joint plan of reorganization for HMC, HMCE, and HMCW proposed by St. Francis, and all Exhibits attached hereto or referenced herein, as the same may be amended, modified or supplemented.

1.51 **"Joint Plan Proponents"** means St. Francis.

1.52 "**Joint Plan Supplement**" means a supplemental appendix to the Joint Plan that will contain the draft form of the documents to be executed, delivered, assumed, and/or performed in conjunction with the consummation of the Joint Plan on the Effective Date, including, but not limited to (i) Articles of Incorporation; (ii) Bylaws; (iii) documents related to the New Notes; (iv) the Tolling Agreement; and (v) the Working Capital Facility Credit Agreement, to be filed no later than 10 days before the date of the Confirmation Hearing, and in any event no later than 5 days prior to the Voting Deadline.

9

1.53 **"Liens"** means any mortgage, pledge, deed of trust, assessment, security interest, lease, lien, adverse claim, levy, charge, constructive trust claim, equitable lien or other encumbrance of any kind, or any conditional sale contract, title retention contract or other contract to give any of the foregoing.

1.54 "**New Notes**" means Term Note A, Term Note B, each Term Note C, and Term Note D issued pursuant to this Joint Plan.

1.55 **"Ordinary Course Professionals Order"** means the "Order Authorizing Employment And Retention Of Professionals Utilized By The Debtors In The Ordinary Course of Business *Nunc Pro Tunc* To The Petition Date" entered on or about October 21, 2008.

1.56 **"Ordinary Course Administrative Expenses"** means Allowed Administrative Expenses that represent obligations incurred by the Debtor in the ordinary course of its business during the Reorganization Cases.

1.57 **"Other Priority Claim"** means a Claim that is entitled to priority in payment pursuant to section 507(a) of the Bankruptcy Code that is not an Administrative Expense Claim or a Priority Tax Claim.

1.58 "**Person**" means an individual, corporation, partnership, association, joint stock company, joint venture, limited liability company, limited liability partnership, trust, estate, unincorporated organization or other entity, or any government, governmental agency or any subdivision, department or other instrumentality thereof.

1.59 **"Petition Date"** means August 29, 2008.

1.60 "**Physician Guarantor**" means any Person that is a member of or indirectly owns, holds, or controls a membership interest in Hawaiian Physicians Group, LLC and has executed a St. Francis Guaranty.

1.61 **"Priority Tax Claim"** means a Claim that is entitled to priority in payment pursuant to section 507(a)(8) of the Bankruptcy Code.

U.S. Bankruptcy Court - Hawaii   #08-01369   Dkt # 1118   Filed  03/12/10   Page 85 of 143

1.62 **"Professional"** means any professional employed in the Reorganization Cases pursuant to sections 327 or 1103 of the Bankruptcy Code or any professional or other Person seeking compensation or reimbursement of expenses in connection with the Reorganization Cases under or pursuant to section 503(b)(4) of the Bankruptcy Code.

1.63 **"Professional Fee Claim"** means a Claim under sections 330(a), 331, 503 or 1103 of the Bankruptcy Code for compensation of a Professional or other Person for services rendered or expenses incurred in the Reorganization Cases.

1.64 **"Professional Fee Order"** means the "Order Establishing Interim Compensation Procedure For Chapter 11 Professionals" on or about October 21, 2008.

1.65 **"Pro Rata"** means, when used with reference to a distribution to holders of Allowed Claims in a particular Class (or other specified group) of Claims or Interests pursuant to Article III, proportionately so that with respect to a particular Allowed Claim or Interest in such Class or group, the ratio of (a)(i) the amount of consideration distributed on account of such Claim to (ii) the amount of such Claim or Interest, is the same as the ratio of (b)(i) the amount of consideration distributed on account of all Allowed Claims or Interests in such Class or group of Claims or Interests to (ii) the aggregate amount of all Allowed Claims or Interests in such Class or group of Claims or Interests.

1.66 **"PTO"** means "paid time off" as contemplated by and in accordance with the Debtors' written policies in effect for their employees as of the Effective Date.

1.67 **"Real Property Executory Contract and Unexpired Lease"** means, collectively, an Executory Contract or Unexpired Lease relating to the Debtors' interest in real property and any Executory Contracts and Unexpired

U.S. Bankruptcy Court - Hawaii  #08-01369  Dkt # 1118  Filed  03/12/10  Page 86 of 143

Leases granting rights or interests related to or appurtenant to the applicable real property, including all easements; licenses; permits; rights; privileges; immunities; options; rights of first refusal; powers; uses; usufructs; reciprocal easement or operating agreements; vault, tunnel or bridge agreements or franchises; development rights; and any other interests in real estate or rights *in rem* related to the applicable real property.

      1.68 **"Recovery Action(s)"** means, collectively and individually: (a) preference actions, fraudulent conveyance actions, rights of setoff and other claims or causes of action under sections 510, 544, 547, 548, 549, 550 and 553 of the Bankruptcy Code and other applicable bankruptcy or nonbankruptcy law; (b) claims or causes of action to recover illegal dividends or stock redemptions and similar claims; (c) claims or causes of action based on piercing the corporate veil, alter ego liability or similar legal or equitable theories of recovery arising out of the ownership or operation of the Debtors; and (d) claims or causes of action of the Debtors based on unjust enrichment against an officer of director, for fraud, breach of fiduciary duty, mismanagement, malfeasance or relating to the provision of retiree medical benefits or director and officer liability insurance or indemnification.

      1.69 **"Reinstated"** or **"Reinstatement"** means rendering a Claim or Interest unimpaired within the meaning of section 1124 of the Bankruptcy Code. Unless the Joint Plan specifies a particular method of Reinstatement, when the Joint Plan provides that an Allowed Claim will be Reinstated, such Claim will be Reinstated, at the Joint Plan Proponents' discretion, in accordance with one of the following: (a) the legal, equitable and contractual rights to which such Claim entitles the holder will be unaltered; or (b) notwithstanding any contractual provision or applicable law that entitles the holder of such Claim to demand or receive accelerated payment of such Claim after the occurrence of a default: (i) any

U.S. Bankruptcy Court - Hawaii   #08-01369   Dkt # 1118   Filed 03/12/10   Page 87 of 143

such default that occurred before or after the commencement of the applicable Reorganization Cases, other than a default of a kind specified in section 365(b)(2) of the Bankruptcy Code, will be cured; (ii) the maturity of such Claim as such maturity existed before such default will be reinstated; and (iii) the holder of such Claim will be compensated for any damages incurred as a result of any reasonable reliance by such holder on such contractual provision or such applicable law; and the legal, equitable or contractual rights to which such Claim entitles the holder of such Claim will not otherwise be altered.

   1.70 **"Reorganization Cases"** means the bankruptcy cases pending for the Debtors in the Bankruptcy Court, under Case Nos. 08-1371, 08-1372, and 08-1373.

   1.71 "**Reorganized Debtors**" means collectively, Reorganized HMC, Reorganized HMCE, and Reorganized HMCW after the Effective Date.

   1.72 "**Reorganized HMC**" means a non-profit subsidiary of St. Francis designated in the Joint Plan Supplement.

   1.73 "**Reorganized HMCE**" means a non-profit subsidiary of St. Francis designated in the Joint Plan Supplement.

   1.74 "**Reorganized HMCW**" means a non-profit subsidiary of St. Francis designated in the Joint Plan Supplement.

   1.75 "**Rights of Action**" means any and all actions, causes of action, suits, accounts, controversies, agreements, promises, rights to legal remedies, rights to equitable remedies, rights to payment and claims, whether known, unknown, reduced to judgment, not reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, secured or unsecured and whether asserted or assertable directly or derivatively, in law, equity or otherwise and whether commenced before or after the Effective Date, including Derivative Claims and Recovery Actions.

13

1.76 **"Schedules"** means the schedules of assets and liabilities and the statements of financial affairs Filed by the Debtors, as the same may have been or may be amended, modified or supplemented.

1.77 **"Secured Claim"** means a Claim that is secured by a lien on property in which an Estate has an interest or that is subject to setoff under section 553 of the Bankruptcy Code, to the extent of the value of the Claim holder's interest in the Estate's interest in such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to sections 506(a) and, if applicable, 1129(b) of the Bankruptcy Code.

1.78 **"Secured Tax Claim"** means a Priority Tax Claim that is also a Secured Claim.

1.79 "**Siemens Financial**" means Siemens Financial Services, Inc.

1.80 "**Siemens Leases**" means certain master lease agreements by and among Siemens Medical, HMC and HMCW.

1.81 "**Siemens Medical**" means Siemens Medical Solutions USA, Inc.

1.82 "**Siemens Secured Credit Agreement**" means that certain Loan and Security Agreement dated as of January 13, 2007, as amended, modified or supplemented from time to time, by and among HMC, HMCE, HMCW, as borrowers, and Siemens Financial.

1.83 "**Siemens Secured Credit Documents**" means, collectively, the Siemens Secured Credit Agreement and all other agreements, instruments, notes, guarantees and other documents executed in connection therewith, including, without limitation, the Siemens Secured Credit Guaranties and all collateral and security documents executed by the Debtors and certain non-Debtor affiliates in favor of Siemens Financial.

14

1.84  "**Siemens Secured Credit Guaranties**" means those guaranties dated as of January 13, 2007 as amended, modified or supplemented from time to time, made by HMCW, HMCE, CHA Hawaii, respectively, as guarantors of all Siemens Secured Obligations, in favor of Siemens Financial.

1.85  "**Siemens Secured Lender Claim**" means the aggregate amount of the Siemens Secured Obligations owing by the Debtors under the Siemens Secured Credit Agreement and the other Siemens Secured Credit Documents as of the Effective Date, including (i) all principal obligations owing under the Siemens Secured Credit Agreement, (ii) all accrued and unpaid interest owing under the Siemens Secured Credit Agreement, (iii) all accrued and unpaid fees and expenses that are chargeable or reimbursable under the Siemens Secured Credit Documents, (iv) all contingent claims or rights of reimbursement under the Workers Compensation LC, and (v) all other fees, charges and expenses that are chargeable or reimbursable under the Siemens Secured Credit Documents, in each case to the maximum extent allowable under section 506(b) of the Bankruptcy Code.

1.86  "**Siemens Secured Obligations**" means all obligations of the Debtors arising under the Siemens Secured Credit Agreement or any other Siemens Secured Credit Document, including all loans, advances, debts, letters of credit, liabilities, fees, charges, expenses and obligations for the performance of covenants, tasks or duties, of any kind or nature, whether or not evidenced by any note, agreement or other instrument, and whether arising by reason of an extension of credit, loan, foreign exchange risk, guaranty, indemnification, or in any other manner

1.87  "**Siemens Services Agreements**" means the agreements with Siemens Medical for the provision of certain services related to certain equipment located at HMCE and HMCW.

U.S. Bankruptcy Court - Hawaii   #08-01369   Dkt # 1118   Filed  03/12/10   Page 90 of 143

1.88 "**Substantive Consolidation Order**" means an order, or provision of the Confirmation Order, substantively consolidating the Reorganization Cases for certain limited purposes, as provided in Section 5.1 of this Joint Plan.

1.89 "**St. Francis**" means collectively, St. Francis Healthcare System Of Hawaii, St. Francis Medical Center, And St. Francis Medical Center – West.

1.90 "**St. Francis Credit Documents**" means that certain Loan Agreement dated as of January 13, 2007, as amended, modified, or supplemented from time to time, and all other agreements, instruments, notes, interest pledges, guaranties and other documents executed in connection therewith, including, without limitation, the St. Francis Guaranties and all collateral and security documents executed by the Debtors and certain Non-Debtor Affiliates in favor of St. Francis.

1.91 "**St. Francis Deficiency Claim**" shall have the meaning ascribed to such term in Section 4.7.

1.92 "**St. Francis Guaranties**" means those certain guaranties and those certain interest pledges dated as of January 13, 2007 as amended, modified or supplemented from time to time, made by CHA Hawaii, HPG and certain individuals, as guarantors of all St. Francis Secured Claims.

1.93 "**St. Francis Leases**" means all non-residential real property leases under which St. Francis is a lessor to any of the Debtors.

1.94 "**St. Francis Secured Claims**" means all obligations owed by the Debtors under the St. Francis Credit Documents and the St. Francis Leases, including, without limitation, all loans, advances, debts, liabilities, fees, charges, expenses and obligations for the performance of covenants, tasks or duties, of any kind or nature, whether or not evidenced by any note, agreement or other

instrument, and whether arising by reason of an extension of credit, loan, foreign exchange risk, guaranty, indemnification, or in any other manner.

1.95 **"Stipulation of Amount and Nature of Claim"** means a stipulation or other agreement between, on the one hand, the Debtor or the Reorganized Debtor and, on the other hand, a holder of a Claim or Interest, or an agreed order of the Bankruptcy Court, establishing the Allowed amount, priority, and/or secured status of a Claim or Interest.

1.96 **"Tax"** means (a) any net income, alternative or add-on minimum, gross income, gross receipts, sales, use, ad valorem, value added, transfer, franchise, profits, license, property, environmental or other tax, assessment or charge of any kind whatsoever (together in each instance with any interest, penalty, addition to tax or additional amount) imposed by any federal, state, local or foreign taxing authority; or (b) any liability for payment of any amounts of the foregoing types as a result of being a member of an affiliated, consolidated, combined or unitary group, or being a party to any agreement or arrangement whereby liability for payment of any such amounts is determined by reference to the liability of any other Person.

1.97 "**Term Note A**" means a new note issued by the Reorganized Debtors in the principal amount of $20,000,000 to be secured by a first priority lien against and security interest in substantially all of the Reorganized Debtors' assets, bearing interest at the rate of 10% per annum from the Effective Date payable semi-annually, having a maturity date of the fifth anniversary of the Effective Date and containing affirmative and negative covenants and events of default similar to those included in the St. Francis Credit Documents.

1.98 "**Term Note B**" means a new note issued by the Reorganized Debtors in the principal amount of $37,500,000 secured by a second priority lien against and security interest in substantially all of the Reorganized Debtors' assets,

bearing interest at the rate of 7% per annum from the Effective Date payable semi-annually, having a maturity date of the eighth anniversary of the Effective Date, with the amount necessary to satisfy the principal in full to be calculated as a percentage of the principal based upon the Reorganized Debtors' average EBIDA over the four years prior to the maturity date as follows:  (a) Average EBIDA is less than $11,000,000 then 60% of the principal amount; (b) Average EBIDA is greater than $11,000,000 but less than or equal to $13,500,000, then 80% of the principal amount; (c) Average EBIDA is greater than $13,500,000 but less than or equal to $16,000,000 then 100% of the principal amount; and (d) Average EBIDA is greater than $16,000,000 then 160% of the principal amount, and containing affirmative and negative covenants and events of default similar to those included in the St. Francis Credit Documents.  In the event that the Reorganized Debtors are required to issue Term Note D, then Term Note B shall provide that in the event that, and only in the even that, the Reorganized Debtors commence voluntarily proceedings under Title 11 of the United States Code or an involuntary proceeding under Title 11 of the United States Code in which an order for relief is entered is commenced against the Reorganized Debtors prior to the maturity date of Term Note D, then Term Note B shall be subordinated in right of payment only to Term Note D.

   1.99 "**Term Note C**" means a new unsecured note issued by the Reorganized Debtors, bearing interest at the rate of 2% per annum from the Effective Date payable semi-annually, having a maturity date of the tenth anniversary of the Effective Date, with the amount necessary to satisfy the principal in full to be calculated as a percentage of the principal based upon the Reorganized Debtors' average EBIDA over the five years prior to the maturity date as follows:  (a) Average EBIDA is less than $13,500,000 then 20% of the principal amount; (b) Average EBIDA is greater than $13,500,000 but less than or equal to

U.S. Bankruptcy Court - Hawaii   #08-01369   Dkt # 1118   Filed 03/12/10   Page 93 of 143

$14,485,000, then 40% of the principal amount; (c) Average EBIDA is greater than $14,485,000 but less than or equal to $16,485,000 then 80% of the principal amount; (d) Average EBIDA is greater than $16,485,000 but less than or equal to $18,485,000 then 100% of the principal amount; (e) Average EBIDA is greater than $18,485,000 but less than or equal to $20,485,000 then 120% of the principal amount; (d) Average EBIDA is greater than $20,485,000 but less than or equal to $22,485,000 then 140% of the principal amount; and (d) Average EBIDA is greater than $22,485,000 then 160% of the principal amount.  In the event that the Reorganized Debtors are required to issue Term Note D, then Term Note C shall provide that in the event that, and only in the even that, the Reorganized Debtors commence voluntarily proceedings under Title 11 of the United States Code or an involuntary proceeding under Title 11 of the United States Code in which an order for relief is entered is commenced against the Reorganized Debtors prior to the maturity date of Term Note D, then Term Note C shall be subordinated in right of payment only to Term Note D.

   1.100 "**Term Note D**" means a new non-interest bearing unsecured note issued by the Reorganized Debtors in the principal amount of $1,750,000 having a maturity date of the third anniversary of the Effective Date.

   1.101 "**Tolling Agreement**" means that certain tolling agreement described in Section 5.8 pursuant to which a (A) Physician Guarantor agrees to toll any applicable statute of limitation periods related to St. Francis' enforcement of the St. Francis Guaranty for such Physician Guarantor; and (B) the Physician Guarantor agrees to provide services to St. Francis or the Reorganized Debtors in exchange for a reduction in such Physician Guarantor's liability under its St. Francis Guaranty, in the form included in the Joint Plan Supplement.

   1.102 **"Tort Claim"** means any Claim that has not been settled, compromised or otherwise resolved that (a) arises out of allegations of personal

U.S. Bankruptcy Court - Hawaii   #08-01369   Dkt # 1118   Filed  03/12/10   Page 94 of 143

injury, wrongful death, property damage, products liability, medical malpractice, or similar legal theories of recovery; or (b) arises under any federal, state or local statute, rule, regulation or ordinance governing, regulating or relating to health, safety, hazardous substances or the environment.

1.103 **"Trade Claim"** means any Unsecured Claim arising from or with respect to the sale of goods or rendition of services prior to the Petition Date in the ordinary course of the Debtors' business, including any Claim of an employee that is not a Priority Claim.

1.104 **"Unclaimed Property"** shall have the meaning ascribed to such term in Section 7.6 herein.

1.105 **"Uninsured Claim"** means any Claim that is not an Insured Claim.

1.106 **"Unsecured Claim"** means any Claim that is not an Administrative Expense Claim, Cure Amount Claim, Priority Claim, Priority Tax Claim, or Secured Claim.

1.107 **"Voting Deadline"** means the date and time set by the Bankruptcy Court as the deadline for submitting Ballots to accept or reject the Joint Plan in accordance with section 1126 of the Bankruptcy Code.

1.108 "**Workers Compensation LC**" means that certain irrevocable standby letter of credit No. LCA03120701433NY issued by The Royal Bank of Scotland on March 12, 2007 in favor of the State of Hawaii Department of Labor and Industrial Relations that is scheduled to expire on December 31, 2011.

1.109 "**Working Capital Facility Credit Agreement**" means that certain credit agreement by and among the Reorganized Debtors, as borrowers, and the Working Capital Facility Lender, providing for the Working Capital Facility.

1.110 "**Working Capital Facility**" means the credit facility provided under that certain credit agreement (and any related documents, agreements, and

instruments) to be entered into by the Reorganized Debtors as of the Effective Date, subject to the consent of St. Francis, to provide funds for working capital and other general corporate purposes after the Effective Date.

1.111 "**Working Capital Facility Lender**" means that party to the Working Capital Facility Credit Agreement.


Interpretation; Application of Definitions and Rules of Construction.

Unless otherwise specified, all section, schedule or exhibit references in this Joint Plan are to the respective section in, article of, or schedule or exhibit to, this Joint Plan, as the same may be amended, waived or modified from time to time.

The words "herein," "hereof," "hereto," "hereunder," and others of similar import refer to the Joint Plan as a whole and not to any particular section, subsection, or clause contained in the Joint Plan.

The rules of construction contained in section 102 of the Bankruptcy Code shall apply to the construction of this Joint Plan.

Any capitalized term used herein and not defined herein but defined in the Bankruptcy Code shall have the meaning assigned to such term in the Bankruptcy Code.

ARTICLE II

TREATMENT OF ADMINISTRATIVE

EXPENSE CLAIMS AND PRIORITY TAX CLAIMS

2.1    Administrative Expense Claims.  Except as provided in Section 2.2 below or to the extent that the holder of an Allowed Administrative Expense Claim agrees to a different treatment, the Reorganized Debtor shall pay to each holder of an Allowed Administrative Expense Claim Cash in an amount equal to such Allowed Administrative Expense Claim on the later of the Effective Date and the date such Administrative Expense Claim becomes an Allowed Administrative

21

Expense Claim, or as soon thereafter as is practicable; provided, however, that all Ordinary Course Administrative Expenses shall be paid in full by Reorganized Debtor in the ordinary course of business in accordance with the terms and conditions of agreements relating thereto. The Confirmation Order shall contain a bar date for purposes of assertion and allowance of Administrative Expense Claims, other than Ordinary Course Administrative Expenses.

2.2     Compensation and Reimbursement Claims.  Except as provided in Section 2.3, all Entities that are awarded compensation or reimbursement of expenses by the Bankruptcy Court in accordance with section 330 or 331 of the Bankruptcy Code or entitled to the priority pursuant to section 503(b)(2), 503(b)(3), 503(b)(4) or 503(b)(5) of the Bankruptcy Code, shall be paid in full, in Cash, the amounts allowed by the Bankruptcy Court (a) on or as soon as reasonably practicable following the later to occur of (i) the Effective Date and (ii) the date on which the Bankruptcy Court order allowing such Claim becomes a Final Order, or (b) upon such other terms as may be mutually agreed upon between such holder of an Allowed Administrative Expense Claim and Reorganized Debtor.

2.3     Bar Dates for Administrative Expense Claims

2.1.1     General Bar Date Provisions:  Except as otherwise provided herein, unless previously Filed, requests for payment of Administrative Expense Claims must be Filed and served on the pertinent Reorganized Debtors, pursuant to the procedures specified in the Confirmation Order and the notice of entry of the Confirmation Order, no later than 30 days after the Effective Date (the **"Administrative Claims Bar Date"**).  Holders of Administrative Expense Claims that are required to File and serve a request for payment of such Administrative Expense Claims and that do not File and serve such a request by the applicable Bar Date will be forever barred from asserting such Administrative Expense Claims

U.S. Bankruptcy Court - Hawaii   #08-01369   Dkt # 1118   Filed  03/12/10   Page 97 of 143

against the Debtors or the Reorganized Debtors or their respective property, and such Administrative Expense Claims will be deemed discharged as of the Effective Date. Objections to such requests must be Filed and served on the Reorganized Debtors and the requesting party by the later of (A) 120 days after the Effective Date or (B) 60 days after the Filing of the applicable request for payment of Administrative Expense Claims.

   2.1.2 <u>Bar Dates for Certain Administrative Expense Claims</u>: Professionals or other Entities asserting a Professional Fee Claim for services rendered to the Estate before the Effective Date must File and serve on the pertinent Reorganized Debtors and such other Entities who are designated by the Bankruptcy Rules, the Confirmation Order, the Professional Fee Order or other order of the Bankruptcy Court an application for final allowance of such Professional Fee Claim, as it relates to services provided to the Estate, no later than 60 days after the Effective Date. Objections to any Professional Fee Claim must be Filed and served on the Reorganized Debtors and the requesting party by the later of (1) 90 days after the Effective Date or (2) 30 days after the Filing of the applicable request for payment of the Professional Fee Claim. To the extent necessary, the Confirmation Order will amend and supersede any previously entered order of the Bankruptcy Court, including the Professional Fee Order, regarding the payment of Professional Fee Claims.

   2.4 <u>Payment of Priority Tax Claims</u>. The Allowed Priority Tax Claim held by the Internal Revenue Service and any state taxing authority relating to any taxable year shall be the lesser of: (a) the Allowed Claim held by such Person; (b) the estimated claim amount held by such Person, if estimated by the Bankruptcy Court for purposes of allowance; or (c) the amount of such claim as determined by any administrative or judicial tribunal of competent jurisdiction before which such issue is brought by final order or as compromised and settled by

U.S. Bankruptcy Court - Hawaii   #08-01369   Dkt # 1118   Filed  03/12/10   Page 98 of 143

the pertinent Reorganized Debtor and such taxing authority. Notwithstanding any other provision of this Joint Plan to the contrary, payments in respect of Allowed Priority Tax Claims shall not be made on the Effective Date, but rather shall, at the sole option and discretion of the pertinent Reorganized Debtors be made (a) in full, in Cash, on the later of the Effective Date or the Date of Assessment, (b) in accordance with section 1129(a)(9)(c) of the Bankruptcy Code, in full, in Cash, in up to twenty (20) equal quarterly installments, commencing on the first Business Day following the Date of Assessment of such Allowed Priority Tax Claim, together with interest from the Date of Assessment at a rate to be determined by the Bankruptcy Court, or (c) by mutual agreement of the holder of such Allowed Priority Tax Claim and pertinent Reorganized Debtors.

      2.5    <u>Other Provisions Concerning Treatment of Priority Tax Claims</u>: Notwithstanding the provisions of Section 2.2, the holder of an Allowed Priority Tax Claim will not be entitled to receive any payment on account of any penalty arising with respect to or in connection with the Allowed Priority Tax Claim. Any such Claim or demand for any such penalty will be subject to treatment in Class 7 if not subordinated to Class 7 Claims pursuant to an order of the Bankruptcy Court. The holder of an Allowed Priority Tax Claim will not assess or attempt to collect such penalty from the pertinent Debtor, Reorganized Debtor or their respective property.

ARTICLE III

<u>CLASSIFICATION OF CLAIMS AND EQUITY INTERESTS</u>

      3.1    Claims and Interests, other than Administrative Expense Claims and Priority Tax Claims are classified for all purposes, including, where applicable, voting, confirmation, and distribution pursuant to the Joint Plan, as follows:

U.S. Bankruptcy Court - Hawaii   #08-01369   Dkt # 1118   Filed  03/12/10   Page 99 of 143

Class 1 – Secured Tax Claims

Class 2 – Siemens Secured Lender Claim

Class 3 – St. Francis Secured Claims

Class 4 – Other Secured Claims

Class 5 – Employee PTO Claims

Class 6 – Other Priority Claims

Class 7 – General Unsecured Claims

Class 8 – Convenience Claims

Class 9 – Equity Interests

## ARTICLE IV

## TREATMENT OF CLAIMS AND EQUITY INTERESTS

4.1    CLASS 1 – SECURED TAX CLAIMS:  Class 1 consists of Secured Tax Claims.

4.1.1    Treatment:  On the Effective Date, each holder of an Allowed Secured Tax Claim shall retain its lien and receive, in full satisfaction of its Allowed Secured Tax Claim, at the sole option and discretion of the Reorganized Debtors, payment (a) in full, in Cash, on the later of the Effective Date or the Date of Assessment, (b) in accordance with section 1129(a)(9)(c) of the Bankruptcy Code, in full, in Cash, in up to twenty-four (24) equal quarterly installments, commencing on the first Business Day following the Date of Assessment of such Allowed Secured Tax Claim, together with interest from the Date of Assessment at a rate of 3.25% per annum, or (c) by mutual agreement of the holder of such Allowed Secured Tax Claim and the pertinent Reorganized Debtors.

4.1.2    Voting:  Class 1 is unimpaired.  The Holders of Claims in Class 1 will not vote to accept or reject the Joint Plan.

4.2     CLASS 2 – SIEMENS SECURED LENDER CLAIM:  Class 2 consists of the Siemens Secured Lender Claim.

4.2.1     Treatment:  The Siemens Secured Lender Claim shall be Allowed in the amount of $3,415,250, plus all applicable interest, fees and costs of Siemens Financial pursuant to the Secured Financing Agreements (as defined in the Final Cash Collateral Order).  On the Effective Date, the Reorganized Debtors shall (A) pay the Allowed Siemens Secured Lender Claim in full in Cash and (B) either (i) cause the cancellation of the Workers Compensation LC or (ii) fully collateralize the Workers Compensation LC with a cash deposit.

4.2.2     Voting:  Class 2 is unimpaired.  The Holders of Claims in Class 2 will not vote to accept or reject the Joint Plan.

4.3     CLASS 3 – ST. FRANCIS SECURED CLAIMS:

4.3.1     Treatment:  On the Effective Date St. Francis shall receive Term Note A, Term Note B, a Term Note C in a face amount equal to $19.5 million and 100% of the equity of each of the Reorganized Debtors on account of the St. Francis Secured Claims, provided however that if Classes 7 and 8 are found to have voted to accept the Joint Plan and the Committee does not object to, oppose, impede, impair, or otherwise delay confirmation of the Joint Plan, then the Term Note C distributed to St. Francis under this section shall have a face amount equal to $10 million.[1]

4.3.2     Voting:  Class 3 is Impaired.  Because Class 3 is Impaired and Holders of Class 3 Claims receive consideration under the Joint Plan,

---

[1]  Although St. Francis intends to accept the treatment of its claims proposed in this Joint Plan, it is not willing to accept this treatment under any other plan of reorganization proposed for the debtors.  Indeed, St Francis cannot be compelled to accept the treatment proposed in this Joint Plan if it were to vote to reject the Joint Plan.

the Holders of Claims in Class 3 are permitted to vote to accept or reject the Joint Plan.

      4.4      <u>CLASS 4 – OTHER SECURED CLAIMS</u>: Class 4 consists of all Other Secured Claims.

      4.4.1      <u>Treatment</u>:  On the Effective Date, at the election of the pertinent Reorganized Debtor, the Holder of each Allowed Other Secured Claim shall, on account of such Claim, either:  (i) be paid in Cash in full, (ii) have surrendered to it, without representation or warranty, the collateral securing its Claim, (iii) notwithstanding any contractual provision or applicable law that entitles the Holder of such Claim to demand or receive accelerated payment of such Claim after the occurrence of a default (A) be paid a cure of any such default that occurred prior to the Effective Date, other than a default of a kind specified in section 365(b)(2) of this title, (B) have Reinstated the maturity of such Claim as such maturity existed before such default, (C) be compensated for any damages incurred as a result of any reasonable reliance by such Holder on such contractual provision or such applicable law, and (D) otherwise not have altered the legal, equitable, or contractual rights to which such Claim entitles the Holder of such Claim, or (iv) have left unaltered the legal, equitable, and contractual rights to which such Claim entitles the Holder of such Claim.  In the case of option (ii) or (iii), in the event that any such Claim is not completely satisfied by such distribution, the Deficiency Amount will constitute a Deficiency Claim against the Debtor and will be classified in the appropriate other Class and will receive the same treatment as other Claims in such Class.  Any Holder of an Other Secured Claim may agree to accept less favorable treatment.

      4.4.2      <u>Voting</u>:  Class 4 is unimpaired.  The Holders of Claims in Class 4 will not vote to accept or reject the Joint Plan.

U.S. Bankruptcy Court - Hawaii   #08-01369   Dkt # 1118   Filed  03/12/10   Page 102 of 143

4.5     CLASS 5 – EMPLOYEE PTO CLAIMS:  Class 5 consists of all Claims for PTO by employees of the Debtors that are employed by the Reorganized Debtors.

       4.5.1     Treatment:  On the Effective Date, all PTO that was accrued as of the Petition Date by an employee of the Debtors employed by the Reorganized Debtors as of the Effective Date shall be Reinstated against the Reorganized Debtors.

       4.5.2     Voting:  Class 5 is unimpaired.  The Holders of Claims in Class 5 will not vote to accept or reject the Joint Plan.

4.6     CLASS 6 – OTHER PRIORITY CLAIMS:  Class 6 consists of all Other Priority Claims.

       4.6.1     Treatment:  On the Effective Date, each holder of an Allowed Other Priority Claim shall receive Cash equal to the amount of such Allowed Other Priority Claim or have its Allowed Other Priority Claim Reinstated.

       4.6.2     Voting:  Class 6 is unimpaired.  The Holders of Claims in Class 3 will not vote to accept or reject the Joint Plan.

4.7     CLASS 7 – UNSECURED CLAIMS:  Class 7 consists of all Unsecured Claims, other than Convenience Claims.  St. Francis shall have an Allowed Unsecured Claim in the amount of $14 million that is included in Class 7 (the "**St. Francis Deficiency Claim**").

       4.7.1     Treatment of Unsecured Claims:

          (A)     In the event that Class 7 is found to have voted to accept the Joint Plan <u>and</u> the Committee does not object to, oppose, impede, impair, or otherwise delay confirmation of the Joint Plan, then on the Effective Date or as soon thereafter as is practicable, each Holder of an Allowed Class 7 Unsecured Claim shall receive a Term Note C in a face

U.S. Bankruptcy Court - Hawaii   #08-01369   Dkt # 1118   Filed  03/12/10   Page 103 of 143

amount equal to its Allowed Class 7 Unsecured Claim and St. Francis shall receive no distribution on account of the St. Francis Deficiency Claim.

(B)     In the event that Class 7 is found to have voted to reject the Joint Plan or the Committee objects to, opposes, impedes, impairs, or otherwise delays confirmation of the Joint Plan, then on the Effective Date or as soon thereafter as is practicable, then each Holder of an Allowed Class 7 Unsecured Claim, including the St. Francis Deficiency Claim, shall receive a Pro Rata interest in Term Note D and shall not receive the treatment described in Section 4.7.1(A) above.

4.7.2     Voting:  Class 7 is Impaired.  Because Class 7 is Impaired and Holders of Class 7 Claims receive consideration under the Joint Plan, the Holders of Claims in Class 7 are permitted to vote to accept or reject the Joint Plan.

4.8     CLASS 8 – CONVENIENCE CLAIMS:  Class 8 consists of all Convenience Claims.

4.8.1     Election to Reduce Claim to a Convenience Claim: By checking the appropriate box on a timely cast Ballot, the Holder of what otherwise would be an Allowed Unsecured Claim in an amount greater than $5,000 may elect to reduce the collective amount of all of such Holder's Allowed Unsecured Claims to $5,000 and be treated as the Holder of an Allowed Class 8 Convenience Claim in the amount of $5,000.  Such an election shall constitute a waiver of the right to collect, and a release of, the amount of all such Holder's Unsecured Claims to the extent that the aggregate amount thereof exceeds $5,000. Thus, upon such election, the Holder of such Allowed Class 8 Convenience Claim shall be deemed to have released the Debtors and their Estates, the Reorganized

U.S. Bankruptcy Court - Hawaii   #08-01369   Dkt # 1118   Filed  03/12/10   Page 104 of 143

Debtors and their property, and all other parties (unless such other parties expressly waive and release any indemnity or contribution claim against the Debtor relating to such Claim) from any and all liability for such excess amount. The Holder of one or more Allowed Unsecured Claims which timely elects to reduce the amount of its Allowed Claim(s) shall be bound hereby and be deemed to be the Holder of an Allowed Class 8 Convenience Claim for classification, voting, and all other purposes under the Joint Plan.

  4.8.2  <u>Election of Treatment of Convenience Claims</u>:

   (A)  In the event that Class 8 is found to have voted to accept the Joint Plan <u>and</u> the Committee does not object to, oppose, impede, impair, or otherwise delay confirmation of the Joint Plan, then each Holder of an Allowed Class 8 Convenience Claim may elect to receive either (a) Cash in an amount equal to 20% of such Allowed Class 8 Convenience Claim on the Effective Date or as soon thereafter as is practicable or (b) a Term Note C in a principal amount equal to the amount of such Allowed Class 8 Convenience Claim.

   (B)  In the event that Class 8 is found to have voted to reject the Joint Plan <u>or</u> the Committee objects to, opposes, impedes, impairs, <u>or</u> otherwise delays confirmation of the Joint Plan, then on the Effective Date or as soon thereafter as is practicable each Holder of an Allowed Class 8 Convenience Claim shall receive Cash in an amount equal to 5% of such Allowed Class 8 Convenience Claim and shall not receive the treatment described in Section 4.8.2(A) above.

U.S. Bankruptcy Court - Hawaii   #08-01369   Dkt # 1118   Filed  03/12/10   Page 105 of 143

4.8.3    Voting:  Class 8 is Impaired.  Because Class 8 is Impaired and Holders of Class 8 Claims receive consideration under the Joint Plan, the Holders of Claims in Class 8 are permitted to vote to accept or reject the Joint Plan.

4.9    CLASS 9 – INTERESTS:  Class 9 consists of all Interests in the Debtors.

4.9.1    Treatment:  All Interests in the Debtors will be canceled on the Effective Date.  Holders of Class 9 Interests shall not receive or retain any Interests or property under the Joint Plan.

4.9.2    Voting:  Class 9 is Impaired.  Because holders of Class 9 Interests shall not receive any property under the Joint Plan, Class 9 is deemed to reject the Joint Plan.

ARTICLE V

MEANS FOR IMPLEMENTATION OF THE JOINT PLAN

5.1    Substantive Consolidation For Purposes of Treating Impaired Claims:

5.1.1    Substantive Consolidation.  This Joint Plan contemplates and is predicated upon entry of an order substantively consolidating the Debtors solely for the purposes of this Joint Plan, that is, for voting, confirmation and distribution purposes.  This Joint Plan does not contemplate the substantive consolidation of the Debtors for any other purpose.  On the Effective Date (i) any obligation of any Debtor and all guarantees executed by one or more of the other Debtors shall be treated as a single obligation and any obligation of two or more Debtors, and all multiple Impaired Claims against such entities on account of such joint obligations shall be treated and Allowed only as a single Impaired Claim against the consolidated Debtors and (ii) each Claim filed against any Debtor shall be deemed filed against the consolidated Debtors and shall be

deemed a single Claim against and a single obligation of the consolidated Debtors. Except as set forth in this Section 5.1, such substantive consolidation shall not (other than for purposes related to this Joint Plan) (i) affect the legal and corporate structures of the Reorganized Debtors, (ii) cause any Debtor to be liable for any Impaired Claim or Unimpaired Claim under this Joint Plan for which it otherwise is not liable, and the liability for any such Claim shall not be affected by such substantive consolidation, (iii) affect Interests in Debtors, (iv) affect any obligations under any leases or contracts assumed in this Joint Plan or otherwise subsequent to the filing of the Reorganization Cases or (v) affect any obligations to pay quarterly fees to the United States Trustee. All Claims of a Debtor against another Debtor shall be deemed extinguished.

       5.1.2    <u>Substantive Consolidation Order</u>. This Joint Plan shall serve as, and shall be deemed to be, a motion for entry of an order substantively consolidating the Debtors solely to the extent provided in Section 5.1 hereof. If no objection to substantive consolidation is timely filed and served by any Holder of an Impaired Claim affected by this Joint Plan as provided herein on or before the deadline for objection to confirmation of this Joint Plan, the Substantive Consolidation Order (which may be the Confirmation Order) may be entered by the Bankruptcy Court. If any such objections are timely filed and served, a hearing with respect to the substantive consolidation of the Reorganization Cases and the objections thereto shall be scheduled by the Bankruptcy Court, which hearing may, but is not required to, coincide with the Confirmation Hearing.

       5.1.3    <u>Transfer of Assets</u>. Except as otherwise provided in the Joint Plan, on and after the Effective Date, all property of the Estates of the Debtors, including all Rights of Action, and any property acquired by the Debtors under or in connection with the Joint Plan shall be assigned to and will vest in the Reorganized Debtors free and clear of all Claims, Liens, charges, other

U.S. Bankruptcy Court - Hawaii  #08-01369  Dkt # 1118  Filed  03/12/10  Page 107 of 143

encumbrances and Interests. On and after the Effective Date, the Reorganized Debtors may operate their business and may use, acquire and dispose of property and compromise or settle any Claims or Interests without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules, other than restrictions expressly imposed by the Joint Plan or the Confirmation Order. Sources of Cash for future operations will include, *inter alia*, Cash of the Debtors and anticipated revenue from further business operations. In accordance with section 1109(b) of the Bankruptcy Code, nothing in this paragraph shall preclude any party in interest from appearing and being heard on any issue in the Reorganization Cases.

5.2    Articles of Incorporation & By-Laws:  The Articles of Incorporation will, among other things, prohibit the issuance of nonvoting equity securities to the extent required by section 1123(a) of the Bankruptcy Code.  After the Effective Date, the Reorganized Debtors may amend and restate their Articles of Incorporation, By-Laws and other constituent documents as permitted by applicable non-bankruptcy law.

5.3    Management/Board of Directors:  From and after the Effective Date, the persons named in the Joint Plan Supplement shall serve as the Reorganized Debtors' board of directors subject to the terms and conditions of the Articles of Incorporation, the By-Laws and applicable law.  The officers of the Reorganized Debtors shall be disclosed in the Joint Plan Supplement.

5.4    Corporate Actions:  On the Effective Date, all actions contemplated by the Joint Plan shall be deemed authorized and approved in all respects (subject to the provisions of the Joint Plan), including, without limitation, the following:  (a) the adoption and the filing with the Director of the Department of Commerce and Consumer Affairs of the Articles of Incorporation; (b) the adoption of the By-Laws; (c) the issuance of the New Notes; (d) the cancellation of

the Interests; (e) the execution and delivery of the Working Capital Facility; and (f) the execution and the delivery of, and the performance under, all documents and agreements contemplated by or relating to any of the foregoing. All matters provided for under the Joint Plan involving the corporate structure of the Reorganized Debtors and any corporate action required by the Reorganized Debtors in connection with the Joint Plan shall be deemed to have occurred and shall be in effect pursuant to the Bankruptcy Code, without any requirement of further action by the shareholders or the directors of the Reorganized Debtors. On the Effective Date, the appropriate officers of each of the Reorganized Debtors are authorized and directed to execute and to deliver all agreements, documents and instruments contemplated by the Joint Plan in the name and on behalf of the pertinent Reorganized Debtors.

        5.5    <u>Reorganized Debtors Qualified As Nonprofit Corporations</u>. On the Effective Date, the Reorganized Debtors shall be qualified as nonprofit entities owned or controlled by St. Francis.

        5.6    <u>Sources of Cash for Plan Distributions</u>. The sources of Cash for distribution under the Joint Plan shall be the Debtors' Cash, the proceeds of a Working Capital Facility, and future revenues of the Reorganized Debtors that may be retained by the Reorganized Debtors or transferred to the Disbursing Agent as necessary for distribution pursuant to the terms and conditions of the Joint Plan.

        5.7    <u>Working Capital Facility</u>. To the extent that the Reorganized Debtors require working capital financing, the Reorganized Debtors shall be authorized to (a) enter into the Working Capital Facility, (b) grant any liens and security interests and incur or guarantee the indebtedness as required under the Working Capital Facility, and (c) issue, execute and deliver all documents, instruments and agreements necessary to implement and effectuate borrowings under the Working Capital Facility.

U.S. Bankruptcy Court - Hawaii   #08-01369   Dkt # 1118   Filed  03/12/10   Page 109 of 143

5.8    St. Francis Guaranties.  To the extent permissible under applicable law and only upon receipt of a satisfactory advisory opinion from the United States Department of Health & Human Services Office of Inspector General, St. Francis and the Reorganized Debtors shall offer to enter into a Tolling Agreement with each Physician Guarantor.  The Tolling Agreement shall contain an agreement among St. Francis, the Reorganized Debtors, and such Physician Guarantor for the Physician Guarantor to provide services to either St. Francis or the Reorganized Debtors, on terms and conditions acceptable to St. Francis or the Reorganized Debtors, in exchange for the cancellation or extinguishment of some or all of such participating Physician Guarantor's obligation under the applicable St. Francis Guaranty.  The Tolling Agreement shall further provide that the executing Physician Guarantor agrees to toll any applicable limitations period related to St. Francis' rights under the applicable St. Francis Guaranty for 60 days after the executing Physician Guarantor fails to comply with the terms of the Tolling Agreement.  In order to be eligible to enter into a Tolling Agreement, a Physician Guarantor must enter into a stipulation with St. Francis prior to the Voting Deadline that such Physician Guarantor (A) will not object to confirmation of the Joint Plan and (B) will not support any other Person that objects to, opposes, impairs, impedes, or otherwise delays confirmation of the Joint Plan.

ARTICLE VI

TREATMENT OF EXECUTORY

CONTRACTS AND UNEXPIRED LEASES

6.1    Assumption and Rejection of Executory Contracts and Unexpired Leases.  On the Effective Date, all executory contracts or unexpired leases to which any of the Debtors is a party shall be deemed automatically assumed in accordance with the provisions and requirements of sections 365 and

1123 of the Bankruptcy Code, unless such executory contracts or unexpired leases (i) shall have been previously rejected by the Debtors by Final Order of the Bankruptcy Court, (ii) shall be the subject of a motion to reject pending on or before the Effective Date, (iii) are listed on Joint Plan Schedule 6.1, which shall be the schedule of executory contracts or unexpired leases rejected pursuant to this Joint Plan, or (iv) are otherwise rejected pursuant to the terms of this Joint Plan. Joint Plan Schedule 6.1 shall be Filed no later than five Business Days prior to the Confirmation Date. The Joint Plan Proponents reserve the right to amend Joint Plan Schedule 6.1 at any time prior to the Confirmation Date. Entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of the rejections and assumptions contemplated hereby pursuant to sections 365(a) and 1123 of the Bankruptcy Code as of the Effective Date. Each executory contract and unexpired lease assumed pursuant to this Article VI shall revest in and be fully enforceable by the respective Reorganized Debtor in accordance with its terms, except as modified by the provisions of this Joint Plan, or any order of the Bankruptcy Court authorizing and providing for its assumption or applicable federal law. Neither the exclusion nor the inclusion by the Joint Plan Proponents of a contract or lease on Joint Plan Schedule 6.1 nor anything contained in this Joint Plan shall constitute an admission by the Joint Plan Proponents that such lease or contract is an unexpired lease or executory contract that any Debtor or Non-Debtor Affiliate has any liability thereunder. The Joint Plan Proponents reserve the right, subject to notice, to amend, modify, supplement, or otherwise change Joint Plan Schedule 6.1 on or before the Effective Date.

6.2     Collective Bargaining Agreements:  The Debtors shall assume their collective bargaining agreements.

6.3     St. Francis Leases:  St. Francis contends that the St. Francis Leases constitute "true" leases, however, in the interest of compromising

controversies, St. Francis has agreed to treat the St. Francis Leases as secured financings, which are included in the amount of the St. Francis Secured Claims.

6.4     Assumption of Medicare Provider Agreement(s). The Reorganized Debtors shall expressly assume all of the Debtors' Medicare provider agreement(s) and numbers with the Centers for Medicare and Medicaid Services ("**CMS**") with modifications that are satisfactory to St. Francis.  The Reorganized Debtors shall cure any defaults under such agreements, pursuant to 11 U.S.C. § 365, by paying such defaults in the ordinary course (or such defaults shall be cured by CMS' collection of any amount due via offset or recoupment in the ordinary course).  Because any amount due shall be collected in the ordinary course, CMS shall not be required to file any separate claim in the bankruptcy to collect any amounts due to CMS under the Medicare program, whether via a proof of claim, claim for cure, or administrative claim.  The terms of the Debtors' participation in the Medicare program are governed by the Medicare Act and federal law and shall not be modified by the terms of this Joint Plan or the Confirmation Order, including but not limited to any language in this Joint Plan or the Confirmation Order granting security interests to other parties in the Debtors' healthcare accounts receivable, granting releases or imposing injunctions. Notwithstanding any other provision to this Joint Plan or the Confirmation Order, nothing in this Joint Plan or the Confirmation Order shall release (or operate to enjoin) any claim of the United States against any non-debtor, nor shall this Joint Plan or the Confirmation Order operate to release or enjoin any claim of the United States against the Debtors, except as provided expressly by the Bankruptcy Code.

6.5     Treatment of Bank of Hawaii's Lease.  HMC and HMCW are parties to a certain Equipment Lease Agreement (the "**BOH Lease**") with Bank of Hawaii ("**BOH**").  Reorganized HMC and Reorganized HMCW shall assume the BOH Lease upon the Effective Date of this Joint Plan.

U.S. Bankruptcy Court - Hawaii   #08-01369   Dkt # 1118   Filed  03/12/10   Page 112 of 143

6.6　Treatment of Siemens Medical Leases. The Siemens Leases and the Siemens Service Agreements shall be deemed assumed as of the Effective Date by the Reorganized Debtors. All cure payments required by section 365(b)(1) of the Bankruptcy Code (in an amount to be provided by Siemens Financial and Siemens Medical prior to the Confirmation Hearing) relating to the Siemens Leases and Siemens Service Agreements shall be paid on or prior to the Effective Date.

6.7　Cure of Defaults in Connection with Assumption:  Any monetary amounts by which each executory contract and unexpired lease to be assumed or assumed and assigned pursuant to the Joint Plan is in default will be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, at the option of the pertinent Reorganized Debtor: (a) by payment of the default amount in Cash on the Effective Date or (b) on such other terms as are agreed to by the parties to such executory contract or unexpired lease.  If there is a dispute regarding: (a) the amount of any cure payments; (b) the ability of the pertinent Reorganized Debtor to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the contract or lease to be assumed; or (c) any other matter pertaining to assumption, the cure payments required by section 365(b)(1) of the Bankruptcy Code will be made promptly following the entry of a Final Order resolving the dispute and approving the assumption.

6.8　Bar Date for Rejection Damages:  If the rejection of an executory contract or unexpired lease pursuant to the Joint Plan gives rise to a Claim by the other party or parties to such contract or lease, such Claim shall be forever barred and shall not be enforceable against the Reorganized Debtors, their successors or properties unless a proof of Claim is filed and served on the pertinent Reorganized Debtor and its counsel within 30 days after the Effective Date. Notice of the Bar Date for rejection.  Damages shall be sent to all parties to such

Contracts or Leases that were rejected. All such Claims for which proofs of Claim are required to be filed, if Allowed, will be, and will be treated as, Unsecured Claims (or Convenience Claims, if appropriate) subject to the provisions of the Joint Plan.

6.9     Bar Date for Bankruptcy Code § 365(n) Election:  If the rejection of an executory contract pursuant to the Joint Plan gives rise to the right by the other party or parties to such contract to make an election under § 365(n) of the Bankruptcy Code to either treat such contract as terminated or to retain its rights under such contract, such other party to such contract will be deemed to elect to treat such contract as terminated unless such other party files and serves a notice of its alternative election on the pertinent Reorganized Debtor and its counsel within 30 days after the Effective Date.

6.10    Licensing Requirements.  The Reorganized Debtors shall, as of the Effective Date, comply with all the proper state and federal regulatory requirements, including but not limited to, acquiring any certificates of need, licenses, permits, notices and approvals necessary to operate without restriction as healthcare facilities and to participate in Medicare, Medicaid, and any other government health benefit program in which the Debtors are currently participants under federal and Hawaii law.

## ARTICLE VIIIX
## DISTRIBUTIONS AND RELATED MATTERS

7.1     Reorganized Debtor to Serve As Disbursing Agent:  The Reorganized Debtors shall serve as the Disbursing Agents to hold and distribute Cash and such other property as may be distributed pursuant to the Joint Plan, provided however, that the Reorganized Debtors, in their sole and absolute discretion, may employ another Person, on such terms as may be determined by the Reorganized Debtors, to hold and distribute Cash and such other property as may

be distributed pursuant to the Joint Plan.  Even if the Disbursing Agent is a Person other than the Reorganized Debtors, the Disbursing Agent shall be an agent of the Reorganized Debtors and not a separate taxable Person with respect to, for example, the assets held, income received or disbursements or distributions made for the Reorganized Debtors.  The Reorganized Debtors shall not be required to post or otherwise provide a bond in connection with the making of any distributions pursuant to the Joint Plan.

       7.2    <u>Dates of Distributions</u>:  The Sections of the Joint Plan on treatment of Administrative Expense Claims, Claims, and Interests specify the times for distributions.  Whenever any payment or distribution to be made under the Joint Plan shall be due on a day other than a Business Day, such payment or distribution shall instead be made, without interest, on the immediately following Business Day.  Distributions due on the Effective Date will be paid on such date or as soon as practicable thereafter, provided that if other provisions of the Joint Plan require the surrender of securities or establish other conditions precedent to receiving a distribution, the distribution may be delayed until such surrender occurs or conditions are satisfied.  If, under the terms of the Joint Plan, the resolution of a particular Disputed Claim, (*e.g.,* it is Disallowed), entitles other Holders of Claims or Interests to a further distribution, either (a) the Reorganized Debtors or the Disbursing Agent may make such further distribution as soon practicable after the resolution of the Disputed Claim or (b) if the further distribution is determined in good faith, by the Reorganized Debtors or the Disbursing Agent who is to make such distribution, to be less than $500 for any Creditor, then, in order to afford the Reorganized Debtor an opportunity to minimize costs and aggregate such distributions, the Reorganized Debtor or the Disbursing Agent may make such further distribution any time prior to sixty (60) days after the Final Resolution Date.

U.S. Bankruptcy Court - Hawaii   #08-01369   Dkt # 1118   Filed  03/12/10   Page 115 of 143

7.3    Cash Distributions:  Distributions of Cash may be made either by check drawn on a domestic bank or wire transfer from a domestic bank, at the option of the Reorganized Debtors, as applicable, except that Cash payments made to foreign Creditors may be made in such funds and by such means as are necessary or customary in a particular foreign jurisdiction.

7.4    De Minimis Distributions:  The Reorganized Debtors or Disbursing Agent shall not distribute Cash to the holder of an Allowed Claim in an impaired Class if the total aggregate amount of Cash to be distributed on account of such Claim is less than $25, unless the Reorganized Debtors or the Disbursing Agent determines within its sole discretion to make such distribution.  Any holder of an Allowed Claim on account of which the total aggregate amount of Cash to be distributed is less than $25 will have its claim for such distribution discharged and will be forever barred from asserting any such claim against the Debtors, the Reorganized Debtors or Disbursing Agent, or their respective property.

7.5    Disputed Claims:

7.5.1    Distributions of consideration due in respect of a Disputed Claim shall be held and not made pending resolution of the Disputed Claim.

7.5.2    After an objection to a Disputed Claim is withdrawn, resolved by agreement, or determined by Final Order, the distributions due on account of any resulting Allowed Claim, Allowed Interest or Allowed Administrative Expense Claim shall be made by the Reorganized Debtors or the Disbursing Agent.  Such distribution shall be made at the time provided in the Joint Plan for the next scheduled distribution to the class or type of Claim, Interest or Administrative Expense of such Holder and, if there is no such further scheduled time, within forty-five (45) days of the date that the Disputed Claim becomes an Allowed Claim, Allowed Interest or Allowed Administrative Expense.  No interest

41

shall be due to a Holder of a Disputed Claim based on the delay attendant to determining the allowance of such Claim, Interest or Administrative Expense.

       7.5.3    If the Claim or Interest of a Holder of a Claim or Interest is Disallowed (by example only, under 11 U.S.C. § 502(d)), the Claim or Interest of such Holder shall be cancelled, retired and of no further force and effect and such Holder shall be obligated to surrender any document, certificate or other matter evidencing such Claim or Interest.  The Holders of any such cancelled instruments, securities and other documentation will have no rights arising from or relating to such instruments, securities or other documentation, or the cancellation thereof, except the rights provided pursuant to the Joint Plan.

       7.6    <u>Undeliverable and Unclaimed Distributions</u>: If any distribution under the Joint Plan is returned to the Reorganized Debtor or its agents as undeliverable or the check or other similar instrument or distribution by the Reorganized Debtor remains uncashed or unclaimed for one hundred eighty (180) days, such distribution shall be deemed to be "Unclaimed Property."  Upon a distribution becoming Unclaimed Property, it immediately shall be revested in the Reorganized Debtor.  Pending becoming Unclaimed Property, such distribution will remain in the possession of the Disbursing Agent and, if the Disbursing Agent is notified in writing of a new address for the Holder, it shall cause distribution of the Cash or New Notes, as appropriate, within 45 days thereafter.  Once there becomes Unclaimed Property for a Holder, no subsequent distributions for such Holder which may otherwise be due under the Joint Plan will accrue or be held for such Holder, provided that, if the Reorganized Debtor is notified in writing of such Holder's then-current address and status as a Holder under the Joint Plan, thereafter, the Holder will become entitled to its share of distributions, if any, which first become due after such notification.

U.S. Bankruptcy Court - Hawaii   #08-01369   Dkt # 1118   Filed  03/12/10   Page 117 of 143

7.7     Compliance with Tax Requirements:  The Reorganized Debtors and the Disbursing Agent shall comply with all withholding and reporting requirements imposed by federal, state or local taxing authorities in connection with making distributions pursuant to the Joint Plan.  In connection with each distribution with respect to which the filing of an information return (such as an Internal Revenue Service Form 1099 or 1042) or withholding is required, the Reorganized Debtor and the Disbursing Agent shall file such information return with the Internal Revenue Service and provide any required statements in connection therewith to the recipients of such distribution, or effect any such withholding and deposit all moneys so withheld to the extent required by law.  With respect to any Person from whom a tax identification number, certified tax identification number or other tax information required by law to avoid withholding has not been received by the Reorganized Debtors or the Disbursing Agent, the Reorganized Debtors or the Disbursing Agent may, at their sole option, withhold the amount required and distribute the balance to such Person or decline to make such distribution until the information is received; provided, however, that the Reorganized Debtors or the Disbursing Agent shall not be obligated to liquidate any securities to perform such withholding.

ARTICLE VIII

PROCEDURES FOR RESOLVING

DISPUTED CLAIMS; AND LITIGATION

8.1     Objections to Claims:  All objections to Claims must be Filed and served on the holders of such Claims by the Claims Objection Bar Date, and, if Filed prior to the Effective Date, such objections will be served on the parties on the then-applicable service list in the Reorganization Cases.  If an objection is required to be Filed and has not been Filed to a proof of Claim or a scheduled

Claim by the Claims Objection Bar Date, the Claim to which the proof of Claim or scheduled Claim relates will be treated as an Allowed Claim if such Claim has not been allowed earlier. An objection is deemed to have been timely Filed as to all Tort Claims, thus making each such Claim a Disputed Claim as of the Claims Objection Bar Date. Each such Tort Claim will remain a Disputed Claim until it becomes an Allowed Claim.

8.2     Authority to Prosecute Objections:  After the entry of the Confirmation Order, only the Reorganized Debtor will have the authority to File, settle, compromise, withdraw or litigate to judgment objections to Claims, including pursuant to any alternative dispute resolution or similar procedures approved by the Bankruptcy Court.

8.3     Estimation of Tax Claims:  In addition to any other available remedies or procedures with respect to Tax Claims or Tax issues or liabilities, the Reorganized Debtors or any of them, at any time, may utilize (and receive the benefits of) section 505 of the Bankruptcy Code with respect to: any Tax issue or liability relating to an act or event occurring prior to the Effective Date; or any Tax liability arising prior to the Effective Date.  If a Reorganized Debtor utilizes section 505(b) of the Bankruptcy Code: (1) the Court shall determine the amount of the subject Tax liability or Claim in the event that the appropriate governmental entity timely determines a Tax to be due in excess of the amount indicated on the subject return; and (2) if the prerequisites are met for obtaining a discharge of Tax liability or Claim in accordance with section 505(b) of the Bankruptcy Code, the Reorganized Debtor and any successors to the Debtor shall be entitled to such discharge which shall apply to any and all Taxes relating to the period covered by such return.

8.4     Temporary or Permanent Resolution of Disputed Claims:  The Reorganized Debtors may, at any time, request that the Bankruptcy Court estimate

any Disputed Claim, including without limitation any Tax Claim, pursuant to section 502(c) of the Bankruptcy Code, irrespective of whether the Reorganized Debtor has previously objected to such Disputed Claim or whether the Bankruptcy Court has ruled on any such objection. The Bankruptcy Court will retain jurisdiction to estimate any contingent or unliquidated Disputed Claim at any time during litigation concerning any objection to the Disputed Claim, including during the pendency of any appeal relating to any such objection. If the Bankruptcy Court estimates any Disputed Claim, that estimated amount would constitute either the Allowed amount of such Disputed Claim or a maximum limitation on such Disputed Claim, as determined by the Bankruptcy Court. If the estimated amount constitutes a maximum limitation on such Disputed Claim, the Reorganized Debtors may elect to pursue any supplemental proceedings to object to any ultimate payment on account of such Disputed Claim. In addition, the Reorganized Debtor may resolve or adjudicate any Disputed Claim in the manner in which the amount of such Claim, Interest or Administrative Expense Claim and the rights of the Holder of such Claim, Interest or Administrative Expense Claim would have been resolved or adjudicated if the Reorganization Cases had not been commenced. All of the aforementioned objection, estimation and resolution procedures are cumulative and not necessarily exclusive of one another.

8.5     Setoff: The Reorganized Debtors may, pursuant to section 553 of the Bankruptcy Code or applicable nonbankruptcy law, set off against any Allowed Claim, Interest or Administrative Expense Claim and the distributions to be made pursuant to the Joint Plan on account of such Claim, Interest or Administrative Expense Claim (before any distribution is made on account of such Claim, Interest or Administrative Expense Claim), the Rights of Action of any nature that the Debtor may hold against the Holder of such Allowed Claim, Interest or Administrative Expense Claim. Neither the failure to set off nor the allowance

U.S. Bankruptcy Court - Hawaii   #08-01369   Dkt # 1118   Filed 03/12/10   Page 120 of 143

of any Claim, Interest or Administrative Expense Claim hereunder will constitute a waiver or release by the Reorganized Debtor of any such Rights of Action that it may have against such Holder.

   8.6 <u>Rights of Action</u>:  In accordance with section 1123(b) of the Bankruptcy Code, the Reorganized Debtors, to the extent set forth below, and its successors, any assigns hereunder and future assigns will retain and may exclusively enforce any Rights of Action subject only to any <u>express</u> waiver or release thereof in the Joint Plan or in any other contract, instrument, release, indenture or other agreement entered into in connection with the Joint Plan, and the Confirmation Order's approval of the Joint Plan shall be deemed a *res judicata* determination of such rights to retain and exclusively enforce such Rights of Action.  Absent such express waiver or release, the Reorganized Debtors, or its successors or assigns may pursue Rights of Action, as appropriate, in accordance with the best interests of the Reorganized Debtor (or its successors or future assigns).  The Rights of Actions may be asserted or prosecuted before or after solicitation of votes on the Joint Plan or before or after the Effective Date.

   8.6.1 Absent an express waiver or release as referenced above, nothing in the Joint Plan shall (or is intended to) prevent, estop or be deemed to preclude the Reorganized Debtors from utilizing, pursuing, prosecuting or otherwise acting upon all or any of their Rights of Action and, therefore, no preclusion doctrine, including, without limitation, the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable or otherwise) or laches shall apply to such Rights of Action upon or after Confirmation or Consummation.  *By example only and without limiting the foregoing, the utilization or assertion of a Right of Action or the initiation of any proceeding with respect thereto against a Person, by the Reorganized Debtor or any successor to or assign of it, shall not be barred (whether by estoppel,*

U.S. Bankruptcy Court - Hawaii   #08-01369   Dkt # 1118   Filed  03/12/10   Page 121 of 143

*collateral estoppel, res judicata or otherwise) as a result of: (a) the solicitation of a vote on the Joint Plan from such Person or such Person's predecessor in interest; (b) the Claim, Interest or Administrative Expense Claim of such Person or such Person's predecessor in interest having been listed in the Debtors' Schedules, List of Holders of Interests, or in the Joint Plan, Disclosure Statement or any exhibit thereto; (c) prior objection to or allowance of a Claim, Interest or Administrative Expense Claim of the Person or such Person's predecessor in interest; or (d) Confirmation of the Joint Plan.*

8.6.2    Notwithstanding any allowance of a Claim or Administrative Expense Claim, the Reorganized Debtors reserve the right to seek, among other things, to have such Claim or Administrative Expense Claim disallowed if the Reorganized Debtors, at the appropriate time, determine that one or more of them has a defense under 11 U.S.C. § 502(d), *e.g.*, a Reorganized Debtor holds a Right of Action for an Avoidance claim against the Holder of such Claim or Administrative Expense Claim and such Holder after demand refuses to pay the amount due in respect thereto.  Such reservation shall remain subject to any limitation on application of 11 U.S.C. § 502(d) to Administrative Expense Claim under applicable law.

## ARTICLE IX

## EXEMPTION FROM CERTAIN TRANSFER TAXES

9.1    Pursuant to section 1146(c) of the Bankruptcy Code, any transfers from a Debtor to a Reorganized Debtor or any other Person pursuant to the Joint Plan including (a) the issuance, transfer, or exchange of New Notes, (b) the creation of any mortgage, deed of trust, or other security interest, and (c) the making of any agreement or instrument in furtherance of, or in connection with, this Joint Plan, shall not be subject to any document recording tax, stamp tax,

U.S. Bankruptcy Court - Hawaii   #08-01369   Dkt # 1118   Filed  03/12/10   Page 122 of 143

conveyance fee, intangibles or similar tax, mortgage tax, stamp act, real estate transfer, reconveyance, or conveyance tax, mortgage recording tax or other similar Tax or governmental assessment.

## ARTICLE X

## CONDITIONS PRECEDENT TO CONFIRMATION
## AND CONSUMMATION OF THE JOINT PLAN

10.1    <u>Conditions to Confirmation</u>: The Bankruptcy Court will not enter the Confirmation Order unless and until the following conditions have been satisfied or duly waived pursuant to Section 10.3:

10.1.1    The Confirmation Order will be reasonably acceptable in form and substance to the Joint Plan Proponents.

10.1.2    All Exhibits to the Joint Plan are in form and substance reasonably satisfactory to the Joint Plan Proponents.

10.2    <u>Conditions to the Effective Date</u>:  The Effective Date will not occur, and the Joint Plan will not be consummated, unless and until each of the following conditions have been satisfied or duly waived pursuant to Section 10.3:

10.2.1    The Confirmation Order has been entered, has not been reversed, stayed, modified or amended and has become a Final Order.

10.2.2    The Confirmation Order shall authorize the Reorganized Debtor to take all actions necessary or appropriate to implement the Joint Plan, including consummation of the transactions contemplated by the Joint Plan, as well as the implementation and consummation of all contracts, instruments, releases and other agreement or documents generated in connection with the Joint Plan.

10.2.3    The Joint Plan shall not have been amended, altered or modified from the Joint Plan as confirmed, in any material respect, unless such amendment, alteration or modification has been consented to in accordance with

Section 14.1, and all Exhibits to the Joint Plan remain in form and substance reasonably satisfactory to the Joint Plan Proponents.

        10.2.4    The Effective Date has occurred by June 30, 2010.

        10.3   <u>Waiver of Conditions to the Confirmation or Effective Date</u>: The conditions to Confirmation set forth in Sections 10.1 and the conditions to the Effective Date set forth in Sections 10.2 may be waived, in writing, in whole or in part by the Joint Plan Proponents at any time without an order of the Bankruptcy Court.

        10.4   <u>Effect of Nonoccurrence of Conditions to the Effective Date</u>:  If each of the conditions to the Effective Date is not satisfied or duly waived in accordance with Section 10.3, then upon motion by the Joint Plan Proponents made before the time that each of such conditions has been satisfied or duly waived and upon notice to such parties in interest as the Bankruptcy Court may direct, the Confirmation Order will be vacated by the Bankruptcy Court; *provided, however,* that, notwithstanding the Filing of such motion, the Confirmation Order may not be vacated if each of the conditions to the Effective Date is either satisfied or duly waived before the Bankruptcy Court enters an order granting such motion. If the Confirmation Order is vacated pursuant to this Section 10.4, (1) the Joint Plan will be null and void in all respects, including with respect to:  (a) the discharge of Claims and termination of Interests pursuant to section 1141 of the Bankruptcy Code; (b) the assumptions, assignments or rejections of Executory Contracts and Unexpired Leases pursuant to Article VI; and (c) the releases described in Section 13.6; and (2) nothing contained in the Joint Plan will: (a) constitute a waiver or release of any claims by or against, or any Interest in, the Debtor; or (b) prejudice in any manner the rights of the Debtors, or any other party in interest.

ARTICLE XI

CRAMDOWN

11.1   The Joint Plan Proponents request Confirmation under section
1129(b) of the Bankruptcy Code with respect to any impaired Class other than
Class 3 that does not accept the Joint Plan pursuant to section 1126 of the
Bankruptcy Code.  The Joint Plan Proponents reserve the right to modify the Joint
Plan to the extent, if any, that Confirmation pursuant to section 1129(b) of the
Bankruptcy Code requires modification.

ARTICLE XII

RETENTION OF JURISDICTION AND

MISCELLANEOUS MATTERS

12.1   Retention of Jurisdiction:  Notwithstanding the entry of the
Confirmation Order or the occurrence of the Effective Date, the Bankruptcy Court
shall retain jurisdiction over the Reorganization Cases and any of the proceedings
related to the Reorganization Cases pursuant to section 1142 of the Bankruptcy
Code and 28 U.S.C. § 1334 to the fullest extent permitted by the Bankruptcy Code
and other applicable law, including, without limitation, such jurisdiction as is
necessary to ensure that the purpose and intent of the Joint Plan are carried out.
Without limiting the generality of the foregoing, the Bankruptcy Court shall retain
jurisdiction for the following purposes:

12.1.1          establish the priority or secured or unsecured status
of, allow, disallow, determine, liquidate, classify, or estimate any Claim,
Administrative Expense Claim or Interest (including, without limitation and by
example only, determination of Tax issues or liabilities in accordance with
Bankruptcy Code §505), resolve any objections to the allowance or priority of
Claims, Administrative Expense Claim or Interests, or resolve any dispute as to the

treatment necessary to reinstate a Claim, Administrative Expense Claim or Interest pursuant to the Joint Plan;

        12.1.2        grant or deny any applications for allowance of compensation or reimbursement of expenses authorized pursuant to the Bankruptcy Code or the Joint Plan, for periods ending on or before the Effective Date;

        12.1.3        resolve any matters related to the assumption, assumption and assignment or rejection of any executory contract or unexpired lease to which the Debtor is a party or with respect to which the Debtor may be liable, and to hear, determine and, if necessary, liquidate any Claims or Administrative Expenses arising therefrom;

        12.1.4        ensure that distributions to Holders of Allowed Claims or Administrative Expense Claims are made pursuant to the provisions of the Joint Plan, and to effectuate performance of the provisions of the Joint Plan;

        12.1.5        decide or resolve any motions, adversary proceedings, contested or litigated matters and any other matters and grant or deny any applications involving the Debtor that may be pending before the Effective Date or that may be commenced thereafter as provided in the Joint Plan;

        12.1.6        enter such orders as may be necessary or appropriate to implement or consummate the provisions of the Joint Plan and all contracts, instruments, releases, indentures and other agreements or documents created in connection with the Joint Plan, the Disclosure Statement or the Confirmation Order, except as otherwise provided in the Confirmation Order or in the Joint Plan, including, without limitation, any stay orders as may be appropriate in the event that the Confirmation Order is for any reason stayed, revoked, modified or vacated;

        12.1.7        resolve any cases, controversies, suits or disputes that may arise in connection with the consummation, interpretation or enforcement

U.S. Bankruptcy Court - Hawaii   #08-01369   Dkt # 1118   Filed 03/12/10   Page 126 of 143

of the Joint Plan or the Confirmation Order, including the release and injunction provisions set forth in and contemplated by the Joint Plan and the Confirmation Order or any Person's rights arising under or obligations incurred in connection with the Joint Plan or the Confirmation Order; provided, however, that, absent a Reorganized Debtors' request or consent, such retention of jurisdiction shall not apply to any cases, controversies, suits or disputes that may arise in connection with a Reorganized Debtors' or any other Person's rights or obligations as: (a) the issuer or Holder, respectively, of any securities issued or delivered pursuant to the Joint Plan; or (b) a party to any agreements governing, instruments evidencing or documents relating to the securities issued or delivered pursuant to the Joint Plan;

    12.1.8   subject to the restrictions on modifications provided in any contract, instrument, release, indenture or other agreement or document created in connection with the Joint Plan, modify the Joint Plan before or after the Effective Date pursuant to section 1127 of the Bankruptcy Code or modify the Disclosure Statement, the Confirmation Order or any contract, instrument, release, indenture or other agreement or document created in connection with the Joint Plan, the Disclosure Statement or the Confirmation Order; or remedy any defect or omission or reconcile any inconsistency in any Bankruptcy Court order, the Joint Plan, the Disclosure Statement, the Confirmation Order or any contract, instrument, release, indenture or other agreement or document created in connection with the Joint Plan, the Disclosure Statement or the Confirmation Order, in such manner as may be necessary or appropriate to consummate the Joint Plan, to the extent authorized by the Bankruptcy Code;

    12.1.9   issue injunctions, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any Person with the consummation, implementation or enforcement of the Joint Plan or the Confirmation Order,

U.S. Bankruptcy Court - Hawaii   #08-01369   Dkt # 1118   Filed  03/12/10   Page 127 of 143

12.1.10    consider and act on the compromise and settlement of any Claim against, or Right of Action of the Debtors or the Estates;

12.1.11    decide or resolve any Rights of Action under the Bankruptcy Code, including without limitation, Avoidance Actions and claims under sections 362, 510, 542 and 543 of the Bankruptcy Code;

12.1.12    enter such orders as may be necessary or appropriate in connection with the recovery of the assets of the Debtor or the Reorganized Debtor wherever located;

12.1.13    hear and determine any motions or contested matters involving Tax Claims or Taxes either arising prior (or for periods including times prior) to the Effective Date or relating to the administration of the Reorganization Cases, including, without limitation (i) matters involving federal, state and local Taxes in accordance with sections 346, 505 and 1146 of the Bankruptcy Code, (ii) matters concerning Tax refunds due for any period including times prior to the Effective Date, (iii) any matters arising prior to the Effective Date affecting Tax attributes of the Reorganized Debtor, and (iv) estimation or allowance of any tax claims asserted against the Debtor or Reorganized Debtor;

12.1.14    determine such other matters as may be provided for in the Confirmation Order or as may from time to time be authorized under the provisions of the Bankruptcy Code or any other applicable law;

12.1.15    enforce all orders, judgments, injunctions, releases, exculpations, indemnifications and rulings issued or entered in connection with the Reorganization Cases or the Joint Plan;

12.1.16    remand to state court any claim, cause of action, or proceeding involving the Debtor that was removed to federal court in whole or in part in reliance upon 28 U.S.C. § 1334;

U.S. Bankruptcy Court - Hawaii   #08-01369   Dkt # 1118   Filed 03/12/10   Page 128 of 143

12.1.17    determine any other matters that may arise in connection with or relate to the Joint Plan, the Disclosure Statement, the Confirmation Order or any contract, instrument, release, indenture or other agreement or document created in connection with the Joint Plan, the Disclosure Statement or the Confirmation Order, except as otherwise provided in the Joint Plan;

12.1.18    determine any other matter not inconsistent with the Bankruptcy Code; and

12.1.19    enter an order concluding the Reorganization Cases.

12.2    <u>Headings</u>  The headings used in the Joint Plan are inserted for convenience only and neither constitute a portion of the Joint Plan nor in any manner affect the construction of the provisions of the Joint Plan.

12.3    <u>Notices</u>:  All notices and requests in connection with the Joint Plan shall be in writing and shall be hand delivered or sent by mail addressed to:

Joint Plan Proponents:

ST. FRANCIS HEALTHCARE SYSTEM OF HAWAII
2226 Liliha St. Ste 227
Honolulu, HI 96817
Telephone: (808) 547-8004
Facsimile: (808) 547-8018
Attention:  Mr. Jerry Correa
Chief Administrative Officer

With a copy to:

HENNIGAN, BENNETT & DORMAN LLP
865 South Figueroa Street, Suite 2900
Los Angeles, CA 90017
Telephone: (213) 694-1200
Facsimile:  (213) 694-1234
Attention:  Bruce Bennett and Joshua M. Mester

U.S. Bankruptcy Court - Hawaii   #08-01369   Dkt # 1118   Filed  03/12/10   Page 129 of 143

and

McCORRISTON MILLER MUKAI MacKINNON LLP
Five Waterfront Plaza, 4th Floor
500 Ala Moana Blvd.
Honolulu, HI 96813
Telephone: (808) 529-7300
Facsimile: (808) 535-8037
Attention:  Stewart Pressman

12.4   All notices and requests to any Person holding of record any Claim, Administrative Expense or Interest shall be sent to such Person at the Person's last known address, or if known by the Debtor, to the last known address of the Person's attorney of record.  Any such Person may designate in writing any other address for purposes of this Section of the Joint Plan, which designation will be effective on receipt.

12.5   Successors and Assigns:  The rights, duties and obligations of any Person named or referred to in the Joint Plan shall be binding upon, and shall inure to the benefit of, the successors and assigns of such Person.

12.6   Committee:  The Committee shall be terminated on the Effective Date; provided, however, that following the termination of the Committee, the professionals of the Committee may prepare their respective Fee Applications.

12.7   Severability of Plan Provisions:  If, prior to Confirmation, any term or provision of the Joint Plan is held by the Bankruptcy Court to be invalid, void or unenforceable, the Bankruptcy Court will have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision will then be applicable as altered or interpreted.  Notwithstanding any such holding, alteration

or interpretation, the remainder of the terms and provisions of the Joint Plan will remain in full force and effect and will in no way be affected, Impaired or invalidated by such holding, alteration or interpretation. The Confirmation Order will constitute a judicial determination that each term and provision of the Joint Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to their terms.

12.8    No Waiver:  Neither the failure of the Debtor to list a Claim in the Debtors' Schedules, the failure of the Debtor to object to any Claim or Interest for purposes of voting, the failure of any Reorganized Debtor to object to a Claim, Administrative Expense Claim or Interest prior to Confirmation or the Effective Date, the failure of the Debtor to assert a Right of Action prior to Confirmation or the Effective Date, the absence of a proof of Claim having been filed with respect to a Claim, nor any action or inaction of the Reorganized Debtor or any other party with respect to a Claim, Administrative Expense Claim, Interest or Right of Action other than a legally effective express waiver or release shall be deemed a waiver or release of the right of the Debtor or its successors, before or after solicitation of votes on the Joint Plan or before or after Confirmation or the Effective Date to (a) object to or examine such Claim, Administrative Expense Claim or Interest, in whole or in part or (b) retain and either assign or exclusively assert, pursue, prosecute, utilize, otherwise act or otherwise enforce any Rights of Action.

12.9    Inconsistencies:  In the event the terms or provisions of the Joint Plan are inconsistent with the terms and provisions of the exhibits to the Joint Plan or documents executed in connection with the Joint Plan, the terms of the Joint Plan shall control.

ARTICLE XIII

EFFECT OF CONFIRMATION

U.S. Bankruptcy Court - Hawaii   #08-01369   Dkt # 1118   Filed 03/12/10   Page 131 of 143

13.1    Binding Effect of Confirmation:  Confirmation will bind the Debtor, all Holders of Claims, Administrative Expense Claims or Interests and other parties in interest to the provisions of the Joint Plan whether or not the Claim, Administrative Expense Claim or Interest of such Holder is Impaired under the Joint Plan and whether or not the Holder of such Claim, Administrative Expense Claim or Interest has accepted the Joint Plan.

13.2    Good Faith:  Confirmation of the Joint Plan shall constitute a finding that:  (i) this Joint Plan has been proposed in good faith and in compliance with applicable provisions of the Bankruptcy Code; and (ii) all Persons' solicitations of acceptances or rejections of this Joint Plan and the offer, issuance, sale, or purchase of a security offered or sold under the Joint Plan have been in good faith and in compliance with applicable provisions of the Bankruptcy Code.

13.3    No Limitations on Effect of Confirmation:  Nothing contained in the Joint Plan will limit the effect of Confirmation as described in section 1141 of the Bankruptcy Code.

13.4    Discharge of Claims, Administrative Expenses and Interests: Except as provided in the Joint Plan or Confirmation Order, the rights afforded hereunder and the treatment of Claims, Administrative Expense Claims and Interests thereunder will be in exchange for and in complete satisfaction, discharge and release of all Claims and Administrative Expense Claims and termination of all Interests, including any interest accrued on Claims from the Petition Date. Except as provided in the Joint Plan or the Confirmation Order, Confirmation will: (i) discharge the Debtors and Reorganized Debtors from all Claims, Administrative Expense Claims or other debts that arose before the Confirmation Date and all debts of the kind specified in sections 502(g), 502(h) or 502(i) of the Bankruptcy Code, whether or not (a) a proof of Claim based on such debt is filed or deemed filed pursuant to section 501 of the Bankruptcy Code, (b) a Claim based on such

U.S. Bankruptcy Court - Hawaii   #08-01369   Dkt # 1118   Filed  03/12/10   Page 132 of 143

debt is allowed pursuant to section 502 of the Bankruptcy Code or (c) the Holder of a Claim or Administrative Expense Claim based on such debt has accepted the Joint Plan; and (ii) terminate all Interests and other rights of Interest Holders in the Debtor.  As of the Confirmation Date, except as provided in the Joint Plan or the Confirmation Order, all Entities shall be precluded from asserting against the Debtor, the Reorganized Debtor, their successors or their property, any other or further claims, debts, rights, causes of action, liabilities or equity interests based upon any act, omission, transaction or other activity of any nature that occurred prior to the Confirmation Date.  For greater certainty, no guarantee executed by any person other than a Debtor shall be discharged or otherwise affected by this Joint Plan or by the Confirmation Order.  All such guarantees shall remain in full force and effect.

   13.5 <u>Judicial Determination of Discharge</u>: As of the Confirmation Date, except as provided in the Joint Plan, all Persons shall be precluded from asserting against the Debtors and the Reorganized Debtors any other or further Claims, Administrative Expense Claims, Interests, debts, rights, causes of action, liabilities, or equity interests based on any act, omission, transaction or other activity of any kind or nature that occurred before the Confirmation Date.  In accordance with the foregoing, except as provided in the Joint Plan or in the Confirmation Order, the Confirmation Order will be a judicial determination of discharge of all such Claims, Administrative Expense Claims and other debts and liabilities against the Debtors and termination of all such Interests and other rights of Interest Holders in the Debtors, pursuant to sections 524 and 1141 of the Bankruptcy Code, and such discharges shall void any judgment obtained against the Debtors at any time, to the extent that such judgment relates to a discharged liability, Claim, or Administrative Expense Claim or terminated Interest.

13.6   <u>Injunctions</u>:  Except as provided in the Joint Plan or the Confirmation Order, as of the Effective Date, all Entities that have held, currently hold or may hold a Claim or other debt or liability that is satisfied or released, as applicable, or an Interest or other right of an equity security holder that is terminated pursuant to the terms of the Joint Plan will be permanently enjoined from taking any of the following actions on account of any such discharged or satisfied Claims, debts or liabilities or terminated Interests or rights:
(a) commencing or continuing in any manner any action or other proceeding against the Debtors, the Estates, the Reorganized Debtors or their respective property, other than to enforce any right pursuant to the Joint Plan to a distribution; (b) enforcing, attaching, collecting or recovering in any manner any judgment, award, decree or order against the Debtors, the Reorganized Debtors or their respective property, other than as permitted pursuant to (a) above; (c) creating, perfecting or enforcing any lien or encumbrance against the Debtors, Estates, the Reorganized Debtors or their respective property; (d) asserting a setoff, right of subrogation or recoupment of any kind against any debt, liability or obligation due to the Debtors, Estates, or the Reorganized Debtors; and (e) commencing or continuing any action, in any manner, in any place that does not comply with or is inconsistent with the provisions of the Joint Plan.

13.6.1    As of the Effective Date, all Entities that have held, currently hold or may hold any claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action or liabilities that are released pursuant to the Joint Plan will be permanently enjoined from taking any of the following actions against any released Person or its property on account of such released claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action or liabilities:  (a) commencing or continuing in any manner any action or other proceeding; (b) enforcing, attaching, collecting or recovering in any manner

U.S. Bankruptcy Court - Hawaii   #08-01369   Dkt # 1118   Filed  03/12/10   Page 134 of 143

any judgment, award, decree or order; (c) creating, perfecting or enforcing any Lien; (d) asserting a setoff, right of subrogation or recoupment of any kind against any debt, liability or obligation due to any released Person; and (e) commencing or continuing any action, in any manner, in any place that does not comply with or is inconsistent with the provisions of the Joint Plan.

13.6.2    By accepting any distributions pursuant to the Joint Plan, each Holder of an Allowed Claim or interest receiving distributions pursuant to the Joint Plan will be deemed to have specifically consented to the injunctions set forth in this Section 13.6.

13.7   Compromise And Release Of Claims Against St. Francis.  The Joint Plan shall constitute a settlement and compromise of all Recovery Actions and Rights of Action and Claims of the Debtors, the Estates, and the Reorganized Debtors may have against St. Francis, and the Debtors, Reorganized Debtors, and the Estates shall forever release, waive, and discharge any such Recovery Actions and Rights of Action against St. Francis, whether known or unknown, foreseen, or unforeseen, then existing or hereafter arising, in law, equity or otherwise.

13.8   Exemption from Securities Laws:  The entry of the Confirmation Order shall be (1) a final determination of the Bankruptcy Court that the New Notes, authorized, issued or distributed pursuant to this Joint Plan, are entitled to all of the benefits and exemptions provided by section 1145 of the Bankruptcy Code, (2) a final determination of the Bankruptcy Court that the New Notes authorized pursuant to the Joint Plan are entitled to the exemptions from federal and state securities registration available under Section 4(2) of the Securities Act of 1933, as amended, Rule 701 and/or Regulation D of the SEC, and similar provisions of state securities law, and (3) deemed to incorporate the following as mixed findings of fact and conclusions of law.

13.9    Exculpation and Limitation of Liabilities.  To the maximum extent permitted by law, none of the Joint Plan Proponents, nor any of their employees, officers, directors, agents, members, representatives, or the professionals employed or retained by any of them, whether or not by Bankruptcy Court order (each, an "**Exculpated Person**"), shall have or incur liability to any Person for an act taken or omission made in good faith in connection with or related to the formulation of the Joint Plan, the Joint Disclosure Statement, or a contract, instrument, release, or other agreement or document created in connection therewith, the solicitation of acceptances for or confirmation of the Joint Plan, or the consummation and implementation of the Joint Plan and the transactions contemplated therein.  Each Exculpated Person shall in all respects be entitled to reasonably rely on the advice of counsel with respect to its duties and responsibilities under the Joint Plan.  Entry of the Confirmation Order constitutes a judicial determination that the exculpation provision contained in this Section is necessary to, *inter alia*, facilitate Confirmation and feasibility and to minimize potential claims arising after the Effective Date for indemnity, reimbursement or contribution from the Reorganized Debtor.  The Confirmation Order's approval of the Joint Plan also constitutes a *res judicata* determination of the matters included in the exculpation provisions of the Joint Plan.

13.10  Plan Distributions and Transfers Deemed Not To Be Fraudulent Transfers:  The Confirmation Order is to be a judicial determination that no distribution or transfer of Cash, securities or other property under the Joint Plan by the Debtor or Reorganized Debtor is to be deemed to have been made with the actual intent to hinder, delay, or defraud any creditor.  Moreover, the Confirmation Order shall also be a judicial determination that, with respect to a timely distribution or transfer by the Debtor or Reorganized Debtor of Cash, securities or other property which was required under the Joint Plan to be made on, or as soon

61

as practicable after, the Effective Date, the Debtor or Reorganized Debtor (1) was solvent at the time of such distribution or transfer and immediately thereafter, (2) was not left thereby with an unreasonably small amount of assets with respect to its intended business or transactions, and (3) did not intend to incur, did not believe it would incur, and reasonably should have believed it would not incur, debts beyond its ability to pay as they became due.

ARTICLE XIV

MODIFICATION OR WITHDRAWAL OF PLAN

14.1    The Joint Plan Proponents may seek to amend or modify the Joint Plan at any time prior to its Confirmation in the manner provided by section 1127 of the Bankruptcy Code or as otherwise permitted by law without additional disclosure pursuant to section 1125 of the Bankruptcy Code, except as the Bankruptcy Court may otherwise order, and the Joint Plan Proponents reserve the right to amend the terms of the Joint Plan or waive any conditions to its Confirmation, effectiveness or consummation if the Joint Plan Proponents determine that such amendments or waivers are necessary or desirable to confirm, effectuate or consummate the Joint Plan.

14.2    After confirmation of the Joint Plan, the Joint Plan Proponents may apply to the Bankruptcy Court, pursuant to section 1127 of the Bankruptcy Code, to modify the Joint Plan.  After confirmation of the Joint Plan, the Joint Plan Proponents may apply to remedy defects or omissions in the Joint Plan or to reconcile inconsistencies in the Joint Plan.  The Joint Plan may not be altered, amended or modified without the written consent of the Joint Plan Proponents or their successors.

14.3    The Joint Plan Proponents reserve the right, to be exercised in their sole and unfettered discretion, to revoke and withdraw the Joint Plan at any

U.S. Bankruptcy Court - Hawaii   #08-01369   Dkt # 1118   Filed  03/12/10   Page 137 of 143

time prior to the Effective Date, in which case the Joint Plan will be deemed to be null and void (including, <u>without limitation</u>, (1) any discharge of Claims and Administrative Expenses and termination of Interests pursuant to section 1141 of the Bankruptcy Code will be deemed null and void, (2) the assumptions, assumptions and assignments or rejections of executory contracts and unexpired leases pursuant to the Joint Plan will be deemed null and void, and (3) nothing contained in the Joint Plan will (a) constitute a waiver or release of any Right of Action, Claim, Administrative Expense or Interest or (b) prejudice in any manner the rights of the Reorganized Debtor).

ARTICLE XV

CONFIRMATION REQUEST

15.1   The Joint Plan Proponents request that the Court confirm the Joint Plan and that it do so, if applicable, pursuant to section 1129(b) of the Bankruptcy Code notwithstanding the rejection of the Joint Plan by any Impaired Class other than Class 3.


DATED:  Honolulu, Hawaii

March 12, 2010          */s/ Sister Agnelle Ching*
_____

Sister Agnelle Ching
Administrative Officer
St. Francis Healthcare System Of Hawaii, St.
Francis Medical Center, And St. Francis
Medical Center – West

# APPENDIX B

## (Disclosure Statement Order)

U.S. Bankruptcy Court - Hawaii   #08-01369   Dkt # 1118   Filed  03/12/10   Page 139 of 143

# APPENDIX C

## (Voting Procedures)

770814.5

# APPENDIX D

## (Historical Financial Information)

APPENDIX E

(Financial Forecast)

(To Be Submitted Separately)

770814.5

U.S. Bankruptcy Court - Hawaii   #08-01369   Dkt # 1118   Filed  03/12/10   Page 142 of 143

APPENDIX F

(Liquidation Analysis)

(To Be Submitted Separately)

U.S. Bankruptcy Court - Hawaii   #08-01369   Dkt # 1118   Filed  03/12/10   Page 143 of 143