## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| In re: | Case No. 08-01369 |
| CHA Hawaii, LLC, et al.,[1] | (Chapter 11 Cases) |
| Debtors. | (Jointly Administered) |
| | (Honorable Robert J. Faris) |
| This Document Relates to: | |
| ALL CASES EXCEPT CHA HAWAII, LLC | |

## FIRST AMENDED DISCLOSURE STATEMENT FOR FIRST AMENDED JOINT PLAN OF REORGANIZATION FOR HAWAII MEDICAL CENTER, LLC, HAWAII MEDICAL CENTER EAST, LLC, AND HAWAII MEDICAL CENTER WEST, LLC PROPOSED BY THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS, HAWAII MEDICAL CENTER, LLC, HAWAII MEDICAL CENTER EAST, LLC, HAWAII MEDICAL CENTER WEST, LLC, AND HAWAII PHYSICIANS GROUP, LLC

Dated: April 9, 2010

**THIS IS NOT A SOLICITATION OF ACCEPTANCE OR REJECTION OF THE PLAN. THIS DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL BUT HAS NOT YET BEEN APPROVED BY THE BANKRUPTCY COURT. SOLICITATION OF ACCPETANCE OR REJECTION OF THE PLAN MAY OCCUR ONLY AFTER THE BANKRUPTCY COURT APPROVES THIS DISCLOSURE STATEMENT.**

---

[1] CHA Hawaii, LLC, a Delaware limited liability company (Tax No. 20-3827186); Hawaii Medical Center, LLC, a Hawaii limited liability company (Tax No. 20-3409838); Hawaii Medical Center East, LLC, a Hawaii limited liability company (Tax No. 51-0598670); and Hawaii Medical Center West, LLC, a Hawaii limited liability company (Tax No. 51-0598672).

| ALSTON & BIRD LLP | WAGNER CHOI & VERBRUGGE |
|---|---|
| Martin G. Bunin (admitted *pro hac vice*)<br>Craig E. Freeman (admitted *pro hac vice*)<br>William Hao<br>90 Park Avenue<br>New York, New York 10016<br>Telephone: (212) 210-9400<br>Facsimile: (212) 210-9444<br>Email: marty.bunin@alston.com<br>    craig.freeman@alston.com<br>    william.hao@alston.com | Chuck C. Choi<br>745 Fort Street, Suite 1900<br>Honolulu, HI 96813<br>Telephone: (808) 533-1877<br>Facsimile: (808) 566-6900<br>Email:cchoi@hibklaw.com |

*Counsel for the Official Committee of Unsecured Creditors*

| MCDONALD HOPKINS LLC | MOSELEY BIEHL TSUGAWA LAU & MUZZI<br>A HAWAII LIMITED LIABILITY LAW COMPANY |
|---|---|
| Shawn M. Riley (admitted *pro hac vice*)<br>Paul W. Linehan (admitted *pro hac vice*)<br>Michael J. Kaczka (admitted *pro hac vice*)<br>600 Superior Avenue, East, Suite 2100<br>Cleveland, OH 44114-2653<br>Telephone: (216) 348-5400<br>Facsimile:  (216) 348-5474<br>Email:  sriley@mcdonaldhopkins.com<br>    plinehan@mcdonaldhopkins.com<br>    mkaczka@mcdonaldhopkins.com | Christopher J. Muzzi (6939)<br>Alakea Corporate Tower<br>1100 Alakea Street, 23rd Floor<br>Honolulu, HI 96813<br>Telephone: (808) 531-0490<br>Facsimile:  (808) 534-0202<br>Email:  cmuzzi@hilaw.us |

*Co-Counsel to the Debtors and Debtors in Possession*

| KESSNER UMEBAYASHI BAIN & MATSUNAGA | |
|---|---|
| Steven Guttman<br>220 South King Street, Suite 1900<br>Honolulu Hawaii 96813<br>Telephone: (808) 536-1900<br>Email: sguttman@kdubm.com | |

*Counsel for Hawaii Physicians Group, LLC*

# TABLE OF CONTENTS

I.  INTRODUCTION, DISCLAIMER AND SUMMARY OF TREATMENT OF CLAIMS AND
INTERESTS ...................................................................................................................... 1

SPECIAL NOTE REGARDING FORWARD-LOOKING STATEMENTS ............................ 5

    A.   Failure to Satisfy Vote Requirement ................................................................. 5
    B.   Non-Confirmation or Delay of Confirmation of the Plan ................................. 5
    C.   Non-Consensual Confirmation .......................................................................... 6
    D.   Failure of Litigation Against SFHS .................................................................. 6
    E.   Risk of Non-Occurrence of the Effective Date ................................................ 6
    G.   Classification and Treatment of Claims and Interests ...................................... 7
    H.   Increased Competition on the Island of Oahu for Patient Care Services.......... 8

II.  SUMMARY OF TREATMENT OF CLAIMS AND INTERESTS UNDER THE PLAN...... 9

    A.   Overview of Treatment ..................................................................................... 9

III.  THE DEBTORS AND THE CHAPTER 11 CASES ......................................................... 18

    A.   Business Overview and History ....................................................................... 18
    B.   Prepetition Equity Structure ............................................................................ 18
    C.   Boards of Managers and Executive Officers ................................................... 19
    D.   Prepetition Debt Structure ............................................................................... 21
    E.   Reasons for Chapter 11 Filing ........................................................................ 22
    F.   The Chapter 11 Cases ...................................................................................... 24

IV.  SUMMARY OF THE PLAN OF REORGANIZATION.................................................... 27

    A.   Overview of Chapter 11 .................................................................................. 28
    B.   Conversion of Reorganized Debtors to Nonprofit Corporations and Cancellation of All
        Interests in the Debtors ................................................................................... 28
    C.   Restructuring of SFHS Loans .......................................................................... 29
    D.   Overall Structure of the Plan .......................................................................... 30
    E.   Classification and Treatment of Claims and Interests ..................................... 31
    F.   Method of Distribution Under the Plan ........................................................... 38
    G.   Resolution of Dispute, Contingent and Unliquidated Claims ......................... 43
    H.   Means for Implementation of the Plan ............................................................ 44
    I.   Treatment of Executory Contracts and Unexpired Leases ............................. 50
    J.   Confirmation and Effectiveness of the Plan ................................................... 54
    K.   Effect of Plan Confirmation ............................................................................ 56
    L.   Summary of Other Provisions of the Plan ...................................................... 60

V.  RISK FACTORS TO BE CONSIDERED ......................................................................... 63

    A.   Failure to Satisfy Vote Requirement ............................................................... 63
    B.   Non-Confirmation or Delay of Confirmation of the Plan ............................... 63
    C.   Non-Consensual Confirmation ........................................................................ 63
    D.   Failure of Litigation Against SFHS ................................................................ 64
    E.   Risk of Non-Occurrence of the Effective Date .............................................. 64
    F.   Failure to Obtain Exit Financing ..................................................................... 64
    G.   Classification and Treatment of Claims and Interests ..................................... 64
    H.   Increased Competition on the Island of Oahu for Patient Care Services........ 65

VI.  CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ............ 66

    A.   U.S. Federal Income Tax Consequences to the Debtors and Holders of Interests ..... 67
    B.   U.S. Federal Income Tax Consequences to Holders of Claims ....................... 68

U.S. Bankruptcy Court - Hawaii   #08-01369   Dkt # 1175   Filed 04/10/10   Page 3 of 97

# TABLE OF CONTENTS

**Page**

VII. **FEASIBILITY OF THE PLAN AND BEST INTEREST OF CREDITORS** ....................................... 72

   A.   Feasibility of the Plan ................................................................................. 72
   B.   Acceptance of the Plan ............................................................................... 73
   C.   Best Interests Test ....................................................................................... 74
   D.   Liquidation Analysis ................................................................................... 75
   E.   Application of the 'Best Interests' of Creditors Test to the Liquidation Analyses ................ 75
   F.   Confirmation Without Acceptance of All Impaired Classes: The "Cramdown" Alternative ... 75

VIII. **ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN** .................. 78

   A.   Alternative Plan(s) of Reorganization ....................................................... 78
   B.   Liquidation Under Chapter 7 or Chapter 11 ............................................. 78

IX. **THE SOLICITATION; VOTING PROCEDURE** ........................................................ 80

   A.   Parties in Interest Entitled to Vote ............................................................ 80
   B.   Voting Procedures ....................................................................................... 80
   C.   Waivers of Defects, Irregularities, Etc. ...................................................... 80
   D.   Withdrawal of Ballots; Revocation ............................................................. 81
   E.   Further Information; Additional Copies ...................................................... 82

X. **CONCLUSION AND RECOMMENDATION** ........................................................... 83

U.S. Bankruptcy Court - Hawaii   #08-01369   Dkt # 1175   Filed 04/10/10   Page 4 of 97

# TABLE OF APPENDICES

Appendix    Name

Appendix A    JOINT PLAN OF REORGANIZATION FOR HAWAII MEDICAL CENTER, LLC, HAWAII MEDICAL CENTER EAST, LLC, AND HAWAII MEDICAL CENTER WEST, LLC PROPOSED BY THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS, HAWAII MEDICAL CENTER, LLC, HAWAII MEDICAL CENTER EAST, LLC, HAWAII MEDICAL CENTER WEST, LLC, AND HAWAII PHYSICIANS GROUP, LLC

Appendix B    DISCLOSURE STATEMENT ORDER

Appendix C    VOTING INSTRUCTIONS AND PROCEDURES

Appendix D    POSTPETITION FINANCIAL RESULTS

Appendix E    FINANCIAL FORECASTS

Appendix F    LIQUIDATION ANALYSIS

U.S. Bankruptcy Court - Hawaii   #08-01369   Dkt # 1175   Filed 04/10/10   Page 5 of 97

# I. INTRODUCTION, DISCLAIMER AND SUMMARY OF TREATMENT OF CLAIMS AND INTERESTS

The Official Committee of Unsecured Creditors appointed in the above-captioned cases (the "Creditors Committee"), Hawaii Medical Center, LLC ("HMC"), Hawaii Medical Center East, LLC ("HMCE"), and Hawaii Medical Center West, LLC ("HMCW" and collectively with HMC and HMCE, the "Debtors"), and Hawaii Physicians Group, LLC ("HPG," together with the Creditors Committee and the Debtors, the "Plan Proponents") provide this disclosure statement (the "Disclosure Statement") pursuant to section 1125 of the Bankruptcy Code, for use in the solicitation of votes on the First Amended Joint Plan of Reorganization (the "Plan") of HMC, HMCE, and HMCW proposed by the Plan Proponents. The Plan is being proposed by the Plan Proponents and was filed with the United States Bankruptcy Court for the District of Hawaii (the "Bankruptcy Court") on April __, 2010. A copy of the Plan is annexed as Appendix A to this Disclosure Statement. The Plan is a plan of reorganization for HMC, HMCE and HMCW. The Plan is not a plan of reorganization for CHA Hawaii, LLC ("CHA Hawaii" and collectively with HMC, HMCE and HMCW, the "Company").

The United States Bankruptcy Court for the District of Hawaii has scheduled a hearing on _____, 2010 at _____.m. (Hawaii time) to consider whether to confirm the Plan.

On _____, 2010, after notice and a hearing, the Bankruptcy Court entered the Disclosure Statement Order approving this Disclosure Statement as containing adequate information of a kind and in sufficient detail to enable a hypothetical, reasonable investor typical of the Debtors' creditors and equity interest holders to make an informed judgment whether to accept or reject the Plan. APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT, HOWEVER, CONSTITUTE A DETERMINATION BY THE BANKRUPTCY COURT AS TO THE FAIRNESS OR MERITS OF THE PLAN. THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND RULE 3016 OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE.

The Disclosure Statement Order, a copy of which is attached as Appendix B, sets forth deadlines for voting to accept or reject the Plan and concerning procedures to be followed to object to confirmation of the Plan, and the record date for voting purposes. A Ballot for the acceptance or rejection of the Plan is enclosed with each Disclosure Statement submitted to a Holder of a Claim that is entitled to

vote to accept or reject the Plan. In addition, voting instructions are attached hereto as Appendix C.

This Disclosure Statement sets forth certain information regarding the Debtors' prepetition history, the need to seek chapter 11 protection, significant events that have occurred during the Debtors' chapter 11 cases, and the anticipated reorganization and restructuring of the Debtors upon successful emergence from chapter 11. This Disclosure Statement also describes terms and provisions of the Plan, including certain alternatives to the Plan, certain effects of confirmation of the Plan, certain risk factors associated with the Plan, and the manner in which distributions will be made under the Plan. In addition, this Disclosure Statement discusses the confirmation process and the voting procedures that Holders of Claims entitled to vote under the Plan must follow for their votes to be counted.

Except as otherwise provided herein, capitalized terms used, but not otherwise defined in this Disclosure Statement, have the meanings ascribed to them in the Plan. Unless otherwise noted herein, all dollar amounts provided in this Disclosure Statement and in the Plan are given in United States dollars.

This Disclosure Statement describes certain aspects of the Plan and other related matters. FOR A COMPLETE UNDERSTANDING OF THE PLAN, YOU SHOULD READ THIS DISCLOSURE STATEMENT, THE PLAN, AND THE EXHIBITS, APPENDICES, AND SCHEDULES THERETO IN THEIR ENTIRETY. IF ANY INCONSISTENCY EXISTS BETWEEN THE PLAN AND THIS DISCLOSURE STATEMENT, THE TERMS OF THE PLAN ARE CONTROLLING.

This Disclosure Statement does not constitute an offer to exchange or sell, or the solicitation of an offer to exchange or buy, any securities that may be deemed to be offered hereby with respect to any creditor that is not an "accredited investor" as defined in Regulation D under the Securities Act. In any state or other jurisdiction (domestic or foreign) in which any securities that may be deemed to be offered hereby are required to be qualified for offering in such jurisdiction, no offer is hereby being made to, and the receipt of ballots will not be accepted from, residents of such jurisdiction unless and until such requirements, in the sole and final determination of the Plan Proponents, have been fully satisfied. Until such time, any ballot submitted with respect to any such creditor will be deemed null and void and will not constitute a rejection or acceptance for purposes of determining whether requisite votes for acceptance of the Plan have been received.

NO PERSON IS AUTHORIZED BY THE PLAN PROPONENTS IN

U.S. Bankruptcy Court - Hawaii  #08-01369  Dkt # 1175  Filed 04/10/10  Page 7 of 97

CONNECTION WITH THE PLAN OR THE SOLICITATION OF ACCEPTANCES OF THE PLAN TO GIVE ANY INFORMATION OR TO MAKE ANY REPRESENTATION REGARDING THIS DISCLOSURE STATEMENT OR THE PLAN OTHER THAN AS CONTAINED IN THIS DISCLOSURE STATEMENT AND THE EXHIBITS, APPENDICES, AND/OR SCHEDULES ATTACHED HERETO OR INCORPORATED BY REFERENCE OR REFERRED TO HEREIN, AND, IF GIVEN OR MADE, SUCH INFORMATION OR REPRESENTATION MAY NOT BE RELIED UPON AS HAVING BEEN AUTHORIZED BY THE PLAN PROPONENTS.

THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE LEGAL, BUSINESS, FINANCIAL, OR TAX ADVICE. ANY CREDITOR OR INTEREST HOLDER DESIRING ANY SUCH ADVICE OR ANY OTHER ADVICE SHOULD CONSULT WITH ITS OWN ADVISORS.

THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE AS OF THE DATE HEREOF UNLESS ANOTHER TIME IS SPECIFIED HEREIN, AND THE DELIVERY OF THIS DISCLOSURE STATEMENT WILL NOT CREATE AN IMPLICATION THAT THERE HAS NOT BEEN ANY CHANGE IN THE INFORMATION STATED SINCE THE DATE HEREOF.

THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT, INCLUDING THE INFORMATION REGARDING THE HISTORY, BUSINESS, AND OPERATIONS OF THE DEBTORS AND THE HISTORICAL FINANCIAL INFORMATION REGARDING THE DEBTORS IS INCLUDED FOR PURPOSES OF SOLICITING ACCEPTANCES OF THE PLAN BUT, AS TO CONTESTED MATTERS AND ADVERSARY PROCEEDINGS, IS NOT TO BE CONSTRUED AS AN ADMISSION OR A STIPULATION BUT RATHER AS A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS.

THIS DISCLOSURE STATEMENT MAY NOT BE RELIED ON FOR ANY PURPOSE OTHER THAN TO DETERMINE WHETHER TO VOTE TO ACCEPT OR TO REJECT THE PLAN, AND NOTHING STATED HEREIN WILL CONSTITUTE AN ADMISSION OF ANY FACT OR LIABILITY BY ANY PARTY, OR BE ADMISSIBLE IN ANY PROCEEDING INVOLVING THE DEBTORS, THE CREDITORS COMMITTEE, HPG OR ANY OTHER PARTY, OR BE DEEMED A REPRESENTATION OF THE TAX OR OTHER LEGAL EFFECTS OF THE PLAN ON THE DEBTORS OR HOLDERS OF CLAIMS OR INTERESTS. CERTAIN OF THE STATEMENTS CONTAINED

3

IN THIS DISCLOSURE STATEMENT, BY NATURE, ARE FORWARD LOOKING AND CONTAIN ESTIMATES AND ASSUMPTIONS. THERE CAN BE NO ASSURANCE THAT SUCH STATEMENTS WILL BE REFLECTIVE OF ACTUAL OUTCOMES. ALL HOLDERS OF CLAIMS AND INTERESTS SHOULD CAREFULLY READ AND CONSIDER THIS DISCLOSURE STATEMENT AND THE PLAN IN THEIR ENTIRETY, INCLUDING ARTICLE V, "RISK FACTORS TO BE CONSIDERED," OF THIS DISCLOSURE STATEMENT, BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.

# SPECIAL NOTE REGARDING FORWARD-LOOKING STATEMENTS

This Disclosure Statement contains forward-looking statements, including statements concerning possible or assumed future results of operations of the Debtors or the Reorganized Debtors and those preceded by, followed by, or that include the word may, will, should, could, expects, plans, anticipates, believes, estimates, predicts, potential, or continue or the negative of such terms and other comparable terminology. You should understand that the factors described below, in addition to those discussed elsewhere in this Disclosure Statement, could materially affect the Debtors or the Reorganized Debtors' future results and could cause those results to differ materially from those expressed in such forward-looking statements. Holders of Claims against the Debtors should read and consider carefully the information set forth below, as well as the other information set forth in this Disclosure Statement (and the documents delivered together herewith and/or incorporated by reference), prior to voting to accept or reject the Plan. This information, however, should not be regarded as the only risks involved in connection with the Plan and/or its implementation. These factors include, but are not limited to:

## A.    Failure to Satisfy Vote Requirement

If the Plan Proponents obtain the requisite votes to accept the Plan in accordance with the requirements of the Bankruptcy Code, the Plan Proponents intend, as promptly as practicable thereafter, to seek confirmation of the Plan. In the event that sufficient votes are not received, the Plan Proponents may be forced to pursue an alternative restructuring.

Pursuant to section 1126(c) of the Bankruptcy Code, Classes 5, 6 and 7 will be determined to have accepted the Plan if at least two-thirds in amount and more than one-half in number of Allowed Claims in Classes 5, 6 and 7 (that actually vote) vote in favor of the Plan. If such thresholds are not met, the Plan Proponents may not be able to confirm the Plan as it is currently structured.

## B.    Non-Confirmation or Delay of Confirmation of the Plan

The Bankruptcy Court, which sits as a court of equity, exercises substantial discretion. Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation and requires, among other things, that the confirmation of the Plan not be followed by a need for further financial reorganization and that the value of distributions to dissenting creditors and shareholders not be less than the value of distributions such creditors and shareholders would receive if the Debtors were

U.S. Bankruptcy Court - Hawaii   #08-01369   Dkt # 1175   Filed  04/10/10   Page 10 of 97

liquidated under chapter 7 of the Bankruptcy Code. Although the Plan Proponents believe that the Plan will meet such tests, there can be no assurance that the Bankruptcy Court would reach the same conclusion.

### C.    Non-Consensual Confirmation

In the event any impaired Class does not accept a plan, a bankruptcy court may nevertheless confirm such plan at the proponent's request if at least one impaired class of claims has accepted the plan (with such acceptances being determined without including the vote of any "insider" in such class), and, as to each impaired class that has not accepted the plan, the bankruptcy court determines that the plan of reorganization "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting impaired classes. These requirements may have to be satisfied with respect to Classes 5, 6, and 7. The Plan Proponents believe that the Plan satisfies these requirements.

### D.    Failure of Litigation Against SFHS

The treatment of the SFHS Claim is subject to the SFHS Claim Allowance Process. However, the failure of the litigation is not determinative of Plan success. The Plan Proponents believe that the Reorganized Debtors will be able to meet all Plan obligations, including the obligations owed to SFHS pursuant to the Plan, notwithstanding the success of potential litigation against SFHS.    The Plan Proponents also believe that the Reorganized Debtors will be able to refinance and repay the SFHS obligations within the seven-year maturity of these obligations.

### E.    Risk of Non-Occurrence of the Effective Date

Although the Plan Proponents believe that the Effective Date will occur reasonably soon after the Confirmation Date, there can be no assurance as to such timing or as to whether it will occur.

### F.    Failure to Obtain Exit Financing

The Plan Proponents believe that the Reorganized Debtors must have a working capital Exit Financing Facility to provide adequate borrowing availability and liquidity in order to confirm the Plan.  The Plan Proponents believe that such an Exit Facility should be made available to the Reorganized Debtors, however, there can be no assurances that the Reorganized Debtors can obtain an adequate Exit Financing Facility.

U.S. Bankruptcy Court - Hawaii   #08-01369   Dkt # 1175   Filed 04/10/10   Page 11 of 97

## G.    Classification and Treatment of Claims and Interests

Section 1122 of the Bankruptcy Code requires that the Plan classify Claims against, and Interests in, the Debtors. The Bankruptcy Code also provides that the Plan may place a Claim or Interest in a particular Class only if such Claim or Interest is substantially similar to the other Claims or Interests of such Class. The Plan Proponents believe that all Claims and Interests have been appropriately classified in the Plan.

To the extent that the Bankruptcy Court finds that a different classification is required for the Plan to be confirmed, the Plan Proponents presently anticipate that it would seek (i) to modify the Plan to provide for whatever classification might be required for confirmation and (ii) to use the acceptances received from any creditor pursuant to this solicitation for the purpose of obtaining the approval of the Class or Classes of which such creditor ultimately is deemed to be a member. Any such reclassification of creditors, although subject to the notice and hearing requirements of the Bankruptcy Code, could adversely affect the Class in which such creditor was initially a member, or any other Class under the Plan, by changing the composition of such Class and the vote required for approval of the Plan. There can be no assurance that the Bankruptcy Court, after finding that a classification was inappropriate and requiring a reclassification, would approve the Plan based upon such reclassification. Except to the extent that modification of classification in the Plan requires resolicitation, the Plan Proponents will, in accordance with the Bankruptcy Code and the Bankruptcy Rules, seek a determination by the Bankruptcy Court that acceptance of the Plan of any Holder of Claims pursuant to this solicitation will constitute a consent to the Plan's treatment of such Holder regardless of the Class as to which such Holder is ultimately deemed to be a member. The Plan Proponents believe that under the Federal Rules of Bankruptcy Procedure the Plan Proponents would be required to resolicit votes for or against the Plan only when a modification adversely affects the treatment of the claim of any creditor or equity holder.

The Bankruptcy Code also requires that the Plan provide the same treatment for each Claim or Interest of a particular Class unless the Holder of a particular Claim or Interest agrees to a less favorable treatment of its Claim or Interest. The Plan Proponents believe that it has complied with the requirement of equal treatment. To the extent that the Bankruptcy Court finds that the Plan does not satisfy such requirement, the Bankruptcy Court could deny confirmation of the Plan.

Issues or disputes relating to classification and/or treatment could result in a

U.S. Bankruptcy Court - Hawaii   #08-01369   Dkt # 1175   Filed  04/10/10   Page 12 of 97

delay in the Confirmation and Consummation of the Plan and could increase the risk that the Plan will not be consummated.

### H. Increased Competition on the Island of Oahu for Patient Care Services

Despite the Debtors' quality care and increasing operational efficiencies, it has become increasingly difficult to compete against other, financially strong competitors on the island of Oahu. The healthcare industry in Hawaii has seen the entry of several significant changes during recent years. The level of competition on the island remains formidable.

ANY FINANCIAL FORECASTS OR OTHER FORWARD-LOOKING ANALYSES CONTAINED HEREIN WERE NOT PREPARED WITH A VIEW TO COMPLYING WITH THE GUIDELINES FOR PROSPECTIVE FINANCIAL STATEMENTS PUBLISHED BY THE AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS. THE PLAN PROPONENTS' FINANCIAL ADVISORS HAVE NEITHER COMPILED NOR EXAMINED THE ACCOMPANYING PROSPECTIVE FINANCIAL INFORMATION TO DETERMINE THE REASONABLENESS THEREOF AND, ACCORDINGLY, HAS NOT EXPRESSED AN OPINION OR ANY OTHER FORM OF ASSURANCE WITH RESPECT THERETO.

## II.   SUMMARY OF TREATMENT OF CLAIMS AND INTERESTS UNDER THE PLAN

### A.   Overview of Treatment

As contemplated by the Bankruptcy Code, Administrative Claims and Priority Tax Claims are not classified under the Plan. Allowed Administrative Claims are to be paid in full in accordance with the terms of the Plan. See Article IV, Section E.1(a) of this Disclosure Statement for a summary of the treatment proposed under the Plan for Administrative Claims. See Article IV, Section E.1(e) of this Disclosure Statement for a summary of the treatment proposed under the Plan for Priority Tax Claims.

The Plan further provides that all Non-Tax Priority Claims (Class 1), Other Secured Claims (Class 2) and the Siemens Secured Lender Claim (Class 4) will remain unimpaired. In addition, the Plan provides that Unimpaired Employee Claims (Class 3) will be Reinstated.

The table below summarizes the classification and treatment of the prepetition Claims and Interests under the Plan.

The Plan Proponents intend to seek to consummate the Plan and cause the Effective Date to occur as quickly as practicable. There can be no assurance, however, as to when or whether the Effective Date will occur. The Plan Proponents contemplate that the Effective Date will occur on or about June 1, 2010, or as soon as reasonably practicable thereafter.

The Plan Proponents believe that the Plan provides distributions to all Classes of Claims that reflect an appropriate resolution of the Claims, taking into account the differing nature and priority of such Claims.

U.S. Bankruptcy Court - Hawaii   #08-01369   Dkt # 1175   Filed  04/10/10   Page 14 of 97

1.    *Classification of Debtors' Claims and Interests*

| Description and Amount of Claims or Interests | Summary of Treatment |
|---|---|
| **Class 1 Non-Tax Priority Claims** Class 1 consists of all Non-Tax Priority Claims and is Unimpaired.<br><br>**Estimated Allowed Amount:** $0.1 million<br><br>**Projected Recovery:** 100% | *Non-Tax Priority Claims*. Thirty days after the later of (a) the Effective Date and (b) the date on which such Claim is Allowed by the Bankruptcy Court, each Holder of an Allowed Non-Tax Priority Claim will, at the option of the Reorganized Debtors (i) receive a Cash payment from the Reorganized Debtors in full satisfaction of its Allowed Non-Tax Priority Claim or (ii) have its Allowed Non-Tax Priority Claim Reinstated against the Reorganized Debtors. |
| **Class 2 Other Secured Claims** Class 2 consists of all Other Secured Claims and is Unimpaired.<br><br>**Estimated Allowed Amount:** $5.4 million<br><br>**Projected Recovery:** 100% | *Other Secured Claims*. Unless the applicable Holder of an Allowed Other Secured Claim and the Reorganized Debtors agree to a different treatment, each Holder of an Allowed Other Secured Claim will (a) receive, 30 days after the Effective Date, in full satisfaction of its Allowed Other Secured Claim, at the option of the Reorganized Debtors: (i) the net proceeds of the sale of the property securing such claim, up to the allowed amount of such Allowed Other Secured Claim; (ii) the return of property securing such Allowed Other Secured Claim; (iii) payments in accordance with the provisions of any agreement relating to the property, on substantially the same terms as such agreement; or (iv) Cash equal to the value of the property securing such Allowed Other Secured Claim, up to the value of the Allowed Other Secured Claim, or (b) have its Allowed Other Secured Claim Reinstated against the Reorganized Debtors. |
| **Class 3 Unimpaired Employee Claims** | *Unimpaired Employee Claims*. On the Effective Date, all PTO that was accrued as of the Petition Date by any employee of the Debtors employed by the Reorganized |

10

| | |
|---|---|
| Class 3 consists of all Unsecured Employee Claims and is Unimpaired.<br><br>**Estimated Allowed Amount:** $0.3 million<br><br>**Projected Recovery:** 100% | Debtors as of the Effective Date will be Reinstated against the Reorganized Debtors. |
| **Class 4 Siemens Secured Lender Claim**<br>Class 4 consists of the Siemens Secured Lender Claim and is Unimpaired.<br><br>**Estimated Allowed Amount:** $3.17 million<br><br>**Projected Recovery:** 100% | *Siemens Secured Lender Claim.* The Siemens Secured Lender Claim shall be Allowed and paid in full in Cash on the Effective Date by the Reorganized Debtors. |

| | |
|---|---|
| **Class 5 SFHS Claim**<br><br>Class 5 consists of the SFHS Claim and is Impaired.<br><br>**Estimated Allowed Amount:** $0.0 — $46.29 million<br><br>**Projected Recovery:** 100% plus interest | *SFHS Claim.* Subject to the SFHS Claim Allowance Process, in full satisfaction of the SFHS Claim, on the Effective Date, the Reorganized Debtors shall deliver to SFHS: (i) Cash in the amount of $4,746,240 plus the amount of cash collateral of SFHS held by the Debtors as of the Effective Date constituting proceeds of prepetition collateral of SFHS ("SFHS Effective Date Payment")[2] to be first applied to the principal amount of the amount outstanding under the Working Capital Loan[3] (as defined in the SFHS Secured Credit Agreement) under the SFHS Secured Credit Agreement as of the Petition Date (unless reduced by the Bankruptcy Court), with any remaining amount of the SFHS Effective Date Payment after full satisfaction of the principal amount of the amount outstanding under the Working Capital Loan (as defined in the SFHS Secured Credit Agreement) under the SFHS Secured Credit Agreement as of the Petition Date to be applied to reduce the principal amount of Term Note A; and (ii) a term note from and payable by the Reorganized Debtors in the principal amount of the amount outstanding under the Term Loan[4] (as defined in the SFHS Secured Credit Agreement) under the SFHS Secured Credit Agreement as of the Petition Date (unless reduced by the Bankruptcy Court) minus the amount of the SFHS Effective Date Payment applied to Term Note A, with interest from the Effective Date at 8.04% per annum (the "Term Note A Interest Rate") payable semi-annually (twice a year, on the Fiscal Year Mid Date and the Fiscal Year End Date) beginning on the Fiscal Year End Date immediately following the Effective Date, interest only for seven years, with the principal amount of the note due on the seventh |

---

[2] The SFHS Effective Date Payment shall consist of (i) $4,746,240, which shall satisfy the adequate protection liens granted to SFHS pursuant to the Judgment (Docket No. 1164) on the SFHS motion for adequate protection (Docket No. 886), and (ii) the total amount of cash collateral of SFHS held by the Debtors as of the Effective Date constituting proceeds of prepetition collateral of SFHS. The amount of cash collateral of SFHS held by the Debtors as of April 5, 2010 constituting proceeds of prepetition collateral of SFHS was approximately $1.7 million.

[3] As of the Petition Date, the amount outstanding under the Working Capital Loan (as defined in the SFHS Secured Credit Agreement) under the SFHS Secured Credit Agreement was $6,368,947.

[4] As of the Petition Date, the amount outstanding under the Term Loan (as defined in the SFHS Secured Credit Agreement) under the SFHS Secured Credit Agreement was $40,287,996.

U.S. Bankruptcy Court - Hawaii  #08-01369  Dkt # 1175  Filed 04/10/10  Page 17 of 97

| | Fiscal Year End Date following the Effective Date ("Term Note A"). Term Note A shall be secured by the same assets of the Reorganized Debtors that secured the Term Loan (as defined in the SFHS Secured Credit Agreement) under the SFHS Secured Credit Agreement. Term Note A shall be subject to the SFHS Claim Allowance Process. To the extent that the amount of the SFHS Claim is reduced pursuant to the SFHS Claim Allowance Process, or to the extent that the Bankruptcy Court determines that SFHS is entitled to an Allowed Deficiency Claim, the principal amount of the Term Note A shall be appropriately and accordingly reduced, with the other terms of Term Note A remaining the same. The form of Term Note A will be included in the Plan Supplement. |
|---|---|

| Class 6 General Unsecured Claims (other than Convenience Claims) | *General Unsecured Claims (other than Convenience Claims).* In full satisfaction, settlement of and in exchange for Allowed General Unsecured Claims (other than Allowed Convenience Claims), the Reorganized Debtors, on account of (i) 100% of the total amount of Allowed General Unsecured Claims (excluding Allowed Section 502(h) Claims and Allowed Deficiency Claims)[6] up to $21,000,000; (ii) 50% of the total amount of Allowed General Unsecured Claims (excluding Allowed Section 502(h) Claims and Allowed Deficiency Claims) in excess of $21,000,000; (iii) any Allowed Section 502(h) Claims; and (iv) any Allowed Deficiency Claims (i, ii, iii, and iv together the "<u>GUC Obligation</u>"), shall pay, in Cash, to each Holder of an Allowed General Unsecured Claim (other than an Allowed Convenience Claim) the remaining balance of the amount of such Holder's pro rata share of the GUC Obligation in full (the "<u>GUC Principal Payments</u>") as follows: |
|---|---|
| Class 6 consists of all General Unsecured Claims (other than Convenience Claims) and is Impaired. | |
| **Estimated Allowed Amount:** $19.85 – $20.45 million plus any Allowed executory contract rejection damage Claims, any Allowed Section 502(h) Claims, and any Allowed Deficiency Claims[5] | |
| **Projected Recovery:** From 47% up to 100%, depending upon the size of any Allowed Claims arising from the rejection | |

(x) on the Fiscal Year End Date of the first fiscal year immediately following the first fiscal year containing the Effective Date ("<u>Year One</u>"), the lesser of (a) the then outstanding balance of the amount of such Holder's pro rata share of the GUC Obligation and (b) such Holder's pro rata share of $1,500,000 plus the Term Note A Interest Rate multiplied by the amount of any Deficiency Claim; and

(y) semi-annually (twice a year, on the Fiscal Year Mid Date and the Fiscal Year End Date), beginning on the Fiscal Year Mid Date of the second fiscal year following Year One as follows: during the second fiscal year through the fourth fiscal year following Year One, the lesser of (a) the then outstanding balance of the amount of such Holder's pro rata share of the GUC Obligation and (b) such Holder's pro rata share of $750,000 plus 50% of the Term Note A Interest

---

[5] The Plan Proponents have structured the treatment for the Class 6 General Unsecured Claims such that any Allowed Section 502(h) Claims or any Allowed Deficiency Claims will not affect the amount of the total recovery for Holders of Allowed General Unsecured Claims in Class 6, only the timing of such recovery may be affected.

[6] Except as otherwise set forth herein, the Plan Proponents do not expect any Allowed Section 502(h) Claims or any Allowed Deficiency Claims.

| | |
|---|---|
| of executory contracts and whether the Reorganized Debtors exercise the GUC Prepayment Option. | Rate multiplied by the amount of any Allowed Deficiency Claim; during the fifth fiscal year through the ninth fiscal year following Year One, the lesser of (a) the then outstanding balance of the amount of such Holder's pro rata share of the GUC Obligation and (b) such Holder's pro rata share of $1,000,000 plus 50% of the Term Note A Interest Rate multiplied by the amount of any Allowed Deficiency Claim; during the tenth fiscal year through the thirteenth fiscal year following Year One, the lesser of (a) the then outstanding balance of the amount of such Holder's pro rata share of the GUC Obligation and (b) such Holder's pro rata share of $1,250,000 plus 50% of the Term Note A Interest Rate multiplied by the amount of any Allowed Deficiency Claim; on the Fiscal Year Mid Date of the fourteenth fiscal year following Year One, the lesser of (a) the then outstanding balance of the amount of such Holder's pro rata share of the GUC Obligation and (b) such Holder's pro rata share of $1,250,000 plus 50% of the Term Note A Interest Rate multiplied by the amount of any Allowed Deficiency Claim; and on the Fiscal Year End Date of the fourteenth fiscal year following Year One, the then outstanding balance (if any) of the amount of such Holder's pro rata share of the GUC Obligation.

*Prepayment Option for Reorganized Debtors to Pay Holders of Allowed General Unsecured Claims (other than Allowed Convenience Claims) at a Discount.* Provided that the Reorganized Debtors are then current with and have made all distributions then required by the Plan to the Holders of Allowed General Unsecured Claims[7], the Reorganized Debtors may pre-pay and satisfy all the then remaining GUC Principal Payments due to the Holders of Allowed General Unsecured Claims at a discount (the "GUC Prepayment Option") by paying to each Holder of an Allowed General Unsecured Claim (other than an Allowed Convenience Claim) in Cash: (i) through and including the Fiscal Year End Date following the Effective Date, 57.14% of the then entire outstanding balance owed under the Plan |

---

[7] For the avoidance of doubt, these distributions are all distributions required by the Plan to the Holders of Allowed General Unsecured Claims through and including the date on which the GUC Prepayment Option is exercised.

to such Holder of an Allowed General Unsecured Claim (other than an Allowed Convenience Claim); (ii) after the first Fiscal Year End Date following the Effective Date, through and including the second Fiscal Year End Date following the Effective Date, 58.82% of the then entire outstanding balance owed under the Plan to such Holder of an Allowed General Unsecured Claim (other than an Allowed Convenience Claim); (iii) after the second Fiscal Year End Date following the Effective Date, through and including the third Fiscal Year End Date following the Effective Date, 62.50% of the then entire outstanding balance owed under the Plan to such Holder of an Allowed General Unsecured Claim (other than an Allowed Convenience Claim); (iv) after the third Fiscal Year End Date following the Effective Date, through and including the fourth Fiscal Year End Date following the Effective Date, 66.67% of the then entire outstanding balance owed under the Plan to such Holder of an Allowed General Unsecured Claim (other than an Allowed Convenience Claim); (v) after the fourth Fiscal Year End Date following the Effective Date, through and including the fifth Fiscal Year End Date following the Effective Date, 71.43% of the then entire outstanding balance owed under the Plan to such Holder of an Allowed General Unsecured Claim (other than Allowed Convenience Claim); (vi) after the fifth Fiscal Year End Date following the Effective Date, through and including the sixth Fiscal Year End Date following the Effective Date, 76.92% of the then entire outstanding balance owed under the Plan to such Holder of an Allowed General Unsecured Claim (other than an Allowed Convenience Claim); (vii) after the sixth Fiscal Year End Date following the Effective Date, through and including the seventh Fiscal Year End Date following the Effective Date, 83.33% of the then entire outstanding balance owed under the Plan to such Holder of an Allowed General Unsecured Claim (other than an Allowed Convenience Claim); (viii) after the seventh Fiscal Year End Date following the Effective Date, through and including the eighth Fiscal Year End Date following the Effective Date, 90.91% of the then entire outstanding balance owed under

U.S. Bankruptcy Court - Hawaii    #08-01369    Dkt # 1175    Filed  04/10/10    Page 21 of 97

| | the Plan to such Holder of an Allowed General Unsecured Claim (other than an Allowed Convenience Claim). |
|---|---|
| **Class 7 Convenience Claims** Class 7 consists of all Convenience Claims and is Impaired.<br><br>**Estimated Allowed Amount:** $0.48 – $1.08 million<br><br>**Projected Recovery:** 50% | *Convenience Claims.* All Allowed General Unsecured Claims in the amount of $5,000 or less shall be deemed Allowed Convenience Claims. On the Effective Date, each Holder of an Allowed Convenience Claim shall receive, in full satisfaction, settlement of and in exchange for, such Holder's Allowed Convenience Claim, a Cash distribution from the Reorganized Debtors in the amount of 50% of such Holder's Allowed Convenience Claim.<br><br>*Opt-in Provision.* Each Holder of an Allowed General Unsecured Claim in an amount greater than $5,000 may elect to have such Holder's Allowed General Unsecured Claim reduced to $5,000 and treated as an Allowed Convenience Claim. Each Holder of an Allowed General Unsecured Claim in an amount greater than $5,000 who elects to have such Holder's Allowed General Unsecured Claim treated as an Allowed Convenience Claim shall receive a $2,500 Cash distribution (50% of $5,000) from the Reorganized Debtors on the Effective Date. Such election may be made on such Holder's Ballot. |
| **Class 8 Interests** Class 8 consists of Interests and is Impaired.<br><br>**Estimated Allowed Amount:** N/A<br><br>**Projected Recovery:** 0% | *Interests.* On the Effective Date, all Interests in each of the Debtors shall be deemed cancelled and extinguished. Holders of Interests shall not receive or retain under the Plan on account of their Interests any property. |

**THE PLAN PROPONENTS BELIEVE THAT THE PLAN PROVIDES THE BEST RECOVERIES POSSIBLE FOR HOLDERS OF CLAIMS AND THUS STRONGLY RECOMMEND THAT YOU VOTE TO ACCEPT THE PLAN.**

U.S. Bankruptcy Court - Hawaii   #08-01369   Dkt # 1175   Filed  04/10/10   Page 22 of 97

## III.    THE DEBTORS AND THE CHAPTER 11 CASES

*The following overview is a general summary only, which is qualified in its entirety by, and should be read in conjunction with the more detailed discussions, information, and financial statements and notes thereto appearing elsewhere in this Disclosure Statement and the Plan.*

### A.    Business Overview and History

Established in January 2007, HMC is a Hawaii limited liability company that owns two hospital campuses — HMCE and HMCW — located in North Honolulu and in Ewa Beach, respectively.  HMCE has 240 licensed beds (188 acute and 52 skilled nursing facility beds), and HMCW has 102 acute licensed beds — for a combined total of 342 beds for HMCE and HMCW. As of the Petition Date, the Debtors employed approximately 1,153 individuals, including full-time, part-time, salaried, union and temporary employees. The Debtors' consolidated net revenues for the fiscal year ending June 30, 2008 were approximately $167 million.

The Debtors' hospital system was originally established in 1927 under the sponsorship of the Sisters of the Third Franciscan Order of Syracuse, New York. The hospitals became to be known as St. Francis Medical Center. Among the programs for which SFHS had become well known were transplant services (operating Hawaii's first and only program), End Stage Renal Disease care, cardiac care and the Institute of Cancer. After a period of sustained success, however, SFHS (along with many other hospitals throughout the country) fell victim to the ever-changing healthcare industry.

Shortly after the passage of the Balanced Budget Act of 1997, SFHS began to experience financial difficulties, partially due to its role as the primary health care provider for the uninsured or government-insured in the Honolulu market. SFHS faced a nine-week nursing strike in 2002 and the subsequent loss of physician and community support. By 2005, 74% of the hospitals' patients were either on Medicare or Medicaid. Although the costs of caring for these patients continued to increase, the Medicare and Medicaid reimbursements remained flat. The deterioration of SFHS's financial performance contributed to its deferral of maintenance and capital expenditures, further compromising the long-term viability of the hospital system.

### B.    Prepetition Equity Structure

The ownership structure of the Debtors is as follows: CHA Hawaii owns

54% of the outstanding membership units in HMC; Hawaii Physicians Group, LLC ("HPG") owns 45% of the outstanding units in HMC; and SFHS retained a 1% ownership interest in HMC (and also holds non-voting observation rights on the Board of Managers). HMC is the sole member of both HMCE and HMCW, owning 100% of the membership units in each. Cardiovascular Hospitals of America, LLC ("Cardiovascular Hospitals") is the 84.3% owner of CHA Hawaii; a group of various individual investors owns the remaining 15.7% of CHA Hawaii.

Following is a schematic of the current ownership structure of the Company:



Fn:    CHA Hawaii, LLC is owned by Cardiovascular Hospitals (84.3%) and individual investors (15.7%)

The Non-Debtor parties in which HMC has an interest:

(1)  Hawaii Endoscopy Center (1/3 interest);

(2)  Island Cardiac Center (1/2 interest);

(3)  St. Francis Imaging Center, d/b/a Island Imaging Center (1/2 interest) (assets were liquidated in August 2008).

## C.    Boards of Managers and Executive Officers

Following is a list of the board of managers for HMC and the executive officers for each of HMC, HMCE, and HMCW as of March 29, 2010. The HMC Board has recently had two changes: Alain Abi-Mikhael replaced Doug Kell as a CHA Hawaii-appointed member because Doug Kell is no longer affiliated with CHA Hawaii; and Dr. Henry Louie was named as Chairman of the Board, replacing Dr. Badr Idbeis, who remains on the Board. The Board, including Dr. Idbeis, believed that during this time, a Chairman with a presence in Hawaii was necessary.

U.S. Bankruptcy Court - Hawaii  #08-01369  Dkt # 1175  Filed  04/10/10  Page 24 of 97

| Name | Title | Debtor |
|---|---|---|
| Henry Louie, M.D. | Chairman, Board of Managers | HMC |
| William Lau, M.D. | Secretary, Board of Managers | HMC |
| Alain Abi-Mikhael | Board Member | HMC |
| Badr Idbeis, M.D. | Board Member | HMC |
| Edward Alquero, M.D. | Board Member | HMC |
| Danelo Canete, M.D. | Board Member | HMC |
| Robert Fleming, M.D. | Board Member | HMC |
| Rahul Hooda, M.D. | Board Member | HMC |
| Marc Kruger, M.D. | Board Member | HMC |
| Melanie Kelly, M.D. | Board Member | HMC |
| David Phillips | Board Member | HMC |
| Charlie Sonido, M.D. | Board Member | HMC |
| Richard Steckley | Board Member | HMC |
| Mickey Tseng | Board Member | HMC |
| Sister Agnelle Ching | Board Observer | HMC |
| Jerry Correa | Board Observer | HMC |
| Collin Dang, M.D. | Chief Executive Officer | HMC |
| Salim Hasham | Chief Restructuring Officer (acting as Implementation Officer) | HMC |
| Suanne Morikuni | Chief Financial Officer | HMC |
| Dean Pang | Chief Information Officer | HMC |
| Jessica Sphar | Director of Human Services | HMC |
| Paul Ross | Administrator – HMCE | HMCE |
| Michael Matwichyna | Administrator -HMCW | HMCW |
| James Lumeng, M.D. | Chief Medical Officer | HMCE |
| Maria Kostylo | Chief Nursing Officer | HMCE |
| Wayne Nadamoto, M.D. | Chief Surgical Officer | HMCE |
| Danilo Ablan, M.D. | Chief Medical Officer | HMCW |
| Rebecca Klungreseter | Chief Nursing Officer | HMCW |
| Joseph Zobian, M.D. | Chief Surgical Officer | HMCW |

U.S. Bankruptcy Court - Hawaii   #08-01369   Dkt # 1175   Filed  04/10/10   Page 25 of 97

### D.    Prepetition Debt Structure

As further described herein, the Debtors are parties to various loan, security and guaranty documents with St. Francis Healthcare System of Hawaii, as Agent, St. Francis Medical Center, and St. Francis Medical Center —West (collectively, "SFHS") and separately with Siemens Financial Services, Inc. ("Siemens Financial" and with SFHS, the "Prepetition Secured Lenders"). As of July 31, 2008, the Debtors' consolidated books and records reflected assets totaling approximately $90,442,814 (book value) and total liabilities of $101,663,550 (book value).

As of the Petition Date, the Debtors owed their Prepetition Secured Lenders approximately $51,018,425 in the aggregate on the loans identified below. The Debtors also owed various parties approximately $19,615,000 for prepetition trade debt:

| Obligation | Original Principal |
|---|---|
| Prepetition SFHS Secured Obligations (as defined herein): | |
| Working Capital Loan | $6,261,116 |
| Term Loan | $40,032,500 |
| Prepetition Siemens Secured Obligations (as defined herein): | |
| Revolving Loan Agreement (balance on Petition Date) | $4,724,809 |
| Prepetition Trade Debt | $19,615,000 |

On or about January 13, 2007, the Debtors, as borrowers, entered into that certain Loan and Security Agreement with Siemens Financial (the "Prepetition Siemens Secured Obligations"), pursuant to which the Debtors could borrow from Siemens Financial up to $20,000,000. As of the Petition Date, the balance on the Prepetition Siemens Secured Obligations was approximately $4,724,809. To secure the obligations under the Prepetition Siemens Secured Obligations, the Debtors granted to Siemens Financial a first priority security interest in and lien on the Debtors' healthcare insurance accounts receivable (as such term is defined in the Uniform Commercial Code) and the proceeds thereof (the "Prepetition Siemens Collateral"). CHA Hawaii, HPG and certain other individuals[8] each guaranteed the

---

[8]   Certain individuals executed Validity and Support Agreements for the benefit of Siemens, in which such parties made certain representations and warranties about the Company as a further inducement for Siemens to agree to the Prepetition Siemens Secured Obligations.

U.S. Bankruptcy Court - Hawaii   #08-01369   Dkt # 1175   Filed  04/10/10   Page 26 of 97

Debtors' obligations under the Prepetition Siemens Secured Obligations.

According to the Company, as part of the purchase from SFHS, on or about January 13, 2007, HMC, as borrower, entered into that certain Loan Agreement with the SFHS, which consisted of two separate credit facilities (collectively, the "Prepetition SFHS Secured Obligations"): (i) a term loan with an initial principal amount not to exceed $40,200,000; and (ii) a working capital loan with an initial principal amount of $8,970,833. According to the Company, to secure the obligations under the Prepetition SFHS Secured Obligations, the Debtors granted to SFHS a first priority security interest in and lien on substantially all of the Debtors' assets (excluding the Prepetition Siemens Collateral). In addition, according to the Company, HMC also has granted, for the benefit of SFHS, leasehold mortgages on all of HMC's real property. According to the Company, CHA Hawaii and HPG also conveyed the benefits of two separate membership interest pledge and security agreements to SFHS. Finally, according to the Company, CHA Hawaii, HMCW, HPG and all of the members of HPG have also each executed and delivered certain guaranties in favor of SFHS. According to the Company, as of the Petition Date, the Debtors owed approximately $46,657,000 on account of the Prepetition SFHS Secured Obligations.

## E. Reasons for Chapter 11 Filing

Between the January 2007 acquisition and August 2008, the Debtors suffered operating losses of approximately $21,821,000. The losses were the result of a variety of external and internal factors — from the provision of care beyond actual reimbursements to being overstaffed. Since 2007, the Debtors have made several attempts to correct certain organizational and structural problems they inherited from SFHS in an effort to increase revenues and reduce losses. The Company devised a turnaround plan that identified several major initiatives, including debt restructuring, drug formulary development, pharmacy processing improvement, acute renal dialysis, revenue cycle outsourcing, leasing of unneeded space, improving referrals and reduction of general excise tax costs. These initiatives are at different phases of implementation, and most are not completed. For example, in April 2008, HMC signed an agreement with Perot Systems Revenue Cycle Solutions, LLC ("Perot") whereby Perot assumed HMCE's and HMCW's revenue cycle in order to improve cash collections and revenue flow. As further noted herein, the Company has seen vastly improved collections and revenues as a result of this arrangement with Perot.

As the Company implemented its turnaround initiatives, it also worked to address various defaults under its credit agreements. On or about September 25,

2007, Siemens Financial delivered a notice of default to the Company alleging that it had breached various financial covenants and coverage ratios were in default under the Prepetition Siemens Loan Agreement. As a result, and on or about November 9, 2007, the Company entered into a Forbearance Agreement with Siemens Financial pursuant to which Siemens Financial agreed to continue lending to the Company under the Siemens Prepetition Loan Agreement, but subject to certain financial accommodations, including among others: (i) modification of certain financial covenants; (ii) a change in the fixed charge coverage ratio covenant; and (iii) higher interest on the Prepetition Siemens Secured Obligations.

As financial conditions failed to improve, the Company and Siemens Financial entered into that certain Second Forbearance and Amendment Agreement, effective February 20, 2008 (the "Second Forbearance"). Among other things, the Second Forbearance increased the availability block under the Prepetition Siemens Loan Agreement to $2,750,000 and reduced the maximum revolving credit facility to $12,000,000. The Second Forbearance also required the Debtors to submit a 13-week cash flow forecast and unaudited financial statements, as well as the hiring of a restructuring advisor. In June 2008, at the request of their lenders, the Company hired Focus Management Group to assist with developing a viable restructuring plan.

The Second Forbearance subsequently was amended on three separate occasions — March 31, May 6 and June 5. The amendments to the Second Forbearance included the payment of additional forbearance fees, increasing the availability block to $3,250,000, and reducing the maximum revolving credit to $10,500,000.

On July 25, 2008, the Company and Siemens Financial executed the Third Forbearance and Amendment Agreement (the "Third Forbearance"). The Third Forbearance was set to expire on August 31, 2008. Among other things, the Third Forbearance required the Company to provide Siemens Financial with a copy of a turnaround plan along with evidence satisfactory to Siemens Financial that such plan had been implemented.

On August 29, 2008, the Company approached both Siemens Financial and SFHS with the comprehensive restructuring plan, as well as a proposal, whereby the Company would sell substantially all of its outstanding accounts receivable to an outside purchaser for approximately $25 million. The proceeds of such sale were to be used, in part, to pay down the Prepetition Siemens Secured Obligations. The remaining cash was to be used to bolster cash flows as the Company implemented the restructuring plan. Siemens Financial ultimately did not accept

U.S. Bankruptcy Court - Hawaii   #08-01369   Dkt # 1175   Filed 04/10/10   Page 28 of 97

the restructuring proposal and indicated that it was unwilling to extend any forbearance period beyond August 31, 2008 — the date the Third Forbearance was set to expire.

## F.     The Chapter 11 Cases

On the Petition Date, the Debtors and CHA Hawaii each filed a voluntary petition for relief under the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (the "Delaware Court"). At that time, all actions and proceedings against the Company and all acts to obtain property from the Company were stayed under section 362 of the Bankruptcy Code. The Debtors and CHA Hawaii have continued to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. On September 19, 2008, the Delaware Court transferred venue of the Company's Chapter 11 cases to the United States Bankruptcy Court for the District of Hawaii.

### 1.     First Day Relief

To expedite their emergence from chapter 11, the Company, on the Petition Date, filed "first day" motions seeking the relief to continue uninterrupted operations, including payment of prepetition wages, trust fund taxes and insurance and the acquisition of the use of cash collateral, among other relief, from the Bankruptcy Court.

### 2.     The Company's Professional Advisors

The Company has been advised by the following: McDonald Hopkins LLC, as the Company's chapter 11 counsel; Moseley Biehl, Tsugawa, Lau & Muzzi, LLC, as the Company's co-counsel; Scouler & Company as the Company's financial advisors and experts; Focus Management Group, as the Company's financial advisor; Ernst & Young as the Company's tax preparer; Thomas T. Ueno, CPA as the Company's accountant; and various other legal firms, as ordinary course counsel, primarily defending various lawsuits and providing labor counsel.

### 3.     Appointment of the Creditors Committee

On September 11, 2008, the Office of the United States Trustee appointed the official committee of unsecured creditors consisting of the following members: (i) Clinical Laboratories of Hawaii, LLP; (ii) SBM Site Services LLC; (iii) Sodexho America LLC; (iv) Organ Donor Center of Hawaii; and (v) Liberty

Dialysis Hawaii LLC.[9]   On October 22, 2008, the Office of the United States Trustee appointed the following two additional members to the Creditors Committee: (i) McKesson and (ii) Medical Specialists of Hawaii, LLC. On October 30, 2008 and October 31, 2008, the Bankruptcy Court entered orders approving the retention of Alston & Bird LLP and Wagner Choi & Verbrugge as co-counsel to the Creditors Committee. Deloitte Financial Advisory Services LLP was retained as the financial advisor to the Creditors Committee.

### 4.    Exclusivity and Plans of Reorganization

On November 19, 2008, the Company filed the Motion for an Order Pursuant to 11 U.S.C. § 1121(d) Extending the Time Periods During Which the Debtors Have the Exclusive Right to File a Plan and to Solicit Acceptances Thereto (the "Exclusivity Motion"), Docket No. 254. After a bridge order, on February 10, 2009, the Bankruptcy Court granted the Exclusivity Motion, Docket No. 401, extending the Company's exclusive period to file a chapter 11 plan of reorganization under section 1121(d) of the Bankruptcy Code to March 27, 2009 (the "Exclusivity Period") and extending the Company's exclusive period to solicit acceptances for such plan pursuant to section 1121(c) of the Bankruptcy Code to May 26, 2009. The Bankruptcy Court, with the consent of the Company, Creditors Committee and Prepetition Secured Lenders, extended the Exclusivity Period through March 30, 2009.   In July 2009, the Bankruptcy Court denied the Company's request to further extend exclusivity.

SFHS has obtained approval to solicit votes on the plan of reorganization proposed by SFHS.  The Company and the Creditors Committee have decided at this time to not go forward with their respective proposed plans of reorganization. Instead, the Debtors, the Creditors Committee and HPG have decided to go forward together with the Plan.

### 5.    Bar Dates

The Bankruptcy Court established a bar date for filing proofs of Claim. Generally, proofs of Claim were required to be filed no later than February 4, 2009, except that proofs of Claim for any governmental units were required to be filed no later than February 25, 2009.

---

[9] The Creditors Committee was appointed at a meeting held on September 11, 2008.  The notice of appointment of the Creditors Committee was dated September 12, 2008.

U.S. Bankruptcy Court - Hawaii   #08-01369   Dkt # 1175   Filed  04/10/10   Page 30 of 97

### 6.    Postpetition Operations

Attached in Appendix D is a summary of the Company's financial performance since the Petition Date as reported by the Company.

### 7.    Equipment Upgrades

During the Chapter 11 Cases, the Company sought and received Bankruptcy Court approval for the acquisition of 64-slice CT scanners and MR I imaging equipment at both HMCE and HMCW.

### 8.    Patient Care Ombudsman

On October 16, 2008, the Office of the United States Trustee appointed Dianne M. Okumura to act as the patient care ombudsman (the "Ombudsman") in the Company's Chapter 11 cases.  On December 12, 2008, the Bankruptcy Court authorized the appointment of Lyons, Brandt, Cook & Hiramatsu as counsel for the Ombudsman.  The Ombudsman has filed reports with the Bankruptcy Court.

### 9.    SFHS Motion for Adequate Protection

On December 30, 2009, SFHS filed a Motion For (I) Adequate Protection And (II) Sanctions For Violations Of Bankruptcy Code Section 363(c)(2).  The Debtors and the Creditors Committee opposed this motion. On March 4, 2010, the Bankruptcy Court issued a Memorandum of Decision in which it found that the Debtors had used, without court authorization or consent, approximately $4.7 million of cash in which St. Francis had an interest.

### 10.    Conversion of the Debtors to Nonprofit Corporations

The Plan Proponents intend to convert each of the Debtors to nonprofit corporations.  As discussed further in Section IV.B below, the Plan Proponents believe that the conversion of the Debtors to nonprofit corporations will generate substantial tax savings.  The Debtors intend to immediately begin the process of converting to nonprofit corporate form.  However, because the process may or may not be complete as of the Effective Date, the Plan contemplates and authorizes the continuation of the conversion process in the event that the conversion process is not complete as of the Effective Date.

U.S. Bankruptcy Court - Hawaii   #08-01369   Dkt # 1175   Filed  04/10/10   Page 31 of 97

## IV. SUMMARY OF THE PLAN OF REORGANIZATION

The primary objectives of the Plan are to (i) alter the Debtors' debt and capital structures to permit them to emerge from their Chapter 11 Cases with a viable capital structure, (ii) maximize the value of the ultimate recoveries to all creditor groups on a fair and equitable basis, and (iii) settle, compromise or otherwise dispose of Claims and Interests on terms that the Plan Proponents believe to be fair and reasonable and in the best interests of the Debtors' respective estates and creditors. The Plan provides for, among other things: (A) the restructuring of certain indebtedness, (B) an increase in borrowing availability through exit financing, (C) the discharge of Claims, subject to the terms of the Plan and the Reorganized Debtors' obligations under the Plan, and (D) the cancellation of Interests.

The Plan Proponents believe that the Plan ensures that the Reorganized Debtors will have requisite funding to be a viable institution and will allow the Reorganized Debtors to become a nonprofit hospital system which will actively serve and participate in its community.

The Plan Proponents believe that, through the Plan, Holders of Allowed Claims will obtain a substantially greater recovery from the estates of the Debtors than the recovery they would receive (a) from any other restructuring or (b) if the Debtors were to liquidate under chapter 7 of the Bankruptcy Code. The Plan Proponents likewise believe that the Plan will afford the Reorganized Debtors the opportunity and ability to continue their businesses as viable going concerns and preserve ongoing employment for the Reorganized Debtors' employees.

The statements contained in this Disclosure Statement include summaries of the provisions contained in the Plan and in documents referred to therein. The statements contained in this Disclosure Statement do not purport to be precise or complete statements of all the terms and provisions of the Plan or documents referred to therein, and reference is made to the Plan and to such documents for the full and complete statements of such terms and provisions.

The Plan itself and the documents referred to therein control the actual treatment of Claims against and Interests in the Debtors under the Plan and will, upon the Effective Date, be binding upon all Holders of Claims against and Interests in the Debtors and their Estates, the Reorganized Debtors and other parties in interest. In the event of any conflict between this Disclosure Statement, on the one hand, and the Plan or any other operative document, on the other hand, the terms of the Plan and such other operative document are controlling.

U.S. Bankruptcy Court - Hawaii  #08-01369  Dkt # 1175  Filed 04/10/10  Page 32 of 97

## A.    Overview of Chapter 11

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code. Under chapter 11 of the Bankruptcy Code, a debtor is authorized to reorganize its business for the benefit of itself, its creditors and interest holders. Another goal of chapter 11 is to promote equality of treatment for similarly situated creditors and similarly situated interest holders with respect to the distribution of a debtor's assets.

The commencement of a chapter 11 case creates an estate that is comprised of all of the legal and equitable interests of the debtor as of the filing date. The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor in possession."

The consummation of a plan of reorganization is the principal objective of a chapter 11 case. A plan of reorganization sets forth the means for satisfying claims against and interests in a debtor. Confirmation of a plan of reorganization by the Bankruptcy Court makes the plan binding upon the debtor, any issuer of securities under the plan, any person or entity acquiring property under the plan and any creditor of or equity security holder in the debtor, whether or not such creditor or equity security holder (i) is impaired under or has accepted the plan or (ii) receives or retains any property under the plan. Subject to certain limited exceptions and other than as provided in the plan itself or the confirmation order, the confirmation order discharges the debtor from any debt that arose prior to the date of confirmation of the plan and substitutes, therefore, the obligations specified under the confirmed plan and terminates all rights and interests of equity security holders.

## B.    Conversion of Reorganized Debtors to Nonprofit Corporations and Cancellation of All Interests in the Debtors

The Plan contemplates the conversion of the Debtors or Reorganized Debtors, as the case may be, to nonprofit Hawaii corporations. Currently, HMCE and HMCW, as for-profit hospitals in the state of Hawaii, are required to pay Hawaii general excise tax ("GET") and property tax. Converting HMCE and HMCW to nonprofit hospitals will eliminate the payment of the GET and property taxes which will generate a substantial cost savings of approximately $5 - $6 million annually. Accordingly, with the conversion of the Debtors or Reorganized Debtors, as the case may be, to nonprofit Hawaii corporations, the Plan also contemplates that all Interests in the Debtors will be cancelled.

U.S. Bankruptcy Court - Hawaii  #08-01369  Dkt # 1175  Filed  04/10/10  Page 33 of 97

## C. Restructuring of SFHS Loans

Subject to the SFHS Claim Allowance Process, in full satisfaction of the SFHS Claim, on the Effective Date, the Reorganized Debtors shall deliver to SFHS: (i) Cash in the amount of $4,746,240 plus the amount of cash collateral of SFHS held by the Debtors as of the Effective Date constituting proceeds of prepetition collateral of SFHS ("<u>SFHS Effective Date Payment</u>")[10] to be first applied to the principal amount of the amount outstanding under the Working Capital Loan[11] (as defined in the SFHS Secured Credit Agreement) under the SFHS Secured Credit Agreement as of the Petition Date (unless reduced by the Bankruptcy Court), with any remaining amount of the SFHS Effective Date Payment after full satisfaction of the principal amount of the amount outstanding under the Working Capital Loan (as defined in the SFHS Secured Credit Agreement) under the SFHS Secured Credit Agreement as of the Petition Date to be applied to reduce the principal amount of Term Note A; and (ii) a term note from and payable by the Reorganized Debtors in the principal amount of the amount outstanding under the Term Loan[12] (as defined in the SFHS Secured Credit Agreement) under the SFHS Secured Credit Agreement as of the Petition Date (unless reduced by the Bankruptcy Court) minus the amount of the SFHS Effective Date Payment applied to Term Note A, with interest from the Effective Date at 8.04% per annum (the "<u>Term Note A Interest Rate</u>") payable semi-annually (twice a year, on the Fiscal Year Mid Date and the Fiscal Year End Date) beginning on the Fiscal Year End Date immediately following the Effective Date, interest only for seven years, with the principal amount of the note due on the seventh Fiscal Year End Date following the Effective Date ("<u>Term Note A</u>"). Term Note A shall be secured by the same assets of the Reorganized Debtors that secured the Term Loan (as defined in the SFHS Secured Credit Agreement) under the SFHS Secured Credit Agreement. Term Note A shall be subject to the SFHS Claim Allowance Process. To the extent that the amount of the SFHS Claim is reduced pursuant to the SFHS Claim Allowance Process, or to the extent that the Bankruptcy Court determines that SFHS is entitled to an Allowed Deficiency Claim, the principal amount of the Term Note A shall be appropriately and accordingly reduced, with

---

[10] The SFHS Effective Date Payment shall consist of (i) $4,746,240, which shall satisfy the adequate protection liens granted to SFHS pursuant to the Judgment (Docket No. 1164) on the SFHS motion for adequate protection (Docket No. 886), and (ii) the total amount of cash collateral of SFHS held by the Debtors as of the Effective Date constituting proceeds of prepetition collateral of SFHS. The amount of cash collateral of SFHS held by the Debtors as of April 5, 2010 constituting proceeds of prepetition collateral of SFHS was approximately $1.7 million.

[11] As of the Petition Date, the amount outstanding under the Working Capital Loan (as defined in the SFHS Secured Credit Agreement) under the SFHS Secured Credit Agreement was $6,368,947.

[12] As of the Petition Date, the amount outstanding under the Term Loan (as defined in the SFHS Secured Credit Agreement) under the SFHS Secured Credit Agreement was $40,287,996.

the other terms of Term Note A remaining the same. The form of Term Note A will be included in the Plan Supplement.

The Plan Proponents believe that this treatment of the SFHS Claim will facilitate the successful restructuring of the Reorganized Debtors by minimizing debt service requirements during the seven year term of Term Note A. The seven year term is expected to provide an adequate time period in which the Reorganized Debtors can effectuate a successful turnaround and execute re-financing and/or other transactions or financing to enable the principal amounts of Term Note A to be paid. The total interest expense of Term Note A is expected to be approximately $3.2 million annually, and could be lower if the SFHS Claim is reduced as a result of the SFHS Claim Allowance Process.

## D.    Overall Structure of the Plan

The Plan Proponents believe that the Plan provides the highest, best and most timely possible recovery to the Debtors' Claim Holders. Under the Plan, Claims against the Debtors are divided into different classes. If the Plan is confirmed by the Bankruptcy Court and consummated, on the Effective Date, and at certain times thereafter as Claims are resolved, liquidated or otherwise allowed, the Reorganized Debtors will make distributions to certain Classes of Claims as provided in the Plan. The Classes of Claims against the Debtors created under the Plan, the treatment of those Classes of Claims under the Plan and distributions to be made under the Plan are described below.

Under the Plan, there are three classes of Impaired Claims (Class 5 SFHS Claim, Class 6 General Unsecured Claims and Class 7 Convenience Claims) and one class of Impaired Interests (Class 8). All other Claims are Unimpaired. Holders of Class 1 Non-Tax Priority Claims, Class 2 Other Secured Claims, Class 3 Unimpaired Employee Claims and Class 4 Siemens Secured Lender Claim will be unimpaired by the Plan.

The Plan Proponents have considered obtaining "Exit Financing" as a means to provide additional liquidity at the Effective Date and subsequent to the Debtors' emergence from bankruptcy and believe that the Debtors require Exit Financing to exit bankruptcy. The Plan Proponents intend to seek financing prior to the Effective Date and the execution of the Exit Facility Credit Agreement in form and substance acceptable to the Plan Proponents is a condition precedent to the occurrence of the Effective Date.

**E.  Classification and Treatment of Claims and Interests**

       *1.*    *Unclassified Claims.*

       (a)    **Administrative Claims.**  Subject to the provisions of sections 330, 331 and 503(b) of the Bankruptcy Code, each Allowed Administrative Claim (including Allowed Section 503(b)(9) Claims) shall be paid by the Reorganized Debtors in full, in Cash, 30 days after the later of (i) the Effective Date, (ii) the due date thereof in accordance with its terms, (iii) the date upon which such Administrative Claim becomes an Allowed Claim, (iv) for any liability incurred in the ordinary course of a Debtor's business, the date upon which such liability is payable in the ordinary course of such Debtor's business, consistent with past practices or (v) such other date as may be agreed upon between the Holder of such Allowed Administrative Claim and the Reorganized Debtors.

       (i) Bar Dates For Administrative Claims.

       1.    *General Administrative Claim Bar Date*. Except as otherwise provided in the Plan, unless previously Filed or paid, requests for payment of Administrative Claims (other than for an Administrative Claim (i) incurred in the ordinary course of the Debtors' postpetition business; (ii) for taxes imposed by governmental units and (iii) for Professionals) must be Filed and served on the Debtors or Reorganized Debtors no later than 60 days after the Effective Date (the "General Administrative Claims Bar Date"); provided, however, that the General Administrative Claims Bar Date may be extended from time to time upon mutual agreement of the Reorganized Debtors and the applicable Holder of an Administrative Claim, or pursuant to an Order of the Bankruptcy Court.

       (b)    **Ordinary Course Liabilities.**  Holders of Administrative Claims based on liabilities incurred post-petition in the ordinary course of the Debtors' business (other than Claims of governmental units for taxes or Claims and/or penalties related to such taxes) shall not be required to File any request for payment of such Claims.  Such Administrative Claims shall be paid by the Reorganized Debtors in the ordinary course of business, as appropriate, pursuant to the terms and conditions of the particular transaction giving rise to such Administrative Claim or pursuant to past practices, without any further action by the

31

Holders of such Claims, subject to any applicable defenses of the Reorganized Debtors.

(c) **Tax Claims.** All requests for payment of Administrative Claims for postpetition federal, state and local taxes, for which no bar date has otherwise been previously established, must be Filed on or before the later of (i) 60 days following the Effective Date; and (ii) 120 days following the filing of the tax return for such taxes for such tax year or period with the applicable governmental unit. Any Holder of any Administrative Claim for postpetition federal, state and local taxes that is required to File a request for payment of such taxes and that does not File such a Claim by the applicable bar date shall be forever barred from asserting any such Administrative Claim against any of the Debtors or Reorganized Debtors, or any of their respective properties.

(d) *Professional Fees.* All requests for payment of Professional Fees are addressed in Section 5.11 of the Plan.

(e) *Priority Tax Claims.* Each Holder of an Allowed Priority Tax Claim shall receive on account of such Allowed Priority Tax Claim regular installment payments from the Reorganized Debtors in Cash (i) of a total value, as the Effective Date, equal to the Allowed amount of such Allowed Priority Tax Claim, (ii) over a period not later than five years from the Petition Date; and (iii) at the appropriate non-bankruptcy interest rate pursuant to section 511 of the Bankruptcy Code. Priority Tax Claims include $1.59 million of pre-petition Hawaii general excise taxes.

(f) *Deadline For Objections.* Holders of Administrative Claims (including, without limitation, the holders of any Administrative Claims for postpetition federal, state or local taxes, but excluding Claims of Professionals) that are required to File a request for payment of such Claims and that do not File such requests by the applicable bar date shall be forever barred from asserting such Claims against any of the Debtors or the Reorganized Debtors or any of their respective properties. Unless extended by the Bankruptcy Court or by agreement of the Reorganized Debtors and the Filing party, objections to such request must be Filed and served on the requesting party by the later of 120 days after the Effective Date or (b) 60 days after the Filing of the applicable request for payment of an Administrative Claim.

U.S. Bankruptcy Court - Hawaii   #08-01369   Dkt # 1175   Filed 04/10/10   Page 37 of 97

2. *Unimpaired Classes of Claims.*

(a) **Class 1: Non-Tax Priority Claims.** Thirty days after the later of (a) the Effective Date and (b) the date on which such Non-Tax Priority Claim is Allowed by the Bankruptcy Court, each Holder of an Allowed Non-Tax Priority Claim shall, at the option of the Reorganized Debtors (i) receive a Cash payment from the Reorganized Debtors in full satisfaction of its Allowed Non-Tax Priority Claim or (ii) have its Allowed Non-Tax Priority Claim Reinstated against the Reorganized Debtors.

(b) **Class 2: Other Secured Claims.** Unless the applicable Holder of an Allowed Other Secured Claim and the Reorganized Debtors agree to a different treatment, each Holder of an Allowed Other Secured Claim shall (a) receive from the Reorganized Debtors, 30 days after the Effective Date, in full satisfaction of its Allowed Other Secured Claim, at the option of the Reorganized Debtors: (i) the net proceeds of the sale of the property securing such Allowed Other Secured Claim, up to the allowed amount of such Allowed Other Secured Claim; (ii) the return of property securing such Allowed Other Secured Claim; (iii) payments in accordance with the provisions of any agreement relating to the property, on substantially the same terms as such agreement; or (iv) Cash equal to the value of the property securing such Allowed Other Secured Claim, up to the value of the Allowed Other Secured Claim, or (b) have its Allowed Other Secured Claim Reinstated against the Reorganized Debtors.

(c) **Class 3: Unimpaired Employee Claims.** On the Effective Date, all PTO that was accrued as of the Petition Date by any employee of the Debtors employed by the Reorganized Debtors as of the Effective Date shall be Reinstated against the Reorganized Debtors.

(d) **Class 4: Siemens Secured Lender Claim.** The Siemens Secured Lender Claim shall be Allowed and paid in full in Cash on the Effective Date by the Reorganized Debtors.

3. *Impaired Classes of Claims.*

**Class 5: SFHS Claim.** Subject to the SFHS Claim Allowance Process, in full satisfaction of the SFHS Claim, on the Effective Date, the Reorganized Debtors shall deliver to SFHS: (i) Cash in the amount of $4,746,240 plus the amount of cash collateral of SFHS held by the Debtors as of the Effective Date constituting proceeds of prepetition collateral of SFHS ("SFHS

U.S. Bankruptcy Court - Hawaii   #08-01369   Dkt # 1175   Filed 04/10/10   Page 38 of 97

Effective Date Payment")[13] to be first applied to the principal amount of the amount outstanding under the Working Capital Loan[14] (as defined in the SFHS Secured Credit Agreement) under the SFHS Secured Credit Agreement as of the Petition Date (unless reduced by the Bankruptcy Court), with any remaining amount of the SFHS Effective Date Payment after full satisfaction of the principal amount of the amount outstanding under the Working Capital Loan (as defined in the SFHS Secured Credit Agreement) under the SFHS Secured Credit Agreement as of the Petition Date to be applied to reduce the principal amount of Term Note A; and (ii) a term note from and payable by the Reorganized Debtors in the principal amount of the amount outstanding under the Term Loan[15] (as defined in the SFHS Secured Credit Agreement) under the SFHS Secured Credit Agreement as of the Petition Date (unless reduced by the Bankruptcy Court) minus the amount of the SFHS Effective Date Payment applied to Term Note A, with interest from the Effective Date at 8.04% per annum (the "Term Note A Interest Rate") payable semi-annually (twice a year, on the Fiscal Year Mid Date and the Fiscal Year End Date) beginning on the Fiscal Year End Date immediately following the Effective Date, interest only for seven years, with the principal amount of the note due on the seventh Fiscal Year End Date following the Effective Date ("Term Note A"). Term Note A shall be secured by the same assets of the Reorganized Debtors that secured the Term Loan (as defined in the SFHS Secured Credit Agreement) under the SFHS Secured Credit Agreement. Term Note A shall be subject to the SFHS Claim Allowance Process. To the extent that the amount of the SFHS Claim is reduced pursuant to the SFHS Claim Allowance Process, or to the extent that the Bankruptcy Court determines that SFHS is entitled to an Allowed Deficiency Claim, the principal amount of the Term Note A shall be appropriately and accordingly reduced, with the other terms of Term Note A remaining the same. The form of Term Note A will be included in the Plan Supplement.

**Class 6: General Unsecured Claims (other than Convenience Claims).** In full satisfaction, settlement of and in exchange for Allowed General Unsecured Claims (other than Allowed Convenience Claims), the Reorganized Debtors, on account of (i) 100% of the total amount of Allowed

---

[13] The SFHS Effective Date Payment shall consist of (i) $4,746,240, which shall satisfy the adequate protection liens granted to SFHS pursuant to the Judgment (Docket No. 1164) on the SFHS motion for adequate protection (Docket No. 886), and (ii) the total amount of cash collateral of SFHS held by the Debtors as of the Effective Date constituting proceeds of prepetition collateral of SFHS. The amount of cash collateral of SFHS held by the Debtors as of April 5, 2010 constituting proceeds of prepetition collateral of SFHS was approximately $1.7 million.

[14] As of the Petition Date, the amount outstanding under the Working Capital Loan (as defined in the SFHS Secured Credit Agreement) under the SFHS Secured Credit Agreement was $6,368,947.

[15] As of the Petition Date, the amount outstanding under the Term Loan (as defined in the SFHS Secured Credit Agreement) under the SFHS Secured Credit Agreement was $40,287,996.

General Unsecured Claims (excluding Allowed Section 502(h) Claims and Allowed Deficiency Claims)[16] up to $21,000,000; (ii) 50% of the total amount of Allowed General Unsecured Claims (excluding Allowed Section 502(h) Claims and Allowed Deficiency Claims) in excess of $21,000,000; (iii) any Allowed Section 502(h) Claims; and (iv) any Allowed Deficiency Claims (i, ii, iii, and iv together the "GUC Obligation"), shall pay, in Cash, to each Holder of an Allowed General Unsecured Claim (other than an Allowed Convenience Claim) the remaining balance of the amount of such Holder's pro rata share of the GUC Obligation in full (the "GUC Principal Payments") as follows:

(x)     on the Fiscal Year End Date of the first fiscal year immediately following the first fiscal year containing the Effective Date ("Year One"), the lesser of (a) the then outstanding balance of the amount of such Holder's pro rata share of the GUC Obligation and (b) such Holder's pro rata share of $1,500,000 plus the Term Note A Interest Rate multiplied by the amount of any Deficiency Claim; and

(y)     semi-annually (twice a year, on the Fiscal Year Mid Date and the Fiscal Year End Date), beginning on the Fiscal Year Mid Date of the second fiscal year following Year One as follows: during the second fiscal year through the fourth fiscal year following Year One, the lesser of (a) the then outstanding balance of the amount of such Holder's pro rata share of the GUC Obligation and (b) such Holder's pro rata share of $750,000 plus 50% of the Term Note A Interest Rate multiplied by the amount of any Allowed Deficiency Claim; during the fifth fiscal year through the ninth fiscal year following Year One, the lesser of (a) the then outstanding balance of the amount of such Holder's pro rata share of the GUC Obligation and (b) such Holder's pro rata share of $1,000,000 plus 50% of the Term Note A Interest Rate multiplied by the amount of any Allowed Deficiency Claim; during the tenth fiscal year through the thirteenth fiscal year following Year One, the lesser of (a) the then outstanding balance of the amount of such Holder's pro rata share of the GUC Obligation and (b) such Holder's pro rata share of $1,250,000 plus 50% of the Term Note A Interest

---

[16] Except as otherwise set forth herein, the Plan Proponents do not expect any Allowed Section 502(h) Claims or any Allowed Deficiency Claims.

Rate multiplied by the amount of any Allowed Deficiency Claim; on the Fiscal Year Mid Date of the fourteenth fiscal year following Year One, the lesser of (a) the then outstanding balance of the amount of such Holder's pro rata share of the GUC Obligation and (b) such Holder's pro rata share of $1,250,000 plus 50% of the Term Note A Interest Rate multiplied by the amount of any Allowed Deficiency Claim; and on the Fiscal Year End Date of the fourteenth fiscal year following Year One, the then outstanding balance (if any) of the amount of such Holder's pro rata share of the GUC Obligation.

*Prepayment Option for Reorganized Debtors to Pay Holders of Allowed General Unsecured Claims (other than Allowed Convenience Claims) at a Discount.* Provided that the Reorganized Debtors are then current with and have made all distributions then required by the Plan to the Holders of Allowed General Unsecured Claims[17], the Reorganized Debtors may pre-pay and satisfy all the then remaining GUC Principal Payments due to the Holders of Allowed General Unsecured Claims at a discount (the "GUC Prepayment Option") by paying to each Holder of an Allowed General Unsecured Claim (other than an Allowed Convenience Claim) in Cash: (i) through and including the Fiscal Year End Date following the Effective Date, 57.14% of the then entire outstanding balance owed under the Plan to such Holder of an Allowed General Unsecured Claim (other than an Allowed Convenience Claim); (ii) after the first Fiscal Year End Date following the Effective Date, through and including the second Fiscal Year End Date following the Effective Date, 58.82% of the then entire outstanding balance owed under the Plan to such Holder of an Allowed General Unsecured Claim (other than an Allowed Convenience Claim); (iii) after the second Fiscal Year End Date following the Effective Date, through and including the third Fiscal Year End Date following the Effective Date, 62.50% of the then entire outstanding balance owed under the Plan to such Holder of an Allowed General Unsecured Claim (other than an Allowed Convenience Claim); (iv) after the third Fiscal Year End Date following the Effective Date, through and including the fourth Fiscal Year End Date following the Effective Date, 66.67% of the then entire outstanding balance owed under the Plan to such Holder of an Allowed General Unsecured Claim (other than an Allowed Convenience Claim); (v) after the fourth Fiscal Year End Date following the Effective Date, through and including the fifth Fiscal Year End Date following the Effective Date, 71.43% of the then entire outstanding balance owed under the Plan to such Holder of an Allowed General Unsecured Claim

---

[17] For the avoidance of doubt, these distributions are all distributions required by the Plan to the Holders of Allowed General Unsecured Claims through and including the date on which the GUC Prepayment Option is exercised.

(other than Allowed Convenience Claim); (vi) after the fifth Fiscal Year End Date following the Effective Date, through and including the sixth Fiscal Year End Date following the Effective Date, 76.92% of the then entire outstanding balance owed under the Plan to such Holder of an Allowed General Unsecured Claim (other than an Allowed Convenience Claim); (vii) after the sixth Fiscal Year End Date following the Effective Date, through and including the seventh Fiscal Year End Date following the Effective Date, 83.33% of the then entire outstanding balance owed under the Plan to such Holder of an Allowed General Unsecured Claim (other than an Allowed Convenience Claim); (viii) after the seventh Fiscal Year End Date following the Effective Date, through and including the eighth Fiscal Year End Date following the Effective Date, 90.91% of the then entire outstanding balance owed under the Plan to such Holder of an Allowed General Unsecured Claim (other than an Allowed Convenience Claim).

**Class 7: Convenience Claims.** All Allowed General Unsecured Claims in the amount of $5,000 or less shall be deemed Allowed Convenience Claims. On the Effective Date, each Holder of an Allowed Convenience Claim shall receive, in full satisfaction, settlement of and in exchange for, such Holder's Allowed Convenience Claim, a Cash distribution from the Reorganized Debtors in the amount of 50% of such Holder's Allowed Convenience Claim.

*Opt-in Provision.* Each Holder of an Allowed General Unsecured Claim in an amount greater than $5,000 may elect to have such Holder's Allowed General Unsecured Claim reduced to $5,000 and treated as an Allowed Convenience Claim. Each Holder of an Allowed General Unsecured Claim in an amount greater than $5,000 who elects to have such Holder's Allowed General Unsecured Claim treated as an Allowed Convenience Claim shall receive a $2,500 Cash distribution (50% of $5,000) from the Reorganized Debtors on the Effective Date. Such election may be made on such Holder's Ballot.

4. *Class 8: Impaired Class of Interests.*

On the Effective Date, all Interests in each of the Debtors shall be deemed cancelled and extinguished. Holders of Interests shall not receive or retain under the Plan on account of their Interests any property.

### F. Method of Distribution Under the Plan

        *1.    Sources of Cash for Plan Distributions.* Except as otherwise provided in the Plan or the Confirmation Order, all Cash necessary for the Reorganized Debtors to make payments pursuant to the Plan will be obtained from existing Cash balances, the operations of the Debtors and the Reorganized Debtors, or borrowings under the Exit Facility Credit Agreement. The following are the Sources and Uses of Cash at the Effective Date:

| Sources | Uses | Amount Needed on Effective Date |
|---|---|---|
| Exit Facility Borrowing Availability (est): $8 - $10 million | Siemens Secured Lender Claim | $0.00 - $3.17 million |
| Cash on Hand (est): $3 - $4 million | SFHS Effective Date Payment | $6.45 million |
| | 503(b)(9) Claims: | $0.43 million |
| | Professional Fees: | $0.60 million |
| | | |
| | Convenience Claims: | $0.24 – $0.41 million |
| | Non-Tax Priority Claims: | $0.10 million |
| | Priority Tax Claims: | $0.00 - $0.32 million |
| | A/P Catch-up | $0.50 million |
| | Cure Amounts: | $0.40 million |
| | UST Fees: | $0.05 million |

U.S. Bankruptcy Court - Hawaii   #08-01369   Dkt # 1175   Filed  04/10/10   Page 43 of 97

2.      *Distributions to Holders of Impaired Claims.*  Except as otherwise provided in the Plan or as otherwise ordered by the Bankruptcy Court, distributions to be made on account of Impaired Claims that are Allowed as of the Effective Date shall be made according to the terms of the Plan.  Any distribution to be made on the Effective Date pursuant to the Plan shall be deemed as having been made on the Effective Date if such distribution is made on the Effective Date or as soon thereafter as is practicable. Any payment or distribution required to be made under the Plan on a day other than a Business Day shall be made on the next succeeding Business Day.

3.      *Disputed General Unsecured Claims.*  Holders of General Unsecured Claims that become Allowed Claims after the Effective Date shall receive distributions from the Reorganized Debtors on account of such Allowed General Unsecured Claims as provided for in the Plan. The first distribution to the Holder of an Allowed General Unsecured Claim that becomes Allowed after the Effective Date shall include and make-up the distributions that would have been made up to that point had such Holder's Allowed General Unsecured Claim been Allowed on the Effective Date.

4.      *No Interest on Claims.*  Unless otherwise specifically provided for in the Plan, the Confirmation Order or other order of the Bankruptcy Court, or required by applicable bankruptcy law, postpetition interest shall not accrue or be paid on any Claims, and no Holder of a Claim shall be entitled to interest accruing on or after the Petition Date on any Claim.

5.      *Distributions by Reorganized Debtors.*  All distributions required to be made to Holders of Allowed Claims under the Plan shall be made by the Reorganized Debtors.

6.      *Delivery of Distributions and Undeliverable or Unclaimed Distributions.*

        (a)     ***Delivery of Distributions in General.***

Distributions to Holders of Allowed Claims shall be made at the addresses set forth in the Debtors' records unless such addresses are superseded by proofs of Claim or transfers of Claim filed pursuant to Bankruptcy Rule 3001.

(b) *Undeliverable and Unclaimed Distributions.*

(i) Holding of Undeliverable and Unclaimed Distributions. If the distribution to any Holder of an Allowed Claim is returned to the Reorganized Debtors as undeliverable or is otherwise unclaimed, no further distributions shall be made, as the case may be, to such Holder unless and until the Reorganized Debtors are notified in writing of such Holder's then current address.

(ii) After Distributions Become Deliverable. The Reorganized Debtors shall make all distributions that have become deliverable or have been claimed as soon as practicable after such distribution has become deliverable.

(iii) Failure to Claim Undeliverable Distributions. Any Holder of an Allowed Claim that does not assert a claim pursuant to the Plan for an undeliverable or unclaimed distribution within (i) one year after the Effective Date or (ii) one year after the date on which such undeliverable or unclaimed distribution was mailed, whichever is later, shall be deemed to have forfeited its claim for such undeliverable or unclaimed distribution and shall be forever barred and enjoined from asserting any such claim for an undeliverable or unclaimed distribution against the Debtors or their Estates, the Reorganized Debtors or their property. Any Cash for distribution on account of Claims for undeliverable or unclaimed distributions shall become property of the Reorganized Debtors and eligible for re-distribution to Holders of Allowed General Unsecured Claims. Nothing contained in the Plan shall require the Reorganized Debtors, as the case may be, to attempt to locate any Holder of an Allowed Claim.

7. *Record Date for Distributions.* The Reorganized Debtors shall have no obligation to recognize the transfer of, or the sale of any participation in, any Allowed Claim that occurs after the close of business on the Distribution Record Date, and shall be entitled for all purposes under the Plan to recognize and distribute only to those Holders of Allowed Claims that are Holders of

40

such Claims, or participants therein, as of the close of business on the Distribution Record Date. The Reorganized Debtors shall instead be entitled to recognize and deal for all purposes under the Plan with only those record holders stated on the official claims register as of the close of business on the Distribution Record Date.

8. *Allocation of Plan Distributions between Principal and Interest.* To the extent that any Allowed Claim entitled to a distribution under the Plan is comprised of indebtedness and accrued but unpaid interest thereon, such distribution shall, for all income tax purposes, be allocated to the principal amount of the Claim first and then, to the extent that the consideration exceeds the principal amount of the Claim, to the portion of such Claim representing accrued but unpaid interest.

9. *Means of Cash Payment.* Payments of Cash made pursuant to the Plan shall be in U.S. dollars and shall be made, at the option and in the sole discretion of the Reorganized Debtors by (a) checks drawn on or (b) wire transfer from a domestic bank selected by the Reorganized Debtors. Cash payments to foreign creditors may be made, at the option of the Reorganized Debtors in such funds and by such means as are necessary or customary in a particular foreign jurisdiction.

10. *Withholding and Reporting Requirements.* In connection with the Plan and all distributions hereunder, the Reorganized Debtors shall comply with all withholding and reporting requirements imposed by any federal, state, local, or foreign taxing authority, and all distributions hereunder shall be subject to any such withholding and reporting requirements. The Reorganized Debtors shall be authorized to take any and all actions that may be necessary or appropriate to comply with such withholding and reporting

41

requirements. All Persons holding Claims or Interests shall be required to provide any information necessary to affect information reporting and the withholding of such taxes. Notwithstanding any other provision of the Plan, (a) each Holder of an Allowed Claim that is to receive a distribution pursuant to the Plan shall have sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed by any governmental unit, including income, withholding, and other tax obligations, on account of such distribution, and (b) no distribution shall be made to or on behalf of such Holder pursuant to the Plan unless and until such Holder has made arrangements satisfactory to the Reorganized Debtors for the payment and satisfaction of such tax obligations.

11. *Setoffs.* Subject to approval of the Bankruptcy Court, the Reorganized Debtors may, pursuant to and solely in accordance with section 553 of the Bankruptcy Code or applicable nonbankruptcy laws, but shall not be required to, set off against any Claim, the payments or other distributions to be made pursuant to the Plan in respect of such Claim, or claims of any nature whatsoever that the Debtors or the Reorganized Debtors may have against the Holder of such Claim; provided, however, that neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by the Reorganized Debtors of any such claim that the Debtors or the Reorganized Debtors may have against such Holder. Absent the consent of the Debtors or the Reorganized Debtors or unless otherwise authorized pursuant to the order of the Bankruptcy Court, no party receiving a distribution under the Plan may offset such distribution against any obligations such party may have to the Debtors or the Reorganized Debtors. Without limiting any other rights of the Debtors or the Reorganized Debtors provided for in the Plan, and except as otherwise set forth in the Plan (including, without limitation, with respect to the Exculpated Parties) any distributions under the Plan shall also

remain subject to any causes of action, counterclaims, security interests, or other rights of the Debtors or the Reorganized Debtors with respect to such distributions and the matters giving rise to such distributions.

## G. Resolution of Dispute, Contingent and Unliquidated Claims

*1. Objection Deadline; Prosecution of Objections.* No later than 150 days after the Effective Date (unless such deadline is extended by an order of the Bankruptcy Court), the Reorganized Debtors and the Creditors Committee (with the assistance and cooperation of the Reorganized Debtors) may file objections to Claims with the Bankruptcy Court and serve such objections upon the Holders of each of the Claims to which objections are made; provided, however, that the Reorganized Debtors and Creditors Committee shall not object to any Claims that are Allowed pursuant to the Plan. The Reorganized Debtors and the Creditors Committee (with the assistance and cooperation of the Reorganized Debtors) shall be authorized to resolve all Disputed Claims through settling or by litigating to judgment in the Bankruptcy Court or such other court having jurisdiction over the validity, nature, and/or amount thereof. After the Effective Date, the Reorganized Debtors and the Creditors Committee shall have the authority to object to, settle, compromise or litigate to judgment any and all Claims, including Administrative Claims. Notwithstanding anything in the Plan to the contrary, any settlements or compromises with respect to Claims shall be subject to the approval of the Bankruptcy Court.

*2. No Distributions Pending Allowance.* Notwithstanding any other provision of the Plan, no payments or distributions shall be made by the Reorganized Debtors with respect to all or any portion of a Disputed Claim unless and until all objections to such Disputed Claim have been settled or withdrawn or have been determined by Final Order, and the Disputed Claim, or some portion thereof, has become an Allowed Claim.

43

3. *Distribution After Allowance.* The Reorganized Debtors shall make any applicable payment or distribution to the Holder of any Disputed Claim that has become an Allowed Claim as soon as practicable after the date such Disputed Claim becomes an Allowed Claim.

## H. Means for Implementation of the Plan

1. *Substantive Consolidation for Purposes of Treating Impaired Claims.*

(a) **Substantive Consolidation**. The Plan contemplates and is predicated upon entry of an order substantively consolidating the Debtors solely for the purposes of the Plan, that is, for voting, confirmation and distribution purposes. The Plan does not contemplate the substantive consolidation of the Debtors for any other purpose. On the Effective Date (i) all guarantees of any Debtor of the payment, performance, or collection of another Debtor shall be deemed eliminated and cancelled, (ii) any obligation of any Debtor and all guarantees executed by one or more of the other Debtors shall be treated as a single obligation and any obligation of two or more Debtors, and all multiple Impaired Claims against such entities on account of such joint obligations shall be treated and Allowed only as a single Impaired Claim against the consolidated Debtors and (iii) each Claim filed against any Debtor shall be deemed filed against the consolidated Debtors and shall be deemed a single Claim against and a single obligation of the consolidated Debtors. On the Effective Date, and in accordance with the terms of the Plan and the consolidation of the assets and liabilities of the Debtors, all Claims based upon guarantees of collection, payment, or performance made by the Debtors as to the obligations of another Debtor shall be released and of no further force and effect. Except as set forth in Section 5.1 of the Plan, such substantive consolidation shall not (other than for purposes related to the Plan) (i) affect the legal and corporate structures of the Reorganized Debtors, (ii) cause any Debtor to be liable for any Impaired Claim or Unimpaired Claim under the Plan for which it otherwise is not liable, and the liability for any such Claim shall not be affected by such substantive consolidation, (iii) affect Interests in Debtors, (iv) affect any obligations under any leases or contracts assumed in the Plan or otherwise subsequent to the filing of the Chapter 11 Cases or (v) affect any obligations to pay quarterly fees to the United States Trustee. On the Effective Date, all Claims of a Debtor against another Debtor shall be deemed extinguished.

44

(b) **Substantive Consolidation Order**. Unless the Bankruptcy Court has approved the substantive consolidation of the Chapter 11 Cases by a prior order, the Plan shall serve as, and shall be deemed to be, a motion for entry of an order substantively consolidating the Debtors as provided in Section 5.1 of the Plan. If no objection to substantive consolidation is timely filed and served by any Holder of an Impaired Claim affected by the Plan as provided therein on or before the deadline for objection to confirmation of the Plan, the Substantive Consolidation Order (which may be the Confirmation Order) may be entered by the Bankruptcy Court. If any such objections are timely filed and served, a hearing with respect to the substantive consolidation of the Chapter 11 Cases and the objections thereto shall be scheduled by the Bankruptcy Court, which hearing may, but is not required to, coincide with the Confirmation Hearing.

(c) **Vesting of Assets in the Reorganized Debtors**. As of the Effective Date, pursuant to the provisions of section 1141(b) and (c) of the Bankruptcy Code, all assets of the Debtors of any nature whatsoever, including, without limitation, all property of the Debtors' Estates including, without limitation, Cash, causes of action, accounts receivable, tax refunds, claims, rights, interests and property (real and personal, tangible and intangible), and proceeds of all of the foregoing, shall vest in the Reorganized Debtors free and clear of all Claims, liens, encumbrances, charges, Interests, except as otherwise expressly provided in the Plan or the Confirmation Order, and subject to the terms and conditions of the Plan and the obligations of the Reorganized Debtors under the Plan.

(d) **Payments by Reorganized Debtors**. On and after the Effective Date, all payments and distributions required by the Plan shall be made by the Reorganized Debtors.

2. *Determination of the Claims of SFHS*

(e) **General**. On and after the Effective Date, the Creditors Committee and the Reorganized Debtors shall have the authority and standing to commence and prosecute actions against SFHS (or any successor in interest to SFHS with respect to the SFHS Claim) to determine the proper amount of the SFHS Claim to the extent such actions have not already been commenced as of the Effective Date, and the Creditors Committee and the Reorganized Debtors shall have the authority and standing to continue to prosecute actions against SFHS (or any successor in interest to SFHS with respect to the SFHS Claim) to determine the proper

U.S. Bankruptcy Court - Hawaii   #08-01369   Dkt # 1175   Filed  04/10/10   Page 50 of 97

amount of the SFHS Claim to the extent such actions have been commenced as of the Effective Date (the "<u>SFHS Claim Allowance Process</u>"). All such actions are hereby preserved. All Litigation Claims against SFHS (or any successor in interest to SFHS) are preserved and the Creditors Committee and the Reorganized Debtors shall have authority and standing to commence and prosecute Litigation Claims against SFHS (or any successor in interest to SFHS). If Litigation Claims against SFHS (or any successor in interest to SFHS) are commenced prior to the Effective Date by the Debtors and the Creditors Committee, the Reorganized Debtors and the Creditors Committee shall have authority and standing to continue prosecuting such Litigation Claims against SFHS (or any successor in interest to SFHS) following the Effective Date.

      (f)   **Claim Determination**. The Plan Proponents believe that the SFHS Claim is subject to reduction pursuant to section 548(a) of the Bankruptcy Code and similar fraudulent transfer/conveyance provisions under Hawaii law. All such actions are hereby preserved and the Creditors Committee and the Reorganized Debtors shall have authority and standing to commence and prosecute such actions. If the Creditors Committee, together with the Reorganized Debtors, and SFHS (or any successor in interest to SFHS with respect to the SFHS Claim) cannot reach a settlement regarding the amount of the SFHS Claim, the Creditors Committee and Reorganized Debtors shall have authority and standing to ask the Bankruptcy Court to (i) reduce the SFHS Claim pursuant to such federal and state law provisions or on other grounds and (ii) determine the proper amount of the SFHS Claim.

     3.    *Transactions Authorized Under the Plan*

      (g)   **General**. The Plan Proponents and the Reorganized Debtors are authorized to take such actions as may be necessary or appropriate to effectuate the Plan and Confirmation Order. On and after the Effective Date, the Reorganized Debtors shall make all payments and distributions required by the Plan in accordance with the terms of the Plan.

      (h)   **Reorganized Debtors Conversion to Nonprofit Corporations**. In the event that the Debtors have not already converted to Hawaii nonprofit corporations as of the Effective Date, the Reorganized Debtors, on the Effective Date or as soon as reasonably practicable thereafter, shall adopt plans of conversion, file articles of conversion, and

U.S. Bankruptcy Court - Hawaii  #08-01369  Dkt # 1175  Filed 04/10/10  Page 51 of 97

take such other steps as are necessary to cause the Reorganized Debtors to become organized as Hawaii nonprofit corporations. Upon the Filing of the Plan, the Debtors shall immediately commence taking the requisite steps to convert the Debtors to nonprofit corporations under applicable Hawaii law.

4. *Continued Corporate Existence and Vesting of Assets in the Reorganized Debtors.* Except as otherwise provided in the Plan, and subject to the terms and conditions of the Plan and the obligations of the Reorganized Debtors under the Plan, on and after the Effective Date, all property of the Debtors' Estates, including all claims, rights, and causes of action and any property acquired by the Debtors under or in connection with the Plan, shall vest in the Reorganized Debtors free and clear of all Claims, liens, charges, other encumbrances, and Interests. On and after the Effective Date, the Reorganized Debtors may operate their businesses and may use, acquire, and dispose of property without supervision of or approval by the Bankruptcy Court and free and clear of any restrictions of the Bankruptcy Code or the Bankruptcy Rules, other than restrictions expressly imposed by the Plan or the Confirmation Order. Without limiting the foregoing, the Reorganized Debtors may pay the charges that they respectively incur on or after the Effective Date for professionals' fees, disbursements, expenses, or related support services without application to the Bankruptcy Court.

5. *Corporate Governance, Tax Exemption and Corporate Action.*

(i) **Corporate Governance**. On the Effective Date, the Reorganized Debtors shall each (i) adopt articles of incorporation and by-laws in form and substance acceptable to the Plan Proponents and (ii) appoint an initial board of directors and initial officers consisting of the individuals selected by the Plan Proponents. The initial board of directors of each of the Reorganized Debtors shall consist of eleven voting members. With respect to the initial board of directors of each of the Reorganized Debtors, HPG shall appoint three voting board members, the Creditors Committee shall appoint one voting board member, and the Debtors shall appoint Salim Hasham as a voting board member. The remaining voting

U.S. Bankruptcy Court - Hawaii  #08-01369  Dkt # 1175  Filed 04/10/10  Page 52 of 97

board members shall consist of persons jointly appointed by and acceptable to each of the Plan Proponents. Additionally, one non-voting board member shall be appointed by the Debtors to represent the Holders of Interests, subject to the approval of both HPG and the Creditors Committee, which approval shall not be unreasonably withheld. The individuals selected by the Plan Proponents to serve on the board of directors of each of the Reorganized Debtors will be listed in the Plan Supplement. The Debtors' current onsite (in Hawaii) day-to-day management will continue as the management of the Reorganized Debtors. The individuals who will serve as officers of each of the Reorganized Debtors will be listed in the Plan Supplement.

(j) **Tax Exemption** Upon conversion to nonprofit corporate form, the Debtors or Reorganized Debtors, as the case may be, shall apply for exemption from federal income tax under section 501(c)(3) of the Internal Revenue Code and for exemption from the Hawaii General Excise Tax (and, as appropriate, other state and/or local taxes).

(k) **Corporate Action**. On the Effective Date, the adoption of any new organizing documents, the selection of directors and officers for the Reorganized Debtors, and all other actions contemplated by the Plan shall be authorized and approved in all respects (subject to the provisions of the Plan). All matters provided for in the Plan involving the corporate structure of the Debtors or the Reorganized Debtors, and any corporate action required by the Debtors or the Reorganized Debtors in connection with the Plan, shall be deemed to have timely occurred in accordance with applicable law and shall be in effect, without any requirement of further action by the security holders or directors of the Debtors or the Reorganized Debtors. On the Effective Date, the appropriate officers of the Reorganized Debtors shall be authorized and directed to issue, execute, and deliver the agreements, documents, securities, and instruments contemplated by the Plan in the name of and on behalf of the Reorganized Debtors.

6. *Cancellation of Notes, Instruments, and Interests.* On the Effective Date, except as otherwise provided for in the Plan, (a) the SFHS Secured Credit Documents and the Siemens Secured Credit Documents and any other notes, guarantees, or other instruments or documents evidencing or creating any indebtedness or obligations of a Debtor that are Impaired under the Plan shall be

cancelled, and (b) the obligations of the Debtors under any agreements, guarantees, or certificates of designation governing the Siemens Secured Lender Claim, SFHS Claim, General Unsecured Claims and any other Claims or any notes, guarantees, or other instruments or documents evidencing or creating any Claims against a Debtor that are Impaired under the Plan shall be discharged, subject to the terms of the Plan and the obligations of the Reorganized Debtors under the Plan. For the avoidance of doubt, nothing in the Plan shall serve to release a non-Debtor party from a guarantee in favor of SFHS.

7. *Issuance and Distribution of New Notes and Related Matters.* On the Effective Date, (i) the Debtors shall issue to SFHS Term Note A, without the need for further approval under any applicable law, regulation, order, or rule and such issuance shall be exempt from registration under applicable securities laws pursuant to section 1145(a) of the Bankruptcy Code and (ii) the Reorganized Debtors shall issue or distribute all other instruments, certificates and other documents required to be issued or distributed by any of the Reorganized Debtors pursuant to the Plan without the need for further approval under any applicable law, regulation, order, or rule and with exemption from registration under applicable securities laws pursuant to section 1145(a) of the Bankruptcy Code. Without limiting the effect of section 1145 of the Bankruptcy Code, all documents, agreements, and instruments entered into on or as of the Effective Date contemplated by or in furtherance of the Plan shall become effective and binding in accordance with their respective terms and conditions upon the parties thereto.

8. *Exit Financing.* The Plan Proponents believe that the Debtors require Exit Financing to exit bankruptcy. The Debtors have had discussions with potential exit lenders and the Plan Proponents believe that the Debtors will be able to acquire exit financing. Subject to the approval of

U.S. Bankruptcy Court - Hawaii  #08-01369  Dkt # 1175  Filed  04/10/10  Page 54 of 97

the Exit Facility by the Plan Proponents, the Debtors or the Reorganized Debtors, as applicable, shall be authorized to (a) enter into the Exit Facility, (b) grant any liens and security interests and incur or guarantee the indebtedness as required under the Exit Facility, and (c) issue, execute and deliver all documents, instruments and agreements necessary to implement and effectuate borrowings under the Exit Facility.

9. *United States Trustee Professional Fees.* During the pendency of the Chapter 11 Cases, the Reorganized Debtors shall be obligated to pay accrued quarterly post-confirmation fees pursuant to 28 U.S.C. § 1930(a)(6) regarding the Chapter 11 Cases.

10. *Sources of Cash for Plan Distributions.* Except as otherwise provided in the Plan or the Confirmation Order, all Cash necessary for the Reorganized Debtors to make payments pursuant to the Plan shall be obtained from existing Cash balances, the operations of the Debtors and the Reorganized Debtors, and borrowings under the Exit Facility Credit Agreement.

11. *Professional Fees.* All Professional Fees incurred prior to and including the Effective Date shall be subject to final allowance or disallowance upon application to the Bankruptcy Court pursuant to sections 330 or 503(b)(4) of the Bankruptcy Code. Final applications for Professional Fees for services rendered in connection with the Chapter 11 Cases shall be filed with the Bankruptcy Court no later than 30 days after the Effective Date.

## I. Treatment of Executory Contracts and Unexpired Leases

1. *Assumption of Executory Contracts and Unexpired Leases.* On the Effective Date, all executory contracts or unexpired leases to which any of the Debtors is a party shall be deemed automatically assumed in accordance with the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code, unless

U.S. Bankruptcy Court - Hawaii   #08-01369   Dkt # 1175   Filed  04/10/10   Page 55 of 97

such executory contracts or unexpired leases (i) shall have been previously rejected by the Debtors by Final Order of the Bankruptcy Court, (ii) shall be the subject of a motion to reject pending on or before the Effective Date, (iii) are listed on Plan Schedule 7.1 which shall be the schedule of executory contracts or unexpired leases rejected pursuant to the Plan, or (iv) are otherwise rejected pursuant to the terms of the Plan. Plan Schedule 7.1 shall be Filed no later than five business days before the Confirmation Date. The Plan Proponents reserve the right to amend Plan Schedule 7.1 at any time prior to the Confirmation Date. Entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of the rejections and assumptions contemplated hereby pursuant to sections 365(a) and 1123 of the Bankruptcy Code as of the Effective Date. Each executory contract and unexpired lease assumed pursuant to this Article VII shall revest in and be fully enforceable by the respective Reorganized Debtor in accordance with its terms, except as modified by the provisions of the Plan, or any order of the Bankruptcy Court authorizing and providing for its assumption or applicable federal law. Neither the exclusion nor the inclusion by the Plan Proponents of a contract or lease on Plan Schedule 7.1 nor anything contained in the Plan shall constitute an admission by any of the Plan Proponents that such lease or contract is an unexpired lease or executory contract that any Debtor or Non-Debtor Affiliate has any liability thereunder. The Plan Proponents reserve the right, subject to notice, to amend, modify, supplement, or otherwise change Plan Schedule 7.1 on or before the Effective Date.

2.  *Assumption of Medicare Provider Agreement(s).* The Reorganized Debtors shall expressly assume all of the Debtors' Medicare provider agreement(s) and numbers with the Centers for Medicare and Medicaid Services ("<u>CMS</u>"). The Reorganized Debtors shall cure any defaults under such agreements, pursuant to 11 U.S.C. § 365, by paying such defaults in the ordinary course (or

U.S. Bankruptcy Court - Hawaii   #08-01369   Dkt # 1175   Filed 04/10/10   Page 56 of 97

such defaults shall be cured by CMS' collection of any amount due via offset or recoupment in the ordinary course). Because any amount due shall be collected in the ordinary course, CMS shall not be required to file any separate claim in the bankruptcy to collect any amounts due to CMS under the Medicare program, whether via a proof of claim, claim for cure, or administrative claim. The terms of the Debtors' participation in the Medicare program are governed by the Medicare Act and federal law and shall not be modified by the terms of the Plan or the Confirmation Order, including but not limited to any language in the Plan or the Confirmation Order granting security interests to other parties in the Debtors' healthcare accounts receivable, granting releases or imposing injunctions. Notwithstanding any other provision to the Plan or Confirmation Order, nothing in the Plan or Confirmation Order shall release (or operate to enjoin) any claim of the United States against any non-debtor, nor shall the Plan or Confirmation Order operate to release or enjoin any claim of the United States against the Debtors, except as provided expressly by the Bankruptcy Code.

3.  *SFHS Leases.*   If not conditionally assumed by the Debtors prior to the Effective Date, the SFHS Leases shall be conditionally assumed pursuant to the Plan by the Reorganized Debtors, subject to the right of the Creditors Committee and the Debtors to, *inter alia*, seek to recharacterize the SFHS Leases as a form of financing and to challenge the SFHS Leases as fraudulent conveyances/transfers.   The Creditors Committee and the Debtors shall have authority and standing to seek to, *inter alia*, recharacterize the SFHS Leases as a form of financing and to challenge the SFHS Leases as fraudulent conveyances/transfers and all such causes of action are preserved under the Plan as well as any other causes of action regarding the SFHS Leases.   In the event that the SFHS Leases are recharacterized and/or successfully         challenged        as        fraudulent

U.S. Bankruptcy Court - Hawaii  #08-01369  Dkt # 1175  Filed  04/10/10  Page 57 of 97

conveyances/transfers or otherwise, the annual payments under the SFHS Leases shall be reduced and/or the period during which payments under the SFHS Leases will be made will be shortened in accordance with the Bankruptcy Court's ruling.

4. *Claims Based on Rejection of Executory Contracts and Unexpired Leases.* Schedule 7.1 to the Plan lists the executory contracts and non-residential real property leases to be rejected by the Debtors pursuant to the Plan. Schedule 7.1 to the Plan shall be filed with the Bankruptcy Court not later than five Business Days prior to the Confirmation Date. Any Claim arising for the rejection of an executory contract or non-residential real property lease listed on Schedule 7.1 to the Plan must be Filed within 30 days after the Confirmation Date or shall be forever barred from assertion against the Debtors and the Reorganized Debtors, their Estates or property. If the Plan Proponents amend Plan Schedule 7.1 after the Confirmation Date to add any executory contract or non-residential real property lease to be rejected, the non-Debtor party to any such executory contract or non-residential real property lease so added to Plan Schedule 7.1 after the Confirmation Date shall have 30 days thereafter to File a Claim arising from the rejection of such executory contract or non-residential real property lease, after which, any such Claim shall be forever barred from assertion against the Debtors or the Reorganized Debtors, their Estates or property.

5. *Cure of Defaults of Assumed Executory Contracts and Unexpired Leases.* Except as otherwise expressly provided hereunder, any monetary amounts by which each executory contract or unexpired lease to be assumed pursuant to the Plan is in default shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the default amount in Cash within 60 days after the Effective Date or on such other terms as the parties to each such executory contract or unexpired lease may otherwise agree, subject

U.S. Bankruptcy Court - Hawaii  #08-01369  Dkt # 1175  Filed 04/10/10  Page 58 of 97

to the review and approval of the Plan Proponents. In the event of a dispute regarding (a) the amount of any cure payments, (b) the ability of the Reorganized Debtors or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the contract or lease to be assumed, or (c) any other matter pertaining to assumption, the cure payments required by section 365(b)(1) of the Bankruptcy Code shall be made following the entry of a Final Order resolving the dispute and approving the assumption.

6.  *Treatment of Bank of Hawaii's Lease.* HMC and HMCW are parties to a certain Equipment Lease Agreement (the "<u>Lease</u>") with Bank of Hawaii ("<u>BOH</u>"). Reorganized HMC and Reorganized HMCW shall assume the Lease upon the Effective Date of the Plan.

7.  *Treatment of Siemens Medical Leases.* The Siemens Leases and the Siemens Service Agreements shall be deemed assumed as of the Effective Date by the Reorganized Debtors. All cure payments required by section 365(b)(1) of the Bankruptcy Code (in an amount to be provided by Siemens Financial and Siemens Medical prior to the Confirmation Hearing) relating to the Siemens Leases and Siemens Service Agreements shall be paid on or prior to the Effective Date.

8.  *Licensing Requirements.* The Reorganized Debtors shall, as of the Effective Date, comply with all the proper state and federal regulatory requirements, including but not limited to, acquiring any certificates of need, licenses, permits, notices and approvals necessary to operate without restriction as healthcare facilities and to participate in Medicare, Medicaid, and any other government health benefit program in which the Debtors are currently participants under federal and Hawaii law.

## J.  Confirmation and Effectiveness of the Plan

1. *Conditions to Confirmation.* Confirmation of the Plan shall be subject to satisfaction of the following conditions at or prior to the time the Confirmation Order is entered:

(l) The Confirmation Order shall be acceptable in form and substance to the Plan Proponents; and

(m) The Confirmation Order shall authorize the Reorganized Debtors to take all actions necessary or appropriate to implement the Plan.

2. *Conditions to Effective Date.* The following conditions precedent must be satisfied or waived on or prior to the Effective Date in accordance with Section 9.3 of the Plan:

(n) The Confirmation Order confirming the Plan, as such Plan may have been modified and/or amended, shall have been entered and become a Final Order in form and substance acceptable to the Plan Proponents;

(o) The Exit Facility Credit Agreement, in form and substance acceptable to the Plan Proponents, shall have been executed and delivered and all conditions precedent thereto shall have been satisfied; and

(p) The Confirmation Order shall not then be stayed, vacated or reversed.

3. *Waiver of Conditions.* Except for the condition set forth in Section 9.2(c) of the Plan which may not be waived, each of the conditions set forth in Section 9.2 of the Plan may be waived in whole or in part by the Plan Proponents, without any other notice to parties in interest or the Bankruptcy Court and without a hearing.

4. *Cramdown.* In the event that any Impaired Class of Claims or Interests does not accept, or is deemed to have rejected, the Plan pursuant to section 1126 of the Bankruptcy Code, the Plan Proponents shall request confirmation of the Plan under section 1129(b) of the Bankruptcy Code with respect to such Class. The Plan

U.S. Bankruptcy Court - Hawaii   #08-01369   Dkt # 1175   Filed  04/10/10   Page 60 of 97

Proponents reserve the right to modify the Plan to the extent, if any, confirmation pursuant to 1129(b) of the Bankruptcy Code requires modification.

## K.    Effect of Plan Confirmation

*1.    Binding Effect.*    The Plan shall be binding upon and inure to the benefit of the Debtors, all present and former Holders of Claims and Interests, and their respective successors and assigns, including, but not limited to, the Reorganized Debtors.

*2.    Exculpation.*    **Except as otherwise provided in the Plan, the Plan Proponents and each of the Plan Proponents' members, attorneys, financial advisors, agents, officers, directors, and representatives (collectively, the "Exculpated Parties") shall not have or incur any liability for any act or omission in connection with, relating to, or arising out of, the Chapter 11 Cases, CHA Hawaii's chapter 11 case, the formulation, negotiation, or implementation of the Plan, the solicitation of acceptances of the Plan, or the administration of the Plan, or the property to be distributed under the Plan, except for acts or omissions that are the result of fraud, gross negligence, or willful misconduct or willful violation of federal or state securities laws or the Internal Revenue Code, and in all respects shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities under the Plan.  Nothing in Section 10.2 of the Plan shall limit the obligations of the Reorganized Debtors under the Plan.**

*3.    Discharge of Claims and Termination of Interests.*    **Except as otherwise provided herein or in the Confirmation Order and subject to the terms of the Plan and the obligations of the Reorganized Debtors under the Plan, all consideration distributed under the Plan shall be in exchange for, and in complete satisfaction, settlement, discharge, and release of, all**

**Claims and Interests of any nature whatsoever against the Debtors or any of their assets or properties, and regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims and Interests. Upon the Effective Date, subject to the terms of the Plan and the obligations of the Reorganized Debtors under the Plan, each of the Debtors and the Reorganized Debtors shall be deemed discharged and released under section 1141(d)(1)(A) of the Bankruptcy Code from any and all Claims and Interests, including, but not limited to, demands and liabilities that arose before the Confirmation Date, and all debts of the kind specified in section 502(g), 502(h) or 502(i) of the Bankruptcy Code.**

4.  *Preservation of Rights of Action and Settlement of Litigation Claims.* Except as otherwise provided in the Plan, the Confirmation Order, or in any document, instrument, release, or other agreement entered into in connection with the Plan, in accordance with section 1123(b) of the Bankruptcy Code, the Debtors and their Estates shall retain the Litigation Claims. The Reorganized Debtors, as the successors in interest to the Debtors and the Estates, may enforce, sue on, settle or compromise (or decline to do any of the foregoing) any or all of the Litigation Claims without application to the Bankruptcy Court. Notwithstanding the foregoing, except as otherwise provided in the Plan, and except with respect to Avoidance Actions against SFHS (or any successor in interest to SFHS), from and after the Effective Date, neither the Reorganized Debtors nor anyone else acting on behalf of the Debtors or the Estates shall commence any suit or other proceeding for the enforcement of Avoidance Actions. Notwithstanding anything to the contrary in the Plan, the Reorganized Debtors and the Creditors Committee shall have authority and standing to commence and prosecute Avoidance Actions against SFHS (or any successor in interest to SFHS) and all Avoidance Actions against

SFHS actions are preserved. Notwithstanding anything in the Plan to the contrary, the Reorganized Debtors and the Creditors Committee shall have authority and standing to commence and prosecute Litigation Claims against SFHS (or any successor in interest to SFHS) and all Litigation Claims against SFHS (or any successor in interest to SFHS) are preserved.

5. *Injunction.* **Except as otherwise provided in the Plan, from and after the Effective Date, all Persons who have held, hold, or may hold Claims against or Interests in the Debtors that are discharged or terminated under the Plan are permanently enjoined from taking any of the following actions against the Debtors, their Estates, the Reorganized Debtors, any of their property, or any of the Exculpated Parties on account of any such Claims or Interests: (A) commencing or continuing, in any manner or in any place, any action, or other proceeding; (B) enforcing, attaching, collecting, or recovering in any manner any judgment, award, decree or order; (C) creating, perfecting, or enforcing any lien or encumbrance; (D) asserting a setoff, right of subrogation, or recoupment of any kind against any debt, liability or obligation due to the Debtors; and (E) commencing or continuing, in any manner or in any place, any action that does not comply with or is inconsistent with the provisions of the Plan; provided, however, that nothing contained in the Plan shall preclude such Persons from exercising their rights pursuant to and consistent with the terms of the Plan. By accepting distributions pursuant to the Plan, each Holder of an Allowed Claim or an Allowed Interest shall be deemed to have specifically consented to the injunctions set forth in Section 10.5 of the Plan. Nothing in Section 10.5 of the Plan shall limit the obligations of the Reorganized Debtors under the Plan. For the avoidance of doubt, nothing in the Plan shall enjoin SFHS from enforcing a guarantee of a non-Debtor party in favor of SFHS.**

6. *Term of Bankruptcy Injunction or Stays.* All injunctions or stays provided for in the Chapter 11 Cases under sections 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the Effective Date.

7. *Termination of Subordination Rights and Settlement of Related Claims.* The classification and manner of satisfying all Claims and Interests under the Plan take into consideration all subordination rights, whether arising by contract or under general principles of equitable subordination, section 510(b) or 510(c) of the Bankruptcy Code, or otherwise. All subordination rights that a Holder of a Claim may have with respect to any distribution to be made pursuant to the Plan shall be discharged and terminated, and all actions related to the enforcement of such subordination rights shall be permanently enjoined. Accordingly, distributions pursuant to the Plan to Holders of Allowed Claims shall not be subject to payment to a beneficiary of such terminated subordination rights, or to levy, garnishment, attachment, or other legal process by a beneficiary of such terminated subordination rights.

8. *Continuation of the Creditors Committee.* The Creditors Committee shall continue to exist after the Effective Date for the purposes specified in the Plan. In addition, the Creditors Committee shall continue to exist for a period of at least two years after the Effective Date for the purpose of monitoring and enforcing the Reorganized Debtors' compliance with the Plan. The professionals retained by the Creditors Committee shall be entitled to compensation from the Reorganized Debtors for services performed and reimbursement of expenses incurred in connection therewith. Such compensation shall not be subject to the approval of the Bankruptcy Court and shall be paid by the Reorganized Debtors in the ordinary course of business. Upon completion of its duties under the Plan, the Creditors

Committee shall be dissolved and disbanded, at which time the individual members of the Creditors Committee shall be released and discharged of and from all duties, responsibilities, and obligations related to and arising from and in connection with the Chapter 11 Cases.

## L. Summary of Other Provisions of the Plan

*The following paragraphs summarize certain other significant provisions of the Plan. The Plan should be referred to for the complete text of these and other provisions of the Plan.*

1. *Effectuating Documents and Further Transactions.* Each of the Plan Proponents are authorized to execute, deliver, file, or record such contracts, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan and any notes or securities issued pursuant to the Plan.

2. *Corporate Action.* Prior to, on, or after the Effective Date (as appropriate), all matters expressly provided for under the Plan that would otherwise require approval of the member interest owners or directors of one or more of the Debtors or the Reorganized Debtors shall be deemed to have occurred and shall be in effect prior to, on, or after the Effective Date (as appropriate) pursuant to the applicable general corporation or limited liability company law of the states in which the Debtors or the Reorganized Debtors are incorporated without any requirement of further action by the stockholders, member interest owners or directors of the Debtors or the Reorganized Debtors.

3. *Exemption from Transfer Taxes.* Pursuant to section 1146(a) of the Bankruptcy Code, (a) the issuance, transfer, or exchange of notes or equity securities under the Plan; (b) the creation of any mortgage, deed of trust, lien, pledge, or other security interest; (c) the making or assignment of any lease or sublease; or (d) the making

or delivery of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including, without limitation, any merger agreements, agreements of consolidation, restructuring, disposition, liquidation, or dissolution, deeds, bills of sale, and transfers of tangible property, shall not be subject to any stamp tax, recording tax, personal property tax, real estate transfer tax, sales, or use tax or other similar tax. Unless the Bankruptcy Court orders otherwise, all sales, transfers, and assignments of owned and leased property approved by the Bankruptcy Court on or prior to the Effective Date, shall be deemed to have been in furtherance of, or in connection with, the Plan.

4.  *Severability of Plan Provisions.* If, prior to the Confirmation Date, any term or provision of the Plan is determined by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration or interpretation, the remainder of the terms and provisions of the Plan shall remain in full force and effect and shall in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

5.  *Revocation, Withdrawal, or Non-Consummation.* The Plan Proponents reserve the right to revoke or withdraw the Plan as to any or all of the Debtors prior to the Confirmation Date and to file subsequent plans of reorganization. If the Plan Proponents revoke or withdraws the Plan as to any or all of the Debtors, or if

61

confirmation or consummation as to any or all of the Debtors does not occur, then, with respect to such Debtors, (a) the Plan shall be null and void in all respects, (b) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount any Claim or Interest or Class of Claims or Interests), assumption or rejection of executory contracts or leases affected by the Plan, and any document or agreement executed pursuant to the Plan shall be deemed null and void, and (c) nothing contained in the Plan shall (i) constitute a waiver or release of any Claims by or against, or any Interests in, such Debtors or any other Person, (ii) prejudice in any manner the rights of such Debtors, Creditors Committee or any other Person, or (iii) constitute an admission of any sort by the Debtors, the Creditors Committee or any other Person.

6. *Good Faith.* Confirmation of the Plan shall constitute a finding that: (i) the Plan has been proposed in good faith and in compliance with applicable provisions of the Bankruptcy Code, and (ii) all Persons' solicitations of acceptances or rejections of the Plan have been in good faith and in compliance with applicable provisions of the Bankruptcy Code.

7. *Survival of Settlements.* Except as specifically set forth in the Plan, all Bankruptcy Court-approved settlements shall survive consummation of the Plan.

U.S. Bankruptcy Court - Hawaii   #08-01369   Dkt # 1175   Filed 04/10/10   Page 67 of 97

## V. RISK FACTORS TO BE CONSIDERED

*Holders of Claims should read and consider carefully the information set forth below, as well as the other information set forth in this Disclosure Statement (and the documents delivered together herewith and/or incorporated by reference), prior to voting to accept or reject the Plan. This information, however, should not be regarded as the only risks involved in connection with the Plan and/or its implementation.*

### A. Failure to Satisfy Vote Requirement

If the Plan Proponents obtain the requisite votes to accept the Plan in accordance with the requirements of the Bankruptcy Code, the Plan Proponents intend, as promptly as practicable thereafter, to seek confirmation of the Plan. In the event that sufficient votes are not received, the Plan Proponents may be forced to pursue an alternative restructuring.

Pursuant to section 1126(c) of the Bankruptcy Code, Classes 5, 6 and 7 will be determined to have accepted the Plan if at least two-thirds in amount and more than one-half in number of Allowed Claims in Classes 5, 6 and 7 (that actually vote) vote in favor of the Plan. If such thresholds are not met, the Plan Proponents may not be able to confirm the Plan as it is currently structured.

### B. Non-Confirmation or Delay of Confirmation of the Plan

The Bankruptcy Court, which sits as a court of equity, exercises substantial discretion. Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation and requires, among other things, that the confirmation of the Plan not be followed by a need for further financial reorganization and that the value of distributions to dissenting creditors and shareholders not be less than the value of distributions such creditors and shareholders would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code. Although the Plan Proponents believe that the Plan will meet such tests, there can be no assurance that the Bankruptcy Court would reach the same conclusion.

### C. Non-Consensual Confirmation

In the event any impaired Class of Claims or Interests does not accept a plan, a bankruptcy court may nevertheless confirm such plan at the proponent's request if at least one impaired class of claims has accepted the plan (with such acceptances being determined without including the vote of any "insider" in such class), and, as to each impaired class that has not accepted the plan, the bankruptcy

U.S. Bankruptcy Court - Hawaii   #08-01369   Dkt # 1175   Filed 04/10/10   Page 68 of 97

court determines that the plan of reorganization "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting impaired classes. These requirements must be satisfied with respect to Classes 5, 6, 7 and 8. The Plan Proponents believe that the Plan satisfies these requirements.

### D. Failure of Litigation Against SFHS

The treatment of the SFHS Claim is subject to the SFHS Claim Allowance Process. However, the failure of the litigation is not determinative of Plan success. The Plan Proponents believe that the Reorganized Debtors will be able to meet all Plan obligations, including the obligations owed to SFHS pursuant to the Plan, notwithstanding the success of potential litigation against SFHS. The Plan Proponents also believe that the Reorganized Debtors will be able to refinance and repay the SFHS obligations within seven-years to maturity of these obligations.

### E. Risk of Non-Occurrence of the Effective Date

Although the Plan Proponents believe that the Effective Date will occur reasonably soon after the Confirmation Date, there can be no assurance as to such timing or as to whether it will occur.

### F. Failure to Obtain Exit Financing

The Plan Proponents believe that the Reorganized Debtors must have a working capital Exit Financing Facility to provide adequate borrowing availability and liquidity in order to confirm the Plan. Plan Proponents believe that such an Exit Facility should be made available to the Reorganized Debtors, however, there can be no assurances that the Reorganized Debtors can obtain an adequate Exit Financing Facility.

### G. Classification and Treatment of Claims and Interests

Section 1122 of the Bankruptcy Code requires that the Plan classify Claims against, and Interests in, the Debtors. The Bankruptcy Code also provides that the Plan may place a Claim or Interest in a particular Class only if such Claim or Interest is substantially similar to the other Claims or Interests of such Class. The Plan Proponents believe that all Claims and Interests have been appropriately classified in the Plan.

To the extent that the Bankruptcy Court finds that a different classification is required for the Plan to be confirmed, the Plan Proponents presently anticipate that it would seek (i) to modify the Plan to provide for whatever classification might be

64

required for confirmation and (ii) to use the acceptances received from any creditor pursuant to this solicitation for the purpose of obtaining the approval of the Class or Classes of which such creditor ultimately is deemed to be a member. Any such reclassification of creditors, although subject to the notice and hearing requirements of the Bankruptcy Code, could adversely affect the Class in which such creditor was initially a member, or any other Class under the Plan, by changing the composition of such Class and the vote required for approval of the Plan. There can be no assurance that the Bankruptcy Court, after finding that a classification was inappropriate and requiring a reclassification, would approve the Plan based upon such reclassification. Except to the extent that modification of classification in the Plan requires resolicitation, the Plan Proponents will, in accordance with the Bankruptcy Code and the Bankruptcy Rules, seek a determination by the Bankruptcy Court that acceptance of the Plan of any Holder of Claims pursuant to this solicitation will constitute a consent to the Plan's treatment of such Holder regardless of the Class as to which such Holder is ultimately deemed to be a member. The Plan Proponents believe that under the Federal Rules of Bankruptcy Procedure the Plan Proponents would be required to resolicit votes for or against the Plan only when a modification adversely affects the treatment of the claim of any creditor or equity holder.

The Bankruptcy Code also requires that the Plan provide the same treatment for each Claim or Interest of a particular Class unless the Holder of a particular Claim or Interest agrees to a less favorable treatment of its Claim or Interest. The Plan Proponents believe that it has complied with the requirement of equal treatment. To the extent that the Bankruptcy Court finds that the Plan does not satisfy such requirement, the Bankruptcy Court could deny confirmation of the Plan.

Issues or disputes relating to classification and/or treatment could result in a delay in the confirmation and consummation of the Plan and could increase the risk that the Plan will not be consummated.

## H.     Increased Competition on the Island of Oahu for Patient Care Services

Despite the Debtors' quality care and increasing operational efficiencies, it has become increasingly difficult to compete against other, financially strong competitors on the island of Oahu. The healthcare industry in Hawaii has seen the entry of several significant changes during recent years. The level of competition on the island remains formidable.

## VI.   CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

The discussion below summarizes certain anticipated U.S. Federal income tax consequences of the Plan to the Debtors and certain Holders of Claims or Interests. This summary is provided for information purposes only and is based on the Internal Revenue Code of 1986, as amended (the "Code"), Treasury regulations promulgated thereunder, judicial authorities, and current administrative rulings and practice, all as in effect as of the date hereof and all of which are subject to change, possibly with retroactive effect, that could adversely affect the U.S. Federal income tax consequences described below.

This summary does not address all aspects of U.S. Federal income taxation that may be relevant to a particular Holder of a Claim or Interest in light of its particular facts and circumstances or to certain types of Holders of Claims or Interests subject to special treatment under the Code (for example, non-U.S. taxpayers, financial institutions, broker-dealers, life insurance companies, tax-exempt organizations, real estate investment trusts, regulated investment companies, grantor trusts, persons holding a Claim as part of a "hedging," "integrated," or "constructive" sale or straddle transaction, persons holding claims through a partnership or other pass-through entity, persons that have a "functional currency" other than the U.S. dollar, and persons who have acquired an Interest in HMC or a security in any Debtor in connection with the performance of services). This summary does not address the tax considerations applicable to Holders who obtained their Claims or Interests (or the rights underlying such Claims or Interests) in connection with the performance of services. In addition, this summary does not discuss any aspects of state, local, or non-U.S. taxation, nor does this summary address the U.S. Federal income tax consequences to Holders of Claims that are unimpaired under the Plan and Holders of Claims that are not entitled to receive or retain any property under the Plan.

A substantial amount of time may elapse between the date of this Disclosure Statement and the receipt of a final distribution or transfer under the Plan. Events occurring after the date of this Disclosure Statement, such as additional tax legislation, court decisions, or administrative changes, could affect the U.S. Federal income tax consequences of the Plan and the transactions contemplated thereby. There can be no assurance that the Internal Revenue Service (the "IRS") will not take a contrary view with respect to one or more of the issues discussed below. No ruling will be sought from the IRS with respect to any of the tax aspects of the Plan, and no opinion of counsel has been or will be obtained by the Plan Proponents with respect thereto.

U.S. Bankruptcy Court - Hawaii   #08-01369   Dkt # 1175   Filed 04/10/10   Page 71 of 97

TO ENSURE COMPLIANCE WITH TREASURY DEPARTMENT CIRCULAR 230, EACH HOLDER IS HEREBY NOTIFIED THAT: (A) ANY DISCUSSION OF U.S. FEDERAL TAX ISSUES IN THIS DISCLOSURE STATEMENT IS NOT INTENDED OR WRITTEN TO BE RELIED UPON, AND CANNOT BE RELIED UPON, BY ANY HOLDER FOR THE PURPOSE OF AVOIDING PENALTIES THAT MAY BE IMPOSED ON A HOLDER UNDER THE CODE; (B) SUCH DISCUSSION IS INCLUDED HEREBY BY THE PLAN PROPONENTS IN CONNECTION WITH THE PROMOTION OR MARKETING (WITHIN THE MEANING OF CIRCULAR 230) BY THE PLAN PROPONENTS OF THE TRANSACTIONS OR MATTERS ADDRESSED HEREIN; AND (C) EACH HOLDER SHOULD SEEK ADVICE BASED ON ITS PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.

## A.    U.S. Federal Income Tax Consequences to the Debtors and Holders of Interests

Each of the Debtors is a limited liability company ("LLC") taxed as a pass-through entity for U.S. federal income tax purposes. Since HMC is the sole member (owner) of both HMCE and HMCW, HMCE and HMCW will for U.S. federal tax purposes be disregarded as entities separate from HMC, and any transfer of assets or liabilities by, or any discharge of the liabilities of, HMCE or HMCW will be treated as a transfer or discharge by HMC. Accordingly, the discussion below as to HMC, HMCW and HMCE addresses only the U.S. Federal income tax consequences of the Plan to HMC. Since HMC is taxed as a partnership, the income consequences described below will be passed through to the Holders of Interests in HMC in the method described in HMC's operating agreement and in accordance with the Code and the regulations thereunder. If any direct or indirect owner of HMC is itself a pass-through entity such as a partnership, LLC or S corporation, the income will again be passed through to the owners of that direct or indirect owner, and so on until income is allocated to an individual or to an entity that is not a pass-through for tax purposes.

### 1.    Tax Consequences to Reorganized HMC, HMCW, and HMCE.

Because HMCW and HMCE are disregarded entities that are owned by HMC, and because HMC is a partnership for U.S. federal income tax purposes, none of the Debtors would be required to pay tax on any income or gain recognized by HMCE, HMCW, or HMC.  Rather, any income, gain, or loss recognized on the conversion of the Debtors into nonprofit corporations will be

passed through to the Holders of Interests, and potentially to the direct or indirect owners of the Holders of Interests, as described in the immediately preceding paragraph.

2.    *Tax Consequences to Holders of Interests.*

As noted above, the income consequences of the Plan will be passed through to the Holders of Interests in a manner set forth on HMC's operating agreement and in accordance with the Code and regulations.  Such Holders of Interests or their direct and indirect owners that are not pass-through entities for U.S. federal income tax purposes may be required to recognize income or gain as a result of the Plan, and should consult their own tax advisors regarding the tax consequences of the Plan.  Because Interests shall be deemed cancelled and extinguished under the Plan, Holders of Interests or their direct or indirect owners may recognize loss as a result of the Plan.  Such loss may be of a different character for U.S. federal income tax purposes than any income recognized by such Holders of Interests or their direct or indirect owners.  Holders of Interests and their direct and indirect owners should consult their own tax advisors regarding the tax consequences of the Plan.

## B.    U.S. Federal Income Tax Consequences to Holders of Claims

The U.S. Federal income tax consequences to Holders of Claims arising from the distributions to be made in satisfaction of their Claims pursuant to the Plan may vary, depending upon, among other things: (a) the type of consideration received by the Holder of a Claim in exchange for the Claim; (b) the nature of the indebtedness owed to it; (c) whether the Holder has previously claimed a bad debt or worthless security deduction in respect of its Claim against the corporation; (d) whether such Claim constitutes a security; (e) whether the Holder of a Claim is a citizen or resident of the United States for tax purposes, or otherwise subject to U.S. Federal income tax on a net income basis; (f) whether the Holder of a Claim reports income on the accrual or cash basis; and (g) whether the Holder of a Claim receives distributions under the Plan in more than one taxable year. For tax purposes, the modification of a Claim may represent an exchange of the Claim for a new Claim, even though no actual transfer takes place. In addition, where gain or loss is recognized by a Holder of a Claim, the character of such gain or loss as long-term or short-term capital gain or loss or as ordinary income or loss will be determined by a number of factors, including the tax status of the Holder, whether the Claim constitutes a capital asset in the hands of the Holder and how long the Claim has been held or is treated as having been held, whether the Claim was acquired at a market discount, and whether and to what extent the Holder

68

previously claimed a bad debt or worthless stock or securities deduction with respect to the underlying Claim. A Holder who purchased its Claim from a prior holder at a discount to its face amount may be subject to the market discount rules of the Code. Under those rules, assuming that the Holder has made no election to amortize the market discount into income on a current basis with respect to any market discount instrument, any gain recognized on the exchange of its Claim (subject to a *de minimis* rule) generally would be characterized as ordinary income to the extent of the accrued market discount on such Claim as of the date of the exchange.

### 1.     General Treatment of Holders of Claims

Pursuant to the Plan, the Debtors will transfer assets of the Debtors, either directly or indirectly, to holders of Allowed Claims in satisfaction and discharge of such Claims. Holders of such Claims will likely recognize gain or loss equal to the amount realized under the Plan in respect of their Claims less their respective tax bases in their Claims. The amount realized for this purpose will generally equal the sum of the cash and the fair market value of any other consideration received under the Plan in respect of their Claims. Any gain or loss recognized in the exchange will be capital or ordinary depending on the status of the Claim in the Holder's hands.

To the extent that cash received or deemed received by a Holder of a Claim is attributable to accrued interest on the Claim, the cash will be deemed made in payment of such interest. The federal income tax laws are unclear on how much consideration will be deemed attributable to accrued interest when partial payments are made on a debt on which both principal and interest are owed. To the extent that the Holder of a Claim has not yet included the accrued interest in gross income, the cash deemed received in payment of such interest will generally be included in the Holder's gross income for federal income tax purposes. To the extent the Holder has previously included accrued interest on the Claim in gross income, the cash deemed received in payment of such interest generally will not be included in gross income. The Holder of an Allowed Claim may be able to claim a deductible loss if the cash deemed received for the accrued interest is less than the amount the Holder had previously included in gross income.

### 2.     Bad Debt Deduction

The Holder of an Allowed Claim who under the Plan will receive in respect of a Claim an amount less than the Holder's tax basis in such Claim may be entitled to a bad debt deduction under section 166(a) of the Code. The rules

regarding the ability of a taxpayer, who believes that a debt owed to it will not be collected in full to take a deduction related to such debt's partial or total worthlessness are very complex. Moreover, the application and impact of such rules vary greatly depending upon a taxpayer's individual circumstances, including the facts and circumstances of the holder, the obligor, and the instrument with respect to which a deduction is claimed. Holders of Claims are therefore urged to consult their tax advisors with respect to the allowability of such a deduction.

### 3. *Information Reporting and Backup Withholding*

Certain payments, including the payments with respect to Claims pursuant to the Plan, may be subject to information reporting to the IRS. Moreover, under certain circumstances, Holders of Claims may be subject to "backup withholding" with respect to payments made pursuant to the Plan, unless such Holder either (i) comes within certain exempt categories (which generally include corporations) and, when required, demonstrates this fact, or (ii) provides a correct United States taxpayer identification number and certifies under penalty of perjury that the Holder is a United States person, the taxpayer identification number is correct and the taxpayer is not subject to backup withholding because of a failure to report all dividend and interest income.

Backup withholding is not an additional tax. Amounts withheld under the backup withholding rules may be credited against a Holder of a Claim's U.S. Federal income tax liability, and such Holder may obtain a refund of any excess amounts withheld under the backup withholding rules by filing an appropriate claim for refund with the IRS (generally, a U.S. Federal income tax return).

In addition, Treasury regulations generally require disclosure by a taxpayer on its U.S. Federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer claiming a loss in excess of specified thresholds. Each Holder of a Claim is strongly urged to consult its tax advisor regarding these regulations and whether the transactions contemplated by the Plan would be subject to these regulations and require disclosure on such taxpayer's tax returns.

### 4. *Importance of Obtaining Professional Tax Assistance*

THE FOREGOING DISCUSSION IS INTENDED ONLY AS A SUMMARY OF CERTAIN POTENTIAL TAX CONSEQUENCES OF THE PLAN AND IS NOT A SUBSTITUTE FOR INDIVIDUALLY TAILORED TAX

U.S. Bankruptcy Court - Hawaii   #08-01369   Dkt # 1175   Filed 04/10/10   Page 75 of 97

ADVICE FROM A COMPETENT TAX ADVISOR. THE ABOVE DISCUSSION IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT TAX ADVICE. THE TAX CONSEQUENCES OF THE PLAN ARE IN MANY CASES COMPLEX, UNCLEAR AND UNCERTAIN AND MAY VARY DEPENDING ON A NUMBER OF DIFFERENT FACTORS, INCLUDING A CLAIMHOLDER'S PARTICULAR CIRCUMSTANCES. ACCORDINGLY, CLAIMHOLDERS ARE URGED TO CONSULT THEIR TAX ADVISORS ABOUT THE FEDERAL, STATE AND LOCAL, AND APPLICABLE FOREIGN INCOME AND OTHER TAX CONSEQUENCES OF THE PLAN.

U.S. Bankruptcy Court - Hawaii  #08-01369  Dkt # 1175  Filed 04/10/10  Page 76 of 97

## VII. FEASIBILITY OF THE PLAN AND BEST INTEREST OF CREDITORS

### A.    Feasibility of the Plan

The Bankruptcy Code requires that the Bankruptcy Court determine that confirmation of a Plan is not likely to be followed by liquidation or the need for further financial reorganization of the Debtors. For purposes of showing that the Plan meets this feasibility standard, the Plan Proponents have analyzed the ability of the Reorganized Debtors to meet their obligations under the Plan and retain sufficient liquidity and capital resources to conduct their business.   At the Confirmation Hearing, the Plan Proponents will be prepared to demonstrate that the Plan is feasible.

To support the belief in the feasibility of the Plan, the Plan Proponents have relied upon pro forma financial forecasts prepared by the Debtors for the fiscal years 2011 through 2020 (the "Financial Forecasts"), which are set forth in Appendix E of this Disclosure Statement. The Financial Forecasts indicate that the Reorganized Debtors should have sufficient cash flow to pay and service debt obligations and to fund their operations. Accordingly, the Plan Proponents believe that the Plan complies with the financial feasibility standard of section 1129(a)(11) of the Bankruptcy Code.

The Financial Forecasts were not prepared with a view toward compliance with the published guidelines of the American Institute of Certified Public Accountants or any other regulatory or professional agency or body or generally accepted accounting principles.   Furthermore, the Plan Proponents' financial advisors have not compiled or examined the Financial Forecasts in accordance with AICPA standards relating to prospective financial information and accordingly do not express any opinion or any other form of assurance with respect thereto and assume no responsibility for the Financial Forecasts.

The Financial Forecasts assume that (i) the Plan will be confirmed and consummated in accordance with its terms, (ii) there will be no material change in legislation or regulations, or the administration thereof, including environmental legislation or regulations, that will have an unexpected effect on the operations of the Reorganized Debtors, (iii) there will be no change in the United States regarding generally accepted accounting principles that will have a material effect on the reported financial results of the Reorganized Debtors, and (iv) there will be no material contingent or unliquidated litigation or indemnity claims applicable to the Reorganized Debtors. To the extent that the assumptions inherent in the

U.S. Bankruptcy Court - Hawaii   #08-01369   Dkt # 1175   Filed  04/10/10   Page 77 of 97

Financial Forecasts are based upon future business decisions and objectives, they are subject to change. In addition, although they are presented with numerical specificity and considered reasonable by the Plan Proponents when taken as a whole, the assumptions and estimates underlying the Financial Forecasts are subject to significant business, economic and competitive uncertainties and contingencies, many of which will be beyond the control of the Reorganized Debtors. Accordingly, the Financial Forecasts are only estimates that are necessarily speculative in nature. It can be expected that some or all of the assumptions in the Financial Forecasts will not be realized and that actual results will vary from the Financial Forecasts, which variation may be material. The Financial Forecasts should therefore not be regarded as a representation by any of the Plan Proponents or any other person that the results set forth in the Financial Forecasts will be achieved. In light of the foregoing, readers are cautioned not to place undue reliance on the Financial Forecasts. The Financial Forecasts should be read together with the information in Article V of this Disclosure Statement entitled "Risk Factors to Be Considered," which sets forth important factors that could cause actual results to differ from those in the Financial Forecasts.

The Plan Proponents do not intend to update or otherwise revise the Financial Forecasts, including any revisions to reflect events or circumstances existing or arising after the date of this Disclosure Statement or to reflect the occurrence of unanticipated events, even if any or all of the underlying assumptions do not come to fruition. Furthermore, the Plan Proponents do not intend to update or revise the Financial Forecasts to reflect changes in general economic or industry conditions.

## B.    Acceptance of the Plan

As a condition to confirmation, the Bankruptcy Code requires that each Class of Impaired Claims vote to accept the Plan, except under certain circumstances.

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of impaired claims as acceptance by holders of at least two thirds (2/3) in dollar amount and more than one half (1/2) in number of claims in that class, but for that purpose counts only those who actually vote to accept or to reject the Plan. For example, Class 6 General Unsecured Creditors votes to accept the Plan only if two thirds (2/3) in amount and a majority in number actually voting in such Class cast their Ballots in favor of acceptance.  Holders of Claims who fail to vote are not counted as either accepting or rejecting a plan.

## C.    Best Interests Test

Even if a plan is accepted by the holders of each class of claims and interests, the Bankruptcy Code requires a Bankruptcy Court to determine that the plan is in the best interests of all holders of claims or interests that are impaired by the plan and that have not accepted the plan. The "best interests" test, as set forth in section 1129(a)(7) of the Bankruptcy Code, requires a Bankruptcy Court to find either that all members of an impaired class of claims or interests have accepted the plan or that the plan will provide a member who has not accepted the plan with a recovery of property of a value, as of the effective date of the plan, that is not less than the amount that such holder would recover if the debtor were liquidated under chapter 7 of the Bankruptcy Code.

To calculate the probable distribution to holders of each impaired class of claims and interests if the debtors were liquidated under chapter 7 under the Bankruptcy Code, a bankruptcy court must first determine the aggregate dollar amount that would be generated from such debtors' assets if their chapter 11 cases were converted to chapter 7 cases. This "liquidation value" would consist primarily of the proceeds from a forced sale of the debtors' assets by a chapter 7 trustee.

If a liquidation were to occur in these cases, while Siemens Financial would be paid in full out of its healthcare accounts receivable collateral, the costs and expenses associated with a liquidation and the claims of the SFHS would erode any liquidation value available to unsecured creditors. More specifically, costs of liquidation under chapter 7 of the Bankruptcy Code would include the compensation of a trustee, as well as of counsel and other professionals retained by the trustee, asset disposition expenses, and claims arising from any operations of the Debtors during the chapter 7 cases.  In addition, there may be unpaid expenses incurred in the Chapter 11 Cases (such as compensation of attorneys, financial advisors and accountants and claims arising from the operations of the Debtors during the Chapter 11 Cases). The liquidation might also prompt the rejection of a large number of executory contracts and unexpired leases and thereby significantly enlarge the total pool of unsecured claims by reason of resulting rejection claims.

Once the court ascertains the recoveries in liquidation of secured creditors and priority claimants, it must determine the probable distribution to general unsecured creditors and equity security holders from the remaining available proceeds in liquidation. If such probable distribution has a value greater than the distributions to be received by such creditors and equity security holders under the plan, then the plan is not in the best interests of creditors and equity security holders.

U.S. Bankruptcy Court - Hawaii   #08-01369   Dkt # 1175   Filed  04/10/10   Page 79 of 97

### D. Liquidation Analysis

In order to determine the amount of liquidation value available to creditors, the Plan Proponents have provided a liquidation analysis that provides an estimate of the proceeds that may be generated as a result of a hypothetical chapter 7 liquidation of the Debtors (the "Liquidation Analysis"). While the Plan Proponents believe that the assumptions underlying the Liquidation Analysis are reasonable, it is possible that certain of those assumptions would not be realized in an actual liquidation. The Liquidation Analysis is set forth as Appendix F to this Disclosure Statement.

Notwithstanding the foregoing, the Plan Proponents believe that any liquidation analysis with respect to the Debtors is inherently speculative. The liquidation analysis for the Debtors necessarily contains estimates of the net proceeds that would be received from a forced sale of assets and/or business units, as well as the amount of Claims that will ultimately become Allowed Claims. The estimate of the amount of Allowed Claims set forth in the liquidation analysis should not be relied on for any other purpose, including, without limitation, any determination of the value of any distribution to be made on account of Allowed Claims under the Plan.

The Liquidation Analysis demonstrates that, in an orderly liquidation, SFHS and General Unsecured Creditors would receive less than what they would receive under the Plan.

### E. Application of the 'Best Interests' of Creditors Test to the Liquidation Analyses

The Plan Proponents believe that the "best interests" test of section 1129 of the Bankruptcy Code is satisfied because the Plan Proponents believe that the members of each Impaired Class will receive greater or equal value under the Plan than they would receive in a liquidation. Although the Plan Proponents believe that the Plan meets the "best interests test" of section 1129(a)(7) of the Bankruptcy Code, there can be no assurance that the Bankruptcy Court will determine that the Plan meets this test.

### F. Confirmation Without Acceptance of All Impaired Classes: The "Cramdown" Alternative

In view of a potential rejection by certain holders of Claims or Interests, the Plan Proponents may have to seek confirmation of the Plan pursuant to the "cramdown" provisions of the Bankruptcy Code. Specifically, section 1129(b) of

U.S. Bankruptcy Court - Hawaii #08-01369 Dkt # 1175 Filed 04/10/10 Page 80 of 97

the Bankruptcy Code provides that a plan can be confirmed even if the plan is not accepted by all Impaired classes, as long as at least one impaired class of claims has accepted it. The Bankruptcy Court may confirm a plan at the request of the Plan Proponents if the plan "does not discriminate unfairly" and is "fair and equitable" as to each impaired class that has not accepted the plan. A plan does not discriminate unfairly within the meaning of the Bankruptcy Code if a dissenting class is treated equally with respect to other classes of equal rank.

The Plan Proponents believe the Plan does not discriminate unfairly with respect to holders of Class 5, Class 6, and Class 7 Claims or Holders of Interests in Class 8.

A plan is fair and equitable as to a class of secured claims that rejects a plan if, among other things, the plan provides (a)(i) that the holders of such claims retain the liens securing such claims, whether the property subject to such liens is retained by the debtor or transferred to another entity, to the extent of the allowed amount of such claims, and (ii) that each holder of a claim of such class receive on account of such claim deferred cash payments totaling at least the allowed amount of such claim, of a value, as of the effective date of the plan, of at least the value of such holder's interest in the estate's interest in such property; (b) for the sale, subject to section 363(k) of the Bankruptcy Code, of any property that is subject to the liens securing such claims, free and clear of such liens, with such liens to attach to the proceeds of such sale, and the treatment of such liens on proceeds under clause (a)(i) or (a)(ii) of this subparagraph; or (c) for the realization by such holders of the indubitable equivalent of such claims.

A plan is fair and equitable as to a class of unsecured claims which rejects a plan if the plan provides (i) for each holder of a claim included in the rejecting class to receive or retain on account of that claim property that has a value, as of the effective date of the plan, equal to the allowed amount of such claim; or (ii) that the holder of any claim or interest that is junior to the claims of such class will not receive or retain on account of such junior claim or interest any property at all.

A plan is fair and equitable as to a class of equity interests that rejects a plan if the plan provides (i) that each holder of an interest included in the rejecting class receive or retain on account of that interest property that has a value, as of the effective date of the plan, equal to the greatest of the allowed amount of any fixed liquidation preference to which such holder is entitled, any fixed redemption price to which such holder is entitled, or the value of such interest; or (ii) that the holder of any interest that is junior to the interests of such class will not receive or retain under the plan on account of such junior interest any property at all.

U.S. Bankruptcy Court - Hawaii   #08-01369   Dkt # 1175   Filed 04/10/10   Page 81 of 97

The Plan Proponents believe that they will meet the "fair and equitable" requirements of section 1129(b) of the Bankruptcy Code with respect to Holders of Class 5, Class 6, and Class 7 Claims and Class 8 Interests.

U.S. Bankruptcy Court - Hawaii   #08-01369   Dkt # 1175   Filed  04/10/10   Page 82 of 97

# VIII.  ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN

The Plan Proponents believe that the Plan affords Holders of Claims the potential for the greatest recovery and, therefore, is in the best interests of such Holders. If, however, the requisite acceptances are not received, or the Plan is not confirmed and consummated, the theoretical alternatives include: (i) an alternative plan of reorganization or (ii) liquidation of the Debtors under chapter 7 or 11 of the Bankruptcy Code.

## A.    Alternative Plan(s) of Reorganization

If the requisite acceptances are not received or if the Plan is not confirmed, the Plan Proponents may attempt to formulate and propose a different plan or plans of reorganization. Such a plan or plan(s) might involve both a reorganization and continuation of the Debtors' businesses or an orderly liquidation of assets.

The Debtors' businesses could suffer from increased costs, erosion of patient and vendor confidence and liquidity difficulties if they remained debtors in possession during a lengthy chapter 11 process while trying to negotiate further plans of reorganization.

The Plan Proponents believe that the Plan enables creditors to realize the greatest possible value under the circumstances and that, compared to any alternative plan of reorganization, the Plan has the greatest chance to be confirmed and consummated.

## B.    Liquidation Under Chapter 7 or Chapter 11

If no plan is confirmed, the Debtors may be forced to liquidate under chapter 7 of the Bankruptcy Code, pursuant to which a trustee would be elected or appointed to liquidate the Debtors' assets for distribution to creditors in accordance with the priorities established by the Bankruptcy Code. It is impossible to predict precisely how the proceeds of the liquidation would be distributed to the respective Holders of Claims against or Interests in the Debtors.

The Plan Proponents believe that in a liquidation under chapter 7, before creditors received any distribution, additional administrative expenses involved in the appointment of a trustee or trustees and attorneys, accountants and other professionals to assist such trustees would cause a substantial diminution in the value of the Debtors' Estates. The assets available for distribution to creditors would be reduced by such additional expenses and by Claims from the rejection of

U.S. Bankruptcy Court - Hawaii  #08-01369  Dkt # 1175  Filed  04/10/10  Page 83 of 97

leases and other executory contracts in connection with the cessation of operations and the failure to realize the greater going concern value of the Debtors' assets.

The Debtors could also be liquidated pursuant to the provisions of a chapter 11 plan of liquidation. In a liquidation under chapter 11, the Debtors' assets could be sold in an orderly fashion over a more extended period of time than in a liquidation under chapter 7. Thus, a chapter 11 liquidation might result in larger recoveries than in a chapter 7 liquidation, but the delay in distributions could result in lower present values received and higher administrative costs. Because a trustee is not required in a chapter 11 case, expenses for professional fees could be lower than in a chapter 7 case, in which a trustee must be appointed. Any distribution to the Holders of Claims under a chapter 11 liquidation plan probably would be delayed substantially.

Although preferable to a chapter 7 liquidation, the Plan Proponents believe that any alternative liquidation under chapter 11 is a much less attractive alternative to creditors than the Plan because of the greater return the Plan Proponents believe is provided to creditors under the Plan.

U.S. Bankruptcy Court - Hawaii   #08-01369   Dkt # 1175   Filed  04/10/10   Page 84 of 97

## IX.   THE SOLICITATION; VOTING PROCEDURE

### A.   Parties in Interest Entitled to Vote

Under section 1124 of the Bankruptcy Code, a class of claims or interests is deemed to be "impaired" under a plan unless (i) the plan leaves unaltered the legal, equitable, and contractual rights to which such claim or interest entitles the holder thereof or (ii) notwithstanding any legal right to an accelerated payment of such claim or interest, the plan cures all existing defaults (other than defaults resulting from the occurrence of events of bankruptcy) and reinstates the maturity of such claim or interest as it existed before the default.

In general, a holder of a claim or interest may vote to accept or to reject a plan if (i) the claim or interest is "allowed," which means generally that no party in interest has objected to such claim or interest, and (ii) the claim or interest is impaired by the plan. If, however, the holder of an impaired claim or interest will not receive or retain any distribution under the plan on account of such claim or interest, the Bankruptcy Code deems such holder to have rejected the plan, and, accordingly, holders of such claims and interests do not actually vote on the plan. If a claim or interest is not impaired by the plan, the Bankruptcy Code deems the holder of such claim or interest to have accepted the plan and, accordingly, holders of such claims and interests are not entitled to vote on the plan. Claims in Classes 1, 2, 3 and 4 are Unimpaired under the Plan, and Holders of such Claims are therefore not entitled to vote.

### B.   Voting Procedures

Detailed Voting Procedures are set forth in Appendix C of this Disclosure Statement.

### C.   Waivers of Defects, Irregularities, Etc.

Unless otherwise directed by the Bankruptcy Court, all questions as to the validity, form, eligibility (including time of receipt), acceptance, and revocation or withdrawal of Ballots will be determined by the Plan Proponents in their sole discretion, which determination will be final and binding. As indicated below under "Withdrawal of Ballots; Revocation," effective withdrawals of Ballots must be delivered to counsel for the Debtors prior to the deadline for receipt of Ballots (the "Voting Deadline"). The Plan Proponents reserve the absolute right to contest the validity of any such withdrawal. The Plan Proponents also reserve the right to reject any and all Ballots not in proper form, the acceptance of which would, in the opinion of the Plan Proponents or its counsel, be unlawful. The Plan Proponents

U.S. Bankruptcy Court - Hawaii   #08-01369   Dkt # 1175   Filed 04/10/10   Page 85 of 97

further reserve the right to waive any defects or irregularities or conditions of delivery as to any particular Ballot. The interpretation (including the Ballot and the respective instructions thereto) by the Plan Proponents, unless otherwise directed by the Bankruptcy Court, will be final and binding on all parties. Unless waived, any defects or irregularities in connection with deliveries of Ballots must be cured within such time as the Plan Proponents (or the Bankruptcy Court) determine. Neither the Plan Proponents nor any other Person will be under any duty to provide notification of defects or irregularities with respect to deliveries of Ballots nor will any of them incur any liabilities for failure to provide such notification. Unless otherwise directed by the Bankruptcy Court, delivery of such Ballots will not be deemed to have been made until such irregularities have been cured or waived. Ballots previously furnished (and as to which any irregularities have not theretofore been cured or waived) will be invalidated.

### D.    Withdrawal of Ballots; Revocation

Any party who has delivered a valid Ballot for the acceptance or rejection of the Plan may withdraw such acceptance or rejection by delivering a written notice of withdrawal to counsel for the Debtors at any time prior to the Voting Deadline. A notice of withdrawal, to be valid, must (i) contain the description of the Claim(s) to which it relates and the aggregate principal amount represented by such Claim(s), (ii) be signed by the withdrawing party in the same manner as the Ballot being withdrawn, (iii) contain a certification that the withdrawing party owns the Claim(s) and possesses the right to withdraw the vote sought to be withdrawn and (iv) be received by counsel for the Debtors in a timely manner. The Plan Proponents will determine whether any withdrawals of Ballots were received and whether the requisite acceptances of the Plan have been received. As stated above, the Plan Proponents expressly reserve the absolute right to contest the validity of any such withdrawals of Ballots.

Unless otherwise directed by the Bankruptcy Court, a purported notice of withdrawal of Ballots which is not received in a timely manner will not be effective to withdraw a previously cast Ballot.

Any party who has previously submitted prior to the Voting Deadline a properly completed Ballot may revoke such Ballot and change his or its vote by submitting prior to the Voting Deadline a subsequent properly completed Ballot for acceptance or rejection of the Plan. In the case where more than one timely, properly completed Ballot is received, only the Ballot which bears the latest date of receipt will be counted for purposes of determining whether the requisite acceptances have been received.

U.S. Bankruptcy Court - Hawaii   #08-01369   Dkt # 1175   Filed 04/10/10   Page 86 of 97

## E.  Further Information; Additional Copies

If you have any questions or require further information about the voting procedure for voting your Claim or about the packet of material you received, or if you wish to obtain an additional copy of the Plan, this Disclosure Statement, or any exhibits or appendices to such documents (at your own expense, unless otherwise specifically required by Bankruptcy Rule 3017(d)), please contact Kurtzman Carson Consultants LLC:

Hawaii Medical Center, LLC
KURTZMAN CARSON CONSULTANTS LLC
2335 Alaska Avenue
Los Angeles, CA 90245
Telephone: (310) 823-9000
Website: www.kccllc.net/chahawaii

U.S. Bankruptcy Court - Hawaii   #08-01369   Dkt # 1175   Filed  04/10/10   Page 87 of 97

## X. CONCLUSION AND RECOMMENDATION

The Plan Proponents believe that confirmation and implementation of the Plan is preferable to any of the alternatives described above because it will result in the greatest recoveries to Holders of Claims.

Consequently, the Plan Proponents urge all Holders of Claims entitled to vote to accept the Plan and to evidence their acceptance by duly completing and returning their Ballots so that they will be received by Kurtzman Carson Consultants LLC on or before 5:00 p.m., Prevailing Pacific Time, on _____2010.

Dated: April 9, 2010

Respectfully submitted,

**Official Committee of Unsecured Creditors**

By: /s/ Alyssa Park
    Alyssa Park
    President of Clinical Laboratories of Hawaii LLP
    Chair of the Official Committee of Unsecured
    Creditors

**Hawaii Medical Center, LLC, Hawaii Medical Center East, LLC, and Hawaii Medical Center West, LLC**

By: /s/ Salim Hasham
    Salim Hasham
    Chief Operating and Restructuring Officer

**Hawaii Physicians Group, LLC**

By: /s/ Henry Louie
    Henry Louie, M.D.
    President

83

| ALSTON & BIRD LLP | WAGNER CHOI & VERBRUGGE |
|---|---|
| Martin G. Bunin (admitted *pro hac vice*)<br>Craig E. Freeman (admitted *pro hac vice*)<br>William Hao<br>90 Park Avenue<br>New York, New York 10016<br>Telephone: (212) 210-9400<br>Facsimile: (212) 210-9444<br>Email: marty.bunin@alston.com<br>      craig.freeman@alston.com<br>      william.hao@alston.com | Chuck C. Choi<br>745 Fort Street, Suite 1900<br>Honolulu, HI 96813<br>Telephone: (808) 533-1877<br>Facsimile: (808) 566-6900<br>Email:cchoi@hibklaw.com |
| *Counsel for the Official Committee of Unsecured Creditors* ||
| MCDONALD HOPKINS LLC | MOSELEY BIEHL TSUGAWA LAU & MUZZI<br>A HAWAII LIMITED LIABILITY LAW COMPANY |
| Shawn M. Riley (admitted *pro hac vice*<br>Paul W. Linehan (admitted *pro hac vice*)<br>Michael J. Kaczka (admitted *pro hac vice*)<br>600 Superior Avenue, East, Suite 2100<br>Cleveland, OH 44114-2653<br>Telephone: (216) 348-5400<br>Facsimile:  (216) 348-5474<br>Email:  sriley@mcdonaldhopkins.com<br>      plinehan@mcdonaldhopkins.com<br>      mkaczka@mcdonaldhopkins.com | Christopher J. Muzzi (6939)<br>Alakea Corporate Tower<br>1100 Alakea Street, 23rd Floor<br>Honolulu, HI 96813<br>Telephone: (808) 531-0490<br>Facsimile:  (808) 534-0202<br>Email:  cmuzzi@hilaw.us |
| *Co-Counsel to the Debtors and Debtors in Possession* ||
| KESSNER UMEBAYASHI BAIN & MATSUNAGA | |
| Steven Guttman<br>220 South King Street, Suite 1900<br>Honolulu Hawaii 96813<br>Telephone: (808) 536-1900<br>Email: sguttman@kdubm.com | |
| *Counsel for Hawaii Physicians Group, LLC* ||

# APPENDIX A

## PLAN OF REORGANIZATION

# APPENDIX B

# DISCLOSURE STATEMENT ORDER

**[The Disclosure Statement Order will be included upon its entry.]**

# APPENDIX C

## VOTING INSTRUCTIONS AND PROCEDURES

### A.    Notice to Holder of Claims

This Disclosure Statement will be transmitted to Holders of Claims in Classes 5, 6, and 7.  Claims in Classes 1, 2, 3, and 4 are Unimpaired under the Plan, and Holders of such Claims are not entitled to vote on the Plan. Accordingly, Holders of Claims in Classes 5, 6, and 7 will be the only Holders of Claims that will vote on the Plan.  The purpose of this Disclosure Statement is to provide adequate information to enable such Claim Holders to make a reasonable informed decision with respect to the Plan prior to exercising their right to vote to accept or reject the Plan.

ALL HOLDERS OF CLAIMS IN CLASSES 5, 6, AND 7 ARE ENCOURAGED TO READ THIS DISCLOSURE STATEMENT AND ITS APPENDICIES CAREFULLY AND IN THEIR ENTIRETY BEFORE DECIDING TO VOTE EITHER TO ACCEPT OR REJECT THE PLAN. This Disclosure Statement contains important information about the Plan, considerations pertinent to acceptance or rejection of the Plan.

THIS DISCLOSURE STATEMENT IS THE ONLY DOCUMENT TO BE USED IN CONNECTION WITH THE SOLICITATION OF VOTES IN THE PLAN.  No solicitation of votes may be made except after distribution of this Disclosure Statement, and no person has been authorized to distribute any information concerning the Plan other than the information contained in this Disclosure Statement.

CERTAIN OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS BY ITS NATURE FORWARD LOOKING AND CONTAINES ESTIMATES, ASSUMPTIONS, AND FINANCIAL FORECASES THAT MAY BE MATERIALLY DIFFERENT FROM ACTUAL, FUTURE RESULTS.  Except with respect to the financial forecasts set forth in Appendix E to this Disclosure Statement (the "Financial Forecasts") and except as otherwise specifically and expressly stated herein, this Disclosure Statement does not reflect any events that may occur subsequent to the date hereof and that may have a material impact on the information contained in this Disclosure Statement.  The Plan Proponents do not intend to update the Financial Forecasts; thus, the

Financial Forecasts will not reflect the impact of any subsequent events not already accounted for in the assumptions underlying the Financial Forecasts. Further, the Plan Proponents do not anticipate that any amendments or supplements to this Disclosure Statement will be distributed to reflect such occurrences. Accordingly, the delivery of this Disclosure Statement will not under any circumstances imply that the information herein is correct or complete as of any time subsequent to the date hereof.

EXCEPT WHERE SPECIFICALLY NOTED, THE FINANCIAL INFORMATION CONTAINED HEREIN HAS NOT BEEN AUDITED BY AN INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM AND HAS NOT BEEN PREPARED IN ACCORDANCE WITH GENERALLY ACCEPTED ACCOUNTING PRINCIPLES.

### B. Solicitation Package

In soliciting votes for the Plan pursuant to this Disclosure Statement from the Holders of Claims in Classes 5, 6, and 7, the Plan Proponents will also send copies of the Plan and one or more Ballots to be used by such Holders in voting to accept or reject the Plan.

### C. Voting Procedures and Ballots and Voting Deadline

After carefully reviewing the Plan, this Disclosure Statement and the detailed instructions accompanying your Ballot, please indicate your acceptance or rejection of the Plan by voting in favor of or against the Plan on the enclosed Ballot. Please complete and sign your original Ballot and return it in the envelope provided. Each original Ballot must be mailed by the voting deadline to Kurtzman Carson Consultants, LLC ("KCC") at the address listed below.

**THE VOTING DEADLINE IS _____, 2010 at 5:00 P.M. (Prevailing Pacific Time).**

IN ORDER FOR YOUR VOTE TO BE COUNTED, YOUR BALLOT MUST BE PROPERLY COMPLETED AS SET FORTH ABOVE AND IN ACCORDANCE WITH THE VOTING INSTRUCTIONS ON THE BALLOT AND RECEIVED NO LATER THAN THE VOTING DEADLINE BY KCC AT THE ADDRESS BELOW.

If you have any questions about (i) the procedure for voting your Claim or with respect to the materials you have received or (ii) the amount of your Claim, or if you wish to obtain an additional copy of the Plan, this Disclosure Statement or any appendices or exhibits to such documents, please contact:

Hawaii Medical Center, LLC
Kurtzman Carson Consultants LLC
2335 Alsaska Avenue
Los Angles, CA 90245
Telephone: 310-823-9000
Website: www.kccllc.net/chahawaii

### D.     Confirmation Hearing and Deadline for Objections to Confirmation

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court, after notice, to hold a Confirmation Hearing. Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to confirmation of the Plan.

Notice of the Confirmation Hearing will be provided to Holders of Claims and Interests or their representatives (the "Confirmation Notice") as set forth in an order of the Bankruptcy Court. Objection to confirmation must be filed with the Bankruptcy Court by the date designated in the Confirmation Notice and are governed by Bankruptcy Ruled 3020(b) and 9014 and local rules of the Bankruptcy Court. UNLESS AN OBJECTION TO CONFIRMATION IS TIMELY SERVE AND FILED, IT MAY NOT BE CONSIDERED BY THE BANKRUPTCY COURT.

# APPENDIX D

# POSTPETITION FINANCIAL RESULTS

# APPENDIX E

# FINANCIAL FORECASTS

# APPENDIX F

# LIQUIDATION ANALYSIS